

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| KDE:MEG/LKG | *271 Cadman Plaza East* |
| F. #2018R01984 | *Brooklyn, New York 11201* |

June 18, 2019

<u>By Hand and ECF</u>

The Honorable Roanne L. Mann
United States Chief Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

   Re: United States v. Anthony Zottola, Sr., <u>et al.</u>,
     <u>Criminal Docket No. 18-609 (S-2)(RJD)</u>

Dear Chief Magistrate Judge Mann:

   The government respectfully submits this letter in support of pretrial detention of the defendants Jason Cummings, also known as "The Hat" and "Stacks," Alfred Lopez, also known as "Aloe" Julian Snipe, also known as "Biz" and "Bizzzy," and Anthony Zottola, Sr. (together, the "Defendants"), all of whom are charged as members of a murder-for-hire conspiracy spanning nearly a year that led to the fatal shooting of Sylvester Zottola ("Victim-1") on October 4, 2018, and the near-fatal shooting of Victim-1's son, Salvatore Zottola ("Victim-2"), months earlier. The Defendants are scheduled to be arraigned today on a second superseding indictment and will join five previously charged co-conspirators, all of whom are in custody having previously been ordered detained.[1] The Defendants' charged conduct, which collectively carries the presumption of detention and is punishable by death or a mandatory life sentence, shows that they are not appropriate candidates for bail. For the

---

   [1] One newly charged Defendant, Branden Peterson, also known as "B" and "Mur B," has not yet been apprehended and is a fugitive. The five previously charged co-conspirators are Herman Blanco, also known as "Taliban" and "L," Arthur Codner, also known as "Feddi," "Feddy," Feddi Bossgod," "Fetty Boss" and "Scary," Kalik McFarlane, also known as "Dottkom" and "Dot," Himen Ross, also known as "Ace" and "A Boggie," and Bushawn Shelton, also known as "Shelz." Because this memorandum is intended to illustrate why the newly charged Defendants should be detained pending trial, it does not set forth in detail the circumstances relating to the previously charged co-conspirators who have already been ordered detained.

reasons set forth below, the Defendants should be detained as a danger to the community and a flight risk.

I.     Background

On October 4, 2018, 71-year-old Victim-1 was shot and killed while waiting in his car at a McDonald's drive-through in the Bronx.  His death was the culminating event in a series of violent episodes in which he and his older son, Victim-2, were targeted over the course of a nearly year-long period.  An investigation conducted by the Federal Bureau of Investigation ("FBI") and New York City Police Department's ("NYPD") Joint Organized Crime Task Force revealed that ZOTTOLA, the younger son of the murder victim, hired Bushawn Shelton, a member of the Bloods street gang, to kill his father and brother.  Shelton, in turn, enlisted the help of other Bloods gang members, including CUMMINGS, LOPEZ, PETERSON and SNIPE to fulfill the contract.

   A.     Acts of Violence Against Victim-1 and Victim-2

Prior to his death, Victim-1 reported a series of violent attacks and attempts on his life to law enforcement.  The earliest reported incident occurred in approximately September 2017 when a man (later identified as PETERSON) approached Victim-1 near his residence and inquired about a job.  The man then punched Victim-1 in the face and fled.  Shortly before the assault, PETERSON sent a series of text messages to Shelton informing Shelton that he was outside Victim-1's home and alerting Shelton to the presence of police in the area.  Shelton quickly texted ZOTTOLA, "Peace brother is everything good with you.  On my way to work I passed your house and it's a lot of police in front.  Just making sure you okay."  Three minutes later, ZOTTOLA responded, "For now yes."  Shelton then assured PETERSON that he was okay to continue as planned:  "He don't know, nothing on his end."

On the afternoon of November 26, 2017, as Victim-1 was driving, a dark van pulled next to and then in front of Victim-1's car, forcing Victim-1 to stop.  An individual wearing a dark mask and gloves exited the van on the passenger side and pointed a gun at Victim-1.  Victim-1 fled the scene in his vehicle and reported the incident to law enforcement.  The dark van was recovered by law enforcement that same day and a mask and gloves were recovered from the van.  Forensic testing revealed the presence of Shelton's DNA on the mask.

Approximately 45 minutes after Victim-1 narrowly escaped that attempt on his life, ZOTTOLA and Shelton exchanged the following coded text messages:

   ZOTTOLA:          How are we looking with the filming

| | |
|---|---|
| ZOTTOLA: | It has gotten real cold over here I hope you can get the actor [i.e., Victim-1] to work |
| SHELTON: | I just hear the costar just got into it with the director about 15 minute ago and they had to call security |
| ZOTTOLA: | Whr[2] |
| ZOTTOLA: | What |
| ZOTTOLA: | Nothing said |
| ZOTTOLA: | Told you he is an ass |
| SHELTON: | The star stormed off set and I think it spooked him |
| SHELTON: | You should see it security checking everyone like they in the airport |
| ZOTTOLA: | That is why we need to get the final secen before |
| ZOTTOLA: | The star doesn't come back |
| ZOTTOLA: | I need this bad that is why I am asking to because I can see the film taking a twist |
| ZOTTOLA: | Got to figure a way quick. You think |
| SHELTON: | Today was set to be the end finally until the actor wanted to do his own stunts and throw it in reverse in the middle of shooting a scene and drive in the opposite direction |
| ZOTTOLA: | Ok. But we can still do the end I hope |
| SHELTON: | Yes of |
| ZOTTOLA: | I just got back. This actor thinks he is god again |
| SHELTON: | I'm putting together a new cast and changing the location of the last scene. We going to film in his dressing room [i.e., Victim-1's residence].  Just gotta figure out if the new lights [i.e. surveillance cameras] they put in are |

---

[2] The typographical errors are in the co-conspirators' the text messages.

3

|            |                                                                                                                                 |
|------------|---------------------------------------------------------------------------------------------------------------------------------|
|            | monitored by Con Ed or are they just being managed in-house.                                                                    |
| ZOTTOLA:   | In house                                                                                                                        |
| SHELTON:   | Perfect                                                                                                                         |
| ZOTTOLA:   | I know that. He was riding in the trailer like he was Jesus walking on water. Have a good night see what happens next.          |

Text messages between Shelton and PETERSON leading up to the November 26 incident revealed that on November 11, 2017, PETERSON sent Shelton a photograph of what appeared to be the same mask as the one recovered from the van: "Got a mask for u." Additional text message correspondence between the two indicates that Shelton and PETERSON met on the morning of November 26 and discussed payments. Shelton texted PETERSON: "After all the spending I think we left with 6.5 or 7. You take it and give your man what you want being that he going." PETERSON responded, "Ok np [i.e., no problem]."

On December 25, 2017, ZOTTOLA texted Shelton, "Merry Christmas," and, then, "I saw the actor [i.e., Victim-1] today he looks ready to finish the scene. Hopefully everyone is ready tomorrow to wrap it up." Two days later, on December 27, 2017, Victim-1 was viciously attacked in his home by several men who struck him with a firearm, stabbed him repeatedly in the neck, slashed his throat and robbed him of personal property. Despite being seriously wounded, Victim-1 survived. Phone records revealed that Shelton and ZOTTOLA had over twenty contacts that day. Their correspondence includes the following exchanges, which, although coded[3], reveal ZOTTOLA's role in the attempt on his father's life and his provision of keys that enabled the perpetrators to enter his father's home:

|            |                                                                                                                                                                                                                              |
|------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| ZOTTOLA:   | Did you hear anything if not like we talked about last night I get the keys to the dressing room [i.e., Victim-1's residence] so that he has to finish tonight cause the people who live in the studios above are gone for the evening but just tonight |
|            | * * *                                                                                                                                                                                                                        |
| ZOTTOLA:   | We have to finish the film ASAP cause now I am really messed up if we don't by tonight                                                                                                                                       |
| ZOTTOLA:   | I got the keys to the dressing room                                                                                                                                                                                          |

---

[3] The investigation has not revealed ZOTTOLA's or Shelton's participation in any actual movie production.

4

| | |
|---|---|
| ZOTTOLA: | What do u think. I hate to bother you but th s film is making my life hell if not done by tonight |
| SHELTON: | I am also dealing with hell behind this film. Which dressing room do you have access to? |
| ZOTTOLA: | The main one. Where the actor [i.e., Victim-1] leaves from |

On May 1, 2018, CUMMINGS broke into an office used by Victim-1 and Victim-2, which was connected to Victim-1's residence, minutes after Shelton texted him the four-digit passcode. CUMMINGS abandoned his mission prematurely that day because of police presence in the area, as revealed in a text message to Shelton: "I can run toss the tool [presumably a weapon] in the water but I gotta get out of here."

Two months later, Victim-2 survived a near-fatal shooting. On July 11, 2018, a man approached Victim-2 outside his residence in the early morning hours and shot him repeatedly. Victim-2 was struck in the head, chest and hand, but survived the unprovoked attack. The investigation revealed that SNIPE helped facilitate the murder attempt and was present at the scene, although not the shooter.

Prior to returning to his home on the morning of July 11, Victim-2 was out of town in New Jersey with his family. The day before the attack, on July 10, 2018, ZOTTOLA texted Shelton: "The fisherman [i.e., Victim-2] went on a trip for three days. Just so you know. All docks are empty. But if you are around later let's meet up[.]" Shelton responded: "I know the blue boat [i.e., Victim-2's vehicle] been sitting in Jersey all day." ZOTTOLA quickly replied, "That is where the fish is." Additional text messages revealed that Shelton and ZOTTOLA arranged to meet on the evening of July 10. Then on July 11, beginning a few hours after the shooting, Shelton and ZOTTOLA exchanged the following messages:

| | |
|---|---|
| SHELTON: | I hope so I've been waiting for your text |
| ZOTTOLA: | All good. No worries.[4] |
| SHELTON: | Ok are you around |
| ZOTTOLA: | No. Dealing with a headache from this morning. |
| SHELTON: | Yeah I also had a migraine from this morning and I wanted to pick your brain |

---

[4] According to the NYPD, ZOTTOLA did not arrive at the scene of Victim-2's non-fatal shooting until approximately 1:00 p.m., despite numerous calls from law enforcement who wanted access to the DVR machine containing video footage of the incident.

5

| | | |
|---|---|---|
| ZOTTOLA: | | Ok. I text u in a bit. |
| SHELTON: | | Should I hang around or head back home |
| ZOTTOLA: | | Head home. Be by you tomorrow I can meet u at ur place if you want |
| SHELTON: | | Okay |

On October 4, 2018, at approximately 4:45 p.m., an individual described by witnesses as an African American male wearing a hooded sweatshirt fatally shot Victim-1 through the window of his car. According to witnesses, the shooter fled the McDonald's parking lot on foot and thereafter entered a waiting vehicle. LOPEZ was the driver of that vehicle, which had been following Victim-1's car for some time before the shooting. LOPEZ sold the getaway car approximately one week after the murder.

Shelton's knowledge of Victim-2's whereabouts in New Jersey leading up to the July 2018 nonfatal shooting was not fortuitous. The investigation revealed that the co-conspirators relied on multiple sophisticated tracking devices placed on vehicles used by Victim-1 and Victim-2 to facilitate their plot, including on July 11, 2018, the day Victim-2 was shot, and on October 4, 2018, the day Victim-1 was killed. Two of the devices were recovered by law enforcement during the course of the investigation.

    B.    <u>Proof that ZOTTOLA Orchestrated the Plan to Murder Plot</u>

ZOTTOLA's position at the helm of this sinister plot is most readily revealed by his communications with Shelton throughout the charged period, including on days that critical acts of violence occurred.

On March 11, 2018, less than three months after the home-invasion robbery and non-fatal stabbing of his father in December 2017, ZOTTOLA made clear in a text message to Shelton his desire to have both his father and younger brother murdered: "Can we get a double header at all. My business is all messed up by both of them especially the MF captain [i.e., Victim-1] the worst. Everyday it's gets harder for me." Shelton responded that his people had been surveilling a location where the targets were expected to be, but to no avail: "My people go to the boathouse[5] for weeks and its virtually impossible." When ZOTTOLA assured Shelton that his father could be found at the "warehouse" tomorrow, but only during a "15 min" window, Shelton responded that his people "wait in the warehouse [but] he never shows." ZOTTOLA then expressed his appreciation for Shelton's efforts on his behalf: "You are working hard for me. Trust me I know. And I thank you." In addition, there is evidence that he facilitated the acts of violence committed against his father by providing Shelton and other co-conspirators with keys to his father's home and the passcode to the security system for the office he shared with his father and brother.

---

    [5] At the time, Victim-1 resided near a marina in the Bronx.

6

On the day of his father's murder, ZOTTOLA was in communication with Shelton before and after the fateful shooting. Minutes after the fatal shots were fired, a co-conspirator texted Shelton, "Done." Minutes later, Shelton texted ZOTTOLA, "Can we party today or tomorrow?" After agreeing to meet the following day, ZOTTOLA assured Shelton in code that he would have his payment ready soon: "I have the cases of water in a day or so." A photograph taken on October 5, 2018 that was recovered from one of Shelton's cellular telephones depicts a cardboard box of bottled water, as well as over $200,000 in banded currency. Two days later, on October 7, ZOTTOLA texted Shelton, "All good. Did you drink the water. Was it the right one," to which Shelton responded, "Definitely was the right one thanks I was able to water the plants and get some of them squared away." This message reveals that Shelton compensated other members of the conspiracy whom he had recruited to carry out ZOTTOLA's murderous scheme.

### C. Second Superseding Indictment

On June 13, 2019, a grand jury in the Eastern District of New York returned a sealed second superseding indictment (the "Indictment") charging the Defendants with murder for hire conspiracy resulting in death, in violation of Title 18, United States Code, Section 1958(a), unlawful possession and use of firearms, in violation of Title 18, United States Code, Section 924(c), and causing death through use of a firearm, in violation of Title 18, United States Code, Section 924(j).

### D. Execution of Search Warrants

In connection with the arrests of the Defendants, which began late yesterday afternoon, law enforcement agents recovered in excess of $130,000 from ZOTTOLA's residence[6] and one loaded firearm and over 70 rounds of ammunition from SNIPE's residence.

## II. Legal Standard

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). While a finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), risk of flight can be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

A rebuttable presumption applies here because the Defendants have been charged with a firearm offense under 18 U.S.C. § 924(c). 18 U.S.C. § 3142(e). The presumption means that the Court must initially presume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." Id. The Defendants must come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). Even if the

---

[6] Some of the currency appears to be counterfeit.

Defendants were to meet their burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id.

Four factors guide the Court's determination of whether each of the Defendants should be released on bail: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence" or whether it "involves a . . . firearm"; (2) the "weight of the evidence against" the defendant; (3) the "history and characteristics" of the defendant; and (4) the seriousness of the danger posed by the defendant's release. 18 U.S.C. § 3142(g).

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffer. Id. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." Id. (internal quotation marks omitted); see also Mercedes, 254 F.3d at 437 ("[The defendant] has twice been convicted of weapon possession--one felony conviction, and one misdemeanor conviction. We find the district court committed clear error in failing to credit the government's proffer with respect to [the defendant's] dangerousness.").

III.    Argument

Clear and convincing evidence demonstrates that ZOTTOLA poses a danger to the community based on his conceptualization and execution of a sophisticated plot to have his father and brother murdered. The same applies to CUMMINGS, LOPEZ, PETERSON and SNIPE for their willingness and active involvement in efforts to make ZOTTOLA's vision become a reality. The Defendants are also considerable flight risks given the prospect of facing a mandatory life sentence or death. And ZOTTOLA's access to large sums of cash indicates that he has the means to flee and to help others do the same.

Even if the Defendants were not a flight risk, none can show that any set of bail conditions would protect the community. That is why the Second Circuit has repeatedly rejected elaborate bail packages for violent defendants, even ones that include "home detention and electronic monitoring," which the Court has explained try to "replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions." United States v. Millan 4 F.3d 1039, 1049 (2d Cir. 1993) (citation and internal quotation marks omitted). For these reasons, and for those articulated below, all the Section 3142(g) factors counsel in favor of the Defendants' detention.

A.    Nature of the Crimes Charged

The nature and circumstances of the charged crimes could not be more serious. The Defendants have been indicted for their involvement in a long-running plot to have a

8

father and his son executed in cold blood. Each has been indicted on multiple "crimes of violence," and the murder-for-hire conspiracy involved the use of a firearm on several occasions, including on the day of the murder of Victim-1 and the shooting of Victim-2— factors that are emphasized in Section 3142(g).

### B. The Weight of the Evidence

The evidence against the Defendants is exceedingly strong and includes, among other things, text message correspondence related to the murder plot, cell site data placing the Defendants at locations related to the charged crimes, video surveillance, telephone records, witness testimony and physical evidence.

### C. The Defendants' History and Characteristics

The history and characteristics of all of the Defendants counsel heavily in favor of detention. CUMMINGS, LOPEZ, PETERSON and SNIPE are members of the Bloods street gang, a violent criminal enterprise responsible for murders, kidnappings, robberies and assault, and each has prior criminal convictions.

CUMMINGS has two 2015 felony convictions for burglary, for which he was sentenced to five years' imprisonment on each, and he is currently facing additional state burglary charges. Additionally, CUMMINGS committed the charged crimes while on parole for the felony convictions. CUMMINGS also has a 2011 conviction for criminal contempt for disobeying a court order.

LOPEZ has a felony narcotics conviction from 2011, for which he was sentenced to two years' imprisonment, and another from 2007, for which he was sentenced to 18 months imprisonment, as well as a history of drinking and driving related convictions, including one that qualified as a felony because of an earlier misdemeanor conviction for driving while intoxicated.

PETERSON has a 2012 misdemeanor conviction for criminal possession of a weapon for which he was sentenced to one year in jail.

SNIPE has multiple criminal convictions, and his criminal association with Shelton dates back to 2002 when they were arrested together. In 2016, SNIPE was convicted of misdemeanor attempted assault and sentenced to 30 days' jail. SNIPE was also convicted of felony grand larceny in 2016 and sentenced to one and half to three years' imprisonment. In 2006, SNIPE was convicted of a felony narcotics offense and sentenced to six years' imprisonment. His parole was revoked on at least one occasion after his release on that case. In 2003, SNIPE was convicted of a felony firearms offense and sentenced to one year imprisonment. Additionally, SNIPE's access to weapons was confirmed this morning when a search of his residence revealed a loaded firearm and over 70 rounds of ammunition.

Although ZOTTOLA has no prior documented criminal history, his involvement in a depraved plot to kill his father and brother speaks volumes as to his characteristics. ZOTTOLA's persistence over the course of months after multiple failed

attempts on the lives of his close family members speaks to his commitment to carry his mission and to devastate his family.

        D.     Danger Posed by the Defendants' Release

Each of the Defendants poses a clear danger if released. Not only would there be a very serious danger to potential witnesses, including Victim-2, but the community at large would also be endangered. The Defendants are charged with committing multiple crimes of violence, including murder. The Defendants have shown their commitment to committing violent crimes. Facing serious federal charges, the Defendants are likely to resort to the same violent tactics that have led to the Indictment.

IV.    Conclusion

For these reasons, the government respectfully requests that the Court enter orders of permanent detention as to each of the Defendants.

                                    Respectfully submitted,

                                    RICHARD P. DONOGHUE
                                  United States Attorney

                 By:     /S/
                          Lindsay K. Gerdes
                          Kayla Bensing
                          Assistant U.S. Attorneys
                          718-254-6155/6279

cc:    Clerk of Court (RJD) (by ECF)