

125 Park Avenue, 7th Floor
New York, NY 10017
Telephone (212) 655-3500
Facsimile (212) 655-3535

Henry E. Mazurek
*Partner*
Direct (212) 655-3594
Fax (646) 682-9222
hem@msf-law.com

**VIA ECF**

Hon. Raymond J. Dearie
United States District Court Judge
United States Courthouse
225 Cadman Plaza East
Courtroom 10A S
Brooklyn, NY 11201

  Re: *United States v. Anthony Zottola*, 18-cr-609 (RJD)

Dear Judge Dearie:

  We represent Defendant Anthony Zottola in the above-captioned case. Pursuant to 18 U.S.C. § 3145(b), we write to appeal the June 18, 2019 order of Magistrate Judge Roanne L. Mann denying Mr. Zottola's bail application.[1] Since the June 18 hearing, Mr. Zottola has substantially increased both the financial commitment and the other restrictions included in his proposed bail package.[2] Mr. Zottola's new proposal is sufficient to ensure his appearance in Court and the safety of the community, warranting his release under the Bail Reform Act.

**I. Introduction and Legal Standard**

  The Bail Reform Act of 1984 requires pretrial release on a personal recognizance bond "unless the [Court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). In making this determination, the Court should consider the following factors: "(1) the nature and circumstances of the offense charged . . .; (2) the weight of the evidence against the

---

[1] The transcript from the June 18, 2019 arraignment and bail application hearing before Magistrate Judge Mann is attached hereto as **Exhibit A**.

[2] The bail package that Mr. Zottola initially proposed was home detention, a $1.5 million personal recognizance bond secured by his house in Larchmont, New York and co-signed by five financially responsible suretors. (Ex. A at 22:8-11, 28:9.) His present bail proposal includes a significantly higher financial commitment, several more suretors, and vastly more restrictive terms. *See infra* § II. The additional financial burden also addresses the magistrate judge's concerns that his original proposal of a $1.5 million bond was insufficient. (*See* Ex. at A 35:5-10.)

person; (3) the history and characteristics of the person . . . (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* at § 3142(g).

Even if the Court finds that release on the defendant's personal recognizance creates a risk of flight or a danger to the community, the law still favors pretrial release "subject to the least restrictive further condition, or combination of conditions, that [the Court] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B); *accord United States v. Zherka,* 592 F. App'x 35, 36 (2d Cir. 2015) (quoting *United States v. Sabhnani,* 493 F.3d 63, 75 (2d Cir. 2007)). When deciding an issue of pretrial release, "the court should bear in mind that it is only a limited group of offenders who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987).

While there is a presumption of detention for the charges against Mr. Zottola, that burden of production is rebuttable, and "is not heavy." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991). The burden may be satisfied "with evidence that he does not pose a danger to the community or a risk of flight," *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001), at which point, "the presumption" becomes "but one factor among many" for the Court to consider. *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985). "Regardless, in a presumption case, the Government still bears the burden of persuasion of demonstrating dangerousness by clear and convincing evidence and risk of flight by a preponderance of the evidence." *United States v. Paulino*, 335 F. Supp. 3d 600, 610 (S.D.N.Y. 2018) (citing *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011)).

Contrary to the Bail Reform Act's clear dictates, Mr. Zottola is presently detained simply because he is charged with an admittedly terrible crime. (*See* Gov. Ltr. at 8;[3] Ex. A at 34-35.)[4] He is presumed innocent of those charges, and in any event, the statute only permits his pretrial detention if there are no conditions that can reasonably assure his appearance and the community's safety—but there are. The proposed bail package, detailed below, restricts his movement, limits his access to communication devices, and prohibits him from meeting with co-defendants or other alleged members of organized crime. Those constraints meaningfully curtail his ability to either flee or orchestrate any crimes similar to those alleged in the Indictment, overcoming even the presumption against his release. The $5 million bond, and the financial exposure of his nine

---

[3] The government's June 18, 2019 detention letter [Dkt. 100] is referred to herein as "Gov. Ltr."

[4] Under 18 U.S.C. § 3145(b), this Court's review of the Magistrate Judge's detention order is *de novo*. *United States v. Molina*, No. 11 CR. 528 JFK, 2012 WL 3564013, at *3 (S.D.N.Y. Aug. 16, 2012) ("A district court having original jurisdiction over a charged offense must review a magistrate judge's detention order *de novo* and do so promptly."). Thus, in deciding Mr. Zottola's bail application, this Court should "exercise its independent judgment, and not defer to the magistrate." *Paulino*, 335 F. Supp. 3d at 609 (citing *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985)).

suretors, all of whom are Mr. Zottola's close family and friends and have collectively offered seven properties as security, provide powerful moral suasion for Mr. Zottola's compliance.

Mr. Zottola's conduct during the pendency of the investigation that culminated in his arrest is perhaps the clearest indication that he does not pose a meaningful danger to the community or risk of flight. After learning in 2018 that he was a subject of the murder investigation, and that numerous members of his familial and social circles were subpoenaed to the grand jury, Mr. Zottola did not engage in any improper or dangerous conduct, attempt to flee or otherwise interfere with the investigation. (*See* Ex. A at 31:9-22.) There is simply no reason to believe that Mr. Zottola's conduct would differ now following his arrest and the last several months of his pre-trial detention.

While Mr. Zottola faces the threat of the stiffest of criminal penalties available in the federal criminal justice system, there is no greater penalty to him than having his children believe that he is guilty of the heinous crimes charged. Mr. Zottola knows he is innocent of these charges—is presumed innocent of these charges—and has shown an unyielding commitment to defend himself against the unimaginable crime of patricide. The conditions presented in this bail proposal are sufficient to ameliorate any concern of the defendant's risk of flight. Mr. Zottola's personal history, the letters of support submitted herewith, and his family circumstances make clear that he would never abandon his children (ages 12, 9 and 4), nor leave them with a legacy that he abandoned them because he refused to defend the claim that he was behind the murder of their grandfather. And any notion that he would risk his young children's safety and well-being by seeking to take them in a brazen attempt to flee while on house arrest is also preposterous. To Mr. Zottola, any harm that befell his children would be the most unbearable penalty of all. These particular circumstances combined with the substantial and restrictive conditions of pretrial release proposed here, provide a strong justification for granting bail.[5]

## II. Proposed Pretrial Conditions of Release

We respectfully submit that the following conditions are sufficient to assure Mr. Zottola's appearance during this case and ameliorate the risks asserted by the government:

(1) A $5 million bond signed by Mr. Zottola and nine other financially responsible individuals; largely secured by seven properties, five of which are primary

---

[5] In this case, there is another reason the Court should consider the substantial bail proposal presented here. Mr. Zottola's Indictment includes ten defendants, all of whom have been asked to submit death penalty mitigation materials to the United States Department of Justice. This administrative mitigation process alone could result in litigation delays of a year or more. Then, the adjudication of the charges, including pretrial motions litigation, discovery review, possible severance motions, and the specter of multiple trials among the charged defendants (if only because of the number of charged defendants), will add considerable time to the final resolution of this matter for Mr. Zottola. Because Mr. Zottola retains his presumption of innocence throughout this period, *see* Bail Reform Act, 18 U.S.C. § 3142(j), at some point his prolonged pretrial detention becomes punitive.

    residences of the families posting them as bond;[6]

(2) Home detention with electronic monitoring (by G.P.S. tracking device); travel limited to medical and legal visits that are pre-approved by Pretrial Services, with at least 48 hours' notice to Pretrial Services prior to the visit;

(3) Continued surrender of Mr. Zottola's passport, and an agreement not to secure new travel documents;

(4) Strict Pretrial Services supervision;

(5) Restricted computer access, limited to reviewing discovery provided in this case and other case-related materials provided by his attorneys, with Internet access strictly prohibited in the home;

(6) Telephone access limited to a single government monitored land-line telephone approved by Pretrial Services to make and receive calls only to and from phone numbers agreed upon by counsel for Mr. Zottola and the government; no cellular/mobile telephones authorized in the house (any cellular/mobile device owned by Mr. Zottola's wife would be required to be left outside the home); and

(7) Mr. Zottola will not directly or indirectly associate or have contact, outside the presence of his counsel, with his co-defendants, alleged co-conspirators, or any individual allegedly currently or formerly associated with "the Bloods" or other organized crime as identified by the government; however, this prohibition does not limit his defense attorneys and their investigators from conducting an appropriate defense investigation.

### III. Zottola's Bail Package Ameliorates Any Flight Risk or Danger to Other Persons or Community

####  A. *Mr. Zottola's Proposed Conditions of Release Reasonably Assure the Safety of the Community*

   In its detention letter, the government asserts that "[c]lear and convincing evidence demonstrates that ZOTTOLA poses a danger to the community based on his conceptualization and execution of a sophisticated plot to have his father and brother murdered." (Gov. Ltr. at 8.) But the government's argument misses the point: the operative question is not whether Mr. Zottola's charged offense conduct may raise the specter of danger to the community, but whether there is *any* combination of pretrial conditions that could effectively ameliorate that danger. *See* 18 U.S.C.

---

[6] Pursuant to the Court's individual practice, we will make Mr. Zottola's proposed suretors available for interview by Pretrial Services prior to the bail hearing. We will also confer with the government and the Court's docket clerk regarding a briefing schedule, and proposed hearing date convenient to the Court.

§ 3142(b). Mr. Zottola's proposed conditions, which substantially restrict his liberty and curtail his access to technology and communication devices, amply meet that standard. *See Paulino*, 335 F. Supp. at 615 (ordering the defendant's release subject to bail conditions, although finding that he "presents *some* danger to the community if he were simply released with no conditions.").

Mr. Zottola's proposed bail package includes several conditions targeted to ensuring the safety of the community. The considerable restrictions on Mr. Zottola's movement, including home detention with electronic monitoring, combined with technological restrictions, including limiting access to only a single monitored land-line telephone and no mobile telephones or Internet access in the house, would effectively impede any criminal undertaking while he is on pretrial release. These provisions are particularly tailored to prevent commission of a crime by proxy similar to that charged in the Indictment. The allegations against Mr. Zottola are that he orchestrated a murder-for-hire scheme through coded text messages with his co-defendants. The proposed package would prevent him from: (1) meeting with co-defendants and alleged members of organized crime; (2) calling anyone not on the list of numbers pre-approved by Pretrial Services; (3) making any unmonitored telephone calls; or (4) sending text messages or emails of any kind by removing Internet access in the residence. Because the strict monitoring of both Mr. Zottola's movement and electronic communications would permit almost immediate detection of any effort to commit future crimes, they also serve as a strong deterrent. Contrary to the government's assertion, the proposed bail conditions will effectively preclude him from committing any acts like those alleged in the Indictment. *See, e.g., United States v. Esposito*, 309 F. Supp. 3d 24, 31 (S.D.N.Y. 2018) (ordering defendant's pretrial release subject to strict conditions as the "danger Esposito poses to the community can be reasonably mitigated by conditions of release," although finding that "there is sufficient evidence that Esposito has significant involvement and influence in violent activities").[7]

Mr. Zottola's lack of criminal history, his stable family environment, the steadfast support he receives from his wife and her family, and his significant family responsibilities likewise weigh heavily in favor of his release. Mr. Zottola's wife Heidi and their three young children, ages 12, 9, and 4, live in their house in Larchmont, New York. Since the birth of his first child in 2007, Mr. Zottola has poured much of his energy into his family. His friends and extended family attest to his dedication. (*See, e.g.,* Ex. B, Jason Fox Letter (describing Anthony as a "great father"); Christopher Kandell Letter at 1 ("Anthony loves his kids more than anything and he makes sure that he put his family first everyday."); Heather March Letter at 1 ("Anthony comes home after working a long day and always makes time for his wife and kids. He does homework with the boys and helps the kids study for tests. He lays on the floor and reads books with [his daughter] and plays soccer or basketball with [his sons] in the back yard."); Joseph March Letter at 2 ("Anthony

---

[7] In concluding that "putting [Mr. Zottola] on home detention is not going to be sufficient to ensure the safety of the community," (Ex. A at 35:12-14), the magistrate court focused solely on the alleged crimes. (*See id.* at 34-35.) But the nature of the crime alone is insufficient to warrant Mr. Zottola's detention, particularly as the proposed bail conditions are tailored to adequately assure the safety of the community. *See, e.g., Paulino*, 335 F. Supp. at 615.

Zottola has proven to be an exceptional family man.").)  He has spent countless hours nurturing his children, exemplified by his tremendous effort in arranging and coaching his children's sports teams.  (*See, e.g.,* Ex. B, Sami Benmaneour Letter ("a true family man who worked harder than anyone I know and still managed to find time to take care of all sports activities for his children"); Jason D'Oro Letter; Laura Rameshwar Letter ("He is there for his children, whether it be picking them up from school or driving a bus load of children to and from soccer practice and even having tea parties with his daughter.").)

Upon his release, Mr. Zottola would resume living with his family, and will thus also be able to provide his children with a modicum of stability as his family navigates the challenges posed by this case.  (*See, e.g.,* Ex. B, Heidi Zottola Letter ("The time that he stands to lose from his life while awaiting this trial in jail will never be given back to him or us."); *accord* Roseanna Grega Letter ("His family misses him tremendously and are adversely affected by his absence."); Fabio Lepore Letter ("The kids are suffering without their father. He was always with them, so his absence is taking a toll on them."); Heather March Letter at 2 (Anthony's three children "need to be with their father. I believe it is crucial for their well being moving forward.").)  The harm that his continued detention would wreak on his family suggests that Mr. Zottola would be unlikely to violate the conditions of his bail, or endanger the community once released.  *See Paulino*, 335 F. Supp. at 615 (considering the defendant's "suitable and stable residence with his mother," "extensive family support" and that he was "expecting a child," in holding that "while the Government has shown that Paulino presents some danger to the community, they have not proven by clear and convincing evidence that no conditions could be set that reasonably assure the safety of the community").

The outpouring of goodwill that Mr. Zottola has received from his extended family and friends further reflects the strong network to which he would return.[8]  The financial exposure of his nine suretors, all of whom are Mr. Zottola's close friends and family members, and who collectively are risking seven homes (including several family homes in which minor children reside), favors release.  *See  United States v. Batista*, 163 F. Supp. 2d 222, 224 (S.D.N.Y. 2001) (discussing suretors "moral suasion" over the defendant as a basis for granting bail); *United States v. Sierra,* No. 99 CR. 962, 1999 WL 1206703 (S.D.N.Y. Dec. 16, 1999) (considering with approval local community ties and moral suasion exerted by friends and cousins in the United States).

Mr. Zottola also has no criminal record.  Other than the present charges against him, of which he is presumed innocent, Mr. Zottola has led a blameless life.  He grew up in the Bronx, graduating from Mount Saint Michael Academy in 1995.  He attended Iona College in New Rochelle, New York and received a B.S. in Finance in 2000.  Since graduating from college, Mr. Zottola has worked in his family's real estate and construction businesses, and started his own construction business focused on projects in the Bronx and Westchester in 2018.  Mr. Zottola's "history and characteristics," 18 U.S.C. § 3142(g), uniformly suggest that he would not be a danger

---

[8] In addition to the 23 letters of support attached hereto as **Exhibit B**, defense counsel received messages of support for Mr. Zottola from approximately 40 more friends and family members of Mr. Zottola.

to the community if his bail application is granted. *See United States v. Sierra*, No. 99 CR. 962 (SWK), 1999 WL 1206703, at *2 (S.D.N.Y. Dec. 16, 1999) (granting defendant bail in presumption case where "counsel for Sierra has introduced evidence attenuating the presumption of dangerousness and risk of flight," including "that Sierra has no criminal history, and that Sierra is an engineering student one year away from obtaining his degree.").

In advocating for Mr. Zottola's continued detention based on his presumed dangerousness, the government relies almost exclusively on the Indictment's allegations against him. The government argues that "[c]lear and convincing evidence demonstrates that ZOTTOLA poses a danger to the community based on his conceptualization and execution of a sophisticated plot to have his father and brother murdered." (Gov. Ltr. at 8.) But because Mr. Zottola is presumed innocent, "the weight of the evidence is the least important of the various factors;" it should not be accorded "undue weight." *Paulino*, 335 F. Supp. 3d at 613.

Mr. Zottola's proposed bail conditions, particularly those restricting his liberty and ability to communicate remotely, are sufficient to reasonably assure the safety of the community. This Court should, therefore, order Mr. Zottola's release pending trial.

### B. *The Proposed Bail Package Adequately Addresses any Risk of Flight*

The government similarly cannot bear its burden of demonstrating by a preponderance of the evidence that that Mr. Zottola "is likely to flee," and that there are no "conditions or a combination of conditions which reasonably will assure the presence of the defendant at trial if he is released." *Shakur*, 817 F.2d at 194–95.

Mr. Zottola is a lifelong New Yorker, tethered to the community by his strong family and business ties in the area. Mr. Zottola has spent his entire life living in the Bronx and Westchester. He has three young children, all of whom live with his wife in their family home in Larchmont, New York. Mr. Zottola lived in his family's Larchmont home until his arrest in June 2019, and would resume living there upon his release. Mr. Zottola's business interests are also deeply rooted in New York City and its environs. The family real estate and construction businesses that he has worked in and managed since 2000 are based in the Bronx. Furthermore, Mr. Zottola has already surrendered his passport, and has no means of fleeing the country, or known contacts in foreign countries who could support him. (*See* Ex. A at 3:10 – 11.) His strong family and financial connections to the community negate any suggestion that he poses a real risk of flight. *See United States v. Gallo*, No. 99 CR. 1199 LMM, 2000 WL 269894, at *2 (S.D.N.Y. Mar. 10, 2000) (finding that the government had not met its burden demonstrating that the defendant was a flight risk, noting the defendant "has strong roots in the community" and "does not have a passport"). Mr. Zottola's proven devotion to his three young children and the possibility that flight would endanger their welfare or future security in their home are additional reasons why Mr. Zottola poses little, if any, flight risk.

The government cannot demonstrate otherwise. The government asserts that Mr. Zottola is a "considerable flight risks given the prospect of facing a mandatory life sentence or death. And ZOTTOLA's access to large sums of cash indicates that he has the means to flee and to help others

do the same." (Gov. Ltr. at 8.) But Mr. Zottola's sentencing exposure is insufficient to meet the government's burden. *See United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988) ("we have required more than evidence of the commission of a serious crime and the fact of a potentially long sentence to support a finding of risk of flight."); *Paulino*, 335 F. Supp. at 619 ("it is well-established that a greater showing than commission of a serious crime and the fact of a potentially long sentence is necessary to support a finding of risk of flight." (internal quotation marks, citations, and modifications omitted).

Nor do Mr. Zottola's financial resources demonstrate that he is a flight risk. Defendants of substantial financial means, even those who are a far greater risk of flight, are frequently granted bail. *See, e.g., United States v. Webb*, No. 15 Cr. 252 (PKC) [Dkt. 35] (E.D.N.Y. July 18, 2015) (defendant, a citizen of the Cayman Islands who was extradited from Switzerland, was released on a $10 million bond with the condition of strict house arrest in international FIFA bribery case); *United States v. Seng*, No. 15 Cr. 706 (VSB) [Dkt. 35] (S.D.N.Y. Oct. 16, 2015) (defendant, arrested for large-scale bribery of a United Nations official while boarding his private jet to leave the country, released on house arrest although he was a citizen of China, worth $1.8 billion, had access to private jets, and had no ties to the U.S.); *Madoff*, 586 F. Supp. 2d at 249 (in one of the largest fraud cases in this nation's history, defendant was released on restrictive conditions of house arrest, although defendant knew he was facing a life sentence and the government proved probable access to substantial illegal assets); *United States v. Dreier*, 596 F.Supp.2d 831-32 (S.D.N.Y. 2009) (defendant, who the court characterized as "not only a master of deceit and a doyen of dishonesty but the kind of person who, under stress, may resort to desperate measures," was released on bail, although the court found he was dishonest about international travel and likely hiding assets from his alleged "colossal criminality"); *United States v. Brooks*, No. 06 Cr. 550 (JS) [Dkt. 75] (E.D.N.Y. Jan 3, 2008) (defendant released on rigorous bail conditions although he had bought a house in London the day the indictment against him was filed, he had attempted to obstruct the investigation, including by removing several computers he allegedly used to engage in the charged conduct). In this case, the government has not proffered any evidence that Mr. Zottola has access to, or has even accumulated substantial additional liquid assets (other than those seized at the time of his arrest) that would be available to him if released on home detention. His greatest assets are his interests in his family's real estate businesses, which are not transferrable, and cannot be liquidated without approval of his siblings, who are co-owners.

In any event, even if this Court finds that Mr. Zottola poses some risk of flight, the substantial bail package he proposes ameliorates any such risk. Several of the conditions, including home detention with GPS monitoring, continued surrender of his passport, strict Pretrial Services supervision, and electronic communications restrictions and monitoring would effectively curtail any attempt to flee. *See Madoff*, 586 F. Supp. 2d at 249 ("The [Bail Reform] Act does not require that the risk be zero, but that conditions imposed 'reasonably assure' appearance."). The financial risk to Mr. Zottola's nine family members and friends who have agreed to act as suretors on his $5 million bond, collectively posting seven properties, provides substantial security that Mr. Zottola will not flee. *See, e.g., Esposito*, 309 F. Supp. 3d at 31 (holding that although the defendant "poses some . . . risk of flight . . . these risks can be reasonably mitigated by the bail conditions set forth in the Bail Order."); *Dreier*, 596 F. Supp. 2d at 833-35

(releasing defendant on substantial conditions, including home confinement, and a $10 million personal recognizance bond, despite finding "that [the defendant], if released without conditions, would pose a genuine risk of flight.").

Because the government has failed to demonstrate that any risk of flight or danger posed by Mr. Zottola can only be addressed by his pretrial detention, the Court should order Mr. Zottola's release under the proposed conditions.

## IV. Conclusion

The government simply has not carried its burden of demonstrating that the proposed combination of conditions presented here are insufficient to ameliorate any risks posed by Mr. Zottola's pretrial release. This Court should, therefore, order his release on these substantial conditions. *See* 18 U.S.C. § 3142(c) (the "judicial officer *shall* order the pretrial release of the person -- . . . (B) subject to the *least restrictive* further condition, or combination of conditions, that such judicial officer determines will reasonably assure . . . the safety of any other person and the community…") (emphasis added).

Respectfully submitted,

/s/ HEM
Henry E. Mazurek
Ilana Haramati
Meister Seelig & Fein LLP
125 Park Avenue, Suite 700
New York, New York 10017
*Counsel for Defendant Anthony Zottola*