

U.S. Department of Justice

United States Attorney
Eastern District of New York

NS:LKG/KCB  
F. #2018R01984

271 Cadman Plaza East  
Brooklyn, New York 11201

March 31, 2020

By Email and ECF

The Honorable Raymond J. Dearie  
United States District Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

      Re:   United States v. Anthony Zottola, Sr.  
             Criminal Docket No. 18-609 (S-2) (RJD)

Dear Judge Dearie:

      The government respectfully submits this letter in response to defendant Anthony Zottola's emergency motion for release on bail, in which he requests to be released on bond due to the COVID-19 pandemic or, in the alternative, requests temporary release from Bureau of Prisons ("BOP") custody during the pendency of the COVID-19 pandemic. For the reasons set forth below, the motion should be denied.

I.     Background

      The defendant was arrested on June 18, 2019, after a grand jury returned an indictment charging him with murder for hire conspiracy, in violation of 18 U.S.C. § 1958(a), unlawful use and possession of firearms, in violation of 18 U.S.C. § 924(c), and causing death through use of a firearm, in violation of 18 U.S.C. § 924(j)(1). The murder for hire conspiracy charge is punishable by death or a mandatory life sentence.[1] Since his arrest, the defendant has been detained at the Metropolitan Correctional Center in Manhattan ("MCC").

---

[1]     The causing death through use of a firearm charge is punishable by death or by imprisonment for a term of years up to life, with a mandatory minimum of 10 years' imprisonment. The unlawful use and possession of firearms charge is punishable by a mandatory minimum sentence of 10 years' imprisonment.

As set forth in the government's detention memorandum filed on June 18, 2019, and at the detention hearing on January 17, 2020, both of which are incorporated herein by reference, on October 4, 2018, the defendant's 71-year-old father, Sylvester Zottola, was shot and killed while waiting in his car at a McDonald's drive-thru in the Bronx. See Detention Mem., ECF No. 100; Tr of Proc., Jan. 17, 2020, attached hereto as Ex. A. His death was the culminating event in a series of violent episodes targeting the defendant's father and the defendant's brother, specifically: a September 2017 beating of the defendant's father; a November 2017 attempted kidnapping of the defendant's father; a December 2017 home invasion and attempted murder of the defendant's father, during which his throat was slashed; a May 2018 break-in at the office of the defendant's father; a July 2018 shooting of the defendant's brother, who suffered gunshot wounds in his head, chest and hand, but survived; and, finally, the October 2018 murder of the defendant's father. The investigation has revealed that the defendant orchestrated each of the attacks on his father and his brother by hiring, and planning with, Bushawn Shelton, a member of the Bloods street gang, who in turn enlisted the help of other Bloods gang members to fulfill the contract. After each of these violent incidents, rather than call off the plot, the defendant and his coconspirators doubled their efforts, enlisting a growing number of recruits to finish the job. Minutes after the defendant learned his father was murdered, the defendant and Shelton exchanged text messages about when they could meet to celebrate.

Since his arrest, the defendant has sought, and been denied, release on bail three times. First, at the defendant's arraignment, then-Chief Magistrate Judge Roanne L. Mann denied the defendant's request for release on bond. In doing so, Judge Mann observed that "these are horrendous charges," and stated, based on the limited evidence then before the court, that "[i]t's clear that he was—the evidence of his involvement in the murder of his own father and the attempted murder of his brother just based on the evidence before the Court, which I'm sure is just the tip of the iceberg, is overwhelming." See Tr. of Proc., June 18, 2019, attached hereto as Ex. B., at 34. Judge Mann reasoned that, despite the defendant's lack of criminal history, "his involvement in these crimes is so overwhelming and the danger to the community is manifest." Id. Finally, Judge Mann ruled that she was "of the firm view that detention is warranted in this case, that putting him on home detention is not going to be sufficient to ensure the safety of the community." Id. At that time, defense counsel observed that the defendant's only medical condition that should be reflected on the court's remand order was a back injury. Id. at 35-36.

On December 18, 2019, the defendant moved again for release on bond. See ECF No. 169. The Court held a detention hearing on January 17, 2020. Four days later, on January 21, 2020, the Court denied the motion, ruling that,

> given the full range of circumstances and applying the statutory factors, the [proposed] suretors' well-meaning gestures of trust and support, even with the significant bail conditions, do not satisfy the Court that release is appropriate. The charges and potential sanctions could not be more serious and disturbing and

2

coupled with the statutory presumption compel the finding that
Mr. Zottola is a flight risk and a danger to the community.

Order, ECF No. 176.

Then on March 5, 2020, the defendant moved for an emergency bond or transfer due to conditions at the MCC. Mot., ECF No. 186. The Court denied the motion on March 23, 2020, ruling that certain circumstances mentioned in the motion had abated, and that "the Court is otherwise unwilling to reconsider bail." Mar. 23, 2020 Order.

Despite the Court's orders, the defendant has again moved for release on bond or temporary release due to the potential that he may contract COVID-19, a respiratory illness that can spread from person to person, while incarcerated at the MCC. The defendant does not assert that he has any medical or other conditions that place him in a high-risk category should he contract COVID-19. Rather, the defendant moves for bail based principally on the existence of the COVID-19 pandemic. The Court should deny the motion.

II. The Defendant Remains a Flight Risk and a Danger to the Community

The presumption of detention established by 18 U.S.C. § 3142(e) for defendants charged with firearms offenses has not been overcome in this case by the COVID-19 outbreak, which is the only changed circumstance cited by the defendant since his last bail application. As an initial matter, the defendant's request should be denied because the conditions of pretrial confinement—here, the possibility that COVID-19 may affect the defendant—are not a basis for release from custody under § 3142(g). See 18 U.S.C. § 3142(g) (requiring judicial officer to consider, in assessing detention, the nature and circumstances of the charged offense; the weight of the evidence against the defendant; the history and characteristics of the person; and the "nature and seriousness of the danger to any person or the community that would be posed by the person's release").

As outlined in greater detail in the government's detention memorandum, and at the January 17 detention hearing, the factors set forth in § 3142(g) compel the defendant's detention in this case. Specifically, and as previously found by the Court, the defendant remains a danger to the community and a flight risk. His dangerousness is demonstrated by, among other things: (i) the charged conduct in this case, including the defendant's sophisticated orchestration of violent attacks against his closest family members, which not just continued but increased in severity even after the defendant saw the near-fatal injuries suffered by his family members; (ii) the defendant's effectuation of the murder of his father and near-murder of his brother using telephones and in-person meetings to communicate with co-conspirators, and sophisticated tracking devices to stalk his victims; and (iii) the strength of the government's evidence, which includes, among other things, numerous text messages between the defendant and Bushawn Shelton discussing and planning the attacks on the defendant's father and brother, cell site data, video surveillance, telephone records, witness testimony and physical evidence. Moreover, the danger to members of the community, including the defendant's brother, who survived the attacks against him, as well

3

as other witnesses in the case and the public at large, is substantial given the defendant's commitment to carrying out numerous violent acts—acts committed even after seeing, firsthand, the panic and harm that they wrought on his family.

Finally, the defendant's risk of flight is demonstrated by the defendant's access to large sums of cash and the prospect of facing death or a mandatory life sentence upon his conviction. Indeed, now that the defendant has received discovery and knows the strength of the government's case against him, his incentive to flee has only increased. Notably, the defendant's motion does not even attempt to rebut these factors, on which the government relied in demonstrating the defendant's dangerousness just two months ago.

Rather, the defendant asserts that the risk that he may contract COVID-19 while he is incarcerated itself poses a danger to the community that "tips the balance in favor of his release." Def. Mot. at 4. The defendant relies on two cases in support of this proposition, United States v. Stephens, No. 15-CR-95 (AJN), ECF No. 2798, and United States v. Raihan, No. 20-CR-68 (BMC) (JO), ECF No. 20, both of which are easily distinguishable from this case.

In United States v. Stephens, 2020 WL 1295155, 15 CR 95 (AJN) (S.D.N.Y. March 19, 2020), the first basis offered by the district court for reversing the pretrial detention order was that "the strength of the primary evidence relied upon by the Government to demonstrate the danger the Defendant poses to the community has been undermined by new information not available to either party at the time of the [original detention hearing]" and that the new information "indicates that the Government's case is weaker than it believed to be [at the original detention hearing]." Id. at *1. Notably, the defendant there faced a violation of supervised release charge, id., and his supervised release hearing was scheduled to occur within the week. Thus, the term of the temporary release was quite short and against the backdrop that he did "not pose a danger to the community," id. at *3. The defendant here, whose trial is not imminent, is not on similar footing. Importantly, there is no new information undermining the government's prior position on the defendant's dangerousness.

Second, in United States v. Raihan, 20-CR-68 (BMC) (JO), ECF No. 20 (E.D.N.Y. March 12, 2020), which the defendant cites for the proposition that the court "continue[d] a criminal defendant on pretrial release rather than order him remanded to the Metropolitan Detention Center" based on the COVID-19 pandemic, Def. Mot. 4, that defendant violated the bond issued by Magistrate Judge Orenstein within 24 hours and Magistrate Judge Bloom ordered him detained the next day. See id. ECF Dkt. No. 22. There was no specific finding that being housed at the MDC posed any risk that outweighed the operation of all other pertinent factors under the Bail Reform Act. Moreover, unlike the defendant in Raihan, the defendant was already incarcerated before widespread community transmission of COVID-19 within the United States, and his incarceration therefore poses no risk of new infection to the community within the MCC.

Finally, the defendant's assertion that bail is being granted in cases similar to the defendant's, which the defendant characterizes as "cases involving credible allegations of violence," does not withstand scrutiny. Def. Br. 4. First, three of the cases cited by the defendant involve non-violent charges, and none involve murder, much less the systematic tracking and execution of a family member. See United States v. Baker, No. 20-CR-125 (KMK), ECF No. 22 (S.D.N.Y.) (reflecting defendant's release on agreed-upon bond in a case charging narcotics trafficking conspiracy); United States v. Santiago Ramos, 20-CR-04 (ER), ECF No. 21 (S.D.N.Y.) (declining to remand a defendant already out on bond for a supervised release violation involving a non-violent wire fraud scheme); United States v. Brandon, 19-CR-644, ECF No. 23 (S.D.N.Y.) (declining to remand a defendant facing a 15-to-21 month Guidelines range following his guilty plea to escape for failing to report to a U.S. Probation Office within 72 hours of his release from custody); United States v. Eli, 20-CR-50 (RER) (RJD), ECF No. 31 (E.D.N.Y.) (granting temporary release to defendant charged with Hobbs Act robbery, cocaine distribution and firearms-related charges due to defendant's medical condition). Second, only two of the cases cited by the defendant have publicly-accessible opinions reflecting that COVID-19 factored into the courts' decisions—and neither of those stand for the proposition that a court may upend its determination that a defendant poses a risk of flight and danger to the community. See United States v. Eli, 20-CR-50 (RER) (RJD), ECF No. 31 (E.D.N.Y.); United States v. Brandon, 19-CR-644, ECF No. 23 (S.D.N.Y.). Unlike this case, both Eli and Brandon involved defendants with medical conditions that placed them in high-risk categories should they contract COVID-19. The courts, on that basis, temporarily released the defendants pursuant to 18 U.S.C. § 3142(i), determining that the defendants' medical conditions placing them at "a substantially heightened risk of developing dangerous complications" upon contracting COVID-19 "as compared to most other individuals" presented compelling reasons warranting temporary release. United States v. Brandon, 19-CR-644, ECF No. 23 (S.D.N.Y.); see also United States v. Eli, 20-CR-50 (RER) (RJD), ECF No. 31 (E.D.N.Y.); United States v. Vizzari, No. 19-CR-767 (VSB), ECF No. 21 (S.D.N.Y. Mar. 20, 2020) (temporarily releasing defendant with lung condition); United States v. Perez, 19-CR-297 (PAE), ECF No. 62 (S.D.N.Y. Mar. 19, 2020) (temporarily releasing defendant whose "serious progressive lung disease . . . place[s] him at a substantially heightened risk of dangerous complications should he contract COVID-19").

III.   Release is Not Warranted Under the Sixth Amendment

The defendant next urges the Court to release him on bail because of a purported interference with the defendant's Sixth Amendment right to counsel. The defendant cites no statutory or legal authority authorizing the Court to do so. The Court should reject the defendant's attempt to turn the tables and use the mitigation efforts put in place by BOP, principally the limitations on legal visits, to suggest they create circumstances that justify release.

The defendant suggests these significant mitigation efforts add to "his inability to regularly access counsel." Def. Mot. 5. However, the defendant does not specify any inability. Consistent with the government's understanding, the defendant acknowledges that

5

"unmonitored legal calls can still be arranged." Id. Thus, the defendant's attempt to rely on Stephens to suggest that the COVID-19 pandemic necessitates his release is misleading. The court in Stephens specifically declined to rule on whether the health risks from the pandemic met the standard applicable to temporarily release defendants not yet convicted. Id., 2020 WL 1295155, at 6 n.3. Rather, the court found that a "compelling reason" justified release pursuant to 18 U.S.C. § 3142(i) because the defendant had proffered specific, unrebutted facts demonstrating that certain precautions taken by the BOP were impeding his ability to prepare for an evidentiary hearing scheduled for the following week. Id. at 5-6. Unlike the defendant in Stephens, who had represented to the court that he had limited-to-no ability to prepare for an upcoming evidentiary hearing, that circumstance is not present here. Indeed, given the restrictions in effect in New York State limiting person-to-person contact even were the defendant no longer in custody, the defendant and his counsel would still be communicating by telephone. The defendant's access to his counsel by phone remains the same as prior to the COVID-19 outbreak.

In sum, the defendant has not shown any significant infringement on his ability to consult with his attorney, much less provided a reason to believe the efficacy of his defense has been adversely impacted.[2] He also has not demonstrated that the infringements put in place by the BOP do not serve and further a "legitimate penological interest[]." Cf. Overton v. Bazzetta, 539 U.S. 126, 131–32 (2003) (upholding restrictions on prison visitation rights). They do serve such an interest, which is protecting the health of people like the defendant and the many employees who work at the MCC. All of the participants in the case, including the government attorneys, defense counsel, case agents and defendants have been affected by COVID-19. The aim is ensure everyone lives through the pandemic and the case can return to normal pre-trial proceedings as soon as possible. The defendant, however, made choices to commit serious crimes prior to this pandemic. Those choices justified his detention, and continue to do so.

IV. Release Is Not Warranted Under the "Compelling Reason" Clause

In the alternative, the defendant seeks temporary release on the grounds that he may contract COVID-19 while in custody, as well as due to unspecified "logistical impediments" to the defendant's access to counsel. The defendant alternatively seeks temporary release under 18 U.S.C. § 3142(i), which provides that a "judicial officer may, by subsequent order, permit the temporary release of [a] person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling

---

[2] Indeed, the most that the defendant complains of is that he is able to communicate with his lawyer, but that he "takes those calls in the presence of other inmates, and is thus constrained to speak freely with counsel." Def. Mot. 5. Legal counsel at the MCC has informed the government that they are making every effort to accommodate legal calls and that such calls take place in the office of MCC personnel—not in the presence of the general inmate population.

reason." Certain extreme medical circumstances may present "compelling reasons" that could warrant a highly circumscribed release. As Judge Garaufis recently noted in rejecting an application similar to the instant motion, "[t]his provision has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." United States v. Hamilton, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (citations omitted).

The defendant does not assert that he has any medical conditions that place him in a high-risk category should he contract COVID-19. Nor does he assert that his age or any other factor make him uniquely situated with respect to the risk of infection of COVID-19. Rather, the defendant asserts that the general risks posed by COVID-19 to MCC inmates warrants his release.

The BOP has implemented national measures to mitigate the spread of COVID-19 within prisons. See Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. These measures, which have been implemented at the MCC, include the following:

- Suspension of all social and legal visits: Social visits and legal visits have been suspended for 30 days, although confidential attorney calls, as discussed above, are being provided. Inmates will be provided additional inmate telephone minutes each month.

- Inmate movement: All inmate facility transfers have been suspended for 30 days, with exceptions permitted for forensic studies or medical or mental health treatment.

- Screening and testing of inmates: All newly-arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms. Inmates with exposure risk factors are quarantined. In addition, inmates exhibiting flu-like symptoms are isolated (either to single rooms or with other patients) and tested for COVID-19 in accordance with local health authority protocols.

- Modified Operations: The BOP is implementing modified operations nationally to maximize social distancing and limit group gatherings in BOP facilities, among other modifications specific to each facility.

Moreover, based on a March 18, 2020 letter from the MCC and MDC to the Honorable Colleen McMahon, Chief Judge for the United States District Court in the Southern District of New York, the government is aware of the following additional measures that the MCC has taken in light of COVID-19:

- "At MCC New York, on Friday, March 13, 2020, bars of soap were delivered to each of the units. This week, another delivery has been made. Commissary will be up and running next week so that inmates who have the ability to purchase

different soap can. In the meantime, staff will be passing out soap and other hygiene items to the inmate population. Any inmate who does not have the money to purchase soap will be afforded the institution soap at no cost. Cleaning supplies are available on each unit and staff have been instructed about who to contact should additional supplies be needed. Inmate orderlies are cleaning the common areas and inmates have been instructed to continue to wipe down their cells."

- "MCC New York has moved the majority of its 'at risk' population—inmates over 55 years old, and/or diagnosed with certain conditions—to one unit in the building. Some inmates were not moved due to security concerns (separations). Medical staff are aware of all the 'at-risk' inmates and will continue to monitor them along with the rest of the population."

See Letter from Warden M. Licon-Vitale (MCC) and Warden D. Edge (MDC) to Chief Judge Colleen McMahon (Mar. 18, 2020).

As of March 30, 2020, the MCC has reported four cases of coronavirus. Legal counsel for the MCC has informed the government that all four inmates are in isolation, and the units where those inmates were housed are quarantined. Legal counsel for the MCC has further informed the government that the defendant is not housed in one of the units currently under quarantine. Moreover, inmates are being provided with information regarding how to properly wash and sanitize themselves and their surroundings. As mentioned, cleaning supplies are available to spray common surfaces and cells. In short, the BOP is monitoring the status of the COVID-19 virus and is taking emergency steps to ensure the safety of its staff, inmates and the public.

Because the defendant is not uniquely situated with respect to the risk of infection of COVID-19, his general circumstances do not overcome the significant danger and flight risk he would pose if released. Indeed, this is the conclusion reached by a growing body of decisions in this district and the Southern District of New York rejecting applications for bail in serious cases based on generalized assertions relating to COVID-19. See, e.g., United States v. Scorcia, No. 19-CR-442 (ILG), ECF No. 254 (E.D.N.Y. Mar. 27, 2020) (ruling that court had already determined defendant was a danger to the community and declining to release defendant based on COVID-19 pandemic for 54-year-old who cited poor health and claimed restrictions at MDC interfered with ability to prepare a defense); United States v. Lipsky, No. 19-CR-203 (NGG), Mar. 24, 2020 Order (E.D.N.Y.) (declining to release defendant, previously detained as a danger to the community, based on general risks of COVID-19 pandemic); United States v. Amato, No. 19-CR-442 (ILG), ECF No. 237 (E.D.N.Y. Mar. 20, 2020) (ruling that court had already determined defendant was a danger to the community and declining to release 61-year old defendant with asthma based on COVID-19 pandemic); United States v. Hamilton, No. 19-CR-54 (NGG) 2020 WL 1323036, at *1-2 (E.D.N.Y. Mar. 20, 2020) (declining to release defendant charged with two counts of murder while engaged in narcotics trafficking who had sought release due to the COVID-19 pandemic based on defendant's "advanced age and medical conditions," finding that

defendant had not "met his burden to rebut the presumption of danger to the community that attaches based on" the charged acts of violence); United States v. Bradley, 19-CR-632 (GBD), ECF No. 25 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC on controlled substances and firearm charges who had recently experienced a stroke and had high blood pressure); United States v. Rivera, 20-CR-6 (JSR), Mar. 25, 2020 Order (S.D.N.Y.) (denying bail application for inmate detained in MCC on controlled substance charge who had a childhood history of asthma); United States v. White, 19-CR-536 (KC), Mar. 25, 2020 Order (S.D.N.Y.) (denying bail application for inmate detained at Valhalla on controlled substance and Hobbs Act charges with history of whooping cough); United States v. Acosta, 19-CR-848 (NRB), ECF No. 14 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC that "reli[ed] mainly on a form letter proffering general reasons to release inmates because of the spread of the COVID-19 virus).

V. Conclusion

Accordingly, the defendant has neither overcome the presumption of detention applicable in this case nor presented a "compelling reason" for his temporary release under Section 3142(i). Based on this information, and because the defendant poses a serious danger to the community and a risk of flight, the permanent order of detention should remain in effect.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:       /s/
Lindsay K. Gerdes
Kayla Bensing
Assistant U.S. Attorneys
(718) 254-6155/6279

cc: Defense Counsel (by ECF)
     Clerk of the Court (RJD) (by ECF)