

*Henry E. Mazurek*
*Partner*
*Direct (212) 655-3594*
*Fax (646) 682-9222*
*hem@msf-law.com*

August 24, 2020

Hon. Raymond J. Dearie
United States District Court Judge
United States Courthouse
225 Cadman Plaza East
Courtroom 10A S
Brooklyn, NY  11201

Re:    *United States v. Anthony Zottola*, 18-cr-609 (RJD)

Dear Judge Dearie:

We write on behalf of defendant Anthony Zottola in the above-referenced matter.  We respectfully seek the Court's assistance in effectuating Mr. Zottola's transfer to the federal contract facility at the Westchester County Jail in Valhalla, New York ("Westchester County Jail") from the Metropolitan Correction Center ("MCC") in Manhattan where he has been detained since July 2019, shortly after his arrest in this case.

1.    **Introduction**

As the Court is aware, Mr. Zottola is charged with a murder-for-hire conspiracy, and faces the most severe consequences available in our legal system.  His charges are death-eligible, and government prosecutors have requested that defense counsel submit a mitigation package to the Department of Justice ("DOJ") before it decides whether to authorize the local U.S. Attorney's Office to seek the statutory death penalty.  Because his very life is at stake, Mr. Zottola has a heightened need for sustained contact with defense counsel—both for his capital mitigation submission and his defense to the charges in the Superseding Indictment.  Yet, Mr. Zottola's access to counsel has been repeatedly denied by a series of lengthy lockdowns at the MCC.

Over the last year, the seemingly endless cancellations of legal visits at MCC Manhattan have made a mockery of Mr. Zottola's constitutionally guaranteed access to counsel.  The latest five-month moratorium on in-person legal visits at the MCC due to COVID-19 is only the most recent interruption in a cascade of counsel rebuffs.  Defense counsel has previously and repeatedly expressed growing alarm over their inability to meet with Mr. Zottola long before March 2020, as government prosecutors are aware.  Indeed, from the very outset of our representation, we were unable to visit with Mr. Zottola because of sustained lockdowns in the summer of 2019, due to the suicide of a high-profile inmate, Jeffrey Epstein.  Later, there were shutdowns because of gang unrest in the facility.  Then, there were power issues at the jail that canceled visits.  Finally, just days before the COVID-19 closing, for long stretches in February 2020, the MCC was closed to all visits while staff searched for a reported loaded firearm among the inmate population.  All the while, counsel for Mr. Zottola lost any chance at building a productive attorney-client relationship, and Mr. Zottola fell into deeper despair.

Mr. Zottola has also faced some of the harshest conditions that exist in any federal Bureau of Prisons ("BOP") facility.  Although he has been a model prisoner since his arrest, during the week of August 12-19, 2020,

Mr. Zottola was held in the MCC's "super-max" unit in 10 South, designed to secure drug kingpins and charged international terrorists. *See* Joseph Goldstein, "Manhattan Jail That Holds El Chapo Is Called Tougher Than Guantanamo Bay," *The New York Times* (Jan. 23, 2017). Mr. Zottola's isolation was ostensibly triggered by a suspected COVID-19 infection. But, based on a review of his BOP medical records, Mr. Zottola tested negative for COVID-19 just prior to his quarantine. His isolation was thus unnecessary for the public health of the MCC's inmates and staff, and it needlessly endangered his mental health.[1]

While it cannot reverse the physical and emotional trauma that Mr. Zottola has endured at the MCC (as a pretrial detainee he is presumed to be cloaked in the constitutional imprimatur of innocence), transferring him to the Westchester County Jail would at least alleviate continued interference with another of Mr. Zottola's constitutional protections—his Sixth Amendment right to counsel. The Westchester County Jail presently ***permits in-person attorney visits***, with certain COVID-19 precautions.[2] Thus, almost immediately after Mr. Zottola's transfer, we could begin meeting with him again—for the first time since March—to prepare for both the capital mitigation submission and his defense more broadly.

We first conferred with the government directly to make this transfer request, and they informed us that the U.S. Marshal's Service declined to transfer Mr. Zottola. Therefore, a Court order is now needed to effectuate Mr. Zottola's urgent need for a pretrial detention transfer to protect his Sixth Amendment right to counsel, and to give some semblance of value to the Fifth Amendment's presumption of innocence, as he prepares to fight the capital charges against him.

2.  **Since Mr. Zottola's Arrest in June 2019, Conditions at MCC Manhattan Have Practically Negated his Right to Counsel and Prevented Any Meaningful Preparation of His Capital Defense**

Mr. Zottola has been detained since his arrest on the Superseding Indictment on June 18, 2019. He was originally housed at the Metropolitan Detention Center in Brooklyn, New York. There, he spent weeks in the segregated housing unit ("SHU") because of case separation orders and credible safety risks due to potential threats from co-defendants and other inmates, who are alleged to be dangerous gang members. For these reasons, Mr. Zottola was transferred to the MCC Manhattan in July 2019, where he has been housed ever since.

The conditions of Mr. Zottola's detention have markedly deteriorated since his transfer to the MCC. In the last year, he has suffered repeated and sustained disruptions to counsel visitation. The last five months of the COVID-19 pandemic, in which counsel have only had limited telephonic and no in-person contact with Mr. Zottola, represent only the latest obstruction of his Sixth Amendment right. In August 2019, following Jeffrey

---

[1] Mr. Zottola's placement in the "super-max unit" of 10 South is also strangely suspect because the MCC already created a separate unit for COVID-19 patients on the third floor of the jail. Undersigned counsel knows this because earlier during a virus outbreak in the facility, Mr. Zottola was erroneously moved there.

[2] The precautions include limiting close contact between clients and counsel to minimize the risk of the virus' spread. Even non-contact legal meetings would be a vast improvement for Mr. Zottola who has not met with any of his attorneys since March 11, and generally has been limited to one telephone call per week. The non-contact nature of the visits is only moderately burdensome. It does not interfere with discovery review, for example, as attorneys are permitted to bring personal laptops into the Westchester County Jail without prior approval.

Epstein's reported suicide at the MCC, conditions at the jail declined precipitously, reducing counsel's access to the facility. Later, in the fall of 2019 and early 2020, various unreported conditions at the MCC continued to frustrate our attempted visits. We encountered seemingly random suspension of attorney visits (we were never told why counsel visits were being denied), or extremely lengthy wait times—sometimes several hours—for an attorney visiting room, among other obstacles.

The COVID-19 lockdown began throughout BOP facilities on March 13, 2020.[3] Just before, the MCC was on complete lockdown (no inmate movement whatsoever) for more than a week from February 27 through March 6, 2020, apparently because of a frantic search for a loaded gun smuggled into the facility. *See* "Memo: MCC Enters 7th Day of Lockdown, Unclear When Operations Will Return to Normal," *NBC News* (Mar. 4, 2020).[4] During that time, information about Mr. Zottola was unobtainable: he had no access to telephones or computers to communicate to anyone outside the jail. In the several weeks prior to the BOP's COVID-19 shutdown, we were only able to have a single private meeting with Mr. Zottola on March 11, 2020. Although Mr. Patel, Mr. Zottola's capital learned counsel, visited on March 8, 2020, their meeting took place in the non-private social visiting area, and Mr. Patel's conversation with his client was within earshot of other inmates in the room.

On March 13, 2020, the BOP suspended all legal visits due to the COVID-19 pandemic. The BOP remains silent as to its plan or timeline for their resumption. We have not met with Mr. Zottola in over five months. In the first month of the pandemic, we had only sporadic contact with our client, including just two brief calls, which Mr. Zottola informed us were not private. While we have been able to schedule regular calls with Mr. Zottola in the last few months, they are brief, restricted to between 30 minutes and an hour. These limited telephone calls simply cannot replace in-person attorney-client meetings; they are not conducive to serious consultations regarding his capital mitigation investigation, discovery review, or defense strategizing.

Nor can we effectively communicate with our client over email. Inmate email communications, even with counsel, are monitored and thus not privileged. *See United States v. Asaro*, 14-CR-26 (ARR), 2014 WL 12828985, at *1 n.1 (E.D.N.Y. July 17, 2014) ("because BOP inmates and their counsel are provided with prior warning that their TRULINCS [email] communications will not be treated as privileged and must accept those terms prior to using TRULINCS, their TRULINCS emails do not qualify for the protection of attorney-client privilege."). Finally, written mail is obviously no substitute for real time attorney-client consultations, and even that has been subject to intrusions on the attorney-client privilege—our client has repeatedly reported to us that he has received his clearly marked legal mail only after it was opened and reviewed by corrections officers, in violation of the BOP's stated legal mail policy. *See* BOP Program Statement §§ 540.18-19 (Apr. 5, 2011) (outlining legal mail procedures, and prohibiting corrections officers form opening or screening legal mail outside the recipient's presence).

Mr. Zottola's time at the MCC has also been marred by horrific, even inhumane, conditions. After living through months of lockdown and periodic isolation, he was, seemingly arbitrarily, placed in isolation in the

---

[3] *See Federal Bureau of Prisons COVID-19 Action Plan* (Mar. 13, 2020), available at: https://www.bop.gov/resources/news/20200313_covid-19.jsp.

[4] Available at: https://www.nbcnewyork.com/news/local/crime-and-courts/mcc-enters-7th-day-of-lockdown-unclear-when-operations-will-return-to-normal-memo-shows/2312475/.

"super-max" 10-South unit—the most infamous unit in the jail, where suspected terrorists are held in notoriously harsh conditions—for over a week. Specifically, on Wednesday, August 12, 2020, we were notified by Mr. Zottola's family that he had tested positive for COVID-19. However, Mr. Zottola's medical records reflected that his most recent test, on August 12, 2020, had come back negative for COVID-19.[5] (*See* Ex. A at 11 ("Patient was tested with the Abbott Rapid test for COVID-19 which was Negative on 08-12-2020.").) Inexplicably, although he had tested negative for the virus the previous day, Mr. Zottola's medical records indicate that on August 13, he was deemed a "Confirmed case [of] COVID-19," and placed in quarantine in 10-South. (Ex. A at 9.) Mr. Zottola's recent negative COVID-19 test only highlights the MCC administration's recklessness and shocking indifference to the palpable risks that isolation in the 10-South unit poses to a person's mental and emotional health. Mr. Zottola's needless isolation in these excessively severe conditions is also a flagrant violation of his constitutional right not to be housed in punitive pretrial conditions, while he is presumed innocent. *See, e.g. Iqbal v. Hasty*, 490 F.3d 143, 164-65 (2d Cir. 2007) ("under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.") (quotation marks and citations omitted).

At this point, Mr. Zottola has been in pretrial custody for over 13 months with no timeline for a trial date, no deadline for a decision on the capital aspect of his case, and no hope for pushing his case forward given his minimal access to counsel. The short weekly legal calls we are now afforded are simply insufficient to make meaningful progress in defending our client's capital case. Mr. Zottola's capital mitigation package will require counsel to collect records and interview witnesses touching on all aspects of Mr. Zottola's life. Mr. Zottola himself is the best source for identifying potential mitigation issues and witnesses, and limited weekly phone calls cannot create the kind of meaningful exchange that is needed to create a relationship where a client is able to share the most private and personal moments of his life and interpersonal affairs. Nor can we effectively work with Mr. Zottola on his defense to the capital murder charges against him. Presently, we are wholly unable to review the case discovery together, which includes voluminous electronic records, videos, and documents. We also are unable to engage in meaningful discussions regarding the results of our defense investigation because we simply are reluctant to give Mr. Zottola sensitive and protected information over a telephone that MCC staff usually monitor and which, in any event, our client does not want us to use for conveying defense strategy materials. After a year of maddening interruptions in attorney-client visitation, these torturous and preclusive conditions at MCC Manhattan have crippled our ability to prepare our client's defense.

3. **The Conditions at MCC Manhattan Substantially Impair Mr. Zottola's Ability to Prepare his Defense to the Capital Charges Against Him, Violating his Sixth Amendment Right to Counsel**

This status quo—including, most acutely, Mr. Zottola's wholesale inability to meet with counsel for the last five months—represents an unreasonable infringement of his right to counsel under both 18 U.S.C. § 3142(i), and the Sixth Amendment. *See United States v. Shipp*, 19-CR-29 (NGG), 2020 WL 3642856, at *3 (E.D.N.Y. July 6, 2020) ("unreasonable interference" with Sixth Amendment right to counsel occurs "when defense attorneys routinely face[d] unpredictable, substantial delays in meeting with clients.") (quotation marks and citations omitted); 18 U.S.C. § 3142(i)(3) ("In a detention order issued under subsection (e) of this section, the judicial officer shall . . . direct that the person be afforded reasonable opportunity for private consultation with counsel"). As the Second Circuit has held, "in the context of the right to counsel, unreasonable interference with

---

[5] Mr. Zottola's 2020 BOP medical records are attached as Exhibit A, and are being privately submitted to chambers because of HIPAA statutory health privacy protections.

the accused person's ability to consult counsel is itself an impairment of the right. As . . . 'to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself.'" *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001) (quoting *Maine v. Moulton,* 474 U.S. 159, 170 (1985)); *accord Fed. Defs. of N.Y. v. Fed. Bureau of Prisons*, 954 F.3d 118, 134 (2d Cir. 2020) ("The right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system."); *Wolfish v. Levi,* 573 F.2d 118, 133 (2d Cir. 1978) ("one of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense"), *rev'd on other grounds, Bell v. Wolfish,* 441 U.S. 520 (1979).

The numerous pre-COVID interferences with counsel visitation by MCC staff only exacerbate the Sixth Amendment problems stemming from counsel's inability to meet with Mr. Zottola since the pandemic's onset in mid-March. Particularly because Mr. Zottola faces capital charges, this Court should not "countenance pretrial conditions of confinement that . . . in practical effect significantly restrict [Mr. Zottola's] attorneys' ability to prepare a defense in this case." *Basciano v. Lindsay*, 530 F. Supp. 2d 435, 450 (E.D.N.Y. 2008) (ordering the government and BOP to ensure the defendant's effective access to counsel, explaining "the court is concerned about the ongoing difficulties Basciano has had recently in . . . effectively and efficiently meeting with his attorneys at the MDC . . . . Basciano's lawyers routinely wait for extended periods of time to be escorted to see their client and to be escorted from their visits with him.").[6]

Indeed, the heightened stakes of Mr. Zottola's case entitle his constitutional rights to similarly "heightened protections . . . to ensure his ability to prepare fully for trial and possible sentencing." *Basciano v. Martinez*, 2007 WL 2119908, at *11. Securing Mr. Zottola's adequate access to counsel at this critical stage of the case when he is preparing both a capital mitigation submission to the DOJ and a trial defense to the murder charges against him is "of the utmost importance." *United States v. Basciano*, 369 F. Supp. 2d 344, 352-53 (E.D.N.Y. 2005) (releasing defendant from solitary confinement, in a death penalty case, explaining that "the foremost factor informing my conclusion is the reality that Basciano is a death-eligible defendant whose attorneys are now preparing to make a mitigation submission to the Attorney General. It is therefore of the utmost importance that Basciano be capable of working with his attorneys as they attempt to dissuade the Attorney General from seeking the death penalty against him. Yet . . . [a]s a practical matter, the security restrictions in place in the SHU make it much more difficult for Basciano to have productive meetings with his counsel"). Courts in this district have been clear: "Where, as here, a life may be cut short by the state, the courts must be especially careful to ensure that a defendant's due process rights are not unnecessarily infringed." *Basciano v. Martinez*, No. 07-CV-421 (NGG)(RML), 2007 WL 2119908, at *11 (E.D.N.Y. May 25, 2007) (finding that defendant's limitation to non-

---

[6] Although the government has yet to authorize the death penalty as a potential punishment for Mr. Zottola, because capital punishment remains a possibility, this Court should treat Mr. Zottola as a capital defendant, affording him the additional rights attendant to such exposure. *See, e.g., United States v. Perez*, 222 F. Supp. 2d 164, 168-69 (D. Conn. 2002) ("this case is a death penalty case until the Government informs the Court otherwise.")

contact visits with counsel violated his Sixth Amendment right and ordering availability of contact visits with counsel).[7]

4. **The Court Should Order Mr. Zottola's Transfer to the Westchester County Jail Where He Can Immediately Resume In-Person Legal Visits**

While the present restrictions on attorney visits at the MCC, and throughout BOP facilities, are borne of the exigencies of the COVID-19 pandemic, they have now practically prevented Mr. Zottola's access to counsel for nearly five months. This continued denial of meaningful access to counsel is compounded by the earlier interferences that prevented Mr. Zottola to meet and develop a relationship with his lawyers.

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court set out a four-part test to determine whether prison regulations impermissibly interfere with a defendant's constitutional right, including access to counsel: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally, and (4) whether there are "obvious, easy alternatives" to the constitutionally problematic regulation, which "may be evidence that the regulation is not reasonable." *Id.* at 89-90; *accord United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir. 2000) (applying the four factor *Turner* test to evaluate the constitutionality of a pretrial detainee's lengthy detention); *United States v. Loera*, No. 09-CR-466 (BMC), 2017 WL 9481022, at *4 (E.D.N.Y. Sept. 27, 2017) (applying *Turner* to evaluate constitutionality of interferences into a pretrial detainee's access to counsel); *United States v. Mohamed*, 103 F. Supp. 3d 281, 287 (E.D.N.Y. 2015) (applying *Turner* to pretrial detainee's Sixth Amendment access to counsel claim as "while the government may have different interests with respect to a pretrial detainee than with respect to a convicted prisoner, the steps of a *Turner* review of a pretrial detainee's challenges remain the same."). The perpetual disruptions to Mr. Zottola's access to counsel, and the readily available remedy of his transfer to the Westchester County Jail easily satisfy *Turner*.

a. **The COVID-19 Public Health Crisis Does Not Justify Indefinite Encumbrance of Mr. Zottola's Sixth Amendment Right to Counsel**

Although the COVID-19 health emergency, and the "social distancing" measures necessary to stem the virus' spread are plainly a rational basis for restricting visits to the MCC, that does not end the *Turner* inquiry. A "rational connection," between the restrictions and the government's concerns, does not sanction the nearly absolute obstruction of Mr. Zottola's ability to consult with counsel since the pandemic's outset. Mr. Zottola remains entitled to protection of his constitutional right to counsel. *See, e.g., Fed. Defs. of N.Y., Inc. on behalf of Metro. Detention Ctr. - Brooklyn v. Fed. Bur. of Prisons*, 416 F. Supp. 3d 249, 251 (E.D.N.Y. 2019) (ordering resumption of legal visits following a multi-week suspension of all legal visits due to fire and power outage at the MDC, explaining "[t]he Court recognizes that security concerns are ever present in the prison context. This alone, however, does not permit the wholesale denial of a detainee's Sixth Amendment right."); *United States v. Loera*,

---

[7] Of course, the conditions imposed on attorney-client communication in this case far surpass the limitations imposed on Basciano's counsel. Here, there are ***no*** in-person visits happening at all on behalf of Mr. Zottola. Our contact is limited to weekly phone calls lasting no more than an hour at a time. The difference is stark and alarming.

No. 09-CR-00466 (BMC), 2017 WL 4675773, at *2 (E.D.N.Y. Oct. 17, 2017) (while "the Government had identified a legitimate concern for safety and security in the Metropolitan Correctional Center, and a rational connection between that concern and the prohibition on attorney contact visits," the no-contact visits infringed the defendant's right to counsel as "it was impracticable for defendant and his counsel to review the substantial documentary and electronic discovery in the confines of the divided room").

Recognizing that these severe impositions on pretrial detainees' right to counsel require a drastic remedy, courts in this Circuit have released pretrial defendants for the pendency of the pandemic to facilitate their access to counsel. *See, e.g., United States v. Deutsch*, No. 18-CR-502 (FB), 2020 WL 3577398, at *6 (E.D.N.Y. July 1, 2020) (granting bail in presumption case based, in part, on the MDC's restrictions on defendant's access to counsel during the COVID-19 pandemic); *United States v. Chandler*, 1:19-CR-867 (PAC), 2020 WL 1528120, at *1-*2 (S.D.N.Y. Mar. 31, 2020] (temporarily releasing defendant from the MCC under § 3142(i) based on inability to access counsel at MCC due to lockdown because of "a loaded gun that was smuggled into an MCC housing unit" followed by the COVID-19 pandemic, explaining that "[t]he extraordinary burdens imposed by the coronavirus pandemic, in conjunction with Chandler's right to prepare for his defense, certainly constitute a 'compelling reason that permits this Court to order the temporary release of Chandler pursuant to 18 U.S.C. § 3142(i).'"); *United States v. Stephens*, No. 15-CR-95 (AJN), 2020 WL 1295155, at *3 (S.D.N.Y. Mar. 19, 2020) (defendant's release was "necessitate[d]" by "the obstacles the current public health crisis poses to the preparation of the Defendant's defense," which "impacts the Defendant's ability to prepare his defenses. . . ."). To similarly preserve Mr. Zottola's rights, this Court should order his transfer to the Westchester County Jail.

      **b.**     **Transferring Mr. Zottola is an "Obvious, Easy Alternative" that Would Ameliorate his Constitutional Complaints**

The next three *Turner* factors—the availability of "alternative means," "the impact" of the "accommodation" on guards and other inmates, and the existence of "obvious, easy alternatives"—all focus on the feasibility of remedies. *See Turner*, 482 U.S. at 89-90. Ordering Mr. Zottola's transfer to the Westchester County Jail satisfies these additional *Turner* inquiries as well.

As a federal contract facility, the Westchester County Jail routinely houses federal pretrial detainees; numerous federal inmates are presently housed there. *See, e.g., United States v. Pedersen*, No. 3:12-CR-00431-HA, 2013 WL 3187208, at *3 (D. Or. June 20, 2013) ("[a] majority of federal defendants awaiting trial are held in state and local facilities pursuant to intergovernmental agreements."). And because he would be joining an existing federal pretrial population in the New York City area, Mr. Zottola's transfer would impose a minimal

burden on the U.S. Marshals, corrections officers, or other inmates.[8] It is, thus, an "obvious, easy alternative," to his present detention at the MCC.[9]

This minimally burdensome accommodation, narrowly tailored to resolve Mr. Zottola's Fifth and Sixth Amendment complaints, is precisely the type of redress contemplated under *Turner*. Thus, in *United States v. Loera*, No. 09-CR-466 (BMC), 2017 WL 9481022 (E.D.N.Y. Sept. 27, 2017),[10] the court applied *Turner* to require "implementation of readily achievable additional security measures and/or reasonable modifications," of the MCC's facilities to facilitate the defendant's effective access to counsel. *Loera*, 2017 WL 9481022, at *9; *see also Loera*, No. 09-CR-00466 (BMC), 2017 WL 4675773, at *3.[11] Because these modifications, necessary to protect the defendant's constitutional rights, would only modestly inconvenience the government and BOP, the *Loera* court found that they were warranted under *Turner*. *Loera*, No. 09-CR-466 (BMC), 2017 WL 9481022, at *5-*7; *accord Basciano v. Martinez*, No. 07-CV-421(NGG)(RML), 2007 WL 2119908, at *8 (E.D.N.Y. May 25, 2007) (applying *Turner* to require the BOP to facilitate contact attorney visits where the defendant "presented substantial evidence that the requirement of non-contact visits with his attorneys infringes upon his right to

---

[8] While it is true that Mr. Zottola would take up a spot in the Westchester County Jail that would otherwise house another inmate, and he would need to be transported to Brooklyn for his pretrial court appearances, those burdens are modest compared to the protections this transfer would afford his Sixth Amendment right to counsel. Moreover, to minimize any burden on the U.S. Marshals in transporting Mr. Zottola from the Westchester County Jail during his trial, we would consent to Mr. Zottola's transfer back to the MCC or the Metropolitan Detention Center in Brooklyn for the pendency of his trial.

[9] Mr. Zottola may be subject to a 14-day quarantine upon his arrival at the Westchester County Jail to prevent the spread of COVID-19, but his legal visits will resume immediately upon his release from quarantine. *See BOP Implementing Modified Operations* ("All newly-arriving BOP inmates are processed through quarantine or jail/detention sites and screened for COVID-19 exposure risk factors and symptoms."), available at: https://www.bop.gov/coronavirus/covid19_status.jsp.

[10] Although to accommodate significant public health concerns, the attorney visits in Valhalla are presently non-contact visits, which were challenged in *Loera*—even non-contact visits would be a vast improvement to Mr. Zottola's present circumstance, where he has not had ***any*** in-person contact with counsel in over five months. *Loera* remains instructive as it clarifies that the Court should ensure that any restrictions on Mr. Zottola's access to counsel are no more burdensome than necessary to achieve the BOP's administrative goals. Accordingly, while the BOP has a legitimate interest in protecting MCC inmates and staff from the further spread of COVID-19 in the facility, as in *Loera*, even a legitimate administrative goal does not justify endless obstruction of Mr. Zottola's Sixth Amendment rights. As explained *infra*, these rights are only heightened and require additional protections because of the stakes implicated by the capital charges here.

[11] The operative opinion regarding the defendant's Sixth Amendment claims in *United States v. Loera*, No. 09-CR-466 (BMC), 2017 WL 9481022, at *5 (E.D.N.Y. Sept. 27, 2017), is a Report and Recommendation written by Magistrate Judge Mann. While the district court agreed with Magistrate Judge Mann's conclusions, *see Loera*, No. 09-CR-00466 (BMC), 2017 WL 4675773, at *3, the Sixth Amendment remedies prescribed by the magistrate court were mooted when the issues were later considered by the district court based on new accommodations that the government proposed in the interim. *Id.* at *1.

counsel," and there was "ample and undisputed evidence in the record that this requirement impinges upon petitioner's right to prepare his defense and confer with his attorneys").[12] Transferring Mr. Zottola to the Westchester County Jail would pose even less of an imposition.

Although ordinarily the details of Mr. Zottola's detention would appropriately be left to the U.S. Marshals' discretion, the Court may be "actively involved" in regulating his conditions of confinement to protect Mr. Zottola's Sixth Amendment right.[13] *See United States v. Martinez-Hernandez*, No. 3:15-CR-00075 JAF, 2015 WL 6133050, at *8 (D.P.R. Oct. 15, 2015) (the court "may remain actively involved in the protection of the Defendants' right to counsel. A pretrial detainee may challenge conditions of his confinement that affect his right to counsel before the judge presiding over the underlying criminal case."); *accord Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001) (addressing the court's authority to reject as unconstitutional prison regulations curtailing pretrial detainees' access to counsel). Thus, courts in the Second Circuit and throughout the country have exercised authority over pretrial detainees' transfer to preserve their access to counsel. *See, e.g., Benjamin*, 264 F.3d at 187 (addressing the court's authority to "enjoin[] prison transfers that "significantly interfered" with pretrial detainees' access to counsel."); *Falcon v. United States Bureau of Prisons,* 52 F.3d 137, 139 (7th Cir. 1995) (considering whether the defendant's Sixth Amendment right to counsel "is being infringed," such that the court should order a pretrial detainee transferred into the custody of the United States Marshal); *Covino v. Vermont Dept. of Corrections*, 933 F.2d 128, 130 (2d Cir. 1991) (remanding to the district court to address in the first instance whether the defendant's transfer to a facility 56 miles away from his counsel "unconstitutionally impaired Covino's Sixth Amendment right of access to his trial counsel."); *Cobb v. Aytch*, 643 F.2d 946, 957 (3d Cir. 1981) ("We have already noted the trial court's extensive findings on the effect of the transfers on pretrial detainees' access to legal representation, and the consequent infringement on their exercise of their right to counsel, as protected by the Sixth and Fourteenth Amendments. We agree with the district court that the transfers of pretrial detainees, at a minimum, significantly interfered with their access to counsel."); *United States v. Rodriguez*, No. 12-CR-83S, 2014 WL 4094561, at *2 (W.D.N.Y. Aug. 18, 2014) (denying bail, but without prejudice, based on

---

[12] The district court accepted Magistrate Judge Levy's report and recommendation in *Basciano v. Martinez*, No. 07-CV-421(NGG)(RML), 2007 WL 2119908, at *8 (E.D.N.Y. May 25, 2007). *See Basciano v. Lindsay*, 530 F. Supp. 2d 435, 437 (E.D.N.Y. 2008) ("For the reasons set forth below, the court adopts the conclusions contained in Judge Levy's R & R"). However, the district court did not consider the magistrate court's Sixth Amendment access to counsel decision because the issue was mooted by the BOP's accommodation of contact attorney visits between the defendant and his counsel. *See id.* ("since Judge Levy's R & R, Basciano has been allowed contact visits with his attorneys, which thus renders this particular aspect of his habeas petition moot.").

[13] The *Loera* court was similarly "mindful that it should ordinarily defer to the expert judgment of correctional officials in such matters," but declined to do so in that case as the BOP applied the prohibition against contact visits with attorneys inconsistently. The court thus concluded that "the government's opposition to defendant's motion seems less tailored to the particulars of this defendant's situation and more a defense of existing structures." *Loera*, 2017 WL 9481022, at *8. The same reasoning applies here. The two operative issues—in-person legal visits and transfer to the Westchester County Jail—are both available to certain inmates selected by the U.S. Marshals. As was the case in *Loera*, any opposition by the government to Mr. Zottola's request is unlikely to be "tailored" to his specific interests in being given adequate access to his attorneys in the defense of his capital case. Instead, the government's argument is likely to rest on "a defense of" the Marshal's existing, general policy for choosing which defendants are housed in the Westchester County Jail, which does not consider any particularized constitutional need such as the dire case presented here.

incomplete record and the defendant's transfer to pretrial detention over 400 miles away, which interfered with his ability to confer with counsel); *United States v. Pedersen*, No. 3:12-CR-00431-HA, 2013 WL 3187208, at *4 (D. Or. June 20, 2013) in a death penalty case, scheduling a hearing to address the defendant's requested transfer to a different pretrial detention facility as part of the court's ongoing effort to ensure the "defense team['s] regular access to [their client]."). This Court should do the same, and order Mr. Zottola's transfer to preserve his continued access to counsel.

      c.      **Mr. Zottola's Exposure to Capital Punishment Entitles him to Heightened Protection of his Sixth Amendment Right to Counsel**

Finally, we recognize that the several hundred pretrial detainees at the MCC face the same obstacles to their access to counsel, and that transferring everyone is not feasible. But Mr. Zottola is differently situated than almost all of these detainees: he is a first-time offender charged with capital offenses, raising both the stakes of his case and the constitutional protections to which he is entitled. *See United States v. Pedersen*, No. 3:12-CR-00431-HA, 2013 WL 3187208, at *2 (D. Or. June 20, 2013) ("Defendants held in pretrial confinement are guaranteed the Sixth Amendment's right to the assistance of counsel . . . . both defendants stand accused of capital crimes and face a possible sentence of death. As such, they are afforded rights and benefits atypical of a defendant charged with crimes punishable by fines and imprisonment."); *Basciano v. Martinez*, 2007 WL 2119908, at *11(capital defendant's right to counsel entitled to "heightened protections"); *United States v. Ayala-Lopez,* 327 F.Supp.2d 138, 144 (D.P.R. 2004) ("We note that as a pretrial detainee and as a capital defendant, Defendant enjoys greater protections.").

The Supreme Court has been clear that "death is different." *See United States v. Taveras*, No. 04-CR-156 (JBW), 2006 WL 8435839, at *8 (E.D.N.Y. Mar. 21, 2006) ("The proposition that 'death is different' is central to the [Supreme] Court's death penalty jurisprudence.") (citing *Harmelin v. Michigan*, 501 U.S. 957, 994 (1991) and *Caldwell v. Mississippi*, 472 U.S. 320 (1985)). Thus, the Court should evaluate Mr. Zottola's Sixth Amendment rights under this heightened consideration and order his transfer to the Westchester County Jail, so he may begin to revive his relationship with counsel and begin in earnest to prepare his defense against the capital charges against him. *See United States v. Martinez-Hernandez*, 3:15-CR-00075 JAF, 2015 WL 6133050, at *11 (D.P.R. Oct. 15, 2015) (ordering that capital defendants be permitted contact visits with their defense team, and explaining that the court "makes this ruling *only* because these moving Defendants currently face the death penalty and death *is* different").

## 5. Conclusion

Because of ongoing and sustained interferences at MCC Manhattan with Mr. Zottola's attorney visits, and the heightened need to prepare both his capital mitigation submission and trial defense to the murder-for-hire charges against him, we respectfully request this Court to order Mr. Zottola's transfer to the Westchester County Jail where in-person attorney visits are presently permitted.

Respectfully submitted,

/s/ HEM
Henry E. Mazurek
Ilana Haramati
Meister Seelig & Fein LLP
125 Park Avenue, Suite 700
New York, New York 10017

Andrew G. Patel
80 Broad Street, Suite 1900
New York, NY 10004

*Counsel for Defendant Anthony Zottola*