

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NS:LKG/KCB
F. #2018R01984

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 2, 2020

<u>By Email and ECF</u>

The Honorable Raymond J. Dearie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Anthony Zottola, Sr.
              <u>Criminal Docket No. 18-609 (S-2) (RJD)</u>

Dear Judge Dearie:

      The government respectfully submits this letter in response to defendant Anthony Zottola's request that the Court order his transfer from the Metropolitan Correctional Center in Manhattan, New York ("MCC") to the Westchester County Jail in Valhalla, New York ("MCJ"). For the reasons set forth below, the motion should be denied.

I.    <u>Background</u>

      As the Court is well aware from considering, and denying, the defendant's two prior requests for release on bond, the defendant was arrested on June 18, 2019, after a grand jury returned an indictment charging him with murder for hire conspiracy, in violation of 18 U.S.C. § 1958(a), unlawful use and possession of firearms, in violation of 18 U.S.C. § 924(c), and causing death through use of a firearm, in violation of 18 U.S.C. § 924(j)(1). The murder for hire conspiracy charge is punishable by death or a mandatory life sentence.[1] The government will not repeat again the factual circumstances behind the defendant's orchestration of his father's murder and his brother's attempted murder, which were detailed at length in the government's detention memorandum and in the government's responses to

---

[1] The causing death through use of a firearm charge is punishable by death or by imprisonment for a term of years up to life, with a mandatory minimum of 10 years' imprisonment. The unlawful use and possession of firearms charge is punishable by a mandatory minimum sentence of 10 years' imprisonment.

the defendant's prior motions for release, but incorporates these prior submissions by reference. See Detention Mem., ECF No. 100; Response in Opp'n to Mot. for Bond, ECF Nos. 189, 189-1 and 189-2.

Due to separation orders in place in this case, following his arrest, the defendant was transferred from the Metropolitan Detention Center in Brooklyn, New York ("MDC") to the MCC in late June 2019, where he has since resided. On March 13, 2020, the Bureau of Prisons ("BOP") implemented national measures to mitigate the spread of COVID-19 within prisons, including the temporary suspension of legal visits. However, as detailed in the government's prior submissions and discussed more below, confidential attorney telephone and video calls are being provided, and inmates are given additional telephone minutes each month. See Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313 _covid-19.jsp. Further, "case-by-case accommodation [of legal visits] will be accomplished at the local level." Id.

The defendant last moved for release on bail in March 2020, citing a number of the same issues and cases that he relies on in the present motion. See Mot. for Bond, ECF No. 188. In denying the release request, the Court ruled,

> The current situation poses unprecedented challenges and risks for us all. My colleagues and I are deeply concerned about the potential impact of the coronavirus on the safety and health of persons entrusted to the care of the Bureau of Prisons . . . . None of this is pleasant. None of it is easy. And as counsel appropriately points out, effective communications between counsel and client are made somewhat more difficult by the current circumstances, and that is an unfortunate aspect of the current dilemma. But there are other compelling circumstances in Mr. Zottola's case that have not abated since the Court last addressed the issue of bail. The authorities cited by counsel are readily distinguishable, and the supposedly comparable cases referenced by counsel do not reflect the compelling circumstances requiring detention in this case. The motion is denied.

Order, Mar. 31, 2020.

On August 3, 2020, the defendant received a COVID-19 test at the MCC. See Ex. A (medical report documenting test).[2] On August 12, 2020, the MCC learned that this test result was positive. See id. That same day, the defendant was tested again—this time

---

[2] Consistent with the defendant's submission of his medical records to the Court under seal, the government respectfully requests permission to provide the positive test result to the Court under seal. The government understands from counsel at the MCC that this positive test result had not yet been added to the defendant's medical file at the time it was disclosed to defense counsel.

2

with a rapid test—which came back negative for COVID-19. Nonetheless, due to concerns about the reliability of the conflicting test results, and in light of the defendant's prior positive test a week earlier, he was placed into quarantine until August 20, 2020.[3] Thus, contrary to the defendant's assertion that his quarantine was "unnecessary" and "needless," staff at the MCC were following protocol established to ensure the health and safety of all inmates at the MCC, not just the defendant.[4]

The defendant now moves the Court to order the United States Marshals Service ("USMS") and the BOP to transfer the defendant from the MCC to WCJ. For the reasons set forth below, the Court should deny the motion.

II.  Legal Background

Congress has delegated responsibility for administration of the federal prison system to the executive branch, in the person of the Attorney General. See 18 U.S.C. § 4001. The Attorney General, in turn, has delegated that authority to the Bureau of Prisons. See 28 C.F.R. § 0.96 ("The Director of the Bureau of Prisons is authorized to exercise or perform any of the authority, functions, or duties conferred or imposed upon the Attorney General by any law relating to the commitment, control, or treatment of persons . . . charged with or convicted of offenses against the United States . . . ."). In so doing, "Congress has given federal prison officials full discretion to control . . . conditions of confinement." Moody v. Daggett, 429 U.S. 78, 88 (1976) (citing 18 U.S.C. § 4081)). Accordingly, among the duties specifically delegated to the BOP is the "[p]romulgat[ion of] rules governing the control and management of Federal penal and correctional institutions and providing for the classification, government, discipline, treatment, care, rehabilitation, and reformation of inmates confined therein." Id. (citing 18 U.S.C. §§ 4001, 4041, 4042)).

With respect to the detention of pretrial inmates, the Supreme Court has explained that the BOP may "subject [pretrial inmates] to the restrictions and conditions of

---

[3] The defendant asserts his placement in quarantine in unit 10 South at the MCC is "strangely suspect because the MCC already created a separate unit for COVID-19 patients on the third floor of the jail." Def. Br. 2 n.1. It is unclear what the defendant's suspicions are, but, in any event, the government understands from counsel at the MCC that a tier within the Special Housing Unit on 10 South has historically been used as an isolation tier – even before COVID-19 – and continues to be used as such during the current pandemic.

[4] The government does not address the defendant's other asserted complaints with his detention at the MCC, namely, the handful of access issues he experienced prior to the BOP's implementation of modified operations in light of the COVID-19 pandemic. The government understands the current request for transfer to be based on the present in-person legal visitation conditions at the MCC. Nonetheless, should the Court wish additional information on the defendant's access to counsel prior to March 2020, the government will confer with counsel for the MCC and provide the Court with additional information.

3

the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." Bell v. Wolfish, 441 U.S. 520, 536-37 (1979). The Supreme Court explained that a "detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'" Id. at 537. Indeed, a particular restriction imposed by the BOP on a pretrial detainee does not amount to "punishment" if it is "reasonably related to a legitimate governmental objective." Id. at 539. Moreover, "the effective management of the detention facility . . . is a valid objective that may justify imposition of conditions and restrictions of pretrial detention." Id. at 540.

"To determine whether a prison regulation burdens fundamental rights, the reviewing court asks whether the regulation is reasonably related to legitimate penological objectives, or whether it represents an exaggerated response to those concerns." United States v. El-Hage, 213 F.3d 74, 81 (2d Cir. 2000) (quoting Turner v. Safley, 482 U.S. 78, 87 (1987)) (quotation marks omitted). "The court must consider first whether there is a valid, rational connection between the regulation and the legitimate government interest used to justify it; second, whether there are alternative means for the prisoner to exercise the right at issue; third, the impact that the desired accommodation will have on guards, other inmates, and prison resources; and fourth, the absence of ready alternatives." Id. (internal quotation marks omitted). Courts have found that a pretrial condition "will not amount to punishment if it is reasonably related to a legitimate governmental objective, but will if it is arbitrary or purposeless." Basciano v. Lindsay, 530 F. Supp. 2d 435, 445 (E.D.N.Y. Jan. 14, 2008) (quoting Bell, 441 U.S. at 539) (quotations omitted).

III. Application

The current restrictions on in-person legal visits are warranted because they are reasonably related to the government's legitimate interest in preventing the spread of an infectious disease, namely COVID-19, within its walls and causing illness to hundreds of other inmates beyond the defendant, as well as BOP staff. The defendant's transfer to a county-run facility is not a reasonable alternative means to accommodate his in-person visits with counsel in the midst of a pandemic. Accordingly, the restrictions do not infringe on the defendant's constitutional rights and the Court should reject the defendant's request to be transferred.

First, the current attorney-client visiting restrictions are undoubtedly reasonably related to a legitimate penological interest, namely, preventing the spread of COVID-19 to inmates and staff at the MCC—a principal that even the defendant does not contest. Def. Br. 6 ("[T]he COVID-19 health emergency, and the 'social distancing' measures necessary to stem the virus' spread are plainly a rational basis for restricting visits to the MCC."). Indeed, this has been widely recognized by courts in this Circuit since the onset of COVID-19 in the New York City area. See, e.g., United States v. Landji, No. 18-CR-601 (PGG), 2020 WL 1674070, at *6 (S.D.N.Y. Apr. 5, 2020) (observing that "spread of COVID-19 throughout New York State – and the country – has compelled the Bureau of Prisons to suspend all visits, including legal visits" and finding such suspension reasonable

4

"in light of the global pandemic and the threat it poses to inmates, residents of New York City, and the nation at large"); United States v. Ellison, No. 18-CR-834-9 (PAE), 2020 WL 1989301, at *2 (S.D.N.Y. Apr. 27, 2020) (holding that defendant's "grievance about limited communications with counsel in the weeks since the pandemic struck do not establish a constitutional violation in his or any other case").

      The defendant nonetheless asserts that these circumstances do not "sanction the nearly absolute obstruction of Mr. Zottola's ability to consult with counsel since the pandemic's outset." Def. Br. 6. The defendant ignores the measures that have been implemented to minimize the access-to-counsel disruptions that a national pandemic has caused to every inmate. Specifically, as numerous courts have found,

> Inmates do have access to counsel, however. They receive 500, instead of 300, minutes of phone time per month. Federal Bureau of Prisons, Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp. And prison officials have stated that "case-by-case accommodation will be accomplished at the local level and confidential legal calls will be allowed in order to ensure inmates maintain access to counsel. Attorneys seeking an in-person visit with their client or a confidential call should contact the institution Executive Assistant . . . or contact the appropriate Consolidated Legal Center for the BOP institution." Id.

Landji, 2020 WL 1674070, at *6; see also Ellison, 2020 WL 1989301, at *2 (detailing MCC's protocol expanding defendants' access to attorney calls, "specifically setting aside the afternoon hours for 'non-court' calls, including calls between defendants and their attorneys). Indeed, as Judge Garaufis recently observed, "[e]very pandemic-era decision of which the court is aware has found that temporary restrictions on attorney visits and legal calls is reasonable" given the circumstances. United States v. Shipp, 19-CR-29 (NGG), 2020 WL 3642856, at *4 (E.D.N.Y. July 6, 2020) (finding "temporary suspension of legal visits at the MDC [to be] a reasonable restriction on [the defendant's] Sixth Amendment right to counsel in light of the COVID-19 pandemic" and collecting cases); see also United States v. Pena, No. 18-CR-640 (RA), 2020 WL 1674007, at *1 (S.D.N.Y. Apr. 6, 2020) (rejecting claim of Sixth Amendment violation and observing that defendant "retains his right to speak to his counsel by phone, which is a suitable alternative at this time in light of the generally-accepted nationwide mandate against in-person meetings"). The defendant does not assert that he is not being provided legal calls.

      Second, the defendant's transfer to WCJ is not a reasonable alternative means of allowing in-person contact visits in this case. As an initial matter, the government understands from speaking with the USMS that WCJ is a county jail. It is not a BOP-run facility. Although the USMS in the Southern District of New York has an inter-government agreement that allows them to use a certain amount of beds at WCJ for inmates prosecuted by the White Plains office of the U.S. Attorney's Office for the Southern District of New York, because WCJ is not a federal prison, WCJ has the ability to accept or reject inmates. USMS has informed the government that a defendant charged with murder-for-hire does not

5

meet the criteria for acceptance at WCJ. Moreover, USMS has informed the government that WCJ is currently at capacity and cannot house another inmate, even if the defendant had met the criteria for acceptance. In any event, even were the Court to order the defendant's transfer to a county facility—outside the purview of the BOP and at which there are no openings—the USMS has further advised the government that WCJ is accepting attorney visits by appointment only, and those visits are very limited.

The cases cited by the defendant do not stand for the proposition that the Court may or should order a county-run facility to accept a federal inmate, and then require that local facility to allow in-person attorney visits. Rather, the cases cited by the defendant pertain to the BOP's administration of policies within BOP facilities. See Def. Br. 8-9 (citing United States v. Loera, No. 09-CR-466 (BMC), 2017 WL 9481022 (E.D.N.Y. Sept. 27, 2017) (requiring MCC to allow in-person contact visits for defendant subject to Special Administrative Measures); Basciano v. Martinez, No. 07-CV-421 (NGG) (RML), 2007 WL 2119908, at *8 (E.D.N.Y. May 25, 2007) (recommending that district court deny defendant's request for order releasing him from Special Administrative Measures and solitary confinement but grant contact visits with counsel); United States v. Martinez-Hernandez, No. 3:15-CR-75 (JAF), 2015 WL 6133050, at *8 (D.P.R. Oct. 15, 2015) (expanding legal visitation hours to defendants in death penalty authorized case); Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001) (addressing New York City Department of Corrections motion to terminate consent decrees pertaining to attorney visitation pursuant to Prison Litigation Reform Act). Those that do address transfers between one federal facility to another, or one state facility to another, do so in the context of a defendant's pretrial placement miles away from counsel; they do not address complaints of conditions of confinement within an institution. See Falcon v. United States Bureau of Prisons, 52 F.3d 137, 139 (7th Cir. 1995) (denying habeas corpus petition of defendant housed at United States penitentiary that "require[d] his counsel to travel over 2000 miles round trip . . . in order to meet face-to-face with [defendant]" and observing that defendant should raise access to counsel issues with trial judge overseeing criminal case); Covino v. Vermont Dep't of Corrections, 933 F.2d 128, 130 (2d Cir. 1991) (remanding for district court to consider whether Vermont prisoner transferred to Vermont state correctional facility from Vermont county correction facility due to the distance between them violated the Sixth Amendment in lawsuit brought pursuant to 42 U.S.C. § 1983); Cobb v. Aytch, 643 F.2d 946, 948, 957 (3d Cir. 1981) (affirming district court's injunction, in class action suit, practice of transferring pretrial detainees in Philadelphia to "correction institutions maintained by the Commonwealth of Pennsylvania at locations distant from Philadelphia"); United States v. Rodriguez, No. 12-CR-83 (HBS), 2014 WL 4094561 (W.D.N.Y. Aug. 18, 2014) (denying bail motion for further factual development as to whether "remote detention of 185 or 483 miles categorically infringes on [the defendant's] right to effective assistance of counsel").[5]

---

[5] The defendant also cites United States v. Pedersen, No. 3:12-CR-431 (HA), 2013 WL 3187208, at *4 (D. Or. June 20, 2013), asserting that the court in that case scheduled a hearing to address the defendant's requested transfer to a different pretrial detention facility. In that case, the court declined to rule on the defendant's challenge to his placement in administrative segregation, noting that the USMS had informed the court that the USMS

6

Notably, contrary to the factual circumstances of the authority cited by the defendant, the defendant has not asked the government (nor requested a court order) to facilitate in-person legal visits at the MCC, despite the BOP's policy that it will consider such requests on a case-by-case basis, as detailed above. In any event, were the defendant to do so now, he should adhere to the appropriate mechanisms in place that deal with a defendant's access to phone calls and visits, namely, the pursuit of administrative remedies through the BOP's Administrative Remedy Program, "which allows 'an inmate to seek formal review of an issue relating to any aspect of his/her own confinement.'" Grant v. Terrell, No. 10-CV-2769 (MKB), 2014 WL 2440486, at *4 (E.D.N.Y. May 29, 2014) (quoting 28 C.F.R. §§ 542.10–19). At minimum, the Court should allow the government and defense counsel to work with the MCC to explore what options might be available in this case should the defendant wish to pursue in-person legal visits with his counsel at the MCC, which he has not sought in the present motion.

Finally, the defendant has failed to meaningfully address the remaining two factors considered by courts in assessing the reasonableness of a prison restriction, specifically the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and whether the "absence of ready alternatives is evidence of the reasonableness of a prison regulation." Turner, 482 U.S. at 90. Both counsel in favor of denying the defendant's request for transfer. Indeed, the defendant is forced to "recognize that the several hundred pretrial detainees at the MCC face the same obstacles to their access to counsel, and that transferring everyone is not feasible." Def. Br. 10; see also United States v. Guzman, No. 20-CR-56 (PAC), 2020 WL 1700253, at *2 (S.D.N.Y. Apr. 8, 2020) ("To accept the defendant's generalizations about impediments to access to counsel and argument that release is necessary . . . would 'logically result in the wholesale release of pretrial inmates. The Court does not accept the proposition that such a result is either better for the inmate or for society more broadly.'" (quoting United States v. Rudy Acosta, 19 Cr. 848 (NRB), Dkt. 14 (S.D.N.Y. Mar. 25, 2020))). Although the defendant attempts to distinguish his case by asserting that, because he may face the death penalty, he should be treated differently, the reality is that there are numerous defendants with unique and important criminal defense needs. As the Supreme Court advised in Turner,

> Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the

---

would be transferring the defendant from one institution to another, and that because it was "unclear where [the] defendant will be placed moving forward . . . the court defers ruling on this issue until it is clear where defendant will be housed." Id. at *4. The court was not scheduling a hearing to effect a transfer of the defendant.

7

problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby unnecessarily perpetuating the involvement of the federal courts in affairs of prison administration.

Turner, 482 U.S. at 89 (internal quotation marks and alteration omitted).

Although the government does not dispute that the defendant's Sixth Amendment right to counsel is critical in this case, the MCC has been and continues to actively work to protect all inmates' Sixth Amendment rights, even in the midst of all of the challenges that a pandemic brings.[6]

---

[6] Indeed, in denying similar challenges, courts have recognized that "the parties in Federal Defenders of New York, Inc. v. Federal Bureau of Prisons, et al., No. 19-CV-660 (MKB) (E.D.N.Y.) continue to work toward a resolution that balances defendants' right to counsel and the need to protect defendants, staff, and attorneys alike from contracting COVID-19." United States v. Shipp, 2020 WL 3642856, at *4 n.6. As recently as August 21, 2020, a status conference was held in that case at which time "the Court heard from the parties on . . . issues regarding setting a date for an official re-opening of in-person visitations at MDC and MCC." Aug. 21, 2020 Minute Entry, Federal Defenders of New York, Inc. v. Federal Bureau of Prisons, et al., No. 19-CV-660 (MKB) (E.D.N.Y.). Another status conference is scheduled in the case on September 4, 2020. It is the government's understanding that MCC staff, Assistant United States Attorneys in the Civil Division of the Southern District of New York and representatives from the Federal Defenders of New York will be conducting a walk-through of visiting areas of the MCC tomorrow as part of the process of preparing for the resumption of in-person visiting.

IV. Conclusion

      Accordingly, the government respectfully opposes the defendant's request for a court order compelling his transfer from the MCC to WCJ.

                              Respectfully submitted,

                              SETH D. DuCHARME
                              Acting United States Attorney

                By:       /s/
                              Lindsay K. Gerdes
                              Kayla Bensing
                              Assistant U.S. Attorneys
                              (718) 254-6155/6279

cc:     Defense Counsel (by ECF)
        Clerk of the Court (RJD) (by ECF)