

*Ilana Haramati*
*Partner*
*Direct (646) 860-3130*
*Fax (212) 655-3536*
*ih@msf-law.com*

January 28, 2022

**VIA ECF**

Hon. Raymond J. Dearie
United States District Court Judge
United States Courthouse
225 Cadman Plaza East
Courtroom 10A S
Brooklyn, NY 11201

      Re:    *United States v. Anthony Zottola, Sr.*, 18-CR-609 (RJD)

Dear Judge Dearie:

      We represent Defendant Anthony Zottola in the above-captioned case. Because of the material changed circumstance presented by the government's December 30, 2021 decision not to seek capital punishment against Mr. Zottola, we write to request that the Court: (1) reopen Mr. Zottola's bail hearing based on this changed circumstance, pursuant to 18 U.S.C. § 3142(f); and (2) order Mr. Zottola's pretrial release under the substantial bail conditions proposed.

**I.    The Government's Decision not to Seek the Death Penalty Against Mr. Zottola Constitutes a Changed Circumstance**

      Per the Bail Reform Act, a bail hearing "may be reopened" when:

> the judicial officer finds that ***information exists that was not known*** to the movant at the time of the hearing and ***that has a material bearing*** on the issue whether there are conditions of release that will ***reasonably assure the appearance*** of such person as required ***and the safety of any other person and the community***.

18 U.S.C. § 3142(f) (emphasis added). The changed circumstances presented must be truly new, and affect the determination of the defendant's risk of flight or potential danger to the community. *See, e.g., United States v. Lewis*, No. 16-CR-0212 (LAK), 2016 WL 6902198, at *2 (S.D.N.Y. Nov. 16, 2016) ("Rather, the defendant frequently must present new information that bears on truly changed circumstances, something unexpected, a significant event, or the like.") (quotation marks, citations and modifications omitted).

      The government's December 30, 2021 notice that it would not seek capital punishment against Mr. Zottola meets § 3142(f)'s requirements. *See* ECF Doc. 288. While the charges pending against Mr. Zottola, and his potential sentencing exposure remain significant, removing

the possibility of a death sentence—a categorically different and more permanent form of punishment—substantially alters the mix of incentives to flee or commit future crimes.

As other courts considering bail questions in capital murder cases have recognized, the potential for death created a unique motive to flee or commit future crimes interfering with the government's case. The converse is also true: "Facing the death penalty could surely create a motive to flee. Eliminating or reducing the possibility would therefore mitigate the risk." *United States v. Torres-Rosario*, 600 F. Supp. 2d 327, 334 (D.P.R. 2009); *see also United States v. Eischeid*, 315 F. Supp. 2d 1033, 1037 (D. Ariz. 2003) ("The Court is concerned about the severity of the penalty he faces in this case. Other courts have given considerable weight to the prospect of the death penalty in assessing whether a defendant has an incentive to flee.") (citations omitted); *United States v. Gonzales*, 995 F. Supp. 1299, 1302 (D.N.M.1998) (death penalty creates "strong incentive to flee prior to trial"). With death off the table, Mr. Zottola's incentives to flout his bail conditions are dramatically reduced. Whatever happens now, he need not fear for his life.

The Court should, therefore, reopen its bail considerations under § 3142(f), and release Mr. Zottola pursuant to the stringent conditions proposed.

## II. Proposed Pretrial Conditions of Release

We respectfully submit that the following conditions are sufficient to assure Mr. Zottola's appearance during this case and ameliorate the risks asserted by the government:

(1) A $4 million bond secured by seven properties, five of which are primary residences of the families posting them as bond, and signed by Mr. Zottola and nine other financially responsible individuals, including his wife, sister and brother in law, mother in law, wife's uncle, and lifelong friends, all of whom have offered to lien their homes as security;

(2) Home detention with electronic monitoring (by G.P.S. tracking device); only travel outside the house would be for pre-approved and pre-arranged medical and legal visits, as authorized by Pretrial Services;

(3) Continued surrender of Mr. Zottola's passport, and an agreement not to secure new travel documents;

(4) Strict Pretrial Services supervision;

(5) Limited computer access, limited to reviewing the discovery provided in this case and other case-related materials provided by his attorneys, with Internet access strictly prohibited in the home;

(6) Telephone access limited to a single monitored land-line telephone approved by Pretrial Services to make and receive calls to and from phone numbers agreed upon by counsel for Mr. Zottola and the government; no access to cellular/mobile

        telephones (any cellular/mobile device owned by Mr. Zottola's wife or children would be required to be password protected, and Mr. Zottola would be prohibited from obtaining the passwords); and

(7)      Mr. Zottola will not directly or indirectly associate or have contact, outside the presence of his counsel, with his co-defendants, alleged co-conspirators, or any individual currently or formerly associated with "the Bloods" or other organized crime; however, this prohibition does not limit his defense attorneys and their investigators from conducting an appropriate defense investigation.

### III. Mr. Zottola's Proposed Bail Package Adequately to Mitigates Any Future Danger or Flight Risk he May Pose

#### A. Legal Standard

The Bail Reform Act of 1984 requires pretrial release on a personal recognizance bond "unless the [Court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). Section 3142(g) directs the Court to consider the following factors:

> (1) the nature and circumstances of the offense charged . . .; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*Id.* at § 3142(g). Even if the Court finds that release on the defendant's personal recognizance creates a risk of flight or a danger to the community, the law still favors pretrial release "subject to the least restrictive further condition, or combination of conditions, that [the Court] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B).

While there is a presumption of detention for the charges against Mr. Zottola, that burden of production is rebuttable, and "is not heavy." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991). The burden may be satisfied "with evidence that he does not pose a danger to the community or a risk of flight," *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001), at which point, "the presumption" becomes "but one factor among many" for the Court to consider. *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985). "Regardless, in a presumption case, the Government still bears the burden of persuasion of demonstrating dangerousness by clear and convincing evidence and risk of flight by a preponderance of the evidence." *United States v. Paulino*, 335 F. Supp. 3d 600, 610 (S.D.N.Y. 2018) (citing *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011)).

### B. The Presumption of Dangerousness is Rebutted by the Significant Proposed Package and Mr. Zottola's Personal History

#### 1. *The Bail Package, Including Severe Restrictions and Extraordinary Moral Suasion, Ameliorates Any Risk of Future Dangerousness*

While Mr. Zottola is charged with extremely serious crimes, because he remains presumed innocent of the charges—for which he has nevertheless endured over two-and-a-half years of borderline barbaric pretrial detention—the Bail Reform Act looks beyond the violent nature of the allegations. The operative question is not whether Mr. Zottola's charged offense posed danger to the community in the past, but whether *any* combination of pretrial conditions could reasonably mitigate a risk of *future* danger. *See* 18 U.S.C. § 3142(b). Mr. Zottola's proposed bail package, which substantially restricts his liberty, curtail his access to technology and communication devices, and carries tremendous moral suasion amply meets that standard. *See Paulino*, 335 F. Supp. at 615 (ordering the defendant's release subject to bail conditions, although finding that he "presents *some* danger to the community if he were simply released with no conditions.").

Indeed, the extraordinarily restrictive conditions proposed are specifically targeted to reasonably assuring the safety of the community. They restrict Mr. Zottola's movement by mandating home detention with electronic monitoring, severely restrict his use of technology, limited to just a single monitored land-line telephone with access to mobile telephones or Internet strictly prohibited. Those requirements would substantially impede any criminal undertaking while he is on pretrial release. The proposed conditions are also particularly tailored to prevent commission of a crime by proxy similar to that charged in the Indictment. The allegations against Mr. Zottola are that he orchestrated a murder-for-hire scheme through coded text messages with his co-defendants. The proposed package would prevent him from: (1) meeting with co-defendants and alleged members of organized crime; (2) calling anyone not on the list of numbers pre-approved by Pretrial Services; (3) making any unmonitored telephone calls; or (4) sending text messages or emails of any kind by precluding his access to the Internet. Because the strict monitoring of both Mr. Zottola's movement and electronic communications would permit almost immediate detection of any effort to commit future crimes, they also serve as a strong deterrent. *See, e.g., United States v. Esposito*, 309 F. Supp. 3d 24, 31 (S.D.N.Y. 2018) (ordering defendant's pretrial release subject to strict conditions as the "danger Esposito poses to the community can be reasonably mitigated by conditions of release," although finding that "there is sufficient evidence that Esposito has significant involvement and influence in violent activities").

The extraordinary moral suasion exerted by the nine sureties, who have offered to pledge six homes as security will also ameliorate any risks posed by Mr. Zottola's release. The proposed sureties are many of Mr. Zottola's closest family and friends who support his release upon peril of their own financial security and homes. They include Mr. Zottola's wife Heidi, who has effectively been a single mother to their three young children, and now offers to pledge their home—a primary source of their familial stability since Mr. Zottola's arrest over 2 and a half years ago; Heidi's sister and her husband who have offered their home in Scarsdale, New York, which they worked their entire lives to purchase; Heidi's step-mother who was recently widowed of Heidi's father; Heidi's uncle, with whom Heidi lived for part of her upbringing and young adulthood; and four of

Mr. Zottola's lifelong friends who have offered to pledge their primary residences where they live with their young children. Mr. Zottola simply would not jeopardize the homes and livelihoods of these families, and the stability of their children's upbringing. The tremendous moral suasion presented by the bail package weighs heavily in favor of Mr. Zottola's release now that he no longer faces capital punishment. *See, e.g., United States v. Williams*, No. 17-cr-78-FPG, 2018 WL 3633296, at *4 (W.D.N.Y. July 31, 2018) (granting bail in a presumption case, at least in part, because of the moral suasion exerted by her co-signers: "Defendant has a close relationship with her aunt and uncle, who are so confident in her ability to comply with release conditions that they both signed $20,000 surety bonds."); *United States v. Sierra,* No. 99-CR-962, 1999 WL 1206703 (S.D.N.Y. Dec. 16, 1999) (in a presumption case, granting bail based, in large part, on the moral suasion exerted by friends and family acting as bail sureties.).

### 2. *Mr. Zottola's Absence of Criminal History and Perfect Detention Record Support his Release*

Mr. Zottola's lack of criminal history also bears favorably on his risk of future dangerousness. Other than the present charges against him, of which he is presumed innocent, Mr. Zottola has led a blameless life. He grew up in the Bronx, graduating from Mount Saint Michael Academy in 1995. He attended Iona College in New Rochelle, New York and received a B.S. in Finance in 2000. After graduating from college, Mr. Zottola worked long days in his family's real estate and construction business, and started his own construction business focused on projects in the Bronx and Westchester in 2018. Mr. Zottola's "history and characteristics," 18 U.S.C. § 3142(g), uniformly suggest that he would not be a danger to the community if his bail application is granted. *See Sierra*, No. 99-CR-962 (SWK), 1999 WL 1206703, at *2 (granting defendant bail in presumption case where "counsel for Sierra has introduced evidence attenuating the presumption of dangerousness and risk of flight," including "that Sierra has no criminal history, and that Sierra is an engineering student one year away from obtaining his degree.").

Consistent with his conspicuous lack of criminal history, Mr. Zottola has also maintained an exemplary record while incarcerated, even throughout the impossibly difficult detention conditions during the almost two-years of the Covid-19 pandemic. He has faced frequent lockdowns and isolating quarantine periods. He did not see his wife or children for a torturous 17 months, from February 2020 until June 2021. Still, as attested in several attached letters from MCC corrections officers, while enduring unimaginable horrors, first at the notorious MCC in Manhattan, and now at the dilapidated and dysfunctional Hudson County Correctional Center in Kearny, New Jersey, Mr. Zottola has maintained his equanimity.

For example, a March 3, 2021 letter from MCC Officer Stephen Espinet reports that throughout Mr. Zottola's approximately two-year period of incarceration, "he has been a model inmate and has no incident report history." Ex. 1, 3/3/21 Ltr. from CO Espinet; accord Ex. 1, 3/2/21 Ltr. from CO Eklund ("He has maintained clear conduct since his arrival in Bureau of Prisons custody."). MCC Officer Michael Cannata describes Mr. Zottola as a "decent, hard-working and trust worthy person. He has not committed any infractions or received any disciplinary actions during this time. He has been a model inmate." Ex. 1, 7/24/21 Ltr. from CO Cannata. MCC Officer T. Joint's description of Mr. Zottola is similarly laudatory: "I have known

Mr. Zottola for over two years and during that time Mr. Zottola has always struck me as an intelligent human being of good character . . . Mr. Zottola has thus far shown to have a steadfast and resolute demeanor in everything that he does." Ex. 1, Ltr. from CO Joint.

Mr. Zottola has also worked tirelessly during his protracted term of detention on a variety of work assignments. He was lead orderly in his housing unit at MCC from July 1, 2019, almost since the start of his incarceration, through his transfer to Hudson County upon condemnation of the MCC building in September 2021. As orderly, he demonstrated "an eagerness to learn his assignments," and has excelled in the role. Ex. 1, 4/26/21 Ltr. from CO Espinet. His assignments and responsibilities as an orderly were vast: "[h]e [was] in charge of all unit sanitation and daily maintenance duties," and "[d]uring the height of the COVID 19 pandemic, he was instrumental in maintaining a high [d]egree of sanitizing all contact areas to help deter the spread of the disease." Ex. 1, 7/24/21 Ltr. from CO Cannata. Mr. Zottola is "a very hard-working and productive orderly, he always want[s] to help both staff and inmates . . . . He ha[s] shown and prove to be a trustworthy, reliable, and a responsible orderly." Ex. 1, Ltr. from CO Joint; *accord* Ex. 1, 3/3/2021 BOP Summary Reentry Plan—Progress Report at 2 ("He performs professional duties as an orderly in an effective, efficient and outstanding manner to ensure policy compliance. He maintains his professionalism during Program Reviews, ACA visits."). Mr. Zottola's perfect record in custody strongly supports a lack of future dangerousness.

### 3. *The Horrific Conditions of Detention Provide a Further Incentive to Scrupulously Comply with the Bail Conditions*

Mr. Zottola's perfect record in custody is perhaps most notable because of the surrounding circumstances of his detention. He has managed to maintain his productive and blameless prison record while living through the unimaginably harsh conditions at the MCC and Hudson County Jail since the Covid-19 pandemic's onset nearly two years ago.

On March 13, 2020, when the gravity of the Covid-19 pandemic began to set in throughout the country, the BOP instituted lockdown protocols across its facilities, including at the MCC where Mr. Zottola was housed at the time. All social and legal visits were suspended indefinitely. During the first several months of the pandemic, Mr. Zottola spent much of his time locked in his cell unable to communicate with the outside world. Worse yet, he was periodically transferred from his cell to isolation in the SHU whenever the BOP believed he had been in contact with a potential Covid patient. Mr. Zottola and other inmates like him bore the brunt of the BOP's limited tools to control infection. Every time there was a suspected outbreak, Mr. Zottola endured exceptionally punitive conditions, although he had done nothing wrong.

After living through these months of lockdown and periodic isolation, in August 2020 he was placed in isolation in the "super-max" 10-South unit, the most infamous unit in the jail, where drug kingpins and charged international terrorists are held in notoriously harsh conditions. *See* Joseph Goldstein, "Manhattan Jail That Holds El Chapo Is Called Tougher Than Guantanamo

Bay," *The New York Times* (Jan. 23, 2017).[1]  Mr. Zottola was held in 10-South for over a week, where he was locked in an isolation cell with nothing but a concrete mattress and a steel toilet.  He had no chair, no soap, no cleaning supplies (although the pandemic raged at that time), no toothbrush, no towel, no cup to drink from, no reading material, and none of his personal effects.  He neither ate nor slept adequately.  While Mr. Zottola only endured these horrendous conditions because the MCC did not know how else to react to a suspected Covid infection, that does nothing to negate the trauma of protracted isolation in the 10-South unit.

Due to the surge in Covid-19 cases precipitated by the spread of the Omicron variant, Mr. Zottola is once again living through a nearly continuous lockdown at the Hudson Country Jail.  We understand that Mr. Zottola recently tested positive for Covid-19, and will be held in complete isolation for the duration of his illness.  Since mid-December 2021, he has also been locked in his cell all day, every day, and save for approximately 30 minutes periods, two or three times a week when he is released to shower and call his family (if he has time to access the phones).  Compounding the suffering, Mr. Zottola's shower schedule is unpredictable: his 30-minute release could be at 3 p.m., 3 a.m., or any time in between.  If he wants to call his family during those brief periods, he cannot be sure they will be available, or even awake.

The contrast between the brutal conditions of detention he has endured for over two and a half years, and the stable suburban family home to which he would return upon pretrial release is almost unfathomable.  Mr. Zottola's wife Heidi and their three young children, ages 14, 11, and 6, all live in their house in Larchmont, New York.  They are eager to welcome him home.  After more than 30 months of grueling conditions, Mr. Zottola has every incentive to meticulously abide by the stringent bail package for an opportunity to return home to his family.

Even given the statutory presumption of dangerousness, the present charges alone cannot sustain the government's burden to demonstrate by clear and convincing evidence that Mr. Zottola presents an unmitigated risk of future dangerousness.  Thus, courts throughout the country have released defendants facing similarly serious murder charges, based on individualized considerations under the § 3142(g) factors.  *See, e.g., United States v. Jones*, 583 F. Supp. 2d 513, 513-14 (S.D.N.Y. 2008) (setting bail for defendant charged with murder of a government witness); *United States v. Rodriguez-Adorno*, 606 F. Supp. 2d 232, 236-38 (D.P.R. 2009) (releasing death penalty eligible defendant facing murder charges on strict home incarceration, among other restrictive conditions); *Eischeid*, 315 F. Supp. 2d at 1036-37 (defendant charged with murder in aid of racketeering released pretrial where he otherwise led a stable life: "although the gravity of the charge gives the Court considerable pause, it is opposed by Defendant Eischeid's proffer that he is an established and responsible member of the community . . . . the Court cannot conclude, solely on the basis of the Government's charge and proffer, that the Government has met its burden of showing that Defendant Eischeid is a danger to the community by clear and convincing evidence.  The Court reaches the same conclusion with respect to Defendant Eischeid's flight risk.  Defendant Eischeid has close ties to the community, a job and responsible work history, two

---

[1] Available at: https://www.nytimes.com/2017/01/23/nyregion/el-chapo-guzman-manhattan-jail.html.

homes, a retirement fund, virtually no criminal record, a college education, and no apparent history of drug or alcohol abuse."). This Court should do the same, and release Mr. Zottola pursuant to the restrictive conditions proposed.

      **C.    Without the Specter of Capital Punishment, Mr. Zottola Does not Pose an Unmitigated Flight Risk**

The government similarly cannot bear its burden of demonstrating by a preponderance of the evidence that that Mr. Zottola "is likely to flee," and that there are no "conditions or a combination of conditions which reasonably will assure the presence of the defendant at trial if he is released." *United States v. Shakur*, 817 F.2d 189, 194-95 (2d Cir. 1987).

Mr. Zottola is a lifelong New Yorker, tethered to the community by his strong family and business ties. He spent his entire life in the Bronx and Westchester—it is all he has ever known. He has three young children, all of whom live with his wife in their family home in Larchmont, New York. Mr. Zottola lived in his family's Larchmont home until his arrest in June 2019, and would resume living there upon his release. Mr. Zottola has also already surrendered his passport, and has no means of fleeing the country. These strong local roots negate any suggestion that he poses a real risk of flight. *See United States v. Gallo*, No. 99-CR-1199 LMM, 2000 WL 269894, at *2 (S.D.N.Y. Mar. 10, 2000) (finding that the government had not met its burden demonstrating that the defendant was a flight risk, noting the defendant "has strong roots in the community" and "does not have a passport").

Nor do Mr. Zottola's financial resources support a finding that he is an unmitigated flight risk. Defendants of much more substantial financial means, even those who are a far greater risk of flight, are frequently granted bail. *See, e.g., United States v. Webb*, No. 15-CR-252 (PKC), ECF Doc. 35 (E.D.N.Y. July 18, 2015) (defendant, a citizen of the Cayman Islands who was extradited from Switzerland, was released on a $10 million bond with the condition of strict house arrest in international FIFA bribery case); *United States v. Seng*, No. 15-CR-706 (VSB), ECF Doc. 35, (S.D.N.Y. Oct. 16, 2015) (defendant, arrested for large-scale bribery of a United Nations official while boarding his private jet to leave the country, released on house arrest although he was a citizen of China, worth $1.8 billion, had access to private jets, and had no ties to the U.S.); *United States v. Madoff*, 586 F. Supp. 2d 240, 249 (S.D.N.Y. 2009) (in one of the largest fraud cases in this nation's history, defendant was released on restrictive conditions of house arrest, although defendant knew he was facing a life sentence and the government proved probable access to substantial illegal assets); *United States v. Dreier*, 596 F. Supp. 2d 831-32 (S.D.N.Y. 2009) (defendant, who the court characterized as "not only a master of deceit and a doyen of dishonesty but the kind of person who, under stress, may resort to desperate measures," was released on bail, although the court found he was dishonest about international travel and likely hiding assets from his alleged "colossal criminality"); *United States v. Brooks*, No. 06-CR-550 (JS), ECF Doc. 75 (E.D.N.Y. Jan 3, 2008) (defendant released on rigorous bail conditions although he had bought a house in London the day the indictment against him was filed, he had attempted to obstruct the investigation, including by removing several computers he allegedly used to engage in the charged conduct).

And, while Mr. Zottola's sentencing exposure to potential life imprisonment remains severe, that alone cannot meet the government's burden. *See United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988) ("we have required more than evidence of the commission of a serious crime and the fact of a potentially long sentence to support a finding of risk of flight."); *Paulino*, 335 F. Supp. at 619 ("it is well-established that a greater showing than commission of a serious crime and the fact of a potentially long sentence is necessary to support a finding of risk of flight." (internal quotation marks, citations, and modifications omitted).

Still, even if this Court finds that Mr. Zottola poses some risk of flight, the substantial bail package he proposes ameliorates that risk. Several of the conditions, including continued surrender of his passport, strict Pretrial Services supervision, and home detention with GPS monitoring, would effectively curtail any attempt to flee. *See Madoff*, 586 F. Supp. 2d at 249 ("The [Bail Reform] Act does not require that the risk be zero, but that conditions imposed 'reasonably assure' appearance."). The financial risk to Mr. Zottola's nine family members and friends who have agreed to act as his suretors and secure his $4 million bond with seven properties, provides overwhelming moral suasion against flight. *See, e.g., Esposito*, 309 F. Supp. 3d at 31 (holding that although the defendant "poses some . . . risk of flight . . . these risks can be reasonably mitigated by the bail conditions set forth in the Bail Order."); *Dreier*, 596 F. Supp. 2d at 833-35 (releasing defendant on substantial conditions, including home confinement, and a $10 million personal recognizance bond, despite finding "that [the defendant], if released without conditions, would pose a genuine risk of flight.").

Because the government has failed to demonstrate that any risk of flight or danger posed by Mr. Zottola can only be addressed by his pretrial detention, the Court should order Mr. Zottola's release under the proposed conditions.

## IV. Mr. Zottola's Release is Necessary to Effectively Protect his Constitutional Right to Counsel as his Trial Date Approaches

During the Covid-19 lockdowns, and because of the restrictions to accessing the law library at the Hudson County Jail, since his transfer from the MCC, Mr. Zottola has been unable to access his discovery, or review the voluminous new evidence produced by the government in just the last few months. He has thus been unable to meaningfully assist counsel in preparing for trial, presenting another basis for his release.

Because of the Covid-19 lockdown conditions at Hudson County Jail, Mr. Zottola is confined to his cell and released for no more than a few hours a week in 30-minute increments. Needless to say, Mr. Zottola has had no access to the law library—the only place in the facility where inmates are permitted to use a computer—throughout the duration of this weeks-long lockdown.

Even prior to the recent Covid-19 surge, Mr. Zottola's access to the law library was excessively limited. In September 2021, upon his transfer from the MCC, Mr. Zottola was initially afforded just one hour per week at the law library. After counsel conferred with the government, his access increased, but only to two hours per week. Although other local facilities (such as the

Westchester County Jail in Valhalla) permit inmates preparing for trial to maintain laptops (without internet access) in their cells containing discovery, we understand that Hudson County Jail does not. *See, e.g., United States v. Helbrans, et al.*, No. 19-CR-497 (NSR) (S.D.N.Y.) (permitting defendants to receive laptops for discovery review at the Westchester County Jail in Valhalla)

In the years that he has been waiting for trial, Mr. Zottola's conditions of confinement have consistently inhibited his ability to assist counsel in preparing his defense—effectively curtailing his Sixth Amendment right to counsel. Interference with this fundamental constitutional right is a further basis for Mr. Zottola's pretrial release. *See, e.g., United States v. Rush*, No. S1-414-CR-88-RWSSPM, 2017 WL 6541436, at *13 (E.D. Mo. Dec. 1, 2017) (granting bail based on due process considerations, although finding that bail was not warranted under the Bail Reform Act).

## V.     Conclusion

The government simply has not carried its burden. The proposed combination of conditions presented here are sufficient to reasonably assure the Court that Mr. Zottola poses neither a risk of danger nor flight. This Court should, therefore, order his release on the substantial conditions proposed. *See* 18 U.S.C. § 3142(c) (the "judicial officer *shall* order the pretrial release of the person -- . . . (B) subject to the *least restrictive* further condition, or combination of conditions, that such judicial officer determines will reasonably assure . . . the safety of any other person and the community…") (emphasis added).

Respectfully submitted,

/s/ IH
Henry E. Mazurek
Ilana Haramati
Meister Seelig & Fein LLP
125 Park Avenue, Suite 700
New York, New York 10017

*Counsel for Defendant Anthony Zottola, Sr.*

cc:     Counsel of Record (*via ECF)*