UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

UNITED STATES OF AMERICA,

     – against –                                 No. 18-cr-609 (RJD)

ANTHONY ZOTTOLA, SR.,

                        Defendant.

------------------------------------------------------------------------x

---

## DEFENDANT ANTHONY ZOTTOLA, SR.'S MEMORANDUM OF LAW IN SUPPORT OF HIS OMNIBUS PRETRIAL MOTIONS

---

**MEISTER SEELIG & FEIN, LLP**
***Counsel for Anthony Zottola, Sr.***
125 Park Avenue, 7th Floor
New York, New York 10017
Phone: (212) 655-3500
Fax: (212) 655-3535

## <u>TABLE OF CONTENTS</u>

I.      THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM USING EVIDENCE
        PRODUCED TO THE DEFENSE THREE MONTHS AFTER THE COURT-ORDERED
        RULE 16 DEADLINE OF JANUARY 14, 2022 ............................................................ 1

        A.      Procedural History – Discovery Productions and Orders ...................................... 1

                1.      The Government's Representations Regarding Rule 16 Discovery During
                        the December 6, 2021 Conference ............................................................ 1

                2.      The Court's January 14, 2022 Discovery Cutoff Order ............................. 2

                3.      The Government's April 18, 2022 Rule 16 Productions ............................ 2

        B.      The Government's April 18, 2022 Productions, and Any Subsequent Productions
                are too Late for the Defendants to Adequately Utilize them at Trial, Requiring
                their Preclusion ..................................................................................................... 4

II.     THE COURT SHOULD COMPEL THE GOVERNMENT TO MAKE FULL AND
        COMPLETE *BRADY* DISCLOSURES ............................................................................ 6

        A.      *Brady* and Its Progeny Require Specific, Complete and Timely Disclosures ........ 7

        B.      The Government Must Immediately Disclose All *Brady* and *Giglio* Information,
                Including the Complete Statements and Context of Information Summarized in Its
                October 2020 Letter ............................................................................................... 8

III.    THE    COURT    SHOULD    COMPEL    THE    GOVERNMENT    TO    PRODUCE
        IMMEDIATELY ALL STATEMENTS IN ITS POSSESSION, OR CONSTRUCTIVE
        POSSESSION, MADE BY THE DECEDENT DURING THE TIME PERIOD OF THE
        ATTACKS; THIS MATERIAL IS DISCOVERABLE UNDER RULE 16 AND *BRADY*
        ............................................................................................................................. 13

IV.     THE COURT SHOULD ORDER THE GOVERNMENT TO FILE A BILL OF
        PARTICULARS TO PROVIDE MR. ZOTTOLA WITH ADEQUATE NOTICE OF THE
        CHARGES AGAINST HIM ......................................................................................... 16

        A.      The Charges ......................................................................................................... 16

        B.      The Particulars Requested and the Government's Response ................................ 17

        C.      Mr. Zottola Cannot Fully Understand the Charges Against Him Absent a Bill of
                Particulars ........................................................................................................... 18

V.      THE GOVERNMENT'S FLAGRANT DISREGARD OF THE FOURTH AMENDMENT
        IN SEARCHING MR. ZOTTOLA'S MATERIALS WARRANTS SUPPRESSION ..... 21

A.     The Government Conducted General Searches of Mr. Zottola's Devices and Home, Requiring Suppression ............................................................. 23

     1.     The Government Seized and Continued to Search All Data Stored on Mr. Zottola's Devices and Virtually Everything Stored in his Home Office .. 23

     2.     The Government's Continuous General Search of Mr. Zottola's Devices Requires Wholesale Suppression ............................................................. 26

B.     The Home and Devices Warrants Lack Particularity and are Overbroad ............. 31

     1.     The Warrants' Probable Cause Showing ................................................. 31

     2.     Scope of Permitted Seizures ................................................................... 33

     3.     The Home and Devices Warrant Application Improperly Authorized Overbroad Seizures ............................................................................... 35

     4.     The Home and Devices Warrant Does Not Describe with Particularity the Items to be Seized ................................................................................. 38

C.     The Verizon Cellular Telephone Data Should be Similarly Suppressed: The Warrant Lacked Particularity and the Agents Conducted a General Search ........ 41

     1.     The Verizon Warrant's Probable Cause Showing ................................... 41

     2.     The Scope of the Verizon Warrant ......................................................... 44

     3.     The Material Seized Pursuant to the Verizon Warrant ............................ 45

     4.     The Seizure of Material Pursuant to the Verizon Warrant Ran Afoul of the Fourth Amendment ................................................................................ 46

VI.     THE COURT SHOULD SUPPRESS MR. ZOTTOLA'S CONVERSATIONS WITH SHELTON SEIZED FROM SHELTON'S CELLULAR TELEPHONE ....................... 48

A.     The Shelton Device Warrant ............................................................................. 48

B.     The Shelton Device Seizure .............................................................................. 49

C.     Mr. Zottola has Standing to Challenge Seizure of his Communications from the Shelton Device Because He Has a Legitimate Expectation of Privacy in His Personal Conversations ..................................................................................... 50

D.     The Government's Flagrant General Search of the Shelton Device Warrants Blanket Suppression of the Zottola-Shelton Conversation ................................. 56

VII.   MR. ZOTTOLA'S JUNE 17, 2019 POST-ARREST STATEMENTS ARE THE PRODUCT OF IMPROPER CUSTODIAL INTERROGATION AND SHOULD BE SUPPRESSED ......................................................................................................... 58

    A.   Factual Background ......................................................................................... 58

        1.   Mr. Zottola's Custodial Interrogation ....................................................... 58

        2.   The FBI Reports Include Only Some Aspects of Mr. Zottola's Custodial Interrogation ............................................................................................... 60

    B.   Mr. Zottola's Custodial Interrogation Violated *Miranda* and Should be Suppressed ...................................................................................................... 61

        1.   Mr. Zottola Invoked Counsel Throughout his Custodial Interrogation, Even Prior to Receipt of the Miranda Warnings ....................................... 61

    C.   In the Alternative, the Court Should Hold a Suppression Hearing ...................... 65

VIII.  THE COURT SHOULD ORDER THAT A JUROR QUESTIONNAIRE BE USED FOR VOIR DIRE ..................................................................................................... 66

IX.    CONCLUSION ..................................................................................................... 70

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alderman v. United States,*
    394 U.S. 165 (1969) ................................................................................ 49, 51, 52, 53,

*Brady v. Maryland,*
    373 U.S. 83 (1963) ............................................................................................... 7

*Carpenter v. United States,*
    138 S. Ct. 2206 (2018) ...................................................................... 46, 51, 53, 54

*Colorado v. Connelly,*
    479 U.S. 157 (1986) ...................................................................................... 62

*Coolidge v. New Hampshire,*
    403 U.S. 443 (1971) ...................................................................................... 41

*Davis v. United States,*
    512 U.S. 452 (1994) ...................................................................................... 61

*DiSimone v. Phillips,*
    461 F.3d 181 (2d Cir. 2006) ...................................................................... 8, 15

*Giles v. California,*
    128 S.Ct. 2678 (2008) ................................................................................ 13. 14

*Groh v. Ramirez,*
    540 U.S. 551 (2004) .................................................................................. 31, 41

*In re U.S. for an Order Authorizing the Release of Historical Cell-Site Info.,*
    809 F. Supp. 2d 113 (E.D.N.Y. 2011) .................................................... 53, 54

*Jones v. United States,*
    365 F. App'x. 309 (2d Cir. 2010) .............................................................. 65

*Katz v. United States,*
    389 U.S. 347 (1967) .............................................................. 49, 50, 51, 53

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ............................................................................ 8, 15, 72

*McNeil v. Wisconsin,*
    501 U.S. 171 (1991) ...................................................................................... 62

*Minnesota v. Dickerson,*
    508 U.S. 366 (1993) ...................................................................................... 30

iv

*Miranda v. Arizona,*
   384 U.S. 436 (1966) ............................................................................ 61, 64

*O'Connor v. Ortega,*
   480 U.S. 709 (1987) ................................................................................ 54

*Oregon v. Elstad,*
   470 U.S. 298 (1985) ................................................................................ 61

*Riley v. California,*
   573 U.S. 373 (2014) ........................................................................... 52, 53

*Rosales-Lopez v. United States,*
   451 U.S. 182 (1981) ................................................................................ 69

*Smith v. Endell,*
   860 F.2d 1528 (9th Cir. 1988) ................................................................ 62

*Soldal v. Cook Cnty.,*
   506 U.S. 56 (1992) .................................................................................. 50

*Stoner v. California,*
   376 U.S. 483 (1964) ................................................................................ 54

*United States v. Abboud,*
   438 F. 3d 554 (6th Cir. 2006) ................................................................ 40

*United States v. Alleyne,*
   No. 20-CR-266 (E.D.N.Y. Nov. 23, 2021) .............................................. 64

*United States v. Alston,*
   No. 15-CR-435 (S.D.N.Y. Apr. 29, 2016) ............................................... 29

*United States v. Bagley,*
   473 U.S. 667 (1985) .................................................................................. 7

*United States v. Bortnovsky,*
   820 F.2d 572 (2d Cir. 1987) ................................................................... 18

*United States v. Buck,*
   813 F.2d 588 (2d Cir. 1987) ................................................................... 31

*United States v. Cioffi,*
   668 F. Supp. 2d 385 (E.D.N.Y. 2009) ................................................... 28

*United States v. Davidoff,*
   845 F.2d 1151 (2d Cir. 1988) ................................................................. 21

*United States v. Debbi*,
   244 F. Supp. 2d 235 (S.D.N.Y. 2003) ................................................................ 28, 56

*United States v. DiTomasso*,
   56 F. Supp. 3d 584 (S.D.N.Y. 2014) ................................................................. 51, 55

*United States v. Dzialak*,
   441 F.2d 212 (2d Cir. 1971) ....................................................................................... 28

*United States v. Gaines*,
   295 F.3d 293 (2d Cir. 2002) ............................................................................... 61, 62

*United States v. Galpin*,
   720 F.3d 436 (2d Cir. 2013) ...................................................................................... 22

*United States v. Gammarano*,
   No. 06-CR-0072 (E.D.N.Y. July 18, 2007) ........................................................... 20

*United States v. Gupta*,
   848 F. Supp. 2d 491 (S.D.N.Y. 2012) .................................................................... 10

*United States v. Hamilton*,
   538 F.3d 162 (2d Cir. 2008) ...................................................................................... 50

*United States v. Hamlett*,
   No. 3:18-CR-24 (D. Conn. July 26, 2019) ............................................................ 55

*United States v. Harun*,
   232 F. Supp. 3d 282 (E.D.N.Y. 2017) .................................................................... 65

*United States v. Hernandez*,
   No. 09-CR-625 (S.D.N.Y. Jan. 6, 2010) ........................................................... 36, 40

*United States v. Hyman*,
   No. 18-CR-307 (E.D.N.Y. Nov. 4, 2019) ............................................................... 64

*United States v. Kyles*,
   40 F.3d 519 (2d Cir. 1994) ........................................................................................ 69

*United States v. LaChance*,
   788 F.2d 856 (2d Cir. 1986) ................................................................................ 38, 45

*United States v. Lustyik*,
   57 F. Supp. 3d 213 (S.D.N.Y. 2014) ......................................................... 29, 55, 56

*United States v. Mahaffy*,
   693 F.3d 113 (2d Cir. 2012) ........................................................................................ 7

*United States v. Mandell*,
710 F. Supp. 2d 368 (S.D.N.Y. 2010) ............................................................ 19

*United States v. Martoma*,
990 F. Supp. 2d 458 (S.D.N.Y. 2014) ............................................................ 10

*United States v. Martoma*,
No. 12-CR-973 (S.D.N.Y. Jan. 6, 2014) .......................................................... 9

*United States v. Mathieu*,
No. 16-CR-763 (S.D.N.Y. Nov. 9, 2018) ........................................................ 55

*United States v. Matias*,
836 F.2d 744 (2d Cir. 1988) ............................................................................ 47

*United States v. Messalas*,
No. 17-CR-339 (E.D.N.Y. July 14, 2020) ................................................ 47, 57

*United States v. Metter*,
860 F. Supp. 2d 205 (E.D.N.Y. 2012) ....................................................... 22, 29

*United States v. Millar*,
79 F.3d 338 (2d Cir. 1996) ............................................................................. 69

*United States v. Mitchell*,
565 F.3d 1347 (11th Cir. 2009) ..................................................................... 29

*United States v. Morel*,
No. 09-CR-493 (E.D.N.Y. June 18, 2010) ..................................................... 61

*United States v. Nejad*,
436 F. Supp. 3d 707 (S.D.N.Y. 2020) ....................................................... 30, 31

*United States v. Orsini*,
406 F Supp 1264 (E.D.N.Y. 1976) ................................................................. 20

*United States v. Pinto-Thomaz*,
352 F. Supp. 3d 287 (S.D.N.Y. 2018) ....................................................... 27, 56

*United States v. Quinones*,
511 F.3d 289 (2d Cir. 2007) ........................................................................... 69

*United States v. Rahman*,
189 F.3d 88 (2d Cir. 1999) ............................................................................. 69

*United States v. Rivas*,
377 F.3d 195 (2d Cir. 2004) ............................................................................. 7

*United States v. Roberts*,
675 F. Supp. 108 (S.D.N.Y. 1987) ........................................................ 40

*United States v. Rodriguez*,
496 F.3d 221 (2d Cir. 2007) .......................................... 7, 8, 9, 15

*United States v. Rosa*,
626 F.3d 56 (2d Cir. 2010) ...................................................... 40, 46

*United States v. Ruggiero*,
928 F.2d 1289 (2d Cir 1991) ................................................... 52

*United States v. Santillan*,
902 F.3d 49 (2d Cir. 2018) ...................................................... 50

*United States v. Scarpa*,
897 F.2d 63 (2d Cir.1990) ...................................................... 61

*United States v. Seppala*,
No. 16-CR-436 (S.D.N.Y. Nov. 22, 2017) .............................. 62

*United States v. Shi Yan Liu*,
239 F.3d 138 (2d Cir. 2000) ................................................. 27

*United States v. Shipp*,
392 F. Supp. 3d 300 (E.D.N.Y. 2019) .................................... 39

*United States v. Siddiqi*,
No. 06-CR-377 (S.D.N.Y. Feb. 21, 2007) .............................. 20

*United States v. Stewart*,
433 F.3d 273 (2d Cir. 2006) ................................................. 69

*United States v. Stringer*,
730 F.3d 120 (2d Cir. 2013) ................................................. 20

*United States v. Trie*,
21 F. Supp. 2d 7 (D.D.C. 1998) ............................................ 21

*United States v. Triumph Cap. Grp., Inc.*,
544 F.3d 149 (2d Cir. 2008) ................................................... 9

*United States v. Voustianiouk*,
685 F.3d 206 (2d Cir. 2012) ............................................ 23, 26

*United States v. Walsh*,
194 F.3d 37 (2d Cir. 1999) ................................................... 19

*United States v. Warshak*,
  631 F.3d 266 (6th Cir. 2010) ............................................................... 54

*United States v. Wey*,
  256 F. Supp. 3d 355 (S.D.N.Y. 2017) ......................... 22, 27, 29, 30, 31, 37, 38, 39, 41, 45, 57

*United States v. Zemlyansky*,
  945 F. Supp. 2d 438 (S.D.N.Y. 2013) .............................................. 36, 37, 39, 40, 45

*Walczyk v. Rio*,
  496 F.3d 139 (2d Cir. 2007) ................................................................. 36

*Wood v. Ercole*,
  644 F.3d 83 (2d Cir. 2011) .............................................................. 63, 64

**EXHIBIT LIST**

| |
|---|
| **Exhibit A** |
| Transcript of December 6, 2021 Status Conference |
| **Exhibit B** |
| Government Rule 16 Cover Letter Dated April 18, 2022 |
| **Exhibit C** |
| Government Rule 16 Device Disclosures Cover Letter Dated April 18, 2022 |
| **Exhibit D** |
| Government Digital Evidence Spreadsheet |
| **Exhibit E** |
| Government Brady Disclosure Letter Dated October 8, 2020 |
| **Exhibit F** |
| Defense Discovery and Brady Letter Dated January 14, 2022 |
| **Exhibit G** |
| Declaration of Ilana Haramati, Esq. |
| **Exhibit H** |
| Anthony Zottola Residence and Devices Warrant Application |
| **Exhibit I** |
| Anthony Zottola Residence and Devices Warrant |
| **Exhibit J** |
| Warrant Application for Anthony Zottola Devices |
| **Exhibit K** |
| Warrant for Anthony Zottola Devices |

| **Exhibit L** |
| :---: |
| Examples of Over-Seizure from Anthony Zottola Devices |
| **Exhibit M** |
| Examples of Over-Seizure from Anthony Zottola Residence |
| **Exhibit N** |
| Verizon Warrant Application for Anthony Zottola Device |
| **Exhibit O** |
| Verizon Warrant for Anthony Zottola Device |
| **Exhibit P** |
| Warrant Application for Bushawn Shelton Devices |
| **Exhibit Q** |
| Warrant for Bushawn Shelton Devices |
| **Exhibit R** |
| Declaration of Anthony Zottola |
| **Exhibit S** |
| Post-Arrest Video of Anthony Zottola, Video File Submitted Directly to the Court |
| **Exhibit T** |
| FBI 302 Report Drafted on June 28, 2019 |
| **Exhibit U** |
| FBI 302 Report Drafted on July 8, 2019 |
| **Exhibit V** |
| Defense Proposed Juror Questionnaire |

We respectfully submit defendant Anthony Zottola Sr.'s memorandum of law in support of his omnibus pretrial motions requesting that the Court: (1) preclude the government from using evidence produced to the defense three months after the court-ordered Rule 16 deadline; (2) compel the government to make full and complete *Brady* disclosures; (3) compel the government to immediately produce all statements in its possession or constructive possession made by the decedent; (4) order the government to file a bill of particulars; (5) suppress the materials seized pursuant to searches of Mr. Zottola's devices, home, and cellular telephone carrier information; (6) suppress Mr. Zottola's conversations with co-defendant Bushawn Shelton seized from Shelton's cellular telephone; (7) suppress Mr. Zottola's June 17, 2019 post-arrest statements; and (8) order that a juror questionnaire be used for voir dire.

## I. THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM USING EVIDENCE PRODUCED TO THE DEFENSE THREE MONTHS AFTER THE COURT-ORDERED RULE 16 DEADLINE OF JANUARY 14, 2022

### A. Procedural History – Discovery Productions and Orders

#### 1. *The Government's Representations Regarding Rule 16 Discovery During the December 6, 2021 Conference*

During the December 6, 2021 status conference, the government represented that it was still in the process of producing additional discovery to the defendants, including previously unproduced NYPD files related to the incidents involving the two alleged victims.  Ex. A, 12/6/2021 Tr. 7:2-7; 10:4-11:1.[1]  At that time, the government represented that it would make two further substantive productions: one in December 2021 and one additional production that the government planned to have "accomplished by mid-January."  *Id.* 11:9; 10:24-25 ("there's going to be this [December 2021] production and an additional production soon following it").

---

[1] The transcript from the December 6, 2021 conference is attached as Exhibit A.

The government further represented to the Court on December 6 that there were not "any major item[s], that ha[d] not been produced to this date." *Id.* 10:9-11.

### 2.    *The Court's January 14, 2022 Discovery Cutoff Order*

Because, even as of the December 6, 2021 status conference, this case had been pending for over three years, the Court expressed surprise that the government was still in the process of making substantial Rule 16 productions.  The Court thus ordered the government to ensure that discovery "gets done promptly."  Tr. 7:8-10. ("Court: I am a little surprised to hear we are still involved with discovery. So let's make sure that, to the extent you are aware, that that gets done promptly.").  More specifically the Court admonished the government that it must complete Rule 16 discovery imminently: "Or you [the government] are going to run into your own problems and this has got to be done. It has got to be done.  I appreciate you being thorough and I appreciate the fact that things come up, but by and large, by mid-January, please."  Ex. A, 12/6/2021 Tr. 11:11-14.

Following the December 6, 2021 conference, the Court entered the following minute order memorializing its instruction regarding the mid-January 2022 discovery cutoff: "Government is directed to complete remaining discovery by 1/14/2022."

Shortly thereafter, the government made two substantial Rule 16 productions on December 17, 2021 and January 14, 2021.

### 3.    *The Government's April 18, 2022 Rule 16 Productions*

On April 18, 2022, more than three months after the Court's discovery cutoff, more than three and a half years since the initial Indictment, and with just over a week until the adjourned pretrial motions deadline, the government notified defense counsel that it was making two further Rule 16 discovery productions.  Both productions are substantial.

The first April 18 production includes over 750 pages of photographs and NYPD reports, as well as production of 10 devices.  *See* Ex. B.  This production appears to include complete forensic copies of eight of Mr. Zottola's devices to all of his co-defendants.[2]

The second April 18 production was far more extensive yet.  *See* Ex. C.[3]  This production included:  forensic extractions of 17 iCloud accounts, and 24 cellular telephones and other electronic devices.  The production also included an excel spreadsheet containing a list of the 36 devices that the government states it intends to use at trial.  *See* Ex. D.[4]  Based on a comparison of the government's list of these 36 devices to the devices previously produced to Mr. Zottola in earlier Rule 16 productions, approximately 15 of the 36 devices had not been previously produced.  In other words, nearly three years after Mr. Zottola's arrest, and over three and a half years since the initial Indictment, the government is producing  at least 15 devices for use at trial ***for the first time***.

Indeed, according to the government's disclosure, of the 36 devices that it apparently intends to use at trial: (i) the government ***has yet to produce 12 of the 36 devices***; (ii) there are two

---

[2] The government's first April 18, 2022 Rule 16 discovery cover letter is attached as Exhibit B.  In addition to the photographs, NYPD reports and devices, this production also includes 127 recorded Bureau of Prison calls involving Vincent Basciano, apparently produced in response to Mr. Zottola's discovery demand submitted to the government on January 14, 2022.  Additionally, the eight Zottola devices included in this production were seized from Mr. Zottola's residence and were previously produced only to Mr. Zottola, but were not previously produced to the remaining defendants.

[3] The government's second April 18, 2022 Rule 16 discovery cover letter regarding production of additional devices and iCloud extractions is attached as Exhibit C.

[4] Attached as Exhibit D is a copy of the government's April 18, 2022 excel spreadsheet in which the government identifies for each device seized whether: (1) the government anticipates using the device at trial; (2) it has been produced; (3) it has been imaged by the FBI "CART" team; and (4) the device was submitted to the FBI "CART" team for forensic imaging as of the April 18 disclosure.  The rows identifying the devices that the government has stated it intends to use are highlighted in yellow.

devices that the government has yet to even submit to the FBI "CART" team to image; and (iii) three devices that have yet to be imaged by the FBI "CART" team.

Exacerbating the untimely disclosure problems, both of the April 18 productions were made available through the government's third-party discovery vendor DupeCoop, which took until Tuesday April 26, 2022—more than another week—to provide defense counsel with these productions. Because the productions are extremely large, including at least 24 electronic, to date we have been unable to review the overwhelming majority of the material the government identified in its April 18, 2022 Rule 16 Letters.

The portions of the device productions that we have been able to review only raise more troubling questions about the government's conduct of discovery and compliance with the Fourth Amendment. In the last three years of this case, the government had previously seized from Mr. Zottola complete images of more than a dozen electronic devices, and 109 devices total from all defendants—the vast majority of which the government seized and produced to all defendants in their totality. The second April 18, 2022 devices production, appears to include ***for the first time***, the subset of materials that the government deems responsive to the warrants authorizing the devices' searches (referred to as the "warrant returns"). These "warrant returns" are dated in April 2022, indicating that while the government seized and searched the entirety of Mr. Zottola's electronic devices over the last nearly three years, it now recognizes that only a small subset of those devices may be seized under the Fourth Amendment in accordance with the warrants. Very belatedly, the government is apparently attempting to cover its unconstitutional tracks.

**B.     The Government's April 18, 2022 Productions, and Any Subsequent Productions are too Late for the Defendants to Adequately Utilize them at Trial, Requiring their Preclusion**

On April 18, 2022, just a little more than a week before the deadline for filing of these pretrial motions, the government sent to defense counsel a large batch of electronic and other

discovery materials, including the contents of at least 15 electronic devices that it produced for the very first time, over 750 pages of additional NYPD reports, and selected forensic extractions for dozens of other electronic devices.  In doing so, the government wrote: "[p]ursuant to Rule 16 of the Federal Rules of Criminal Procedure, the government hereby furnishes the below-listed supplemental discovery …"  Ex. B

Incredibly and brazenly, the government made this enormous production of new Rule 16 discovery materials, three months after the Court imposed a discovery cut-off date of January 14, 2022 for Rule 16 materials.  As the Court stated in a pretrial conference on December 6, 2021: "I mean, this case has been going on for ages and we are still doing discovery."  Ex. A, 12/6/2021 Tr. at 9-10.  At that point in time, more than 38 months had lapsed since the original indictment. After hearing from the government that a final Rule 16 production of largely NYPD reports would be produced by mid-January 2022, the Court concluded:  "Well, I want this accomplished by mid-January. . . . It has got to be done." (*Id.* at 11.)  The Court followed up this oral order with a minute entry on the docket, which read:  "Government is directed to complete remaining discovery by 1/14/22."  (ECF Order, 12/6/21.)

Trial courts retain considerable discretion to control criminal discovery. *See United States v. Gallo*, 654 F. Supp. 453, 471 (E.D.N.Y. 1987) (in complex, multiple defendant RICO case, trial court imposed multiple deadlines on the government regarding Rule 16 discovery, including ordering things not expressly identified in the Rule).  Rule 16 specifically grants the trial court with this authority.  *See* Fed. R. Crim. P. 16(d)(1) ("At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.")  This discretion is also granted by Rule 57.  Fed. R. Crim. P. 57(b) ("A judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district.").

The government flaunts the Court's discovery order in this case by producing hordes of Rule 16 material at this late stage of the proceedings.  Defense counsel did not have the opportunity to review this material prior to the filing of these motions, and should not be scrambling only a few short months before trial to review this voluminous new batch of Rule 16 discovery.  The government's disregard for the orderly discovery process established by the Court should not be permitted in this extreme case, when the government had a full 39 months from the date of the original indictment to complete its Rule 16 discovery obligations.

The only fair thing for the Court to do at this stage of the proceedings is to preclude the government from admitting this newly produced discovery in its case-in-chief.  Only this ruling would protect defendants' rights to due process and fundamental fairness.  To expect the defendants now to review literally hundreds of thousands of pages of new documents on at least 15 new electronic devices—that were not produced in the first 39 months after indictment – is to place an unfair burden on them, after the Court had ordered the government to do better and complete Rule 16 discovery by January 14, 2022.

We ask the Court to preclude the government from use of this delayed material and restore order in the discovery process in this massive case, a case in which Mr. Zottola faces a mandatory life sentence if convicted.  The stakes are much too large to risk procedural error.

## II.    THE COURT SHOULD COMPEL THE GOVERNMENT TO MAKE FULL AND COMPLETE *BRADY* DISCLOSURES

The government has produced one set of *Brady* disclosures in the last three years of litigation in this matter.  In a letter dated October 8, 2020, the government produced a high-level summary of information it apparently gathered from disparate sources during the course of its

investigation. *See* Ex. E (hereinafter the "October Letter").[5]  This disclosure is woefully inadequate under *Brady* and its progeny.

The disclosures are obviously incomplete.  They are very limited summaries of information provided by witnesses.  They do not include the actual statements of the witnesses, or statements by witnesses' counsel.  They do not include any context and do not identify the source of the information.  The government's disclosures thus deprive defense counsel of critical context for this information, limiting severely our ability to effectively use this information.  In discussions with government counsel, they have taken the position that their disclosures are sufficient under law and refused to produce the underlying source documents.  The Court should now direct the government to produce its full and complete reports on each of the pieces of information summarized in the government's October 2020 Letter.

## A.      *Brady* and Its Progeny Require Specific, Complete and Timely Disclosures

*Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny impose a due process obligation on the government to disclose material information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching."  *United States v. Rodriguez*, 496 F.3d 221, 225 (2d Cir. 2007) (internal quotation marks omitted).  Such information includes evidence that may directly, or indirectly, rebut the prosecution's case "to assist the defense in making its case." *United States v. Bagley*, 473 U.S. 667, 675 & n.6 (1985).  The government's obligation to disclose information extends to exculpatory materials, even those that also contain portions that are consistent with the government's theory.  *See United States v. Mahaffy,* 693 F.3d 113, 130-33 (2d Cir. 2012); *United States v. Rivas*, 377 F.3d 195, 199-200 (2d Cir. 2004).  To establish that

---

[5] Because this October Letter contains sensitive investigative materials, we are producing it to the Court under seal.

information is material, a defendant need not show that the evidence would necessarily result in an acquittal.  *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Moreover, the government must disclose exculpatory material sufficiently in advance of trial to "give[ ] the defendant a reasonable opportunity either to use the evidence in the trial, or *to use the information to obtain evidence for use in the trial.*"  *Rodriguez*, 496 F.3d at 226 (emphasis added); *see also DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006) ("The more a piece of evidence is valuable and rich with potential leads, the less likely it will be that late disclosure provides the defense an opportunity for use") (internal quotation marks omitted).

Similarly, and most importantly here, the form of these "disclosures must be sufficiently specific and complete to be useful."  *Rodriguez,* 496 F.3d at 226.

B.     **The Government Must Immediately Disclose All *Brady* and *Giglio* Information, Including the Complete Statements and Context of Information Summarized in Its October 2020 Letter**

The October 2020 Letter to defense counsel is inadequate to comply with the government's *Brady* obligations.  At a minimum, this disclosure should be supplemented to include the following information:

1.     The government's letter does not include actual witness statements, so we do not know the source of the information or the context in which it was provided.  The government should produce the underlying source documents that recorded the recorded the witness statements, who made the statements, when they were made and to whom.  This is very basic information that should have been produced long ago, especially since the government already admitted the information contained *Brady* material.

2.     The government must also present the statements proffered by any of the witnesses' counsel on behalf of the witness, to the extent those statements relates to the information identified as exculpatory, or could lead to exculpatory information.  Defense counsel have not been provided

8

the sources of the information listed in the October 2020 Letter. ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████   To the extent the content of these

statements falls within *Brady*, these statements must be disclosed whether the statement was made

by a witness or *by their counsel*. *See United States v. Triumph Cap. Grp., Inc.,* 544 F.3d 149, 161-

65 (2d Cir. 2008) (finding *Brady* violation where Government withheld agent's notes of attorney

proffer session); *United States v. Martoma*, No. 12 Cr. 973 (PGG), 2014 WL 31704, at *3

(S.D.N.Y. Jan. 6, 2014) ("*Brady* obligations are broad enough to include exculpatory and

impeachment information that might be found in communications from a witness's counsel to the

USAO.").  Given the length of the government's investigation in this case, it seems highly unlikely

that no such statements exist here, but none have been disclosed.

3.     To the extent the government's information has not been memorialized in specific

notes or FBI 302 reports, but includes topics identified in the government's October 2020 Letter,

or any other exculpatory material, the government must still disclose this information.  *See*

*Rodriguez*, 496 F.3d at 226 ("The obligation to disclose information covered by *Brady* and *Giglio*

rules exists without regard to whether that information has been recorded in tangible form.").

4.     To the extent that witness statements containing exculpatory information were

made to New York Police Department ("NYPD") officers, this information must be disclosed to

the defense.  Here, the investigation of the assaults and eventual homicide of Sylvester Zottola was

originally conducted by the NYPD, and later the FBI joined those efforts, but continued to work

in tandem with them.  A prosecutor's duty to review files for *Brady* material extends to reviewing

information in the possession, custody, or control of another agency where the government

conducts a "joint investigation" with that agency.  *United States v. Gupta,* 848 F. Supp. 2d 491, 495 (S.D.N.Y. 2012) (ordering the government to review SEC files for *Brady* materials); *see also United States v. Martoma*, 990 F. Supp. 2d 458, 462 (S.D.N.Y. 2014) (same).

Here, the government already has produced substantial records from NYPD files, identifying investigative steps taken in response to the various assaults or assault attempts that were reported by Sylvester Zottola.  The government should be compelled to identify what steps it took to ensure that relevant NYPD officers were questioned for *Brady* information, and also identify what other steps it took to ensure that a proper review for *Brady* materials was conducted of the NYPD's files and investigating officers.  The government is required to produce this material to the defense.



---

[6] Defense counsel's January 14, 2022 discovery and *Brady* demand letter, which refers to sensitive discovery materials protected under the Court's Protective Order is produced to the Court under seal.

███████████████████████████████████████

██████████████

This information is materially relevant to the defense, and is likely to lead to exculpatory information, because it adds to the *Brady* information already produced regarding motives by organized crime to assault and kill Sylvester Zottola. ████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████    ████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████

    ██████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████

This information should be produced by the government, to the extent it exists.

III.   **THE COURT SHOULD COMPEL THE GOVERNMENT TO PRODUCE IMMEDIATELY ALL STATEMENTS IN ITS POSSESSION, OR CONSTRUCTIVE POSSESSION, MADE BY THE DECEDENT DURING THE TIME PERIOD OF THE ATTACKS; THIS MATERIAL IS DISCOVERABLE UNDER RULE 16 AND *BRADY***

The government has informed defense counsel that it possesses statements made by the decedent (Sylvester Zottola) during its investigation and intends to introduce such statements in its case-in-chief.   Of course, since the Supreme Court's ruling in *Giles v. California*, the government has a high hurdle to avoid the constitutional problems associated with any effort to introduce those statements at trial.   *See Giles v. California,* 128 S.Ct. 2678 (2008) (vacating murder conviction because decedent's statements were admitted in violation of Sixth Amendment's Confrontation Clause because "forfeiture by wrongdoing" was not constitutional exception).

The government has also declined to produce all of the decedent's statements to defendants, claiming that they purport to be Section 3500 material of the witness who recorded them.   The government's position borders on the absurd.   The statements are not those of the recording witness—they are the decedent's, who clearly is not testifying.   *See* 18 U.S.C. § 3500 (limiting production of witness statements in federal criminal prosecution "***made by*** a Government witness . . . until said witness has testified on direct examination in the trial of the case") (emphasis added).

The decedent's statements, however, qualify as Rule 16 material and potentially *Brady.* The government has indicated that Sylvester Zottola gave multiple interviews to law enforcement officers (and even to federal prosecutors) during the time period in which the Indictment alleges violent attacks against him and his son, Salvatore.   These statements have been recorded in FBI 302 reports, NYPD DD-5 reports, and in some instances, in video or audio recordings.   The government has taken an *ad hoc* approach to producing these recorded statements.   In some instances, it has produced the statements as Rule 16 discovery (*see e.g.,* bodycam video of

interview of Sylvester Zottola by NYPD officers after June 2018 shooting), but in other instances it has refused production.  For example, the government has informed the defense that Sylvester Zottola attended at least one interview session at the United States Attorney's Office in July or August 2018, to answer questions about the violent attacks against him and his son, and to provide investigative leads to law enforcement.  The government has refused to produce its record of this interview.  It apparently has offered unattributed snippets of information from these statements in its earlier *Brady* letter, *see* Ex. E at 4-5, but refused to produce the full reports.

These statements are immediately discoverable by the defense on several grounds.  First, they are discoverable as "documents and objects" under Fed. R. Crim. P. 16(a)(1)(E)(i), that are "material to preparing the defense."[7] ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████ Also, the information gleaned from the snippets produced by the government, *see* Ex. E at 4-5, which apparently came from some of its interviews with the decedent, ████████████████████████████████████████████████████ ████████████████████████████████ In this way, they are also *Brady* material.

---

[7] Also, if the government actually seeks to introduce the decedent's statements at trial, despite the high hurdle established in *Giles, supra,* it must produce these statements under Fed. R. Crim. P. 16(a)(1)(E)(ii) (requiring the government to produce, upon defendant's request, documents or objects "the government intends to use . . . in its case-in-chief at trial").  As stated above, the decedent's statements are recorded, in multiple forms, including in FBI 302 reports, and these statements are **not** those of the FBI agent who recorded them.  To the extent the government intends to introduce the decedent's statements at trial, it needs to produce them now.  Moreover, there will likely be evidentiary disputes surrounding the admissibility of these statements that should be resolved *in limine*, because they involve thorny constitutional issues that should be carefully litigated.

While the government has produced the October 2020 Letter, providing unattributed high-level summaries of information it gleaned from its investigation, as stated in the section *supra,* this limited production does not satisfy *Brady*. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ This information is unquestionably *Brady* under the law: it is exculpatory evidence, or may lead to exculpatory evidence, or tends to negate the guilt of Anthony Zottola. *See Rodriguez*, 496 F.3d at 225. The government cannot pick and choose what it produces, if the information can be deemed material and potentially exculpatory. And it certainly cannot turn on the assessment of the government's view of the reliability of the information. *See DiSimone*, 461 F.3d at 195 ("[I]f there were questions about the reliability of the exculpatory information, it was the prerogative of the defendant and his counsel – and not that of the prosecution – to exercise judgment in determining whether the defendant should make use of it. . . . To allow otherwise would be to appoint the fox as henhouse guard."); *see also Kyles*, 514 U.S. at 440 (doubtful questions on extent and scope of material to be produced must be resolved in the defendant's favor "to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations").

In sum, all relevant statements by the decedent regarding the attacks on him should be produced forthwith. The Court should compel this production.

IV.    **THE COURT SHOULD ORDER THE GOVERNMENT TO FILE A BILL OF PARTICULARS TO PROVIDE MR. ZOTTOLA WITH ADEQUATE NOTICE OF THE CHARGES AGAINST HIM**

A.    **The Charges**

The Indictment charges Mr. Zottola with four counts, three of which span a timeframe of nearly a year, encompass multiple aims, and apparently include numerous discrete events.

Count One Charges Mr. Zottola Murder-for-Hire Conspiracy in violation of 18 U.S.C. § 1958(a) spanning from November 1, 2017 through October 11, 2018 for allegedly "knowingly and intentionally conspire[ing] to use and to cause another to use one or more facilities of interstate commerce . . . with intent that one or more murders be committed . . . to wit: the murders of Sylvester Zottola and John Doe #1 . . . as a consideration for a promise and agreement to pay, something of pecuniary value, and the death of Sylvester Zottola and the personal injury of John Doe #1 did result."  Indict. ¶ 1.

Count Two charges a substantive Murder-for-Hire offense in violation of 18 U.S.C. § 1958(a) similarly spanning from November 1, 2017 through October 11, 2018 for allegedly causing both "the death of Sylvester Zottola and the personal injury of John Doe #1."  *Id.* ¶ 2.

Count Three charges Unlawful Use and Possession of Firearms in Violation of 18 U.S.C. § 924(c), in connection with the murder-for-hire charged in Count Two.  Count Three likewise spans from November 1, 2017 through October 11, 2018.  *Id.* ¶ 3.

Count Four charges Causing Death Through Use of a Firearm in violation of 18 U.S.C. § 924(j) in connection with the October 4, 2018 death of Sylvester Zottola.

While Count Four is plainly limited to the events surrounding the October 4, 2018 death of Sylvester Zottola, Counts One through Three relate to a timeframe spanning nearly a year— based on the discovery produced by the government pursuant to Rule 16, there are at least eight

16

discrete incidents that occurred during that timeframe in addition to the July 11, 2018 shooting of John Doe #1 and the October 4, 2018 death of Sylvester Zottola.

### B.    The Particulars Requested and the Government's Response

On April 6, 2022, defense counsel requested that the government provide particulars regarding the time, place and occurrence of each incident encompassed in Count One (murder for hire conspiracy), Count Two (murder for hire), and Count Three (causing death through use of a firearm) of the Indictment.

On April 19, 2022, the government declined to provide any further particulars.  The government relied on the "indictment's tracking of the plain language of the statute," *see* Ex. G, Haramati Decl. ¶ 7, as a basis to deny the request.  Almost by definition, the general language of the statute followed by the Indictment provides few details.  Each charge spans no more than a paragraph.  Worse yet, however, the Indictment's almost yearlong timeframe, and its mention of only two specific incidents only obfuscates the particulars of the charges.  Indeed, the two incidents explicitly raised the Indictment occurred on July 11, 2018, approximately eight months after the charges begin, and on October 11, 2012 nearly a year into the Indictment's timeframe.

The government similarly pointed to the "volume of discovery, often organized by incident," produced pursuant to Rule 16 as a basis to deny the particulars request.  But that too provides little clarity on the specific incidents included in Counts One, Two, and Three.  The discovery includes materials for at least nine separate incidents in total.  The first, which was a September 8, 2018 scuffle in which Sylvester Zottola was allegedly punched, occurred  nearly two months before the Indictment's November 1, 2018 start date.  The remaining seven incidents included in the government's discovery productions, include such dissimilar allegations as: (1) the October 4, 2018 death of Sylvester Zottola; (2) the July 11, 2018 nonfatal shooting of John Doe #1; (3) a November 26, 2017 vehicular incident on the side of a Bronx highway in which a van

17

pulled in front of Sylvester Zottola's car and an individual allegedly pointed a gun before Sylvester Zottola drove away without violence or injury; (4) a December 27, 2017 home invasion in which Sylvester Zottola was stabbed in the throat; (5) an April 15, 2018 office burglary in which no one was harmed or threatened; (6) an April 16, 2018 incident in which a gun was brandished at Sylvester Zottola; (7) a May 1, 2018 office burglary; and (8) a June 12, 2018 incident in which a gun was allegedly brandished at Sylvester Zottola, which ended with Sylvester Zottola firing a gun.

In addition to discovery addressing these eight incidents, the government has made at least 12 discovery productions, including vast swaths of materials: approximately 80 electronic devices, 17 iCloud accounts, telephone records for approximately two dozen separate numbers, bank records for several dozen accounts, forensic evidence, among other materials. The sheer volume of these materials alone renders all but futile any effort to determine which specific incidents are included in the Indictment's charges. It remains unclear which specific incidents were presented to the grand jury as part of the murder-for-hire and firearms charges in Counts One, Two and Three.

### C. Mr. Zottola Cannot Fully Understand the Charges Against Him Absent a Bill of Particulars

Rule 7(f) of the Federal Rules of Criminal Procedure provides that the accused has the right to seek "a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial [and] to prevent surprise." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). "The purpose of a bill of particulars is to supplement the allegations in the indictment when necessary to (1) enable the defendant to prepare his defense, (2) avoid unfair surprise to the defendant at trial, and (3) preclude a second prosecution of the same offense." *United States v. Mandell*, 710 F. Supp. 2d 368, 384

(S.D.N.Y. 2010).  A bill of particulars is necessary "where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999).

This is a textbook case for requiring a bill of particulars.  Without one, Mr. Zottola has no certainty as to which specific incidents involving the alleged victims the government presented to the grand jury, or which incidents the grand jury charged him with.  While the July 11, 2018 nonfatal shooting of John Doe #1 and the October 4, 2018 death of Sylvester Zottola are plainly identified in the Indictment, the materials Mr. Zottola has received to date strongly suggest that other incidents may be included in the Indictment's charges—but which other incidents remains unclear.  Because of the breadth of the discovery productions, and the Indictment's yearlong timeframe, beginning approximately eight months before the July 11, 2017 shooting of John Doe #1 specifically identified in the Indictment, it is virtually impossible to identify the universe of incidents charged in the Indictment.  He is uncertain whether the eight incidents obviously featured in the Rule 16 discovery are the sole incidents included in the charges, or if there are others that the government has not specifically identified to date.

In other words, based on the Indictment and discovery, Mr. Zottola has no clarity whether the government presented to the grand jury just the two incidents (the July 11 nonfatal shooting and the October 4 death) specifically mentioned in the Indictment, or whether there were many more? And if there were more incidents presented to the grand jury, which?[8]  A bill of particulars is thus required.  *See United States v. Gammarano*, No. 06-CR-0072 (CPS), 2007 WL 2077735,

---

[8] A bill of particulars identifying the time, place and occurrence of the specific incidents encompassed in the Indictment is also necessary to ensure compliance with Federal Rule of Criminal Procedure 404(b).   To the extent any of the alleged incidents included in the government's Rule 16 productions are not included in the Indictment's charges, they may be properly excluded as propensity evidence under Rule 404.

at *10 (E.D.N.Y. July 18, 2007) (a bill of particulars required where "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.") (quotation marks and citations omitted); *see also United States v. Orsini*, 406 F Supp 1264, 1266 (E.D.N.Y. 1976) (ordering bill of particulars: "the Government is directed to set forth the specific dates, locations, and names and addresses of all participants with reference to Overt Act 10, including, if known, the exact date, time, and location of Overt Act 10."); *accord United States v. Stringer*, 730 F.3d 120, 126 (2d Cir. 2013) (disclosure more fulsome than simply "restat[ing] the language of the statute" necessary where required for "fair notice to defendants and to ensure that any conviction would arise out of the theory of guilt presented to the grand jury") (quotation marks and citations omitted).

Understanding the details of the time, place and occurrence of each alleged incident encompassed in Counts One, Two and Three is likewise necessary for any alibi defenses, or other incident-specific defenses that Mr. Zottola and the other defendants may have.   Without information as to when the alleged incidents acts took place, Mr. Zottola cannot adequately prepare for trial.  *See, e.g., United States v. Siddiqi*, No. 06-CR-377 (SWK), 2007 WL 549420, at *3 (S.D.N.Y. Feb. 21, 2007) (ordering bill of particulars explaining "[i]n the absence of more specific information concerning the approximate dates and amounts of individual bribery payments, Siddiqi will be unreasonably hampered in his ability to prepare a defense. For example, Siddiqi will be unable to offer an alibi if he does not know the dates on which he is alleged to have received bribes.").

The risk of ambush at trial is amplified further if the government can change its mind at the last moment as to which and how many alleged incidents with respect to Sylvester Zottola and John Doe #1 are implicated in the Indictment's charges.   With only allegations of a broad

timeframe from November 1, 2017 through October 11, 2018 and identification of two specific incidents—although discovery was produced with respect to many others—nothing prevents the government from expanding its case to include as of yet unidentified incidents on the eve of trial. *See, e.g., United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (vacating conviction based on denial of a particulars request where the indictment put the defendant "on notice" of one transaction when another was raised at trial); *United States v. Trie*, 21 F. Supp. 2d 7, 21 (D.D.C. 1998) ("A defendant . . . should not have to waste precious pre-trial preparation time guessing" what specific actions "he has to defend against . . . when the government knows precisely the statements on which it intends to rely and can easily provide the information."). The Court should order the government to file a bill of particulars to foreclose such gamesmanship.

## V.   THE GOVERNMENT'S FLAGRANT DISREGARD OF THE FOURTH AMENDMENT IN SEARCHING MR. ZOTTOLA'S MATERIALS WARRANTS SUPPRESSION

On June 17, 2019 and July 2, 2019, the government obtained warrants to search Mr. Zottola's private materials, and seize those portions responsive to the warrants. Specifically, the government obtained warrants for Mr. Zottola's: (1) electronic devices; (2) home; and (3) cell site location data. Once it took custody of Mr. Zottola's materials, however, the government proceeded to ignore the warrants both regarding the scope and timing of its searches.

In each and every instance, the government simply seized and conducted continuous searches of *everything*: *all of* contents of Mr. Zottola's devices, *everything* in his home office, and *all aspects* of the cell site data provided by the cellular telephone carrier. While the warrants specified those aspects of the devices, personal papers and effects, and cell site data that the government was permitted to seize, the government paid these strictures no mind. Truly the government did not bother executing the warrants at all. For the last nearly three years, the government opted instead to take and continuously search everything of Mr. Zottola's that it could

get its hands on—whether or not responsive to the warrants. Indeed, the government produced the full contents of Mr. Zottola's devices to co-defendants just in the last week, strongly indicating that the government has utilized the full contents of Mr. Zottola's devices throughout its years-long investigation.

The fact of Mr. Zottola's Indictment, even for such serious crimes as alleged here, does not entitle the government to simply run roughshod over his Constitutional rights. The government's wholesale and systematic disregard of the Fourth Amendment's constraints is precisely what the exclusionary rule was designed to deter. *See United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) ("The chief evil that prompted the framing and adoption of the Fourth Amendment was the indiscriminate searches and seizures") (quotation marks and citations omitted). Courts in this circuit have repeatedly found that when Fourth Amendment violations are persistent and flagrant, as they are here, only wholesale suppression of the materials seized can provide an adequate remedy. *See United States v. Wey*, 256 F. Supp. 3d 355, 406 (S.D.N.Y. 2017).

Nor can the government cure its flagrant Fourth Amendment violations now, close to three years after its initial searches. To the extent the government's April 18, 2022 productions include—for the first time—the warrant returns for Mr. Zottola's devices, it is too late. The June 2019 warrants are now stale; the Fourth Amendment precludes egregiously tardy execution of warrants. *See, e.g., United States v. Metter*, 860 F. Supp. 2d 205, 212 (E.D.N.Y. 2012) (ordering suppression based on the government's execution of the warrant more than a year after the devices were seized). The government's delay in producing the warrant returns only confirms that, for three years it conducted a quintessential general search in flagrant violation of the Fourth Amendment. Suppression is required. *See, e.g., United States v. Voustianiouk*, 685 F.3d 206, 212 (2d Cir. 2012).

In addition, each of the warrants for Mr. Zottola's materials also ran afoul of the Fourth Amendment's particularity and probable cause requirements. They purport to authorize sweeping seizure of a seeming majority of Mr. Zottola's personal communications on his devices, family records, and everything stored in his home office without clear reference to the crimes under investigation. The warrants lack particularity for similar reason. They collectively list more than 30 seizure categories, many of which appear to include virtually all of Mr. Zottola's communications, digital materials, vehicular information and years of business materials, without any guidance as to the types of materials that may be responsive, the relevant individuals, or specific timeframes—other than references to broad murder-for-hire and weapons statutes that on their face provide no particularity guidance at all. Such freewheeling warrants cannot survive Fourth Amendment scrutiny.

### A.     The Government Conducted General Searches of Mr. Zottola's Devices and Home, Requiring Suppression

#### 1.     *The Government Seized and Continued to Search All Data Stored on Mr. Zottola's Devices and Virtually Everything Stored in his Home Office*

On June 17, 2019, the government applied for and obtained a search warrant for Mr. Zottola's Larchmont, New York home and any devices seized therefrom. On June 18, 2019, the government applied for and obtained a further warrant to search two additional devices seized from Mr. Zottola incident to his arrest, which relied on the June 17, 2019 warrant application for a probable cause showing (collectively, the "Home and Devices Warrants").[9] The warrants listed

---

[9] The June 17, 2019 home and devices warrant application, including the affidavit and application for the warrant, produced as BLANCO ET AL 017029 – 92, is attached as Exhibit H; the June 17, 2019 devices warrant issued pursuant thereto, produced as BLANCO ET AL 017100 – 06, is attached as Exhibit I; The June 18, 2019 devices warrant application, including the affidavit and application for the warrant, produced as BLANCO ET AL 017134 – 218, is attached as Exhibit J; the July 2, 2019 devices warrant issued pursuant thereto, produced as BLANCO ET AL 017219 – 22, is attached as Exhibit K.

approximately 30 discrete categories of materials that the agents were authorized to seize, to the extent they related to the murder-for-hire and weapons statutes cited in the warrants.  *See* Ex. I, Attach. B-1; Ex. K, Attach. B.

In executing the warrants on Mr. Zottola's electronic devices, the agents apparently indiscriminately seized and continued to search everything—without regard to whether they were in fact responsive to the warrant.  Specifically, on June 17, 2019, the agents seized 14 electronic devices from Mr. Zottola's home, and two further devices incident to his arrest.  In total, the government seized seven cellular telephones, three iPads, one iPod, and three computers.  The government has provided complete forensic images of all but one of these devices.  All of the devices searched contain significant personal information unrelated to the allegations in the warrants, including substantial material related to Mr. Zottola's minor children.  Indeed, several of the devices appear to have been used by Mr. Zottola's minor children, and not by Mr. Zottola himself, and their communications and materials are included as well.  *See* Ex. L (examples of irrelevant communications and materials seized from Mr. Zottola's devices).[10]

Although Mr. Zottola has a recognized privacy interest in his devices, protected by the Fourth Amendment, the government seized the devices in their entirety.  The government's recent production of the complete devices to Mr. Zottola's co-defendants is a clear indication that the government seized the entire content of these devices in its investigation.  *See* Ex. B at 2 (detailing that the government was producing the "Extraction reports for cellular telephones and electronic devices recovered from the defendant Anthony Zottola, Sr. and his residence, which were

---

[10] Because we cannot provide the Court with a comprehensive review of all the irrelevant materials that the government seized from Mr. Zottola's devices, attached in Exhibit L are just a few representative examples of the many personal and irrelevant communications, photos, and materials seized.

previously produced to defendant Zottola at ZOTTOLA 000032, and searched pursuant to a search warrant (identified as 1B116, 1B117, 1B120, 1B121, 1B123, 1B125, 1 B148 and 1B150).").

Apparently recognizing the blatant unconstitutionality of their three years of searching, the government has only now produced specific "warrant returns" for 24 of the 109 devices that it seized during the course of this case—including seven seized from Mr. Zottola. Specifically, the government's April 18, 2022 discovery disclosure, which we received just earlier this week on April 26, appears to include "warrant returns" for 24 devices, including seven belonging to Mr. Zottola. Apparently searches of 12 additional devices (as far as we can tell, none belonging to Mr. Zottola) are still in progress by the government. According to the forensic reports provided by the government for each device, the searches that generated these warrant returns were conducted just this month, in April 2022—close to three years after Mr. Zottola's arrest, and more than three and a half years after the initial Indictment in this case. In other words, after continuously rummaging through the entirety of Mr. Zottola's devices unfettered by the Warrants' strictures for the last three years, the government is only now attempting to give any attention to the Warrants' limits on Mr. Zottola's devices—*for the first time* in April 2022. *See* Ex. D (government spreadsheet indicating that the government intended to use at trial Mr. Zottola's devices identified as 1B116, 1B117, 1B120, 1B121, 1B123, 1B125, 1 B148 and 1B150); Ex. C (the government's April 18, 2022 Rule 16 devices production cover letter).

The government adopted the same unconstitutional pattern in its searches of Mr. Zottola's Larchmont home and home office: the agents grabbed, searched and continue to utilize every record available in Mr. Zottola's home office—untethered from the limited seizures authorized by the Warrants. For example, agents seized numerous personal documents, ███████████

████████████████████████████████████████████████



*See* Ex. M.[11]

The agents also seized and continue to maintain as products of their searches *all* records related to the real estate businesses run by Mr. Zottola and his family spanning thousands of pages, including rent ledgers from 2006 and receipts dating back to 2004. The sweeping personal and irrelevant documents seized during the search of Mr. Zottola's home were not merely incidental—they reflect a systematic general seizure of all the documents stored in Mr. Zottola's home office.

      2.     ***The Government's Continuous General Search of Mr. Zottola's Devices Requires Wholesale Suppression***

      i.     <u>***The Government Conducted Improper General Searches***</u>

The Constitution requires compliance with the Fourth Amendment both in a warrant's terms, and its execution. When a search exceeds the bounds of a warrant, "such a warrantless search, absent some exception, violates the Fourth Amendment not because the description in the warrant was insufficient or inaccurate, but rather because the agents executing the search exceeded the authority that they had been granted by the magistrate judge." *Voustianiouk*, 685 F.3d at 212. The Fourth Amendment's requirements also extend to the timing of the searches and seizures

---

[11] Exhibit M contains examples of irrelevant and personal materials seized from Mr. Zottola's. These represent but a small fraction of the trove of similar materials that the government seized in its roving search.

executed pursuant to a warrant: once the government has conducted its initial search pursuant to a warrant, it is prohibited from returning to conduct further searches under the same warrant. *See, e.g., United States v. Wey*, 256 F. Supp. 3d 355, 406 (S.D.N.Y. 2017).

The government undertook precisely the improper general searches of Mr. Zottola's devices that the Fourth Amendment was designed to prohibit. Shortly after Mr. Zottola's arrest, we received complete forensic images of more than a dozen devices seized on June 17, 2019 pursuant to the Home and Devices Warrants. The government's conduct to date, including its recent production of the devices in their entirety to Mr. Zottola's co-defendants suggests strongly that the government has seized the contents of the devices in their entirety. Co-defendants should not possess Mr. Zottola's private items for which the government had no authority under the Warrants to seize. This distribution of the entire contents of these devices to the other parties in the case, provides the greatest example of the government's broad breach of the Warrants' limitations. The government took everything and continues to do so.

Such prodigious general searches are in a flagrant disregard of the Home and Devices Warrants' limitations and probable cause showing, and thus the Fourth Amendment. Wholesale suppression of the devices is the only means of vindicating Mr. Zottola's Fourth Amendment rights. *See Wey*, 256 F. Supp. 3d at 406 (granting blanket suppression of all materials seized where agents continued to search the entirety of the defendants' materials, explaining that the agents were "making affirmative choices to treat the Warrants as though they were the functional equivalent of general warrants. Such conduct can and should be deterred."); *see also United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 308-09 (S.D.N.Y. 2018) ("Executing agents are considered to have 'flagrantly disregarded' the warrant's terms where . . . they effect a widespread seizure of items

that were not within the scope of the warrant'") (quoting *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000)).

Indeed, the Home and Devices Warrants' specific authorization to search and seize more limited aspects of Mr. Zottola's devices contrasts sharply with the government's general search and seizure of the devices in toto. The Home and Devices Warrants specifically outline probable cause related to the charged murder-for-hire scheme and attendant weapons crimes, and provided somewhat circumscribed seizure lists. Instead, however, since it obtained the June 2019 Devices Warrants, the government has taken free reign over Mr. Zottola's devices and conducted general searches with impunity. This is a quintessential general search requiring blanket suppression. *See United States v. Dzialak*, 441 F.2d 212, 217 (2d Cir. 1971) (vacating convictions and suppressing seized evidence as "[i]n executing what was a very precise warrant, the police spent more than four hours ransacking appellant's house for any possible incriminating evidence. On the items seized, those which were not described in the warrant far outnumbered those described."); *United States v. Debbi*, 244 F. Supp. 2d 235, 237-38 (S.D.N.Y. 2003) ("seizure was indiscriminate and substantially in excess of what the warrant provided" where warrant authorized seizure of "evidence of either obstruction of justice or the commission of health care fraud," but agents seized "seven boxes of materials . . . includ[ing] many items that plainly fell outside these parameters, such as personal and religious files, general correspondence, family financial records, private patient records").[12]

---

[12] The government's careless execution of the Home and Devices Warrants is anathema to courts' admonitions that the government must take particular care in searching digital devices because of the heightened privacy risks involved. *See, e.g., United States v. Cioffi*, 668 F. Supp. 2d 385, 391 (E.D.N.Y. 2009) ("The risk of exposing intimate (and innocent) correspondence to prying eyes," which the Fourth Amendment's warrant requirement was designed to combat "is magnified because "computers often contain significant intermingling of relevant documents with documents that the government has no probable cause to seize.") (quotations and citations omitted).

ii.     ***The Government Cannot Cure its Fourth Amendment Violations Three Years After its Unconstitutional Searches Began***

The government's belated efforts to comply with the Warrants by conducting narrower searches of Mr. Zottola's devices just this month in April 2022, and producing the "warrant returns" this week cannot cure the last three years of Fourth Amendment violations.  The Warrants themselves have been stale for years: by their express terms, the June 17, 2019 warrant required execution by July 1, 2019, and the June 18, 2019 warrant required execution by July 2, 2019.  Ex. I at 1; Ex. K at 1; *see also United States v. Mitchell*, 565 F.3d 1347, 1350-51 (11th Cir. 2009) (holding that a 21-day delay between seizing a hard drive and obtaining a warrant to search it was unreasonable under the Fourth Amendment).

A nearly three-year delay in executing an actual responsiveness review in accordance with the Warrants itself "constitutes an unreasonable seizure under the Fourth Amendment."  *United States v. Metter*, 860 F. Supp. 2d 205, 212 (E.D.N.Y. 2012) (ordering suppression based on "the government's more than fifteen-month delay in reviewing the seized electronic evidence"); *accord United States v. Lustyik*, 57 F. Supp. 3d 213, 230 (S.D.N.Y. 2014) ("Like all activities governed by the Fourth Amendment, the execution of a search warrant must be reasonable"; "Law enforcement officers therefore must execute a search warrant," including review of electronic communications, "within a reasonable time"); *see also United States v. Alston*, No. 15–CR–435, 2016 WL 2609521, at *3 (S.D.N.Y. Apr. 29, 2016) ("While Rule 41 prescribes no particular time period for data extraction in these circumstances, the time needed to complete off-site copying or review is subject to the rule of reasonableness.").  As in *Metter*, the government's conduct here requires suppression, or at a minimum, a suppression hearing to evaluate the constitutionality of the government's searches.

29

### iii.     *The Government's Continuous Searches Are an Independent Fourth Amendment Violation*

The government's April 18, 2022 production of materials from Mr. Zottola's devices—including the production of the complete contents of the devices to co-defendants—further indicate that the government seized the entire contents of the devices, which it felt entitled to search throughout the last three years.  Such continuous searches present yet another severe Fourth Amendment violation.  *United States v. Wey*, which suppressed the entire set of materials seized pursuant to the warrants, derided subsequent and continuous searches as "plainly problematic" under the Fourth Amendment.  *Wey*, 256 F. Supp. 3d at 406 (addressing subsequent searches of "documents judged irrelevant and left behind" during the warrant's initial execution).   In explaining the Fourth Amendment violation inherent in the government's resumption of its searches on digital media, including portions deemed unresponsive during the warrant's execution, the *Wey* court analogized to a physical search:

> [T]he proper analogy to help appreciate the nature of the agents' conduct here is not the Government seizing, for example, a hard-copy notebook deemed responsive to a warrant, retaining it, and later returning to that notebook for follow-up searches as its investigation developed. Instead, [the agent's] searches are akin to the Government seizing some hard-copy notebooks while leaving others it deemed unresponsive behind, and then returning to the premises two years later to seize the left-behind notebooks based on investigative developments but without seeking a new warrant.

*Id.* at 406-07.  Such continuing searches—precisely what the government has undertaken here—whether on physical or digital materials, are "presumptively impermissible . . . in the absence of a fresh warrant." *Id.* at 406; *see also generally Minnesota v. Dickerson*, 508 U.S. 366, 378-79 (1993) (suppressing drug evidence found during a subsequent search when the officer initially conducted a *Terry* stop for weapons as "the officer determined that the item was contraband only after conducting a further search, one not authorized by *Terry* or by any other exception to the warrant

requirement. Because this further search . . . was constitutionally invalid, the seizure of the cocaine that followed is likewise unconstitutional.").

Likewise, in *United States v. Nejad*, 436 F. Supp. 3d 707 (S.D.N.Y. 2020), after initially searching devices pursuant to a warrant, the government repeatedly undertook further "searches of the entire set of data," seizing several thousand additional pages of materials. *Id.* at 376. *Nejad* held that these subsequent, continuous searches on the full devices violated the Fourth Amendment. *Id.*; *see also* Adv. Comm. Notes to F. R. Crim. P. 41(e)(2) (2009) (in executing warrants on "Computers and other electronic storage media . . . officers may seize or copy the entire storage medium and review it later to determine what electronically stored information *falls within the scope of the warrant*"; anything not deemed responsive during that review is not properly seized pursuant to the warrant) (emphasis added). Per *Wey* and *Nejad*, the government's searches just this month, nearly three years after the 2019 warrants were executed, are exactly what the Fourth Amendment prohibits.[13]

## B.     The Home and Devices Warrants Lack Particularity and are Overbroad

### 1.     *The Warrants' Probable Cause Showing*

As they relate to Mr. Zottola,[14] the affidavits by FBI Special Agent Zoufal to search Mr. Zottola's home and electronic devices detail communications between Mr. Zottola and Shelton as

---

[13] Given the clear case law precluding continuing searches of devices following a warrant's execution, the government should not be able to avoid suppression by invoking the good faith exception. *See, e.g., Groh v. Ramirez*, 540 U.S. 551, 563 (2004) (because the "particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid"); *United States v. Buck*, 813 F.2d 588, 593 n.2 (2d Cir. 1987) (our decision today means that, with respect to searches conducted hereafter, police officers may no longer invoke the reasonable-reliance exception to the exclusionary rule when they attempt to introduce as evidence the fruits of searches undertaken on the basis of warrants containing only a catch-all description of the property to be seized").

[14] The June 17, 2019 warrant application simultaneously sought authority to search the homes and devices of Mr. Zottola, Snipe and Lopez. *See* Ex. H ¶ 2.

the basis for probable cause for the searches.  Specifically, they outline the evidence of Shelton's

role in the attacks on Sylvester and Salvatore Zottola, and subsequently describe communications

between Mr. Zottola and Shelton surrounding the attacks.  *See* Ex. H ¶¶ 30-39.

The Home and Devices Affidavits also asserted that based on information from a

confidential source ("CS-1") that



Ex. H ¶ 26.

In the Home and Devices Affidavits, Agent Zoufal further asserted

*Id.* ¶ 81.

SA Zoufal alleged an additional business connection between Mr. Zottola and Shelton:

*Id.* ¶ 78.

The Home and Devices Affidavits thus asserted a probable cause showing to search Mr.

Zottola's Larchmont, New York home,[15] and the electronic devices found therein primarily

through connections with the Zottola family real estate business.  Specifically, SA Zoufal asserted

---

[15] The June 17, 2019 warrant application refers to Mr. Zottola's Larchmont, New York home as
"Target Premises 1."

that "TARGET PREMISES 1 has been identified as ZOTTOLA's primary residence and work place," and that:



*Id.* ¶¶ 76-77.

### 2.    *Scope of Permitted Seizures*

Based on the Home and Devices Affidavits, the government sought and obtained a search warrant to search Mr. Zottola's home and electronic devices ("Home and Devices Warrant"). These warrants authorized seizure of approximately 30 different categories of materials to the extent they are "evidence, fruits, and instrumentalities of violations" of the murder for hire and firearms statutes enumerated in the warrants.  Ex. I, Attach. B-1 (authorizing seizure of materials that are "evidence, fruits, and instrumentalities of violations" of Title 18, United States Code, Section 1958 (murder-for-hire and conspiracy to commit the same), Title 18, United States Code, Section 1959 (murder in-aid-of racketeering and conspiracy to commit the same), Title 18, United States Code, Section 924(c) (unlawful possession and use of firearms) and Title 18, United States Code, Section 924(j) (causing death through of a firearm).").

The Home and Devices Warrant authorized seizure from Mr. Zottola's home several categories of documents that were so broad that distinguishing responsive documents from innocuous and irrelevant ones was functionally impossible.  These included, for example, (1) *any writings, documents, records or other evidence* indicating the whereabouts of ZOTTOLA on or about and between November 2017 and October 4, 2018"; (2) "*any* license plates, vehicle registration paperwork, and/or vehicle purchase records"; (3) "*any* paperwork related to the

potential sale of properties"; and (4) "*any* records related to the Zottola family's assets, including

its real estate and real estate ventures."  Ex. I, Attach. B-1 (emphasis added).

With respect to electronic devices, the June 17, 2019 Home and Devices Warrant purported

to limit seizure to following categories of materials, to the extent they related to the crimes

enumerated in the warrant:

1.  "[N]ames and telephone numbers, as well as the contents of all call logs, contact lists," communications, "Internet activity . . . and other electronic media constituting evidence, fruits or instrumentalities of the above-listed crimes;"

2.  "Evidence of software that would allow others to control the cellular telephone;"

3.  "Evidence of the lack of such malicious software;"

4.  "Evidence of the attachment to the cellular telephone of other storage devices . . .;"

5.  "Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from such devices;"

6.  "Evidence of the times such devices were used;"

7.  "Passwords, encryption keys, and other access devices that may be necessary to access from such devices;"

8.  "Contextual information necessary to understand the evidence described in this attachment, all of which constitutes evidence, fruits and instrumentalities of the above-listed crimes;"

9.  "Evidence of user attribution . . . .;" and

10. "Records evidencing the use of Internet Protocol addresses to communicate . . . ."

Ex. I, Attach. B-1 ¶ J.

The seizure permitted by the July 2, 2019 Devices Warrant similarly purported to limit

seizure to the following categories of materials, to the extent they related to the crimes enumerated

in the warrant:

1.  "[I]nformation related to the crimes against Victim-1 and Victim-2";

2.  "[I]nformation connecting Anthony Zottola Se., to other individuals involved in the crimes committed against Victim-1 and Victim-2";

3. "[I]nternet search results related to the planning and cover up of the crimes committed against Victim-1 and Victim-2";

4. "[I]nformation recording the cellular device user's schedule or travel";

5. "[A]ny information related to the use of tracking devices";

6. "[A]ll bank records, checks, credit card bills, account information, and other financial records";

7. "[A]ny communication or photographs depicting or discussing identities of co-conspirators"; and

8. "Evidence of user attribution showing who used or owned the SUBJECT DEVICES."

Ex. K, Attach. B-1.

### 3. *The Home and Devices Warrant Application Improperly Authorized Overbroad Seizures*

The Home and Devices Warrants are impermissibly overbroad because they improperly granted the executing agents authority to root around and seize vast swaths of documents, both electronic and physically stored in Mr. Zottola's home and on his electronic devices—most without reference to any particular timeframe. They permitted seizure of such intrusive and general categories as: (1) "[a]ny writings, documents, records or other item[s], indicating a connection between Anthony Zottola ('ZOTTOLA') and Bushawn Shelton, *or others*;" (2) all documents reflecting Mr. Zottola's whereabouts for *an entire year*; (3) all vehicle records—not limited to those related to Mr. Zottola, the victims, or the alleged co-conspirators; (4) "*any records* related to the Zottola family's assets, including its real estate and real estate ventures," an extremely broad category considering, as the government is aware, Mr. Zottola's family has owned and managed a real estate business for decades; (6) all of Mr. Zottola's call logs; (7) any evidence of where Mr. Zottola's electronic devices were used; and (8) all communications, including "contents of all . . . text messages, emails (including those sent, received, deleted and drafted), instant messages, photographs, videos, Facebook posts, FaceTime logs, Google Voice calls,

Internet activity (including browser history, web page logs, and search terms entered by the user), and other electronic media constituting evidence, fruits or instrumentalities of the above-listed crimes," without any specificity as to what those communications entail; and (9) all bank or financial information.   Ex. I, Attach. B-1.   These requests essentially provided unbridled permission to seize virtually *anything* in Mr. Zottola's office regardless of timeframe, or content, and a sweeping set of materials from his electronic devices regardless of the type of media, and irrespective of probable cause.

In determining whether a warrant is overbroad, courts focus on whether probable cause exists "to support the breadth of the search that was authorized." *United States v. Hernandez*, No. 09-CR-625 (HB), 2010 WL 26544, at *8 (S.D.N.Y. Jan. 6, 2010) (citations omitted).   Probable cause is demonstrated where "the totality of circumstances indicates a 'fair possibility that contraband or evidence of a crime will be found in a particular place.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (citations omitted).   A warrant permitting "fairly broad" seizure of materials is permitted *only* where "the affidavit in support of the search warrant application provides the necessary basis for a determination of probable cause to seize items in ***each*** of those categories."   *Hernandez*, 2010 WL 2544, at *8 (emphasis added); *accord United States v. Zemlyansky*, 945 F. Supp. 2d 438, 453 (S.D.N.Y. 2013).   That is not the case here.

The Home and Devices Affidavit did not establish probable cause to seize every record from Mr. Zottola's home office and the entirety of his electronic devices.   The handful of documents attached offer a glimpse of the vast trove of materials seized, touching many aspects of Mr. Zottola's personal life—many of these records have no possible bearing on the allegations in the affidavit or Indictment because they relate to his children, wife, personal matters, or are simply too old.  *See* Exs. L, M.

Instead, while the Home and Devices Warrant suggested that there was probable cause to seize some of Mr. Zottola's correspondence (those with co-defendant Bushawn Shelton, and other alleged co-conspirators) there was nothing suggesting that there could be evidence of the listed crimes in *all* communications.  Similarly, although there was a probable cause showing connecting a potential sale of some Zottola family real estate to the alleged crimes, the Home and Devices Affidavit was notably silent on probable cause to believe that *all* of the Zottola family real estate records—████████████████████████████████████████

████████████████████████████████████████

████████—constituted evidence or instrumentalities of the alleged crimes.

But that is precisely what the Warrants purportedly authorized the agents to seize: ***all*** communications, ***all*** evidence of Mr. Zottola's whereabouts, ***all*** financial records, ***all*** business documents, and ***all*** vehicle records, virtually without limitation.  Such sweep could not be properly circumscribed to materials for which there was a showing of probable cause.  Indiscriminant grabbing of the records stored in Mr. Zottola's home office and devices unsurprisingly ensued.

Recent cases in this Circuit have deemed similar warrants granting blanket permission to seize virtually anything and everything unconstitutionally overbroad.  *United States v. Zemlyansky*, for example, found that a warrant authorizing seizure of "all patient care records, bank account information, and patient appointment information," from a medical billing office was unconstitutionally overbroad.  *United States v. Zemlyansky*, 945 F. Supp. 2d at 464-65.  While the affiant agent in *Zemlyansky* provided probable cause to search and seize materials from the billing office relating to five clinics mentioned in the supporting affidavit, the scope of the warrant's seizure list was not justified.  It authorized search and seizure of "almost everything that one could expect to find at a billing office," and "unlimited search and seizure of all computers and thumb

drives, as well as virtually anything electronic and anything related to the use or operation of those electronics." *Id.* The warrant was thus "for all practical purposes, a prohibited general warrant to search Tri-State for evidence of a crime." *Id.* at 459.

*United States v. Wey* applied a similar analysis. Where "the sheer scope of the Warrants— reaching . . . essentially all documents pertaining to [the defendant's business] and/or the [defendants] unlimited by relevance to criminal conduct or by timeframe—precludes a finding that the seizure authorization remained within the bounds of the Government's probable cause showing." *Wey*, 256 F. Supp. 3d at 393-94. As in *Wey* and *Zemylansky*, the allegations in the Home and Devices Affidavit do not provide probable cause to support seizure of the over 30 absolute categories of materials listed in the Warrant—particularly as those catergories purport to include much or all of Mr. Zottola's personal communications on his devices, family records, and everything stored in his home office without clear reference to the probable cause showing in the Warrant. The Home and Devices Warrant thus fails for unconstitutional overbreadth.

### 4. *The Home and Devices Warrant Does Not Describe with Particularity the Items to be Seized*

To comply with the Fourth Amendment, a warrant must also include a "description of the property or objects of the search that is sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting which items to seize." *United States v. LaChance*, 788 F.2d 856, 874 (2d Cir. 1986) (internal quotation marks omitted). The Home and Devices Warrants do not meet this requirement either.

At best, the Home and Devices Affidavits provide probable cause to seize materials from November 2017 to October 2018 relating to Mr. Zottola's communications with Shelton and other alleged co-conspirators, as well as business materials related to potential real estate deals during that timeframe. *See* Ex. H ¶¶ 77-83. Instead of limiting the searches accordingly, the Home and

Devices Warrants sought materials without circumscribing the individuals, timeframe or subject matter sought.  *See* Ex. I.

To the contrary, by purporting to authorize search and seizure of all of Mr. Zottola's communications in any timeframe, all real estate records, all vehicle records, and all financial records of any kind, the Home and Devices Warrants provided virtually no direction limiting the searching agents to materials for which there was a showing of probable cause.  *See See* Ex. I, Attach. B-1.  It is difficult to conceive of material in Mr. Zottola's home office and devices not facially covered by the warrant, invalidating the the Home and Devices Warrants for lack of particularity.  *See Wey,* 256 F. Supp. 3d at 385 ("warrants are insufficiently particularized" where they "set[] forth expansive categories of often generic items subject to seizure—several of a 'catch-all' variety—without, crucially, any linkage to the suspected criminal activity, or indeed any meaningful content-based parameter or other limiting principle.").

Moreover, while the warrants list the statutes under investigation, any relevant factual context to guide the agents is notably absent.  *See* Ex. I, Attach. B-1.  The Home and Devices Warrants did not identify the specific individuals, entities or allegations discussed in the underlying Affidavits.  The broad murder-for-hire and weapons statutes, without more, cannot effectively curttail the executing agents' discretion and limit the searches and seizure to materials subject to probable cause.  That too fails the Fourth Amendment's particularity requirement.  *See Wey*, 256 F. Supp. 3d at 386 ("By the Warrants' terms, then, no connection to any suspected crime or to any other individual or entity . . . is necessary to render the expansive list of items set forth in Exhibit A seizable."); *Zemlyansky*, 945 F. Supp. 2d at 454 (warrant violated Fourth Amendment as "[a]t no point prior to or during the enumeration of these eight items does the warrant offer any indication of the relevant criminal allegations.").

The Home and Devices Warrants also lacked any limiting timeframe for a majority of the seizures it purported to authorize. While a small subset of the seizure categories include a limiting timeframe, the vast majority of the over 30 categories of materials to be seized provide no temporal parameters at all. This deficiency alone signals an unconstitutional lack of particularity. *Wey*, 256 F. Supp. 3d at 388 (absence of timeframe in warrants "reinforces the . . . conclusion that the [w]arrants are insufficiently particularized") (citation omitted); *accord United States v. Shipp*, 392 F. Supp. 3d 300, 310-11 (E.D.N.Y. 2019) ("A warrant's failure to include a time limitation, where such limiting information is available and the warrant is otherwise wide-ranging, may render it insufficiently particular") (citation omitted); *see also United States v. Abboud*, 438 F. 3d 554, 576 (6th Cir. 2006) (warrant was insufficiently particular because it was not limited to documents from the time period for which the magistrate had probable cause to believe fraud had occurred); *United States v. Roberts,* 675 F. Supp. 108 (S.D.N.Y. 1987), *rev'd on other grounds*, 852 F. 2d 671 (2d Cir. 1988) (without limit as to dates of documents to be seized, the warrant gave rise to an improper general, exploratory search); *Hernandez*, No. 09-CR-625 (HB), 2010 WL 26544, at *9 ("A failure to indicate a time frame could render a warrant constitutionally overbroad because it could allow the seizure of records dating back arbitrarily far and untethered to the scope of the affidavit which ostensibly provided probable cause.").

Finally, the government cannot rely on the Home and Devices Affidavits submitted by SA Zoufal in support of the warrant application for the requisite particularity; it was neither attached nor otherwise incorporated into the warrants. *See Zemlyansky,* 945 F. Supp. at 453 ("Supplementary documents, including affidavits" can particularize a warrant "only if attached and incorporated into the warrant by reference."); *United States v. Rosa*, 626 F. 3d 56, 64 (2d Cir. 2010) ("we may no longer rely on unincorporated, unattached supporting documents to cure an

40

otherwise defective search warrant."). The warrants thus must stand and fall on their own terms. *See Groh v. Ramirez*, 540 U.S 551, 557 (2004) ("The fact that the application adequately described the things to be seized does not save the warrant from its facial invalidity" because the Fourth Amendment "by its terms requires particularity in the warrant."). If the Home and Devices Warrants (including the attachments thereto) fail to satisfy the particularity requirement—as they do—the separate supporting affidavits cannot save it.

Without the particularity mandated by the Fourth Amendment, the executing agents were impermissibly left entirely to their own discretion to determine what to seize without reference to any probable cause showing. Unsurprisingly, under these circumstances, they seized large swaths of irrelevant, old, and personal materials and communications. *See* Exs. L, M. This is the very thing that the Fourth Amendment sought to protect against by outlawing "general warrants." *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (Fourth Amendment warrant clause ensures that "those searches deemed necessary should be as limited as possible"); *Wey*, 256 F. Supp. 3d at 386 (without particularity "to guide the searching agents in distinguishing meaningfully between materials of potential evidentiary value and those obviously devoid of it; the Warrant[ is]—in function if not in form—general warrants."). The Home and Devices Warrants thus violate the Fourth Amendment warranting suppression.

### C.   The Verizon Cellular Telephone Data Should be Similarly Suppressed: The Warrant Lacked Particularity and the Agents Conducted a General Search

#### 1.   *The Verizon Warrant's Probable Cause Showing*

On October 16, 2018, the government applied for "a search warrant for information associated with" Mr. Zottola's cellular telephone number "that is stored at premises controlled by

VERIZON." *See* Ex. N at 1.[16]  ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

    The agent began outlining probable cause by connecting the murders and attacks on

Sylvester Zottola and Salvatore Zottola ████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

    SA Zoufal separately alleged that ██████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████   ████████████

---

[16] The Verizon Warrant Application, including the affidavit and application for the warrant, produced as BLANCO ET AL 016351 – 78, is attached as Exhibit N.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

After nearly 19 pages describing evidence bearing no connection to Mr. Zottola, SA Zoufal stated that based on toll records, there were numerous contacts between Shelton and Mr. Zottola's cellular telephone between June 12, 2018 and October 7, 2018.  The agent detailed that some of those contacts occurred on the dates surrounding the attacks on Sylvester and Salvatore.  *See id.* ¶ 46.  Almost as an aside, ████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

The agent's affidavit explained that the government required "the location of the user of the TARGET PHONE," Mr. Zottola's cellular telephone, and "the substance of his communications close in time to the crimes committed against Victim-l and Victim-2."  *Id.* ¶ 48. The agent stated that given ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

## 2.    *The Scope of the Verizon Warrant*

Although the affidavit only purported to explain the probable cause for searching the content of Mr. Zottola's text messages on the basis of his alleged connections with Shelton, the government sought, and the magistrate judge granted, a warrant permitting the government to seize vast categories of material from Verizon related to Mr. Zottola's cellular telephone.[17]   These included virtually all data related to Mr. Zottola's cellular telephone in Verizon's possession:

1. Account holder names;

2. Account holder addresses and email addresses;

3. "Local and long distance telephone connection records;"

4. "Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ('IP') addresses) associated with those sessions";

5. Length of service;

6. Telephone or instrument numbers;

7. "Other subscribed numbers or identities;"

8. "Means and source of payment;"

9. The existence of any cloud data";

10. "All records . . . relating to wire and electronic communications sent or received by the Account, including . . . the date and time of the communication, the method of the communication, and the source and destination of the communication;"

11. "Information regarding the cell tower and antenna face . . . through with the communications were sent and received;" and

12. "Any and all Verizon messaging app content, including but not limited to the content of all SMS text messages and photographs."

Ex. O, Attach. B § I.

---

[17] The Verizon Warrant, produced as BLANCO ET AL 016379 – 84, is attached as Exhibit O.

The only limitation the warrant provided was that the government may seize those materials that "constitute[] evidence, fruits, contraband and instrumentalities of violations of Title 18, United States Code, Section 1958 (murder-for-hire and conspiracy to commit the same), Title 18, United States Code, Section 1959 (murder in-aid-of racketeering and conspiracy to commit the same), Title 18, United States Code, Section 924(c) (unlawful possession and use of firearms) and Title 18, United States Code, Section 924(j) (causing death through use of a firearm) during the period between November 1, 2017 and October 12, 2018.  Ex. O, Attach. B § II.

### 3.   *The Material Seized Pursuant to the Verizon Warrant*

Based on this warrant, the government seized: (1) text message content from Mr. Zottola's cellular telephone for the month of October 2018, including many with friends and family bearing no alleged connection to the charges; (2) the IP address of his cellular telephone for the year between November 2017 and November 2018, which provides a key to revealing many personal activities, including what websites Mr. Zottola accessed during those months; (3) all of the phone numbers Mr. Zottola contacted by telephone call or text message from November 2017 through October 2018, including the duration of any such calls; and (4) cell site location data for November 2017 through November 2018.  Although the Verizon Warrant purported to limit the permitted seizures based on enumerated crimes, the government apparently seized the full universe of materials provided by Verizon, including text messages, contacts, and location information that were solely personal in nature.  For example, of the text messages seized from Verizon, there were dozens that appear to have no relation to the charges.

4.   ***The Seizure of Material Pursuant to the Verizon Warrant Ran Afoul of the Fourth Amendment***

i.   <u>***The Verizon Warrant Lacks Particularity***</u>

The Verizon Warrant suffers from some of the same defects as the other warrants executed to search Mr. Zottola's materials.  It provides no particularity at all.  It simply lists the code sections at issue without providing the executing agents with any guidance, detail, or factual information to curtail their search within the scope of the Verizon Affidavit's probable cause showing.  Ex. O, Attach. B ¶ II.  The absence of any meaningful direction to the agent fails the Fourth Amendment's particularity requirement.  *See, e.g., Wey*, 256 F. Supp. 3d at 386 (warrant that lists criminal statutes but provides "no connection to any suspected crime or to any other individual or entity" lacks particularity); *Zemlyansky*, 945 F. Supp. 2d at 454 (absence of "any indication of the relevant criminal allegations" lacks particularity); *see also LaChance*, 788 F.2d at 874 (2d Cir. 1986) (Fourth Amendment particularity requirement requires guidance that "that is sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting which items to seize.") (internal quotation marks omitted).

And, of course, because the warrant neither attaches nor otherwise incorporates the Verizon Affidavit, the government cannot rely on the factual detail in the affidavit to salvage the warrant. *See, e.g., Rosa*, 626 F.3d at 64 ("we may no longer rely on unincorporated, unattached supporting documents to cure an otherwise defective search warrant.").  Although the Verizon Affidavit includes significant factual detail, the Verizon Warrant lacks the particularity required by the Fourth Amendment.

The government improperly seized everything produced by Verizon.  These seized materials must be suppressed as well.

### ii. *Seizure of the Entire Record from Verizon Exceeded the Warrant's Scope*

Unsurprisingly, given the total lack of particularity, the agents also seized far more than the Verizon Warrant authorized.  While the Verizon Warrant required the agents to limit the seizure to evidence relevant to the listed statutes (murder for hire and weapons charges), the agents instead seized everything produced from Verizon.  This included: *all* of Mr. Zottola's locations for an entire year, the content of *all* of his text message communications for a month including many from friends and relatives unrelated to the crimes charged, and *all* of his call logs, among other broad swathes of his digital information.  In other words, the government improperly seized sufficient digital materials to understand virtually everything about Mr. Zottola's private life, without reference to the crimes charged. *See, e.g., Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018) (holding that the Government must obtain a warrant for cell location data because "cases establish that warrantless searches are typically unreasonable where 'a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing'") (internal citations omitted).

Indeed, there is no indication that the agents made any meaningful effort to identify those portions of the Verizon records responsive to the Warrant's seizure list.  Such an expansive and indiscriminate seizure is precisely what the warrant requirement seeks to avoid. *See United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) (to comply with the Fourth Amendment, "[a] search must be confined to the terms and limitations of the warrant authorizing it.").  The agents' "flagrant disregard of the warrant's terms" warrants suppression of Mr. Zottola's Verizon records.  *See United States v. Messalas*, No. 17-CR-339 (RRM), 2020 WL 4003604, at *6 (E.D.N.Y. July 14, 2020) (quotation marks and citations omitted).

## VI.     THE COURT SHOULD SUPPRESS MR. ZOTTOLA'S CONVERSATIONS WITH SHELTON SEIZED FROM SHELTON'S CELLULAR TELEPHONE

### A.     The Shelton Device Warrant

On October 10, 2018, the government applied for and obtained a warrant to search Shelton's residence and any devices found therein ("Shelton Affidavit" and "Shelton Warrant").[18] The Shelton Affidavit outlined the evidence connecting Shelton, his vehicle, and electronic device to the July 11, 2018 nonfatal shooting of Salvatore Zottola.  Ex. P at ¶¶ 30-53.  ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████

On this basis, the government requested and obtained a warrant to search Shelton's home and devices for "evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1958 (murder-for-hire and conspiracy to commit the same), Title 18, United States Code, Section 1959 (murder in-aid-or racketeering and conspiracy to commit the same), Title 18, United States Code, Section 924(c) (unlawful possession and use or firearms) and Title 18, United States Code, Section 924(j) (causing death through [use] of a firearm) (collectively, the 'Subject Offenses')."  Ex. Q, Attach. B-1.

As to any cellular telephone or electronic device found in the home, the Shelton Warrant limited seizure to the following materials related to the Subject Offenses:

---

[18] The October 10, 2018 warrant application to search Shelton's home and devices, including the affidavit and application for the warrant, produced as BLANCO ET AL 016167 – 206, is attached as Exhibit P; the October 10, 2018 warrant to search Shelton's home and devices issued pursuant thereto, produced as BLANCO ET AL 016214 – 20, is attached as Exhibit Q.

1. "[N]ames and telephone numbers, as well as the contents of all call logs, contact lists," communications, "Internet activity . . . and other electronic media constituting evidence, fruits or instrumentalities of the above-listed crimes;"

2. "Evidence of software that would allow others to control the cellular telephone;"

3. "Evidence of the lack of such malicious software;"

4. "Evidence of the attachment to the cellular telephone of other storage devices . . .;"

5. "Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from such devices;"

6. "Evidence of the times from such devices were used;"

7. "Passwords, encryption keys, and other access devices that may be necessary to access from such devices;"

8. "Contextual information necessary to understand the evidence described in this attachment, all of which constitutes evidence, fruits and instrumentalities of the above-listed crimes;"

9. "Evidence of user attribution . . . .;" and

10. "Records evidencing the use of Internet Protocol addresses to communicate . . . ."

Ex. Q, Attach. B-1 ¶ L.

### B.    The Shelton Device Seizure

Rather than limiting its seizure to the items permitted by the Shelton Warrant, the government apparently opted for the wholesale seizure of Shelton's cellular telephone, including approximately 60,000 text messages—many of which appear to be personal in nature, over 42,000 images, and over 550 videos. ██████████████████████████████

██████████████████████████████████████████

As it relates to Mr. Zottola, the wholesale seizure of Shelton's cellular telephone encompassed apparently *all* the text message conversations between Mr. Zottola and Shelton during a 14-month period, including those discussing personal matters, ████████████████

██████████████████████████████████████████

### C. Mr. Zottola has Standing to Challenge Seizure of his Communications from the Shelton Device Because He Has a Legitimate Expectation of Privacy in His Personal Conversations

Since *Katz v. United States*, 389 U.S. 347 (1967), and *Alderman v. United States*, 394 U.S. 165 (1969), the Supreme Court has maintained that the Fourth Amendment protects defendants' legitimate privacy interests in their conversations. Those privacy interests attach although such conversations are necessarily shared with a third party, and even if the defendant did not own the phone or premises through which the conversation was recorded. The Supreme Court has recognized that the personal and intimate nature of conversations warrants strong Fourth Amendment protection. It is on that basis that defendants routinely challenge wiretapped conversations in which they are overheard. While the format of the Zottola-Shelton Conversations may be different, their continuous and deeply personal nature raises precisely the same Fourth Amendment issues as the spoken conversations that the Supreme Court vigorously protected in *Katz* and *Alderman*. On that basis, Mr. Zottola has standing to challenge the government's seizure of his text message conversation with Shelton. Because in seizing Shelton's entire cellular telephone, including all of his conversations with Mr. Zottola, the government flagrantly ignored the applicable warrant's strictures, the conversations should be suppressed in their entirety.

"A defendant seeking to suppress the fruits of a search by reason of a violation of the Fourth Amendment must show that he had a 'legitimate expectation of privacy' in the place searched." *United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008). Defendants whose Fourth Amendment rights are implicated in a search have standing to move for suppression. *Id.* Determining when a defendant's "legitimate expectation of privacy" is implicated in a search, "involves two distinct questions: first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable."

*Id.* For decades, the Supreme Court has stated unequivocally that "the Fourth Amendment protects people, not places," *Katz*, 389 U.S. at 351, thus, "property rights are not the sole measure of Fourth Amendment violations." *Soldal v. Cook Cnty.*, 506 U.S. 56, 64 (1992). "One need not be the owner of the property for his privacy interest to be one that the Fourth Amendment protects . . . " *United States v. Santillan*, 902 F.3d 49, 62 (2d Cir. 2018) (citations omitted).

The question here is whether Mr. Zottola had a ***legitimate privacy interest in his conversation*** with Shelton. Does the Fourth Amendment protect the privacy of a text message conversation that touched deeply personal aspects of Mr. Zottola's life, including his family, children, and healthcare over a period of many months?

Under *Katz*, and its progeny the answer must be yes—Mr. Zottola has a legitimate privacy interest in the Zottola-Shelton Conversations, which is protected by the Fourth Amendment. In *Katz*, 389 U.S. at 348, the Supreme Court held that the Fourth Amendment protected telephone conversations that a defendant had in a telephone booth. Although the defendant neither owned the booth nor the telephone line, and his words were shared with the third party on the other end of the conversation. The Court explained "[t]he Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." *Id.* at 353.[19]

---

[19] That Mr. Zottola necessarily shared this conversation with Shelton does not impact his legitimate privacy interest under the Fourth Amendment. Following *Katz*, Courts have held the Fourth Amendment protects certain private materials exposed to or possessed by third parties: "In some domains, people expect information to stay shielded from law enforcement even as they knowingly disclose it to other parties." *United States v. DiTomasso*, 56 F. Supp. 3d 584, 593 (S.D.N.Y. 2014). And in the context of modern cellphones, the Supreme Court in *C* rejected the government's effort to "mechanically apply" the rule that third-party disclosure vitiates Fourth Amendment protections. *Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018).

*Alderman v. United States*, 394 U.S. 165 (1969), went further yet, expressly holding that under *Katz* "the Fourth Amendment protects persons and their ***private conversations***." *Alderman v. United States*, 394 U.S. 165, 180 (1969) (emphasis added).[20] Under *Alderman*, defendants have Fourth Amendment rights protecting (and thus Fourth Amendment standing) against unreasonable governmental intrusion into their ***private conversations***. The Supreme Court firmly held in *Alderman* that any defendant overheard on a wiretap has Fourth Amendment standing to suppress their recorded conversations, whether or not the defendant owned the premises or telephone recorded: "any petitioner would be entitled to the suppression of government evidence originating in electronic surveillance violative of his own Fourth Amendment right to be free of unreasonable searches and seizures. Such violation would occur if the United States unlawfully overheard conversations of a petitioner himself." *Alderman*, 394 U.S. at 176; *id.* 177-78 ("overheard conversations are fruits of an illegal entry and are inadmissible in evidence.").[21]

The significance of maintaining legitimate expectations of privacy in conversations is only heightened in the context of cellular telephones, which facilitate the government's easy search of

---

[20] Similar issues regarding governmental intrusion into private conversations frequently occur in the context of challenging Title III wiretaps. As *Alderman* makes clear, the same analysis applies under the Constitution. Although *Alderman* was decided after passage of the Omnibus Crime Control and Safe Streets Act of 1968 (Wiretap Act), which included the wiretap provisions codified in 18 U.S.C. §§ 2510, *et seq.*, the government recorded the conversations at issue prior to the statute's enactment. *Alderman* thus rests solely on constitutional grounds.

[21] The Fourth Amendment's protection of an individual's legitimate privacy interests in private conversations is reflected in the Title III wiretap statute, which expressly confers standing on "aggrieved persons," defined as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). Decades of caselaw clarify that Title III standing is coterminous with the Fourth Amendment. *See, e.g., United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir 1991) ("18 U.S.C. § 2518(10)(a)(i) and (iii) (1988) provides that '[a]ny aggrieved person' may move to suppress wiretap evidence when 'the communication was unlawfully intercepted' or 'the interception was not made in conformity with the order of authorization.' . . . [T]his provision "is to be construed in accordance with standing requirements usually applied to suppression claims under the fourth amendment.") (citation omitted).

a volume of conversations previously unavailable without months or years of wiretaps.  The Supreme Court described modern cellphones as presenting a "seismic shift[]" in privacy concerns, requiring particular attention in Fourth Amendment jurisprudence.  *Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018).  The Court specifically highlighted the breadth of conversations readily available on modern cellphones as a particular Fourth Amendment concern: whereas in prior decades, "[a] person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone." *Riley v. California*, 573 U.S. 373, 394-95 (2014); *see also id.* at 394 ("Most people cannot lug around every piece of mail they have received for the past several months, . . .—nor would they have any reason to attempt to do so. . . . But the possible intrusion on privacy is not physically limited in the same way when it comes to cell phones.").

The text message conversation between Mr. Zottola and Shelton is emblematic of the privacy problems amplified by modern smartphones.  The conversation includes thousands of messages, spanning months of almost continuous exchanges about a range of topics, including Mr. Zottola's family and minor children.  The privacy intrusion that a government search of this months' long conversation embodies precisely the concerns articulated in *Katz, Alderman, Riley,* and *Carpenter*.

Mr. Zottola thus maintains the same Fourth Amendment protections in his conversations with Shelton, via text message, as he would have had the conversations been intercepted in another (*e.g.,* spoken) form—if anything the court's Fourth Amendment scrutiny of government searches should be heightened in the digital age given the trove of private material available on cellular telephones, and the ease of government overreach.  *Carpenter*, 138 S. Ct. at 2214 ("As technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive

eyes, this Court has sought to assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.") (quotation marks, citations and modifications omitted); *Riley*, 573 U.S. at 403 (uniquity and convenience of information and conversations on "[m]odern [device] . . .does not make the information any less worthy of the protection for which the Founders fought."); *In re U.S. for an Order Authorizing the Release of Historical Cell-Site Info.*, 809 F. Supp. 2d 113, 126-27 (E.D.N.Y. 2011) (the Fourth Amendment should evolve "to accommodate changes in technology," as "to read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication.  The cell phone has replaced the public telephone to near extinction; yet, to date Fourth Amendment doctrine has not developed to embrace the vital role the cell phone has come to play in private communication and the new Fourth Amendment challenges in creates . . . . In light of drastic developments in technology, the Fourth Amendment doctrine must evolve to preserve cell-phone user's reasonable expectation of privacy in cumulative cell-site-location records.").

That the government physically seized the Zottola-Shelton Conversations from a phone belonging to Shelton is of no moment.  The Supreme Court has held that defendants' legitimate privacy interests protected by the Fourth Amendment can extend to places where defendants do not own the premises searched, even when third parties have unfettered access to the premises searched.  For example, in *O'Connor v. Ortega*, 480 U.S. 709 (1987), the Supreme Court held that individuals have an expectation of privacy at their workplaces, although "intrusion is by a supervisor rather than a law enforcement official" may be reasonable, explaining that "[c]onstitutional protection against unreasonable searches by the government does not disappear merely because the government has the right to make reasonable intrusions in its capacity as

employer." *Id.* 717–18.  That analysis also applies to hotel rooms.  Although a hotel room occupant "undoubtedly gives implied or express permission to such persons as maids, janitors or repairmen' to enter his room 'in the performance of their duties," still, searches of hotel rooms are subject to the Fourth Amendment.  *Stoner v. California*, 376 U.S. 483 (1964) (quotation marks and citations omitted); *accord In re U.S. for an Order Authorizing the Release of Historical Cell-Site Info.*, 809 F. Supp. 2d at 123-24 ("a finding of third-party disclosure does not necessarily destroy the reasonable expectation of privacy in all circumstances . . . there are circumstances in which the legal interest being protected from government intrusion trumps any actual belief that it will remain private."); *see also United States v. Warshak,* 631 F.3d 266, 288 (6th Cir. 2010) (an email subscriber "enjoys a reasonable expectation of privacy in the contents of emails that are stored with, or sent or received through, a commercial ISP" such that "[t]he government may not compel a commercial ISP to turn over the contents of a subscriber's emails without first obtaining a warrant based on probable cause.").

The same is true here.  Mr. Zottola's legitimate privacy interest is in his *conversation* with Shelton, even if a third party (Shelton) has ultimate ownership or access to the device housing the conversation.  *See DiTomasso*, 56 F. Supp. 3d at 593 ("people expect information to stay shielded from law enforcement even as they knowingly disclose it to other parties . . . [i]n the digital age, electronic communication" is such a "domain").  Just as defendants overheard on a wiretap have Fourth Amendment standing to suppress their recorded conversations, irrespective of who owned the telephone or premises recorded, the Court should find that Mr. Zottola has Fourth Amendment standing to suppress his private conversation with Shelton.[22]

---

[22] The cases holding that a defendant does not have Fourth Amendment standing to challenge a search of another individual's entire email inbox or complete cellular telephone are inapposite.

### D. The Government's Flagrant General Search of the Shelton Device Warrants Blanket Suppression of the Zottola-Shelton Conversation

The government's disregard of the Shelton Device Warrant is just as flagrant as its disregard of the Zottola Home and Devices Warrants. *See supra* § V. As with Mr. Zottola's devices, the government seized the entirety of Mr. Zottola's conversations with Shelton as part of a wholesale seizure of Shelton's cellular telephone, which was wholly untethered from the Shelton Device Warrant's strictures. This unconstitutional search harmed Mr. Zottola's Fourth Amendment rights—it is only because of this unconstitutional search that the agents seized the Zottola-Shelton Conversation in its entirety. Suppression of the Zottola-Shelton Conversation is thus required as well.[23]

The Shelton Devices Warrant limited seizure to certain categories of communications and digital materials to the extent they related to murder-for-hire and weapons violations. Ex. Q, Attach. B-1. Instead, however, the government simply seized everything: tens of thousands of personal text messages with family, friends and colleagues unrelated to the charges; ████

████████████████████████████████████████

---

None of those cases specifically address a defendant's standing to challenge the search of ***just their private conversations***; they instead rest on the defendant's lack of privacy interest in the telephone or digital account more broadly. *Cf., e.g., United States v. Hamlett*, No. 3:18-CR-24 (VAB), 2019 WL 3387098, at *12 (D. Conn. July 26, 2019) ("Because Mr. Hamlett denounced ownership of the phone at the time of his arrest, he cannot show that he had a reasonable expectation of privacy in the place or object searched.") (quotation marks and citations omitted); *United States v. Mathieu*, No. 16-CR-763 (LGS), 2018 WL 5869642, at *1-2 (S.D.N.Y. Nov. 9, 2018) ("Nowhere in Defendant's motion to suppress does Defendant assert a legitimate expectation of privacy; Defendant does not claim to own either of these accounts. Absent any showing that the email accounts belong to Mathieu, Defendant has no basis for challenging the warrant on Fourth Amendment grounds.") (citation omitted); *Lustyik*, 57 F. Supp. 3d at 223 ("Lustyik lacks an expectation of privacy both in Taylor's email account and in any of his emails received by Taylor. Lustyik therefore cannot show that the search of Taylor's email account and the seizure of emails therefrom—even if unlawful—violated Lustyik's Fourth Amendment rights.").

[23] Mr. Zottola also joins the suppression motion filed on Mr. Shelton's behalf as a further basis to suppress the Zottola-Shelton Conversation as to Mr. Zottola.

████████████████████   The same pattern holds true with respect to the Zottola-Shelton Conversation.   The material seized includes numerous messages relating to personal, family, medical and other personal subjects not relevant to the Indictment.   Indeed, the over-seized material from Shelton's phone dwarfs by manyfold, the relevant material seized. *See Pinto-Thomaz*, 352 F. Supp. 3d at 308-09  ("Executing agents are considered to have 'flagrantly disregarded' the warrant's terms where . . . they effect a widespread seizure of items that were not within the scope of the warrant'") (quotation marks and citations omitted); *Debbi*, 244 F. Supp. 2d at 237-38 (S.D.N.Y. 2003) ("seizure was indiscriminate and substantially in excess of what the warrant provided").   The government's wholesale production of Shelton's device to Mr. Zottola and Shelton's other co-defendants is simply a further indication that their seizure was nothing more than a general search, untethered from the Fourth Amendment's warrant requirement.

Because Mr. Zottola's private communications with Shelton were only seized pursuant to the government's flagrantly unconstitutional search of Shelton's cellular telephone, Mr. Zottola's Fourth Amendment rights were violated as well.  *See Messalas*, No. 17-CR-339 (RRM), 2020 WL 4003604, at *6 (prohibited "general search[es]" are "wide-ranging exploratory searches,' and 'indiscriminate rummaging[s]—are especially pernicious, and 'have long been deemed to violate fundamental rights.").   The proper remedy for this violation of Mr. Zottola's constitutionally protected rights is suppression of ***his materials***.  *See, e.g., Wey*, 256 F. Supp. 3d at 409-10 (where agents engaged in blanket seizure, the court was "[u]nable, then, to further tailor the remedy according to the severability . . . doctrine[]," and "conclude[d] that suppression of all evidence seized during the courses of both Searches is the only appropriate recourse under the circumstances") (quotation marks and citations omitted).   Suppression of   the Zottola-Shelton Conversations is thus warranted.

## VII.   MR. ZOTTOLA'S JUNE 17, 2019 POST-ARREST STATEMENTS ARE THE PRODUCT OF IMPROPER CUSTODIAL INTERROGATION AND SHOULD BE SUPPRESSED

### A.   Factual Background

#### 1.   *Mr. Zottola's Custodial Interrogation*

Mr. Zottola was arrested in Mamaroneck, New York on June 17, 2018, around 6 p.m. by FBI Special Agent Zoufal, NYPD Detectives Jesse Ortiz and Shawn Ricker.  At the time of his arrest, Mr. Zottola's minor son, who was 11-years-old, was also with him.  The agents permitted Mr. Zottola to use his cellular telephone to call his wife so she could pick up his son.  Thereafter, the agents transported Mr. Zottola to FBI offices in Manhattan.  Ex. R, Zottola Decl. ¶ 3.  Mr. Zottola did not receive *Miranda* warnings upon arrest; he was only *Mirandized* nearly one and a half hours later at the end of his custodial interrogation, which occurred at the FBI headquarters in Manhattan.  *Id.* ¶¶ 3, 9.

During the course of law enforcement activities in 2018, Mr. Zottola had retained counsel, who contacted the U.S. Attorney's Office on multiple occasions regarding the grand jury's investigation.  Mr. Zottola invoked his right to speak with his previously-retained counsel during the car ride to the FBI office, and the agents told him that he could only call his counsel after they arrived.  Ex. R, Zottola Decl. ¶ 3.  Upon arrival, Mr. Zottola was placed in an interrogation room where he was handcuffed to the wall.  There, he again asked to call counsel, and the agents responded that he would have an opportunity to do so after his booking was complete.  *Id.* ¶ 4.

Prior to taking his booking information, the agents asked Mr. Zottola questions and engaged him in conversation about his family and the circumstances of his arrest.  *See generally* Ex. R, Zottola Decl. ¶ 5; Ex. S.  A video of Mr. Zottola's post-arrest interrogation, which begins on June 17 just after 7:02 p.m. starts recording when Mr. Zottola is in mid-sentence stating "and my kids are okay,"—plainly a response to questioning and prompts from law enforcement.  *See*

Ex. S; Ex. R, Zottola Decl. ¶ 5.   As reflected in the video, the agents ask Mr. Zottola further questions about his family, prompting Mr. Zottola to state again that he was worried about his children.   Apparently continuing a prior conversation about Mr. Zottola's arrest that occurred before the recording's start, SA Zoufal (who the video shows had just walked into the interrogation room), stated to Mr. Zottola that "it's not how I wanted to do this either, yeah I'm sorry."   In response to the continuous conversation regarding Mr. Zottola's family and the circumstances of his arrest, Mr. Zottola said: "the one thing I can tell you is, I had a feeling you were coming, when I don't know but, I can thank you that it was after Father's day and it was after all my kids' birthdays, whatever it is."   According to the recording, this exchange occurs around 7:03 p.m.  *See* Ex. S.

Mr. Zottola's post-arrest interrogation video shows a continuation of this conversation in which the agents ask him about his family, including about his brother, an alleged victim in this case, and about his company ASZ Maintenance, about which there is also evidence relevant to the Indictment's charges.   Specifically, at 7:07 p.m. SA Zoufal asks Mr. Zottola regarding ASZ Maintenance written on Mr. Zottola's hat: "this is the new company, right? ASZ?," to which Mr. Zottola responded: "uh-uh."   And at 7:08 p.m. SA Zoufal asked Mr. Zottola: "Anthony are you the older brother or the younger brother?" to which Mr. Zottola responded "Youngest child."  *See* Ex. S; Ex. R, Zottola Decl. ¶ 6.   At 7:09 p.m. SA Zoufal began asking Mr. Zottola routine booking questions.  *See* Ex. S; Ex. R, Zottola Decl. ¶ 7.

Several minutes into the booking questions at 7:12 p.m., SA Zoufal asked Mr. Zottola about what medications he takes, to which Mr. Zottola responded that he takes medication for his back. SA Zoufal asked Mr. Zottola: "What do you take?" To which Mr. Zottola responded: "I take what I can.   I usually take those Percocet pills if I can get my hands on some of them because the pain

is just too severe.  That's what's in my house."  SA Zoufal then proceeded to deviate from the routine booking questions to ask whether Mr. Zottola has a prescription for the Percocet, to which Mr. Zottola responded that he did not.  *See* Ex. S; Ex. R, Zottola Decl. ¶ 7.

At 7:13 p.m., Mr. Zottola reiterated his prior invocations of counsel, asking "can I call my lawyer after we're done or when do I call him?"  SA Zoufal again responded that Mr. Zottola could talk to his attorney after booking: "yeah we'll let you talk to your lawyer, let's just get through some of this booking stuff."  *See* Ex. S; Ex. R, Zottola Decl. ¶ 8.

At 7:19 p.m., SA Zoufal finally read Mr. Zottola his *Miranda* warnings for the first time, and asked if he would sign the *Miranda* waiver form to answer additional questions.  Mr. Zottola declined to waive *Miranda*.  Instead, he again invoked counsel stating: "That's if I answer any questions.  But I'm not going to answer any questions until I speak to my lawyer."  *See* Ex. S; Ex. R, Zottola Decl. ¶ 9.  At 7:24 p.m., Mr. Zottola was permitted to speak to his attorney for the first time and at that point the video recording was shut off.  *See* Ex. S.

> ### 2.   *The FBI Reports Include Only Some Aspects of Mr. Zottola's Custodial Interrogation*

In addition to the video recording capturing only a portion of Mr. Zottola's June 17, 2019 post-arrest interview, there are two 302 reports prepared on June 28, 2019 and July 8, 2019 summarizing aspects of his arrest and interrogation.

The June 28, 2019 FBI report, drafted 10 days after Mr. Zottola's arrest was sparce.  It stated only that Mr. Zottola was arrested at 6:05 PM on June 17, 2019 and that:

> [H]e was taken to 26 Federal Plaza, New York, New York, for booking . . . . Special Agent (SA) MICHAEL ZOUFAL then asked standard booking questions.  During standard booking, ANTHONY ZOTTOLA advised he took Percocet without a prescription due to back pain. ZOTTOLA advised these pills were in his home. ZOTTOLA also thanked SA ZOUFAL and Detectives RICKER and ORTIZ for not arresting him until after Father's Day.  At approximately, 7:50 PM SA ZOUFAL read ZOTTOLA an FD-395 Advice of Rights form. ZOTTOLA indicated he would

not sign the advice of rights from and asked to speak with his attorney at approximately 7:52 PM. SA ZOUFAL then let ZOTTOLA call his attorney, KERRY LAWRENCE.

Ex. T.

The FBI 302 report drafted on July 8, 2019 provided further detail about the steps taken on June 17, 2019 to contact Mr. Zottola's wife to pick up their minor child who was with Mr. Zottola at the time of his arrest, but was less descriptive yet regarding Mr. Zottola's invocation of counsel and post-arrest questioning.  It stated only that:

> ZOTTOLA was then transported to 26 Federal Plaza, New York, New York. ZOTTOLA was then asked a series of standard booking questions. ZOTTOLA was advised of his rights via the FD-395 Advice of Rights form. ZOTTOLA invoked his right to counsel and all questioning ceased. ZOTTOLA was then allowed to contact his retained attorney KERRY LAWRENCE.

Ex. U.

Significantly, neither arrest report memorializes Mr. Zottola's invocation of counsel prior to his receipt of the *Miranda* warnings at 7:19 p.m.—although he invoked counsel several times before, including once recorded on video.  *See* Ex. R, Zottola Decl. ¶¶ 3, 4, 8; Ex. T; Ex. U.

**B.    Mr. Zottola's Custodial Interrogation Violated *Miranda* and Should be Suppressed**

**1.    *Mr. Zottola Invoked Counsel Throughout his Custodial Interrogation, Even Prior to Receipt of the Miranda Warnings***

Custodial interrogation of a criminal suspect must be preceded by a knowing and voluntary waiver of *Miranda* rights.  *Miranda v. Arizona*, 384 U.S. 436 (1966).  Where "a defendant is not advised of his *Miranda* rights prior to making his custodial statement, an irrebuttable presumption of compulsion arises and the state cannot show that the suspect waived his rights voluntarily." *United States v. Gaines*, 295 F.3d 293, 298 (2d Cir. 2002) (citing *Oregon v. Elstad*, 470 U.S. 298, 307 (1985)).  Moreover, if a defendant "requests counsel at any time during the interview, he is

not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 458 (1994).

There is a "presumption that the defendant did not waive his rights" in the context of custodial interrogation. *United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir.1990). And, "the government bears the burden of establishing by a preponderance of the evidence that law enforcement officers not only properly advised defendant of his Fifth Amendment rights, but also that the defendant made a knowing and voluntary waiver of those rights." *United States v. Morel*, No. 09-CR-493 (KAM), 2010 WL 2545479, at *8 (E.D.N.Y. June 18, 2010) (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).

As an initial matter, because Mr. Zottola only received *Miranda* warnings at the end of his custodial interrogation, suppression of his pre-*Miranda* statements is warranted on that basis alone. The interrogation was plainly custodial, as Mr. Zottola was under arrest and in FBI custody at the time, raising "an irrebuttable presumption of compulsion" as to these un-*Mirandized* statements. *See Gaines*, 295 F.3d at 298.

 Mr. Zottola also invoked counsel several times throughout his interrogation, including (1) in the agents' car on the way to the FBI Manhattan field office; and (2) upon arrival at the FBI Manhattan field office.  *See* Ex. R, Zottola Decl. at ¶¶ 3, 4.  Mr. Zottola's repeated and unambiguous requests to speak with counsel constituted "clear" and "effective" invocations of counsel.  *See United States v. Seppala*, No. 16-CR-436 (KMW), 2017 WL 5633167, at *2 (S.D.N.Y. Nov. 22, 2017) (suppressing statements because the defendant "unambiguously invoked his right to counsel when he asked, 'Do I have an opportunity to call an attorney?'" as "[i]nvocations of the right to counsel evincing 'no internal debate' are deemed effective"); *see also McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (noting that invocation "requires, at a minimum,

some statement that can reasonably be construed to be an expression of a desire for the assistance

of an attorney"); *Wood v. Ercole*, 644 F.3d 83, 91-92 (2d Cir. 2011) ("I think I should get a lawyer"

was an unambiguous invocation); *Smith v. Endell*, 860 F.2d 1528, 1529, 1531 (9th Cir. 1988)

("Can I talk to a lawyer?" was an unambiguous invocation).

With his first invocation of counsel prior to his arrival at the FBI field office, *see* Ex. R,

Zottola Decl. at ¶ 3, all questioning should have stopped, and permanently.  *See Wood*, 644 F.3d

at 91 (videotaped statement was inadmissible at trial because law enforcement "had an obligation

to stop all questioning after [the suspect] unambiguously asserted his right to counsel").  But it did

not.  Instead, agents continued to engage Mr. Zottola in conversation regarding his family and

business—both of which have clear bearing on the allegations against Mr. Zottola as the alleged

victims are his father and brother who worked with him in the family real estate business—in the

hope of getting him to make substantive statements relevant to the case.  Indeed, at the start of the

video recording, prior to which Mr. Zottola had invoked counsel more than once, Ex. R, Zottola

Decl. at ¶¶ 3, 4, Mr. Zottola is responding to questions about his family.  In the next minute of the

video SA Zoufal initiates further conversation about the circumstances of Mr. Zottola's arrest.

This conduct is precisely what the law prohibits: rather than ceasing all questioning, the agents

proceeded precisely as they had prior to the clear invocation of counsel, warranting suppression.

*See, e.g., Wood*, 644 F.3d at 91.[24]

It is of no moment that Mr. Zottola's invocations of counsel in the car and prior to the start

of the video recording in the FBI interrogation room are not recorded by the government's

materials.  *See* Ex. R, Zottola Decl. at ¶¶ 3, 4.  Indeed, neither FBI 302 report purporting to describe

---

[24] Indeed, the video recording memorializes one example of the agents' cavalier disregard of Mr. Zottola's invocation of counsel: After Mr. Zottola invoked counsel for the third time, agents proceed to brush aside his request, telling him he could speak with counsel only later on.  Ex. S.

material events at Mr. Zottola's arrest included references to Mr. Zottola's invocation of counsel at 7:13 p.m. captured on the FBI's own video recording.  *Compare* Ex. S *with* Ex. T *and with* Ex. U.  These 302 reports were "clearly not an exhaustive record," and should not be treated as such *See United States v. Hyman*, No. 18-CR-307 (BMC), 2019 WL 5696840, at *3 (E.D.N.Y. Nov. 4, 2019) (suppressing defendants' statements following invocation of *Miranda* where the 302 reports did not contain "a complete story" of the custodial interrogation).

Exacerbating the *Miranda* violations here, during the course of the months-long investigation into Mr. Zottola, his retained counsel had reached out to the government several times on Mr. Zottola's behalf.  At the time of his arrest, the government and arresting agents thus knew Mr. Zottola was represented by counsel, and thus that they were prohibited from engaging in any custodial interrogation outside the presence of counsel.[25]  *See United States v. Alleyne*, No. 20-CR-266 (AMD), 2021 WL 5496044, at *10 (E.D.N.Y. Nov. 23, 2021) ("In any event, [the arresting agent] knew that he could not question the defendant because he had a lawyer. Accordingly, any statements that the defendant made after invoking his right to counsel" were improperly "the result of interrogation.") (citations omitted); *Miranda v. Arizona*, 384 U.S. 436, 474 (1966)("If the individual states that he wants an attorney, the interrogation must cease until an attorney is present"). Because Mr. Zottola had invoked his right to counsel and had not been

---

[25] The government's awareness that Mr. Zottola had previously retained counsel who had contacted the federal prosecutors on Mr. Zottola's behalf during the pendency of the investigation, prior to his arrest only further undermines any argument that Mr. Zottola voluntarily and spontaneously decided to waive *Miranda* and speak to agents.  *See Alleyne*, No. 20-CR-266 (AMD), 2021 WL 5496044, at 11 (suppressing post-arrest statements explaining that: "[e]ven crediting [the agent's] testimony that the defendant, who moments earlier not only invoked his right to counsel but had spoken to his lawyer. . . started talking about the details of his two open cases, I find that the government has not met its burden of proving that the defendant evinced a willingness and a desire for a generalized discussion about the investigation.") (quotation marks and citations omitted)).

*Mirandized* prior to any custodial interrogation his post-arrest interrogation statements should be suppressed.

### C.    In the Alternative, the Court Should Hold a Suppression Hearing

At a minimum, the Court should hold a suppression hearing regarding Mr. Zottola's custodial statements.  "An evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, detailed, and nonconjectural to enable a court to conclude that there are contested issues of fact."  *See United States v. Harun*, 232 F. Supp. 3d 282, 285 (E.D.N.Y. 2017) (quoting *Jones v. United States*, 365 F. App'x. 309, 310 (2d Cir. 2010), modifications omitted).  Mr. Zottola's submission amply meets that standard.

Mr. Zottola's invocation of counsel at least twice prior to being handcuffed in the interrogation room: once during the car ride to the FBI office in Manhattan, and again upon arrival at the FBI office.  *See* Ex. R, Zottola Decl. ¶¶ 3, 4.  Neither of those invocations are recorded in the 302s of Mr. Zottola's June 17, 2019 arrest, which were drafted only later on June 28 and July 8, 2019.  *See* Exs. T, U.  Thus, to the extent the government stands by the chronology in the agents' notes, it directly conflicts with Mr. Zottola's declaration.

Moreover, the glaring inconsistencies between the agents' notes as memorialized in the 302 reports, and the video recording of a portion of Mr. Zottola's custodial interrogation only raise further issues of fact.  For example, whereas Mr. Zottola invoked counsel several minutes *prior* to being receiving the *Miranda* warnings, and invoked counsel again after the warnings, the FBI 302 reports memorialize only his invocation of counsel *after* receiving *Miranda* warnings.  Although an earlier request to speak to counsel is plain on the video, it is included in neither 302 report of the June 17 arrest.  *Compare* Ex. T *with* Ex. U *and with* Ex. S.  Those discrepancies undermine the veracity of the agents' reports, which in any event conflict with Mr. Zottola's declaration.  A suppression hearing is thus required.

## VIII.   THE COURT SHOULD ORDER THAT A JUROR QUESTIONNAIRE BE USED FOR VOIR DIRE

Defendant Anthony Zottola, Sr., joined by all remaining co-Defendants, respectfully request that this Court issue a thorough written juror questionnaire, *see* Ex. V,[26] to prospective jurors in this case in advance of trial in order to allow the parties sufficient time to adequately assess the jurors' responses as well as to ensure that media attention related to this case does not affect the defendants' trials.[27]

As the Court is aware, this is a high-profile case that has already garnered significant media attention, and that the defense anticipates will garner even more media attention during trial.  The media attention has already been significantly prejudicial, signaling out, in particular, Mr. Zottola, Mr. Shelton, and Mr. Blanco.  *See, e.g.*, *SEE IT: Reputed Bronx mobster survived botched hit by masked gunman*, NY Daily News, July 13, 2018 (including surveillance video and still photos of July 11, 2018 attempted murder of Sylvester "Sally Daz" Zottola);[28] *Mobster's son behind dad's murder at McDonald's drive-thru: feds*, NY Daily News, June 18, 2019 (describing and quoting from detailed text messages allegedly between co-defendants Shelton and Anthony Zottola relating to both the attempted murder and the subsequent murder charged in the Indictment, and describing Sylvester Zottola's ties to alleged former Bonanno family boss Vincent Basciano and alleged then-acting boss Joseph "Joe C" Cammarano); *Second suspect busted in drive-thru execution of longtime Bonanno family associate 'Sally Daz'*, NY Daily News, Nov. 16, 2018 (referring to co-

---

[26] Defendants' Joint Proposed Juror Questionnaire is attached as Exhibit V.

[27] Due to the number of defendants remaining in this case, coupled with this District's COVID-related capacity limitations in any one courtroom at a time, as of this writing it is assumed that the defendants will be divided into two separate trial groups.  The defendants request a juror questionnaire irrespective of whether two trials, or only one trial, is ultimately necessary.

[28] Available at https://www.nydailynews.com/new-york/nyc-crime/ny-metro-bronx-man-dodge-shooter-20180712-story.html.

defendant Herman Blanco as "[a] gangster known as 'Taliban', explaining that the complaint against Mr. Blanco "was filed by an FBI agent assigned to a squad investigating Balkan and Middle Eastern organized crime," and describing the offense as "execution of a veteran Mafia associate"; also describing Mr. Shelton as a "Brooklyn gangbanger").[29]  The first two articles would prejudice any juror who might have read either one of them, given the graphic details described and shown therein.  Just as prejudicial, the third article gives off the false and inflammatory impression that a co-defendant is a Muslim extremist or terrorist.

These are by no means the only articles describing the offenses, previewing the evidence, and maligning the defendants.  *See, e.g.*, *High-ranking alleged Bloods member faces federal charges for murder-for-hire hit on Bronx mobster*, NY Daily News, November 9, 2018 (describing Mr. Shelton as a "Bloods gang leader" and describing some of the evidence against him);[30] *Hunted for Months, Reputed Mobster is Gunned Down at McDonald*, NY Times, Oct. 4, 2018;[31] *Killing of Mobster at McDonald's Was Ordered by His Son, Prosecutors Say*, NY Times, June 18, 2019.[32] Other articles have closely covered the defendants' bail motions, *see, e.g.*, *No bail for son who arranged hit of mobster father*, NY Daily News, Jan. 21, 2020 (explaining that the Court denied Mr. Zottola's request for release on $5,000,000 bail; also describing "the elder Zottola as a Luchese family associate with ties to now-imprisoned ex-Bonanno family boss Vincent (Vinnie Gorgeous)

---

[29]  Available at https://www.nydailynews.com/new-york/nyc-crime/ny-metro-mob-hit-second-arrest-20181116-story.html.

[30]  Available at https://www.nydailynews.com/new-york/nyc-crime/ny-metro-bloods-member-federally-charged-mob-murder-20181109-story.html.

[31]  Available at https://www.nytimes.com/2018/10/04/nyregion/sylvester-zottola-dead-bonanno-bronx.html?searchResultPosition=2.

[32]  Available at https://www.nytimes.com/2019/06/18/nyregion/mafia-zottolo-mcdonalds-killing.html?searchResultPosition=1.

Basciano");[33] *Son accused of ordering hit on mobster dad at McDonald's wants out of jail over coronavirus*, NY Post, March 28, 2020.[34]  Other articles indicated that the defendants had all been facing the possibility of the death penalty in this case.  *See, e.g., Death penalty hangs over 10 defendants in Bronx drive-through murder of mobster 'Sally Daz' Zottola, failed hit on his son*, NY Daily News, June 30, 2019 (explaining that all of the defendants were, at the time, death-eligible).[35]

While certain media accounts might end up bearing relevance to the trial, individuals should not be seated on the defendants' jury who are already aware of media reports which could taint the ability of many—if not most—potential jurors from sitting on this case.

The topics which must be explored in order to ensure an impartial jury in this case are very sensitive.  A questionnaire would allow the Court to make inquiry in a less confrontational manner, thus encouraging more candid responses to sensitive questions.  There is ample precedent for the use of such questionnaires in cases such as this one.  Among other circumstances, the Second Circuit has approved the use of written juror questionnaires in cases where a large number of prospective jurors must be screened, *see United States v. Rahman*, 189 F.3d 88, 121 (2d Cir. 1999), where there has been extensive pretrial publicity, *see United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006), or where the death penalty may be imposed.  *See United States v. Quinones*, 511 F.3d 289, 299-300 (2d Cir. 2007).

---

[33]  Available at https://www.nydailynews.com/new-york/ny-murder-bail-denied-mob-zottola-20200121-23tp6wexvrb2nhoipsvye6ekfe-story.html.

[34]  Available at https://nypost.com/2020/03/28/son-accused-of-ordering-hit-on-mobster-dad-at-mcdonalds-wants-out-of-jail-over-coronavirus/.

[35]  Available at https://www.nydailynews.com/new-york/nyc-crime/ny-bronx-mob-hit-20190730-37fvhfoeqzbwjb4gq3t7un6qmy-story.html.

Here, a jury questionnaire is appropriate and necessary to adequately question jurors regarding bias and to encourage candid responses, allowing both sides to exercise their peremptory challenges intelligently.  In addition, the Federal Rules allow for questioning by either the Court or the parties or a combination of both, *see* Fed. R. Crim. P. 24(a), and it is well settled that District Courts have "ample discretion in determining how best to conduct the voir dire." *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981); *see also United States v. Millar*, 79 F.3d 338, 342 (2d Cir. 1996).  As such, this Court has "broad discretion whether to pose a defendant's requested voir dire questions," *United States v. Kyles*, 40 F.3d 519, 524 (2d Cir. 1994), including those suggested in Defendants' Joint Proposed Juror Questionnaire (attached).  Given in particular the media attention that this case has already garnered, Mr. Zottola and his co-defendants respectfully request that this Court employ a written juror questionnaire in this case.  No prejudice can come to either party through the use of a juror questionnaire, yet the benefits to a fair trial are exponential.

## IX.    CONCLUSION

Defendant Anthony Zottola, Sr. respectfully requests that this Court grant his pretrial motions and: (1) preclude the government from using evidence produced to the defense three months after the court-ordered Rule 16 deadline; (2) compel the government to make full and complete *Brady* disclosures; (3) compel the government to immediately produce all statements in its possession or constructive possession made by the decedent; (4) order the government to file a bill of particulars; (5) suppress the materials seized pursuant to searches of Mr. Zottola's devices, home, and cellular telephone carrier information; (6) suppress Mr. Zottola's conversations with co-defendant Bushawn Shelton seized from Shelton's cellular telephone; (7) suppress Mr. Zottola's June 17, 2019 post-arrest statements; and (8) order that a written juror questionnaire be used for vior dire.  In the alternative, Mr. Zottola respectfully requests that the Court conduct evidentiary hearings on disputed factual issues that are material to resolution of the motions.

Dated: April 29, 2022                        Respectfully submitted,
       New York, New York

                                             MEISTER SEELIG & FEIN LLP

                              By:  _____/S/_____
                                             Henry E. Mazurek
                                             Ilana Haramati
                                             125 Park Avenue, Suite 700
                                             New York, New York 10017

                                             *Attorneys for Defendant Anthony Zottola, Sr.*