

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NS:KCB/DEL/EJD/AMR          *271 Cadman Plaza East*
F. #2018R01984               *Brooklyn, New York 11201*

July 22, 2022

By E-mail and ECF

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Shelton, et al.
                   Criminal Docket No. 18-609 (S-3) (RJD)

Dear Judge Dearie:

        Trial in this matter is scheduled to begin on August 24, 2022.  The government respectfully submits the following motions in limine to admit certain evidence at trial. Specifically, the government seeks to admit in its case-in-chief (i) various statements made by and between the defendants and their co-conspirators, including oral statements and telephonic communications; (ii) certain statements made by the homicide victim Sylvester Zottola; (iii) 911 calls regarding various charged acts of violence; and (iv) the autopsy and prehospital care reports related to Sylvester Zottola.  Further, the government seeks to preclude (i) the defendants from introducing evidence or eliciting testimony in support of speculative theories of an alternative perpetrator unless the defendant first establishes a sufficient nexus to the charged crimes; (ii) the defendants from introducing their own hearsay statements; and (iii) reference at trial to any potential punishment should the jury convict, or references to the lawfulness of searches and seizures conducted throughout the course of the investigation.  Finally, the government respectfully seeks to cross-examine the defendants, should they testify, on their respective criminal histories within the bounds contemplated by the Federal Rules of Evidence.

        As explained in detail below, all of the proffered statements and reports are relevant and admissible under the Federal Rules of Evidence, pursuant to the hearsay exemptions or exceptions set forth in the Federal Rules of Evidence, or because they are non-hearsay.  And as also detailed below, the Court should preclude the defendants from speculating or appealing to factors that have no bearing on the defendants' guilt.

        The defendants are charged with murder-for-hire conspiracy, murder-for-hire and related firearms offenses for their participation in the attempted murder of Salvatore Zottola and murder of Sylvester Zottola.  An accounting of the principal facts the government intends to

introduce at trial related to the charged crimes is set forth in the government's July 8, 2022 motion in limine seeking to admit "other acts" evidence, which is incorporated herein by reference.  See Gov. Mot., ECF No. 389 ("July 8 Mot.").

I.      Statements by the Defendants and Their Co-Conspirators Are Admissible

As outlined in part in the July 8 Motion, during the course of the conspiracy to commit murder-for-hire—which itself comprised numerous attempts to assault, kidnap and murder the victims in this case—the defendants and their co-conspirators had countless conversations in furtherance of the scheme about (i) the recruitment of individuals into the scheme; (ii) the planning, means and methods used by the conspirators to commit these various acts of violence; (iii) the conspirators' receipt of or anticipated receipt of payment for participation in the scheme; and (iv) the attempts by the defendants and their co-conspirators to conceal their involvement in the scheme.  The government intends to introduce statements made by the defendants and other members of the conspiracy that were made in furtherance of the charged conspiracy.  These statements are admissible because they constitute direct evidence of the charged crimes (as detailed at length in the July 8 Motion), and either are not hearsay or fall within an exception to the hearsay rule under the Federal Rules of Evidence.

A.      Applicable Law

1.      Hearsay

The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  "Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court."  Fed. R. Evid. 802.

i.      Non-Hearsay

Not all out-of-court statements are hearsay.  First, out-of-court statements made by the defendant are not hearsay when introduced by the government in a criminal trial to prove the truth of the facts stated therein because they are admissions of an adverse party.  See Fed. R. Evid. 801(d)(2)(A).

Second, Rule 801(d)(2)(E) excludes from the definition of hearsay statements "made by a party's coconspirator of a party during and in furtherance of the conspiracy."  A co-conspirator statement is admissible if the court finds by a preponderance of the evidence that (1) the conspiracy existed at the time the statement was made; (2) both the declarant and the non-offering party were part of the conspiracy; and (3) the statement was made in furtherance of the conspiracy.  Bourjaily v. United States, 483 U.S. 171, 176 (1987); see also United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1998).  While the hearsay statement itself may be considered in establishing the existence of the conspiracy, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy."  Gigante, 166 F.3d at 82 (quoting United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996)).

2

With respect to the first requirement, the conspiracy in which the defendant and the declarant are engaged "need not be the crime charged in the indictment" for the statements to be admissible.  United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002).  It is sufficient that the defendant and the declarant were in a conspiracy together.  Id.

"As to the second requirement, statements made during the course and in furtherance of a conspiracy must be such as to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." Gigante, 166 F.3d at 82 (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990)).  "This can include those statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." Id. (quoting Maldonado-Rivera, 922 F.2d at 959); see also Russo, 302 F.3d at 46 (statements which "inform . . . [coconspirators] of the status of the conspiracy are in furtherance of the conspiracy within the meaning of 801(d)(2)(e)").  Relatedly, the Second Circuit has held that a status update is sufficient to satisfy the "in furtherance" requirement of Rule 801(d)(2)(E).  United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994); see also United States v. Stewart, 433 F.3d 273, 293 (2d Cir. 2006) (holding that the statement need not actually further the conspiracy, but instead need only be made with the intent to further some objective of the conspiracy); United States v. Mulder, 273 F.3d 91, 103 (2d Cir. 2001); United States v. Schlesinger, 372 F. Supp. 2d 711, 720 (E.D.N.Y. 2005).

Third, statements that are not being offered for their truth also are not hearsay.  For example, out-of-court statements made by a third party are not hearsay if offered as circumstantial evidence of the defendant's state of mind, rather than for their truth.  United States v. Detrich, 865 F.2d 17, 21 (2d Cir. 1988); United States v. Dunloy, 584 F.2d 6, 11 (2d Cir. 1978).  Similarly, questions or commands do not generally constitute hearsay.  See United States v. Bellomo, 176 F.3d 580, 586-87 (2d Cir. 1999); United States v. Dominguez-Gabriel, 511 Fed. App'x 17, 20 (2d Cir. 2013); Quartararo v. Hanslmaier, 186 F.3d 91, 98 (2d Cir. 1999).  Finally, when a defendant makes statements in the context of a conversation with a third party, the statements of the third party are admissible non-hearsay to the extent that they are necessary to place the defendant's statements in proper context.  See United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990); United States v. Davis, 890 F.2d 1373, 1380 (7th Cir. 1989).

ii.   Statements Against Penal Interest - Rule 804(b)(3)

Rule 804(b)(3) of the Federal Rules of Evidence provides for the admissibility of a hearsay statement if the declarant is unavailable and his statement is against his penal interest.  In order to fall within this exception to the rule against hearsay, the statement must be one that:

(A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to . . . expose the declarant to civil or criminal liability; and

3

> (B) is supported by corroborating circumstances that clearly indicate
> its trustworthiness, if it is offered in a criminal case as one that tends
> to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3).

Admission of such a statement "hinges on whether the statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." United States v. Williams, 506 F.3d 151, 155 (2d Cir. 2007) (quoting Williamson v. United States, 512 U.S. 594, 603-04 (1994) (quoting Rule 804(b)(3)) (quotation marks omitted)). "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context… [t]hus, this determination must be made on a case-by-case basis." Id. (citations omitted). Furthermore, a statement against penal interest does not violate the Confrontation Clause when the declarant made the statement in a conversation with a potential co-conspirator. United States v. Saget, 377 F.3d 223, 229 (2d Cir. 2004) (distinguishing Crawford v. Washington, 541 U.S. 36 (2004)).

## 2.   Rule of Completeness – Rule 106

Finally, as relevant to this motion, the "doctrine of completeness," provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. The Second Circuit has "interpreted [the doctrine of completeness] to require that a statement be admitted in its entirety when this is necessary to explain the admitted portion, to place it in context, or to avoid misleading the trier of fact, or to ensure a 'fair and impartial understanding' of the admitted portion." United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) (quoting United States v. Capaldo, 402 F.2d 821, 824 (2d Cir. 1968) (collecting cases)). This is true "even though a statement may be hearsay." United States v. Coplan, 703 F.3d 46, 85 (2d Cir. 2012) (quoting United States v. Kopp, 562 F.3d 141, 144 (2d Cir. 2009)). The doctrine of completeness "does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." Kopp, 562 F.3d at 144. The doctrine of completeness also applies to oral statements. United States v. Johnson, 507 F.3d 793, 796 n. 2 (2d Cir.2007).

## B.   Analysis

The government intends to introduce at trial a number of out-of-court statements made by the defendants and their co-conspirators—both charged and uncharged—that are relevant and either (1) do not constitute hearsay under the Federal Rules of Evidence; (2) are admissible as statements against penal interest; or (3) are otherwise admissible pursuant to the rule of completeness. Specifically, the government intends to introduce the following evidence at trial:[1]

---

[1] The types of statements outlined herein are representative of the statements that the government intends to introduce at trial as direct evidence; it is by no means exhaustive, and the

4

- The testimony of several witnesses, including cooperating and civilian witnesses, about statements by the defendants and their charged co-conspirators, including Herman Blanco and Jason Cummings, as well as other uncharged co-conspirators, including ████████████████ before and after the attempted murder and murder, regarding recruiting, planning, committing and being paid for their respective participation in the murder-for-hire conspiracy.

- Extensive text message correspondence orchestrating the murder-for-hire plot, including between Shelton, the other charged defendants and cooperating witnesses— some examples of which are detailed in the government's July 8 Memo—and uncharged co-conspirators, including, among others, ███████████████████

government expects to introduce as evidence statements of a similar nature that are not outlined here.

██████████████████████████████████████████████████

- Recorded telephone calls, including between Shelton and Takeisha Shelton in December 2018 discussing work needing to be performed on their Brooklyn property, after which Takeisha Shelton contacted Anthony Zottola;

██████████████████████████████████████████████████

- Witness testimony that Takeisha Shelton attempted to retrieve a phone used by Shelton containing significant evidence of the murder-for-hire scheme, and specifically that in late October 2018, following Shelton's arrest, Takeisha Shelton contacted law enforcement by telephone attempting to claim ownership of and retrieve a Samsung Galaxy Note with a case with Shelton's company name on it (Minding My Business Certified). The last four digits of the phone number of the phone Takeisha Shelton attempted to retrieve were the last four digits of a phone Takeisha Shelton had previously told law enforcement was used by Shelton and that his work records listed as his number. When Shelton was taken into custody, he had the phone in question in his hand.

██████████████████████████████████████████████████

- Social media posts, photograph captions and communications evidencing relationships among the co-conspirators as well as participation in unlawful activity or celebration of ill-gotten gains (for example, photograph captions regarding wealth obtained following the murder of Sylvester Zottola).

These statements are admissible.

First, these statements are direct evidence of the defendants' participation in the charged murder-for-hire conspiracy, as outlined at length in the government's July 8 Memo. Second, all of these statements are either non-hearsay or fall within one or more hearsay exceptions. As an initial matter, each of the defendants' own statements constitutes an admission of an adverse party, and thus is admissible against him pursuant to Rule 801(d)(2)(A).

Moreover, the statements detailed above among members of the conspiracy, including the defendants, their co-defendants and uncharged co-conspirators, constitute co-conspirator statements and, thus, are excluded from the hearsay bar pursuant to Rule 801(d)(2)(E). At trial, the government will present substantial evidence that the defendants and the declarants were part of the same conspiracy to kill Salvatore and Sylvester Zottola and that the statements were made in furtherance of the conspiracy because they were either, among other reasons, (i) in furtherance of the agreed-upon plot; (ii) to keep each other informed about acts of violence carried out by members of the conspiracy and the presence of law enforcement; (iii) to avoid detection or apprehension for participating in the conspiracy, or (iv) to facilitate payment for participation in the conspiracy. The government anticipates that the context in which the co-conspirator statements are offered at trial will make clear that the statements were made during and in furtherance of the conspiracy.

The majority of these statements are also statements against penal interest and, thus, also admissible pursuant to Rule 804(b)(3). The government anticipates that each declarant would invoke his or her Fifth Amendment privilege against self-incrimination, thus satisfying Rule 804's unavailability requirement. See, e.g., Fed. R. Evid. 804(a) (noting that declarant "is considered to be unavailable as a witness" pursuant to Rule 804(b)(3) where a privilege applies); United States v. Deluna, 38 F. App'x 644, 645 (2d Cir. 2002) (upholding admission of coconspirator statement where coconspirator "was unavailable to testify as he would have invoked his Fifth Amendment privilege against self-incrimination"). And the admissions detailed above— pertaining to the defendants' and co-conspirators' participation in a murder-for-hire plot or attempts to obstruct law enforcement detection—are patently against each declarant's penal interest.

Finally, the remainder of the statements comprising the witness testimony, recorded telephone calls, text messages, and other correspondence are either (1) not offered for their truth, but, rather, for their effect on the respective listener; (2) are questions or commands generally not constituting hearsay; or (3) otherwise place the admissible statements in context.

## II.     Statements by Sylvester Zottola Are Admissible

The government seeks to admit evidence—including oral statements made by homicide victim Sylvester Zottola (established through witness testimony) and content from his cell phone—describing the crimes being perpetrated against him, injuries that he suffered as a result of these crimes and actions that he took because of and at the time of the commission of the crimes.

Such statements are directly relevant to the charged murder conspiracy because they are evidence of the crimes that can be provided by no one other than Sylvester Zottola, a deceased victim of the murder-for-hire plot. Further, these statements corroborate other evidence in the government's case, establish the circumstances under which Zottola was repeatedly attacked and ultimately died, and provide vital information as to why law enforcement's investigation proceeded as it did. Moreover, Zottola's statements are admissible under numerous exceptions to the prohibitions against hearsay—as excited utterances, present sense impressions, statements as instructive of Zottola's then-existing state of mind and future intent, and statements made for

7

purposes of medical diagnosis.  Further, Zottola's statements to law enforcement describing the crimes being perpetrated against him are admissible under the residual exception.

### A.   Applicable Law

#### 1.   Excited Utterances – Rule 803(2)

Rule 803(2) of the Federal Rules of Evidence provides an exception to the rule against hearsay for excited utterances.  An excited utterance is a statement "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2).    To qualify as an excited utterance, the proponent of an out-of-court statement must establish the following: (i) that a startling event occurred; (ii) that the declarant made the statement while under the stress of the excitement caused by the startling event; and (iii) that the declarant's statement relates to the startling event.  See United States v. Brown, 254 F.3d 454, 458 (2d Cir. 2001).  "The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability.  An excited utterance need not be contemporaneous with the startling event to be admissible under Rule 803(2)."  United States v. Tocco, 135 F.3d 116, 127 (2d Cir. 1998).

#### 2.   Present Sense Impression – Rule 803(1)

Rule 803(1) of the Federal Rules of Evidence provides an exception to the general rule against hearsay for any statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."

"The theory behind this exception is essentially twofold.  First, the immediacy requirement reduces the opportunity for reflection, and thus minimizes the likelihood of deception or fabrication on the part of the declarant."  United States v. Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994) (internal citations omitted).  "Secondly, immediacy also greatly reduces the likelihood that the declarant will have inaccurately remembered the event in question."  Id.  "By its own terms, application of Rule 803(1) has three distinct requirements: [1] the statement must describe or explain the event or perceived; [2] the declarant must have in fact perceived the event described; and [3] the description must be 'substantially contemporaneous' with the event in question."  Id. (citing Fed. R. Evid. 803(1)).  Courts have routinely found 9-1-1 calls to be present sense impressions.  See United States v. Steele, 216 F. Supp. 3d 317, 322 (S.D.N.Y. 2016) (admitting 911 call as present sense impression or excited utterance); see also id. (citing United States v. Shoup, 476 F.3d 38, 42 (1st Cir. 2007) (admitting 911 call made one or two minutes following event); United States v. Hawkins, 59 F.3d 723, 730 (8th Cir. 1995) (911 call made within seven minutes of the event sufficiently contemporaneous to be a present sense impression), vacated on other grounds, 516 U.S. 1168 (1996)).

#### 3.   Then-Existing State of Mind – Rule 803(3)

Federal Rule of Evidence 803(3) provides that the following type of statement does not constitute hearsay, regardless of the out-of-court declarant's availability:

8

> [a] statement of the declarant's then-existing state of mind (such as
> motive, intent, or plan) or emotional, sensory, or physical condition
> (such as mental feeling, pain, or bodily health) . . . .

Fed. R. Evid. 803(3).

Rule 803(3) also permits the admission of out-of-court statements "reflecting a declarant's intentions or future plans" and allows such statements to be introduced, where relevant, "to prove subsequent acts." United States v. Cicale, 691 F.2d 95, 103 (2d Cir. 1982). Under Rule 803(3), "if relevant, a declarant's statement of his intent may be introduced to prove that the declarant thereafter acted in accordance with the stated intent." United States v. Persico, 645 F.3d 85, 100 (2d Cir. 2011) (internal quotation marks and alterations omitted); see also Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 299-300 (1892) (stating principle that statements of intent are reliable, competent evidence).

Further, "[a] declarant's statement of intent may . . . be admitted against a non-declarant when there is independent evidence which connects the declarant's statement with the non-declarant's activities." United States v. Delvecchio, 816 F.2d 859, 863 (2d Cir.1987); see also Persico, 645 F.3d at 100-01; United States v. Best, 219 F.3d 192, 198 (2d Cir. 2000) (collecting cases upholding the admission of statements of intent regarding future illegal transactions, where corroborated by circumstantial evidence, as evidence of the non-declarant defendant's participation in such transactions); United States v. Sperling, 726 F.2d 69, 73-74 (2d Cir. 1984) (holding admissible declarant's statement of intent against non-declarant where corroborated by independent evidence); Cicale, 691 F.2d at 103-04 (same).

### 4.   Residual Exception – Rule 807

Federal Rule of Evidence 807 provides that otherwise inadmissible hearsay may be admitted, where the statement is (1) "supported by sufficient guarantees of trustworthiness—after considering the circumstances under which it was made and evidence, if any, corroborating the statement," and (2) "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807. The Second Circuit breaks this exception down to five requirements: hearsay evidence is admissible if (i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party. United States v. Dawkins, 999 F.3d 767, 791 (2d Cir. 2021) (citing United States v. Bryce, F.3d 346, 350-51 (2d Cir. 1999); see also United States v. Harwood, 998 F.2d 91, 98 (2d Cir. 1993).

Where statements indicate a high degree of trustworthiness, and circumstances indicate that there is little or no reason to believe the declarant had a motive to lie, the statements may be properly admitted under Rule 807. See Bryce, 208 F.3d at 351. In considering the admissibility of statements made to law enforcement under the residual exception, it is proper to evaluate (1) the amount of time that elapsed between the event and the statements; (2) the degree of specificity of the statements; and (3) whether they were intended in good faith to help the officer or agent interviewing the witness solve a crime. See United States v. Carneglia, 256 F.R.D. 384, 392 (E.D.N.Y. March 11, 2009).

B. <u>Analysis</u>

      i. <u>Sylvester Zottola's Oral Statements Made to Law Enforcement Describing the Attacks Against Him Are Admissible as Excited Utterances</u>

The following statements made by Zottola to law enforcement are admissible pursuant to Federal Rule of Evidence 803(2) as excited utterances:

- Statements made to members of law enforcement who responded to a November 26, 2017 incident, where Sylvester Zottola described being blocked in by a van while driving and approached by a masked man who pointed a firearm at Zottola. Zottola's description of the incident was provided to law enforcement within approximately 45 minutes of the incident occurring and provided to a 911 operator within minutes of the incident.

- Statements made to members of law enforcement who responded to Jacobi Hospital after Zottola was attacked and stabbed in his home on December 27, 2017, and taken by ambulance to the emergency room. Zottola's description of the incident was provided to law enforcement while he was in the emergency room approximately 45 minutes after he was rushed to the hospital and while he was undergoing treatment for his serious injuries.

- Statements made to Maximum Security on a May 1, 2018 recorded call regarding a panic alarm going off at the Zottola family office.

- Statements made to members of law enforcement who responded to ▮▮▮▮▮ ▮▮▮▮ on June 12, 2018, after Sylvester Zottola fired a shot at an individual who approached his residence with a firearm. Zottola was captured on New York City Police Department body camera footage in the immediate aftermath of the incident providing a description of the incident, approximately 15 to 20 minutes after it occurred, to law enforcement.

<u>First</u>, these statements are relevant because they are statements describing the crimes being perpetrated against Sylvester Zottola as part of the murder-for-hire conspiracy charged in the indictment, and they are descriptions that only the deceased can provide. <u>Second</u>, the statements made by Sylvester Zottola are not hearsay, as they are excited utterances, all "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). In each of the above-described circumstances, a startling event had just occurred (an attack on Zottola or break-in during the course of an attempted attack), Zottola made the statement while under the stress of the excitement caused by the recent event and Zottola's statements related directly to the startling event. See <u>United States v. Scarpa</u>, 913 F.2d 993, 1016-1017 (2d Cir. 1990) (a victim's statements to law enforcement in a hospital describing being beaten by a "crew" five to six hours earlier were admissible as excited utterances); <u>United States v. Delvi</u>, 275 F. Supp. 2d 412, 414-417 (S.D.N.Y 2003) (statements of a victim made forty minutes after the incident were admitted where the declarant was still bleeding and was being

10

treated in the emergency room); <u>Tocco</u>, 135 F.3d at 128 (statements made by a defendant three hours after setting fire to a building admitted as excited utterances where the fire itself constituted a startling event along with the realization that people could be trapped inside).  Not only would Zottola have had little to no time to fabricate a story, Zottola would have no reason to do so, as he was reporting these incidents to law enforcement in the hopes that law enforcement could and would solve the crimes and save his life.

Accordingly, the statements are admissible.

### ii. Zottola's Oral Statements Made to Law Enforcement Describing the Attacks Against Him Are Admissible Under the Residual Exception

In addition to the statements described above that are admissible as excited utterances, Zottola's descriptions of the crimes against him to law enforcement are all admissible under the residual hearsay exception.  These statements, in addition to the above-described statements, include the following:

- Statements made to members of law enforcement on September 17, 2017, by Zottola describing the September 8, 2017 attack against him.  Specifically, Zottola described standing in front of his residence when an individual (defendant Branden Peterson) approached Zottola to inquire about a job, provided the name "John" and a phone number, and then attacked Zottola, punching him and knocking him to the ground.

- Statements made to members of law enforcement by Zottola on December 31, 2017, describing the December 27, 2017, attack against him in his home.  The interview was conducted in the hospital as Zottola recovered from his injuries.

- Statements made to members of law enforcement by Zottola on January 12, 2018, describing the September, November and December 2017 attacks against him.

As detailed above, admissibility under Rule 807 is governed by the presence of "sufficient guarantees of trustworthiness," along with its probative value analyzed in the context of whether other evidence proving the same point could be obtained.  An analysis of each of the five factors considered by courts when analyzing the admissibility of evidence under the residual exception indicate that Zottola's proffered statements resoundingly pass the test.  First, the statements themselves are particularly trustworthy.  In each instance, Zottola is speaking to law enforcement because he was being attacked, without having any idea of who may have committed the attacks or why.  Zottola was assaulted in front of his home and beaten; then, his car was cut off and blocked in and a man pointed a gun at him before he could escape; and lastly, he was brutally attacked—nearly stabbed to death—in his home.  Zottola had every reason to be truthful with law enforcement in order to prevent further attacks.  <u>See</u> <u>Carneglia</u>, 256 F.R.D. at 393 (police reports containing an interview with a deceased witness who observed a murder admitted where they had guarantees of trustworthiness reflected in (1) their consistency with other statements; (2) the specificity of the statements; and (3) the fact that the witness's only apparent motive was to assist law enforcement).  Here, the indicia of reliability is borne out through significant corroborating evidence that will be introduced by the government.  For example, Zottola's

11

descriptions of the September 8, 2017 and June 12, 2018 attacks are corroborated by video surveillance footage, and his description of the December 27, 2017 attack was corroborated by crime scene photographs and other evidence. The corroboration of Zottola's statements provides additional guarantees of trustworthiness of the statements themselves.

Second, Zottola's statements to law enforcement bear on obviously material facts—the attacks that he is describing are descriptions of the charged crimes. Third, the statements are the most probative evidence addressing those facts because Sylvester Zottola, as the victim, is the only witness to many of these crimes. No one other than Zottola had this information, and, of course, the defendants in this case, having murdered Zottola, rendered it impossible to introduce this evidence in any other manner. Cf. United States v. Delance, 694 F. App'x 829, 834 (2d Cir. 2017) (denying Rule 807 application where comparable testimony from an alternate witness was available); United States v. Gambardella, No. 10-CR-674 (KBF), 2012 WL 279469, at *4 (S.D.N.Y. Jan. 27, 2012) (holding that statements of a victim in a police report were admissible pursuant to both Rule 803(5) and 803(7) where the statements were evidence of a material fact, more probative than other available evidence, and the purposes of the hearsay rules—and justice—would be served by admission).

Moreover, the admission of this evidence advances the interests of justice. It provides the government with the ability to offer Zottola's descriptions of the crimes to law enforcement in spite of the fact that the successful criminal actions of the defendants have rendered him unavailable through his murder. Moreover, its admission is properly balanced with concerns of prejudicing the defendants in this case. Not one of these statements specifically identifies any of the trial defendants. In fact, Zottola is often unable to give detailed descriptions of the perpetrators because they wore hoods and masks. Finally, adequate notice of the government's intent to use Zottola's statements is provided by way of this motion.

Where Zottola's statements during law enforcement interviews contain a description of things said to him by perpetrators during the various attacks, these statements are also admissible. These statements made by the perpetrators are not hearsay because (1) they are the res gestae of the crime;[2] (2) they are statements of co-conspirators made in furtherance of the conspiracy, as detailed above; and (3) in many instances, they are not being offered for their truth. For example, during the course of the December 27, 2017 home invasion, Sylvester Zottola described that one of the perpetrators asked him, "What time is your daughter returning? If you don't open the safe we will rape your daughter." In the September 2017 attack on Sylvester Zottola, one of the perpetrators asked, "When will I hear back about the job?" Any question from a perpetrator, such as the examples just provided, is not hearsay because questions generally have no truth value. See Bellomo, 176 F.3d at 586-87; Dominguez-Gabriel, 511 Fed. Appx. at 20; Quartararo, 186 F.3d at 98; United States v. Wright, 343 F.3d 849 (6th Cir. 2003) ("[A] question is typically not hearsay because it does not assert the truth or falsity of a fact. A question merely seeks answers and usually has no factual content.").

---

[2]     Where statements describe ongoing events connected to the crime and thus constitute part of the res gestae of the crime, they are admissible non-hearsay. See Rivera v. Graham, 11-CV-3546 (BMC), 2012 WL 397826, at *5 (E.D.N.Y. Feb. 7, 2012).

### iii. Zottola's Statements to Law Enforcement are Admissible to Show Effect on the Listener

Should the Court determine that the above-described statements are neither admissible as excited utterances nor admissible under the residual exception to hearsay, Zottola's statements to law enforcement would still be admissible not for their truth but to show the effect on the listener.  Here, where Zottola's statements to law enforcement informed a complex investigation that evolved for more than a year and involved coordinated Federal Bureau of Investigation and New York City Police Department efforts investigating in multiple boroughs of New York City, their effect on the course of the investigation is highly relevant.  See United States v. Law, 990 F. 3d 1058, 1062 (7th Cir. 2021) (statements made in interviews with law enforcement are not hearsay when they are offered to show effect on listener); United States v. Paulino, 445 F.3d 211, 216 (2d Cir. 2006) (statements admissible where they are not offered for their truth, but help a jury understand "the course of events that unfolded").  In order for the government to explain how and why the investigation proceeded as it did, the jury must understand the crimes committed (which often came from Zottola's description alone) and the effect Zottola's descriptions of events had on law enforcement investigating the crimes.

### iv. Statements Offered to Show Zottola's State of Mind

Next, the following statements made by Sylvester Zottola are admissible under Rule 803(3) as relevant evidence showing Zottola's state of mind:

- Statements made to witnesses regarding discussions of selling the Zottola family properties; and

- Statements made to witnesses regarding feelings of surprise and anger when Zottola found out that his son, defendant Anthony Zottola, had moved away from Locust Point unbeknownst to him.

Statements made to other witnesses—who were close family members and friends of Zottola—regarding Sylvester Zottola's intent or lack of intent to sell Zottola family properties are admissible and relevant as they reflect Zottola's "intentions or future plans."  Cicale, 691 F.2d at 103.  While in some cases, a statement such as this may be relevant to prove subsequent acts, here, the statements are relevant because they are evidence of motive.  Specifically, the government anticipates that evidence at trial will establish that Anthony Zottola had his father killed in order to take control of the family business, including the family properties and the decision whether or not to sell them.

Statements made to witnesses regarding Sylvester Zottola's reaction to defendant Anthony Zottola's move away from the family's property are also relevant to Sylvester Zottola's emotional and mental state of mind—and extremely probative to the relationship and/or sources of tension between Sylvester and Anthony Zottola, which are relevant to motive in this case.

13

v.  Zottola's  Statements  to  ████████████████  on  October  4,  2018
are Admissible as Present Sense Impressions

The government expects that Sylvester Zottola's then-girlfriend, ████████████,
will testify that she was on the phone with Zottola—as he was describing what he was doing—in
the minutes and seconds before he was shot and killed.  This description, contemporaneous with
Zottola's actions, is relevant to show what Zottola was doing as he was murdered.  The statements
made by Zottola to ████████████ are admissible under Rule 803(1) as present sense
impressions, as they describe events as they are taking place and while Sylvester Zottola was
perceiving the events.  See Rule 803(1).

vi.  Statements from Sylvester Zottola's Cellular Telephone Are Admissible

The government also seeks to admit evidence from the cellular telephone recovered
from Sylvester Zottola following his murder, including a text message from Sylvester Zottola to
defendant Anthony Zottola's son on October 4, 2018, and text messages from defendant Anthony
Zottola to Sylvester Zottola and Salvatore Zottola on June 21, 2018.

First, on the morning of October 4, 2018, Sylvester Zottola texted Anthony
Zottola's son ██████████████), "Pop pop Love you ████████ so so much happy birthday[.]"
This message from Sylvester Zottola to the defendant's son is admissible, as it is not being offered
for its truth but, rather, that the statement was made, from which jurors can draw the inference that
it was, in fact, Anthony Zottola's son's birthday.  This statement is relevant because, in the minutes
after Sylvester Zottola was murdered—and after being informed that his father was murdered
outside of a McDonald's drive-thru—Anthony Zottola texted Shelton, "It's my lil man bday I am
taking him to his favorite place mc Donald's than a movie.  Lol  Like I can eat that stuff.  Thank
you for being a great friend my man."  Given the extensive use of code used by Shelton and
Anthony Zottola throughout the course of the investigation, that it was in fact Anthony Zottola's
son's birthday—as evidenced by the text message from Sylvester Zottola to his grandson earlier
that day—is probative of the lack of use of a code in this particular exchange.

Second, on June 12, 2018, at 12:11 p.m., Anthony Zottola texted Sylvester Zottola
a message reading "Black male 30 Year's old beat up white 61 year old male over money Pelham
bay either Pelham bay station or middle town road station["."]  Sylvester Zottola replied, "I seen
it on the news."  The defendant's statement is admissible as non-hearsay because it is a statement
of a party-opponent.  Fed. R. Evid. 801(d)(2)(A).  The statement also furthered the conspiracy by
misleading Sylvester Zottola to believe that there were black men in the neighborhood targeting
older white men so that Zottola would continue to be in the dark about the source of the attacks.
Further, Sylvester Zottola's reply is not offered for its truth, but rather to show that he received
defendant Anthony Zottola's misleading text message.

vii.  Admission of Zottola's Statements Does Not Violate the Confrontation
Clause

Admission of the above-described statements does not violate the Confrontation
Clause of the Sixth Amendment to the Constitution.  Where an out-of-court statement is non-

testimonial in nature, its admission does not violate the Confrontation Clause.  See Crawford v. Washington, 541 U.S. 36, 54-57 (2004).  To determine if a statement is testimonial, courts must decide whether the statement has "a primary purpose of creating an out-of-court substitute for trial testimony."  United States v. James, 712 F.3d 79, 91 (2d Cir. 2013) (internal quotations and citations omitted).  Statements are "non-testimonial," and thus do not implicate the Confrontation Clause, when the primary purpose of the statement is to "enable police assistance to meet an ongoing emergency." Hammon v. Indiana, 547 U.S. 813, 822 (2006).  In such cases, the standard rules of hearsay, designed to identify some statements as reliable, will be relevant.  Michigan v. Bryant, 562 U.S. 344, 358 (2011).

   None of the statements that the government intends to offer from the deceased victim, Sylvester Zottola, are testimonial.  Zottola's statements were not made with an eye toward trial.  Rather, they were statements made during the course of an ongoing emergency—namely, the repeated attacks and attempts on his life.  The existence of an emergency, or the parties' perception that an emergency is ongoing, is crucial to determining whether a statement is testimonial.  Bryant, 562 U.S. at 370.  Critically, the existence and scope of an emergency "depend[s] on the type and scope of danger posed to the victim, the police, and the public." Id. at 370-71.  Courts in this Circuit have found that a victim's subsequent statements to law enforcement in the aftermath of a violent attack—even statements that inculpate a suspect—are intended to address an ongoing emergency.  See, e.g., Houston v. New York, No. 18-CV-723 (FPG), 2021 WL 809986, at *6 (W.D.N.Y. Mar. 3, 2021) (discussing that statements from a gunshot victim to police following a home invasion with an unknown motive and an at-large assailant established that there was an ongoing emergency); Donohue v. Lempke, No. 09-CV-3890 (SJF), 2012 WL 2930204, at *10 (E.D.N.Y. July 13, 2012) (noting that a victim may not have a testimonial purpose when making a statement, but may instead "want the attacker to be incapacitated temporarily or rehabilitated" (quoting Bryant, 562 U.S. at 368)); Nieves-Andino v. Conway, 80-CV-5887 (NRB), 2010 WL 1685970, at * X (S.D.N.Y. Apr. 20, 2010) (finding that a shooting victim's on-scene statements to law enforcement had the primary purpose of enabling police to meet an ongoing emergency).  Here, Zottola's statements to law enforcement (and non-law enforcement) about the crimes were made during the course of an ongoing emergency—numerous attempts on his life— and made solely to assist in the ongoing emergency.  See Bryant, 562 U.S. at 368.

### viii.   Zottola's Admissible Statements Are Not Unduly Prejudicial

   The statements by Sylvester Zottola that the government seeks to admit are not unduly prejudicial.  The government must prove to the jury that a conspiracy to murder Sylvester Zottola was taking place.  In some cases, the only person who can and did describe these crimes was the now deceased victim, who was murdered as the successful outcome of the murder-for-hire conspiracy.  Further, the government must explain at trial why the investigation proceeded as it did, including proceeding in various directions as a result of information provided by the deceased. Zottola's statements provide important context not only for the fact of the various crimes committed against him, but also the location, timing, descriptions of the scene and law enforcement's response.  Notably, none of Zottola's statements offered by the government specifically identify the defendants on trial.  To the contrary, Zottola was unaware that the defendants on trial—including his son—were engaged in a murder-for-hire plot against him, and therefore was unable to lead authorities to the perpetrators of the crimes.  Therefore, the high

probative value of the statements is not substantially outweighed by any danger of unfair prejudice and Rule 403 does not bar their admissibility.  The statements should be admitted at trial.

III.   The 911 Calls Are Admissible

The government seeks to admit five 911 calls stemming from three separate incidents of violence: on December 27, 2017, following the home invasion and stabbing of Sylvester Zottola, on July 11, 2018, following the non-fatal shooting of Salvatore Zotttola, and on October 4, 2018, following the murder of Sylvester Zottola.  These calls constitute both present sense impressions and excited utterances under the Federal Rules of Evidence and are, thus, admissible.

On December 27, 2017, Sylvester Zottola was held captive in his home, robbed and stabbed multiple times in the neck and torso by three assailants.  Caller-1 found Zottola injured on the first floor of Zottola's home against a staircase and immediately called 911, stating, "I need an ambulance."  Caller-1 reported that Zottola was "barely conscious," having difficulty breathing and muttering, "oh my god, oh my god, I can't breathe, I can't breathe."  Caller-1 initially had trouble answering the operator's questions at first, stuttering and stumbling over the word "ambulance" and interrupting the operator.  Caller-1 only appeared to be more collected when he is finally connected to emergency medical services.  See Gov't Ex. 1 (BLANCO ET AL 031603).

On July 11, 2018, Salvatore Zottola was shot multiple times in the head, torso, and hand in front of his home moments after he arrived home.  At least six individuals called 911.  Caller-2 called 911 and reported her neighbor had been shot on the 3100-block of Tierney Place in the Bronx.  For the first 18 seconds of the call, Caller-2 was evidently distressed, but ultimately provided the relevant address to the 911 operator.  See Gov't Ex. 2 (BLANCO ET AL 019520).  Caller-3, also calling regarding the July 11 shooting, requested an ambulance "right away [because] someone got shot."  Caller-3 reported she heard approximately five gunshots, saw someone on the ground and that a "burgundy" car sped away from the street after the shots were fired.  Throughout the call, Caller-3 spoke quickly, clearly reacting to the unfolding events before her and appeared to reassure those around her that she alerted 911 ("I'm on with them now!").  See Gov't Ex. 3 (BLANCO ET AL 019517).  Caller-4 called 911, provided the address to the operator and reported "somebody got shot" and the victim "was lying in the street."  Caller-4, speaking with urgency, also reported the perpetrators used what looked like "a maroon [Nissan] Maxima."  When the operator asked Caller-4 if the caller saw the shooters, he reported seeing "people get out of a car."  Caller-4 can also be heard in the background repeating "a maroon Maxima, gold plates."  At 28 seconds into the call, Caller-4 interrupted the operator to say, "A man is lying in the street!"  See Gov't Ex. 4 (BLANCO ET AL 019519).

On October 4, 2018, Sylvester Zottola was shot and killed while he sat in his car at a McDonald's drive-thru in the Bronx.  Caller-5 called 911 and requested an ambulance because "someone got shot in the parking lot."  Caller-5 told the operator the victim was in a "burgundy Acura" right in the drive-thru when "somebody ran to the car and shot at him."  Caller-5, in a raised voice, informed the 911 operator, after the operator asked about the status of the victim, responded, "Yes, he's dead!"  See Gov't Ex. 5 (BLANCO ET AL 000919).

A.  Applicable Law

As an initial matter, the 911 recordings themselves and the sprint reports associated with the calls fall within the "business record" exception to the general prohibition on hearsay evidence.  See Fed. R. Evid. 803(6).   Further, the statements made on the 911 calls the government seeks to admit are not testimonial and fall within two exceptions to the general bar against hearsay. Specifically, the statements made during the 911 calls constitute both present sense impressions under Rule 803(1) of the Federal Rules of Evidence and excited utterances under Rule 803(2) of the Federal Rules of Evidence.

As detailed above, Rule 803(1) of the Federal Rules of Evidence provides an exception to the general rule against hearsay for any statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."  As also detailed above, Rule 803(2) of the Federal Rules of Evidence also provides an exception that a declarant's out-of-court statements "relating to a startling event or condition made while the declarant was under the stress of the excitement caused by the event or condition" are admissible.  Fed. R. Evid. 803(2); see also Tocco, 135 F.3d at 127.

B.  Analysis

ix.  Business Records

Federal Rule of Evidence 803(6) provides that the following items "are not excluded by the rule against hearsay":

> A record of an act, event, condition, opinion, or diagnosis if: (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit (C) making the record was a regular practice of that activity; . . . and (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Sprint reports, which are maintained in the regular course of business by 911 and NYPD radio operators, contain all of these indicia of reliability.  The same is true of the recordings of 911 calls.  "Phone logs" fall within Rule 803(6)'s hearsay exception.  See United States v. Stewart, 433 F.3d 273, 316-17 (2d Cir. 2006).  Sprint reports and the fact and timing of the 911 calls are indistinguishable from phone logs in that they provide a record of the telephone call made to 911.  See, e.g., John v. Masterson, 2010 WL 1957876, at *1 (D. Conn. May 14, 2010) (unpublished opinion) ("The record of [911 telephone calls] is admissible . . . as a 'business record.'"); United States v. Harper, 2009 WL 140125, at *2 (W.D.N.Y. Jan. 20, 2009) (unpublished opinion) ("There does not seem to be any dispute here that the [911 call report] itself meets the requirements for admission as a business record . . . ."); United States v. Padilla, 1995 WL 261513, at *3 (S.D.N.Y. May 3, 1995) (unpublished opinion) ("[T]he [911] incident records

qualify [as] documents for admission under [the business records exception], as records of regularly conducted activity.").

> x.   The 911 Calls Contain Present Sese Impressions and Excited Utterances

The 911 calls in this case constitute both present sense impressions and excited utterances under the Federal Rules of Evidence.

The calls are present sense impressions because the calls describe and explain to the operators what the callers heard or saw in the immediate aftermath of a home invasion and stabbing, a non-fatal shooting on the street, and an execution-style murder in the McDonald's drive-thru. As to Sylvester Zottola's attack during the home invasion, Caller-1 provided an address and a depiction of Zottola's condition at the time, noting that he was "barely conscious," having difficulty breathing and muttering, "oh my god, oh my god, I can't breathe, I can't breathe." As to Salvatore Zottola's non-fatal shooting, Callers-2, -3, and -4 provided several crucial details; in addition to the location of the incident, they noted the number of gunshots, a description of how the shooting occurred and the shooter's getaway vehicle. As to Sylvester Zottola's murder, Caller-5 described how Zottola was shot and how the shooter approached him. The statements are straightforward and clear, and there is no indicia the statements were calculated for an ulterior purpose or deceptive; these were typical 911 calls summoning emergency help. See United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002) ("Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." (citation omitted)). Records of the 911 calls, video surveillance footage and medical records indicate each of the calls were placed in the immediate aftermath of the violence. The government anticipates that the testimony at trial will establish that it was because of 911 callers that law enforcement and medical personnel responded to the scenes on November 27, 2017, July 11, 2018 and October 4, 2018. Courts routinely admit similar statements under the present sense impression hearsay exception. See Mejia-Valez, 855 F. Supp. at 613 (admitting 911 call placed 18 minutes after murder); United States v. Blakey, 607 F.2d 779, 785-86 (7th Cir. 1979) (applying rule where interval was potentially 23 minutes); United States v. Obayagbona, 627 F. Supp. 329 (E.D.N.Y. 1985) (Weinstein, J.) (applying the hearsay exception where interval was 14 minutes and 25 seconds). These 911 calls are clearly admissible present sense impressions.

The 911 calls are also exited utterances: every call references a startling event, the callers were clearly under the stress of the event during the call and, given that the calls are requests for help in response to alarming events just heard or witnessed, the statements clearly relate to the events themselves. Although Caller-1 does not appear to know Sylvester Zottola had been stabbed and robbed, Caller-1 found Zottola lying in a stairwell unable to breathe. Zottola's physical condition alone was enough for Caller-1 to dial 911 and request an ambulance, rather than attempt to assist him without medical professionals. During the call, Caller-1 had trouble answering the operator's initial questions at first, fumbling for words, repeating statements and speaking over the operator. To illustrate the severity of Zottola's condition, Caller-1 reported Zottola was muttering, "oh my god, oh my god, I can't breathe, I can't breathe." Callers-2, -3, and 4 all reference the shooting of Salvatore Zottola in the street outside his home, an event clearly startling to those living in the community. The stress of these callers is clearly apparent from their tone and

demeanor on the calls. The callers' statements also clearly relate to Salvatore Zottola's shooting—all three request the operator send immediate medical attention. Caller-5, an employee at the McDonalds where Zottola was shot and killed in the drive-thru lane, in response to a question from the operator, responded in a raised voice, "Yes, he's dead!" The caller was undoubtedly anxious because of what was unfolding in front of her at her workplace.

Finally, introduction of the 911 calls does not offend the Confrontation Clause of the Sixth Amendment. "Statements admitted as excited utterances or present sense impressions are nontestimonial and thus do not implicate the Confrontation Clause." United States v. Harper, 2009 WL 140125, at *4 (W.D.N.Y. Jan. 20, 2009) (citing Davis v. Washington, 547 U.S. 813, 821 (2006)) (statements made in 911 call "to describe current circumstances requiring police assistance" were not testimonial); United States v. Cadieux, 500 F.3d 37, 41-42 (1st Cir. 2007) ("the statements recorded during the 911 call are nontestimonial"); United States v. Thomas, 453 F.3d 838, 843-44 (7th Cir. 2006) (anonymous caller's statements to the 911 operator, that "'[t]here's a dude that just got shot . . .,' and that 'the guy who shot him is still out there,'" were nontestimonial and did not implicate defendant's right to confrontation)). See, e.g., Coleman v. Squilliante, No. 06 Civ. 13518, 2008 WL 4452351 at *8-9 (S.D.N.Y. Oct. 2, 2008) (admission of 911 recording where caller stated "a man just jumped out and beat on his, a, another man and his wife. He beat her with a cane" did not implicate the Confrontation Clause); Jackson v. Senkowski, No. 03 Civ. 1965 (JG), 2007 WL 2275848, at *10 (E.D.N.Y. Aug.7, 2007) (admission of 911 recording identifying defendant as murderer did not violate Confrontation Clause).

Accordingly, because these calls constitute both present sense impressions and excited utterances under the Federal Rules of Evidence, the Court should admit them at trial.

IV.    The Autopsy Report and Pre-Hospital Care Reports Are Admissible

As described above, Federal Rule of Evidence 803(6) provides that certain business records are not excluded by the hearsay rule. "Business records are made reliable by 'systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by duty to make an accurate record as part of a continuing job or occupation.'" Parker v. Reda, 327 F.3d 211, 214-15 (2d Cir. 2003) (quoting Fed. R. Evid. 803(6) advisory comm. note). Rule 803(6) "favors the admission of evidence rather than its exclusion if it has any probative value at all." United States v. Kaiser, 609 F.3d 556, 574 (2d Cir. 2010) (citation and quotation marks omitted).

Sylvester Zottola's autopsy report is admissible. Autopsy reports are admissible business records under Rule 803(6). United States v. Feliz, 467 F.3d 227, 236 (2d Cir. 2006). Here, the autopsy report at issue was prepared by the Office of the Chief Medical Examiner of New York ("OCME"). As the Second Circuit held in Feliz:

> Autopsy reports are "reports kept in the course of a regularly conducted business activity"; the Office of the Chief Medical Examiner of New York conducts thousands of routine autopsies every year, without regard to the likelihood of their use at trial. Nor do the Chief Medical Examiner's reports constitute the

19

> observations of a police officer; § 557 of the New York City Charter describes the office as an "independent office" within the Department of Health and Mental Hygiene. See also Rosa, 11 F.3d at 332 (holding that the employees of the Medical Examiner's Office are "physicians and pathologists," not "attorneys" and that autopsy reports are business records); Washington, 86 N.Y.2d at 192, 630 N.Y.S.2d 693, 654 N.E.2d 967 (holding that under New York law, the Medical Examiner is "not subject to the control of the prosecutor"); Durio, 794 N.Y.S.2d at 867 (holding that "[u]nder New York law an autopsy report can be considered a business record. . . ."). Because the autopsy reports are business records as defined in FED. R. EVID. 803(6), they are nontestimonial.

Feliz, 467 F.3d at 236–37. This holding applies to the autopsy report in this case, which is admissible at trial. See id.[3]

The prehospital care reports in this case are also admissible business records. A prehospital care report was prepared regarding the emergency medical response to ████ ██ Bronx, New York on December 27, 2017, at which point Sylvester Zottola was found with multiple stab wounds, cared for and rushed to the hospital. A prehospital care report was also prepared regarding the October 4, 2018 emergency medical response to 1625 Webster Ave, Bronx, New York, where the body of Sylvester Zottola was found shot dead in his vehicle. Both of these are admissible.

As an initial matter, the documents bear a stamp, signed by an New York City Fire Department official, which reads:

> FIRE DEPARMENT – CITY OF NEW YORK
> I hereby certify pursuant to CPLR 2306 and 2307 that this document is a true and accurate copy of a Fire Department record kept in the regular course of Fire Department business

Prehospital care reports are prepared by Emergency Medical Technicians every day in the ordinary course of work contemporaneously with the events they memorialize, and the reports are accurate and trustworthy. See Kaiser, 609 F.3d at 574. The drafting medical technician, of course, "had no motive to falsify the record in question," United States v. Freidin, 849 F.2d 716, 719 (2d Cir. 1988), and its contents are accurate. In addition, the reports are probative because they (1) provide details about Sylvester Zottola's condition upon arrival of the Emergency Medical Technicians on December 27, 2017 and (2) provide details about where and when Zottola's body was found on October 4, 2018, as well as his condition upon the arrival of the Emergency Medical Technician.

Further, Sylvester Zottola's statements contained in the December 27, 2017

---

[3]    In addition, this autopsy report is admissible as a public record under Rule 803(8). See Feliz, 467 F.3d at 237-38.

prehospital care report are admissible pursuant to Federal Rule of Evidence 803(4), which provides that a patient's statement as documented in a medical record is not excluded by the rule against hearsay if the statement "is (a) made for—and is reasonably pertinent to—medical diagnosis or treatment; and (b) describes medical history; past or present symptoms or sensations; their inception; or their general cause." Fed. R. Evid. 803(4). This exception to the rule against hearsay is premised on the notion that "a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility." White v. Illinois, 502 U.S. 346, 356 (1992). Further, statements made relating to an injury's cause are admissible. United States v. Marrero, 05-CR-942 (DLI), 2014 WL 3611625, at *14 (E.D.N.Y. July 22, 2014) (internal quotations and citations omitted). Accordingly, the prehospital care reports in their entirety should be admitted into evidence at trial.

V.     Any "Alternative Perpetrator" Argument Must Be Supported by Evidence Establishing a Sufficient Nexus to the Charged Crimes

     The government moves to preclude the defendants from introducing evidence or eliciting testimony in support of speculative theories of an alternative perpetrator unless the defendant first establishes a sufficient nexus to the charged crimes.

A.     Applicable Law

     A criminal defendant may not introduce evidence tending to show that another person committed the charged crime unless the evidence "sufficiently connects the other person to the crime." United States v. Hendricks, 921 F.3d 320, 331 (2d Cir. 2019) (quoting United States v. White, 692 F.3d 235, 244 (2d Cir. 2012)). Although a defendant "has a right to attempt to establish his innocence by showing that someone else did the crime, a defendant must still show that his proffered evidence on the alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the asserted alternative perpetrator." Wade v. Mantello, 333 F.3d 51, 61-62 (2d Cir. 2003) (quoting United States v. McVeigh, 153 F.3d 1166, 1191 (10th Cir. 1998)). It is not sufficient for a defendant to offer up "unsupported speculation that another person may have done the crime." Id. at 62. Courts require defendants show a sufficient connection to the charged crime because "[t]he potential for speculation into theories of third-party culpability to open the door to tangential testimony raises serious concerns." Id. at 61. As explained by the Tenth Circuit in McVeigh and applied by the Second Circuit in Wade, courts "must be sensitive to the special problems presented by alternative perpetrator evidence" when balancing probative value and adverse dangers of its presentation to the jury. Id. (quoting McVeigh, 153 F.3d at 1191). Specifically, "speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice." Id. at 62.

     Even if the defendants can show that an alternative perpetrator may have had motive and opportunity to commit the crime charged, a nexus does not exist without evidence connecting that alternative perpetrator to the specific crime in question. Id. at 60-61 (citing Dibenedetto v. Hall, 272 F.3d 1, 8 (1st Cir. 2001) ("Evidence that tends to prove a person other than the defendant committed a crime is relevant, but there must be evidence that there is a

connection between the other perpetrators and the crime, not mere speculation on the part of the defendant.")) (motive is insufficient on its own); see also Willcock v. Martuscello, No. 17-CV-454 (KAM), 2020 WL 2748031, at *3 (E.D.N.Y. May 27, 2020) (noting that the trial court disallowed evidence that the defendant's twin brother had committed past stabbings because, "in order to introduce evidence of an unrelated stabbing to prove the existence of an alternative perpetrator, the modus operandi must be so unique as to conclude the same person did it"); cf. United States v. Serrano, 192 F. Supp.3d 407 n.2 (S.D.N.Y. 2016) (allowing alternative perpetrator evidence where third-party had made self-inculpatory statements which were corroborated by evidence admitted by the government). In other words, the fact that "a third party may have borne animus towards the victim, standing alone, does little to establish that the third party committed the crime." United States v. Diaz, 176 F.3d 52, 82 (2d Cir. 1999)).

For instance, in Wade, the defendant attempted to suggest another individual—a gang member named "Gene"—had a motive to kill the victim on cross-examination of a government witness. 333 F.3d at 54. The defendant sought to question the witness regarding whether a person named Gene was a member of the gang, and whether the witness was physically attacked by members of the gang the night after the murder. Id. The trial court sustained the government's objection to this line of cross examination, noting no evidence connected a rival gang to the victim's death and therefore, it was "speculative and irrelevant." Id. Later, the court entertained defense counsel's offer of proof concerning a witness's testimony that he had witnessed a shoot-out between the victim and Gene but agreed with the prosecution that the proposed testimony was irrelevant and inflammatory. Id. at 60. The Second Circuit affirmed, holding, "[t]hat a third party may have borne animus towards the victim, standing alone, does little to establish that the third party committed the crime." Id. (citing Diaz, 176 F.3d at 82 (affirming court's refusal to allow motive evidence regarding an assault between a murder victim and another inmate while in jail because it "was creative conjecturing and the court properly exercised its discretion in excluding such speculative evidence")).

In Hendricks, the Second Circuit held that a defendant had failed to show the required nexus to present evidence that his co-defendant had committed the charged crime with the assistance of an individual named Jamar Sesum, also known as "Bam." 921 F.3d at 325, 331. At trial for a bank robbery conducted by four men, the defendant sought to offer evidence that Bam (not the defendant) was involved in the robbery, and sought to elicit the following facts: (1) Bam was a close friend of the co-defendant; (2) Bam better fit the physical description provided by an eyewitness ("two kids") than the defendant who was 55 years old; (3) Bam and the codefendant exchanged telephone calls before and after the robbery in question; and (4) Bam and the co-defendant went shopping for sneakers after the robbery. Id. The Hendricks court found the defendant's proposed evidence failed to create a sufficient nexus because it tended to prove only that Bam, the alternative perpetrator, was aware of the robbery, not that he himself had participated in it rather than the defendant. Id.

B.    Analysis

Should the defendants seek to blame an alternate third party for the charged crimes, the Court should preclude them from introducing evidence or questioning witnesses for the purpose of eliciting testimony regarding speculative alternative perpetrators. The evidence at trial

will demonstrate that Zottola was in frequent contact with Shelton concerning the various attempts to kill Zottola's father and brother and to coordinate payment after Shelton had successfully arranged for Sylvester Zottola's murder.  The evidence will also demonstrate that certain acts of violence required defendant Anthony Zottola's intimate knowledge of his family member's locations, schedule, and access to specific locations associated with Sylvester and Salvatore Zottola.  Witness testimony will further establish that Anthony Zottola had a motive to commit these crimes.

Based on defense requests to the government, the government anticipates that Zottola may seek to blame his father's murder on █████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████  However, absent more, any such testimony is "[in]sufficiently connect[ed] . . . to the crime." Hendricks, 921 F.3d at 331.  Instead, the evidence in this case establishes that Anthony Zottola, with the help of Shelton and others recruited by Shelton, spearheaded the efforts to kill his father and brother.  Because Zottola is unable to provide evidence connecting the Albanian mafia to the actual acts of violence against the victims, Zottola should be precluded from suggesting these individuals could be alternative perpetrators.[4]

Zottola's claim that an Albanian organized crime figure or his underlings may have had a motive to kill Sylvester Zottola because of ███████████ is, on its own, insufficient. For instance, in Wade, the district court held (and the Second Circuit affirmed) that evidence of a rival gang previously exchanging gunfire with the victim, and thus supplying these rival gang members with a motive to kill the victim, was reasonably precluded by the trial court. 333 F.3d at 62. As the Circuit explained in Diaz, the fact that "a third party may have borne animus towards the victim, standing alone, does little to establish that the third party committed the crime." 176 F.3d at 82.  Nor does the fact the FBI initially investigated the Albanian mafia and its members furnish the required nexus here.  In fact, it demonstrates the opposite—in its investigation, the FBI did not uncover evidence supporting mafia involvement in the various attempts to hurt or kill Salvatore or Sylvester Zottola.  Thus, Zottola is unable to establish a sufficient nexus to connect an alternative perpetrator to the specific crimes in question.  Accordingly, Zottola should be precluded from suggesting an alternative perpetrator of the crimes through cross-examination or his case in chief.  See Wade 333 F.3d at 61; Hendricks, 921 F.3d at 331.

To the extent Zottola seeks to proffer credible evidence of an alternative perpetrator, the government respectfully asks the Court to decide its admissibility in a pretrial hearing.  First, the Second Circuit has explained that the purpose of requiring a sufficient nexus before offering alternative perpetrator evidence is to respond to the "grave risk of jury confusion" posed by such evidence.  Wade, 333 F.3d at 61-62 (quoting McVeigh, 153 F.3d at 1191). Allowing a defendant to present a speculative theory of an alternative perpetrator may result in jurors becoming distracted by irrelevant testimony, "turning attention away from issues of [the

---

[4]       Should Zottola seek to offer evidence of an alternate perpetrator not discussed herein, the government asks the Court to apply the same standard and determine its admissibility in a pretrial hearing, as discussed below.

defendant's] culpability to those of [the victims] character," and issuing a verdict based on emotion or prejudice.  Id.  Second, the interest of judicial efficiency is better served by deciding the issue prior to the empanelment of the jury.  Leaving the issue open may later result in a lengthy "trial within a trial" to determine whether Zottola can demonstrate the required nexus.  Pretrial determination eliminates the risk that jurors will be exposed to speculative testimony and precludes the need to "unring the bell" during the trial itself.

VI.     The Court Should Preclude the Defendants from Introducing Their Own Hearsay Statements

It is well established that "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." Marin, 669 F.2d at 84; see also United States v. Mitchell, 502 F.3d 931, 964 (9th Cir. 2007) (defendant was properly precluded from eliciting, on cross-examination of government agents, exculpatory statements that he had made during interviews with agents, since those statements were inadmissible hearsay); United States v. Jadusingh, No. 18-CR-257 (KAM), 2020 WL 207950, at *2 (E.D.N.Y. Jan. 14, 2020 (precluding defendant "from introducing her own post-arrest statements to prove the truth of the matter(s) asserted" (emphasis omitted)); United States v. Davidson, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004) (a defendant may not "attempt to get his side of the . . . story in front of the jury without himself testifying and opening himself up to cross-examination").

Accordingly, the defendants should be precluded from seeking to introduce their own statements for the truth of the matters asserted in the form of recorded jail calls or prior out-of-court statements, or from seeking to elicit from government witnesses any of the defendants' prior exculpatory statements, unless they are offered pursuant to a proper exception to the rule against hearsay.  Jadusingh, 2020 WL 207950, at *2 ("The rule against hearsay would not bar the Government from introducing [the defendant's] statements because a statement offered against an opposing party and that was made by the party' is not hearsay.  It would, however, bar [the defendant] from introducing her own post-arrest statements to prove the truth of the matter(s) asserted." (internal citations omitted)).[5]

VII.    If Any Defendant Testifies, He May Be Cross Examined on His Criminal History

Should Lopez, Ross or Shelton choose to testify, the government intends to cross-examine them about certain of their prior felony convictions.  The prior felony convictions of the defendants are as follows:

---

[5] The government may admit portions of Zottola's and Ross's video-recorded post-arrest statements, as well as a non-custodial video-recorded statement of Lopez.  The government does not anticipate that any of the portions of statements the government seeks to admit will run afoul of the requirements of Bruton v. United States, 391 U.S. 123 (1968) but, should defense counsel disagree, will endeavor to confer and address any concerns absent intervention from the Court.

24

- <u>Lopez</u>:  In January 2014, Lopez was convicted after a jury trial of felony driving under the influence in New York County Supreme Court and initially sentenced to five years' probation.  In April 2014, Lopez was sentenced to a term of incarceration of 1 to 3 years.  In August 2014, Lopez was convicted upon a plea of guilty of criminal possession of a controlled substance in the third degree in Bronx County Criminal Court and sentenced to two years' imprisonment.

- <u>Ross</u>:  In March 2015, Ross was convicted of attempted assault in the second degree (injuring a person while confined in a correctional facility) in Bronx County Supreme Court.   That same month, Ross was also convicted of knowingly making or possessing dangerous contraband in prison in the first degree in Bronx County Supreme Court.  In both cases, Ross was sentenced to one to three years' imprisonment and released in April 2015.

- <u>Shelton</u>: In 2010, Shelton pled guilty to criminal possession of a weapon in the second degree in Queens County Supreme Court, for which he was sentenced to 42 months' imprisonment and 30 months' supervised release.  He was released to parole on November 21, 2012.

A.    <u>Applicable Law</u>

Federal Rule of Evidence 609 governs the admissibility of evidence of prior convictions for impeachment purposes.  As relevant here, if the witness is a criminal defendant, evidence of a prior felony conviction is admissible "if the probative value of the evidence outweighs its prejudicial effect to that defendant."  Fed. R. Evid. 609(a)(1)(B).  Under Rule 609(a)(1), the "evidence" of prior convictions that may be admitted includes "the essential facts of a witness's convictions, including the statutory name of each offense, the date of conviction, and the sentence imposed."  <u>United States v. Estrada</u>, 430 F.3d 606, 615 (2d Cir. 2005); <u>see also</u> <u>United States v. Brown</u>, 606 F. Supp. 2d 306, 315-16 (E.D.N.Y. 2009) (same).

In weighing the probative versus prejudicial value of impeaching a defendant with a prior conviction, courts generally consider five factors: (1) the impeachment value of the prior crimes; (2) the date of the convictions and the defendant's subsequent history; (3) the degree of similarity between the past crimes and the charged crime, with dissimilarity favoring admission; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue.  <u>See</u> <u>United States v. Jimenez</u>, 214 F.3d 1095, 1098 (9th Cir. 2000); <u>United States v. Smith</u>, 131 F.3d 685, 687 (7th Cir. 1997); <u>United States v. Sloman</u>, 909 F.2d 176, 181 (6th Cir. 1990); <u>Jones v. City of New York</u>, No. 98 Civ. 6493 (LBS), 2002 WL 207008, at *2 (S.D.N.Y. Feb. 11, 2002).

If the later of the date of conviction or the date of the defendant's release from confinement for that conviction is more than ten years old, then, pursuant to Rule 609(b), evidence of the conviction is admissible only if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect" and the party seeking to offer it gives the opposing party reasonable written notice of its intent to use the evidence.  Courts apply the same balancing test as that prescribed by Rule 609(a), but the heightened standard of Rule 609(b)

requires that the evidence have more probative value than that required under Rule 609(a).  See Brown, 606 F. Supp. 2d at 313.  In addition, under Rule 609(b), a court must "make an on-the-record finding based on specific facts and circumstances that the probative value of the evidence substantially outweighs the danger of unfair prejudice." Jones v. N.Y. City Health & Hosps. Corp., 102 F. App'x 223, 226 (2d Cir. 2004) (summary order); see also United States v. Payton, 159 F.3d 49, 57-58 (2d Cir. 1998) (upholding district court's decision to admit defense witness's 13-year-old convictions where court specifically found that witness's "credibility was 'crucial' because she would be testifying in direct contradiction to the government's witnesses on the key element of possession of the .38 caliber revolver; the impeachment value of her convictions was substantial; and the government provided defendant with sufficient advance notice of its intent to use these convictions in her cross examination").

    B.   Analysis

The government should be permitted to cross-examine and introduce evidence of Lopez's felony convictions; Ross's felony convictions for attempted assault and knowingly making or possessing dangerous contraband in prison; and Shelton's felony conviction for criminal possession of a weapon during cross-examination if they testify at trial.  The government addresses each defendant's prior convictions in turn.

    i.   Lopez

Lopez has numerous felony convictions, but the government seeks only to question Lopez about his two 2014 felony convictions.  All five factors weigh in favor of permitting inquiry on these convictions.  With respect to the first factor, the impeachment value of the prior crime, "Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully." United States v. Estrada, 430 F.3d 606, 617 (2d Cir. 2005).  The second factor, the date of the convictions and the defendant's subsequent history, also weighs in favor of admission; the conviction occurred within five years of the conduct charged here.  See Fed. R. Evid. 609(b).  Nor does the third factor, dissimilarity to the current crimes, apply here, as the government does not seek to cross-examine Lopez on the facts underlying or nature of his convictions.  The probative value of the 2014 convictions concerns Lopez's failure to abide by rules.  The fourth and fifth factors—the importance of Lopez's testimony and the centrality of the credibility issue—also weigh in favor of the government.  Whenever a defendant testifies and denies having committed the charged offense, he places his credibility directly at issue.  See United States v. Alexander, 48 F.3d 1477, 1489 (9th Cir. 1995).  Regardless of the substance of the defendant's testimony, once he places his version of the events before the jury, his credibility becomes central to the jury's determination of the case.  To permit the defendant to take the stand and appear "pristine" would be "unfair and misleading to the jury." United States v. Ortiz, 553 F.2d 782, 785 (2d Cir. 1977).  Thus, the government should be permitted to cross-examine Lopez surrounding a conviction that necessarily bears on his truthfulness and willingness to abide by or, in this case, skirt the rules.

ii.      Ross

The government seeks to cross-examine Ross about his 2015 convictions for attempted assault in the second degree and knowingly making or possessing dangerous contraband in prison. All five factors weigh in favor of permitting inquiry on these convictions. As explained, with regard to the first factor, all felonies are at least somewhat probative of a witness's propensity to testify truthfully." Estrada, 430 F.3d at 617. Ross's convictions occurred within two years of the charged conspiracy and within the 10 years of the scheduled trial. See Fed. R. Evid. 609(b). Possession of contraband is sufficiently dissimilar here so as not to suggest propensity to commit the charged crimes and is probative as to Ross's failure to abide by prison rules and regulations. While attempted assault does, on its face, more closely resemble Ross's role in the attempted murder of Salvatore Zottola and the murder of Sylvester Zottola, a proper limiting instruction that indicates the prior conviction was only offered in connection with Ross's credibility, would sufficiently mitigate the possibility that the jury would draw any improper inferences. The fourth and fifth factors also weigh in favor of admission. During a post-arrest interview, Ross denied having any knowledge of Sylvester Zottola or being involved in any violence toward the Zottolas. The government's evidence will show Ross was involved in multiple acts of violence toward the Zottolas. Therefore, if he were to testify to the same, he would place his credibility directly at issue. See Alexander, 48 F.3d 1477. Thus, the government should be permitted to cross-examine Ross surrounding his prior convictions as they necessarily bear on his truthfulness and willingness to follow the rules.

iii.      Shelton

Similarly, all factors weigh in favor of allowing the government to cross-examine Shelton concerning his 2010 conviction for criminal possession of a weapon should he choose to testify. Cross-examination as to this felony conviction would be probative as this conviction inherently exhibits a willingness to break the rules and carry a firearm without proper permitting. Furthermore, given that Shelton was released to parole on November 21, 2012, this conviction falls within the 10-year period set forth in Rule 609. As to the third factor, because Shelton is charged with being a felon in possession and has a prior conviction for possession of a firearm, there is a risk that the jury could find Shelton has a propensity to commit firearms offenses. Therefore, the government proposes that should Shelton testify, the government be allowed to inquire about the fact of his felony conviction, the date and sentence, but not the basic nature of the offense. See United States v. White, No. 08-CR-682 (NGG), 2009 WL 4730234, at *4 (E.D.N.Y. Dec. 4, 2009). This compromise minimizes the risk of unfair prejudice to Shelton but permits cross examination on a qualifying conviction, which is an element of the felon-in-possession charge the government must prove at trial.

VIII.   The Court Should Preclude Reference to Zottola's Lack of Criminal History and Specific Non-Relevant Background Evidence for All Defendants

The Federal Rules of Evidence ordinarily prohibit witnesses from proving good character through specific instances of conduct. See Fed. R. Evid. 405(a). The Second Circuit has concluded, however, that evidence of a lack of prior convictions or arrests is admissible for the purpose of gauging the credibility of a testifying witness. See United States v. Blackwell, 853

27

F.2d 86, 88 (2d Cir. 1988) (noting the "relatively low probative value" of this evidence).  Thus, such evidence becomes relevant and admissible if—and only if—the defendant testifies, and even then for the limited purpose of providing background information relating to his credibility as a witness.  In addition, "[d]istrict courts have broad discretion to balance the probative value of evidence against possible undue sympathy or bias as well as prejudice."  United States v. Miller, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009).  Courts may exclude evidence if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one[.]"  Fed. R. Evid. 403 advisory committee notes.  Indeed, when evidence is of limited probative value, it should be excluded if it has the "potential to engender sympathy in an inappropriate effort to excuse defendant's commission of the charged offenses."  Miller, 641 F. Supp. 2d at 167; see also United States v. Paccione, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that the defendant had son with cerebral palsy); United States v. Battaglia, No. 05-CR-774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); United States v. Harris, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

Consistent with Blackwell, the government requests that Zottola be precluded from informing the jury of his lack of felony criminal history, unless and until he chooses to testify.  Counsel should not be permitted to advise the jury of the defendant's lack of criminal history in opening statements, through cross examination or otherwise.

In addition, specific details of the defendants' backgrounds have no bearing on the issues in this case because they are not probative of whether the defendants committed the charged crimes.  For example, whether Zottola (or any other defendant) has otherwise demonstrated good character in certain instances does not make it more or less likely that he committed the crimes charged in the indictment.  See Fed. R. Evid. 401.  Moreover, the clear purpose of introducing evidence at trial of these extraneous details would be to elicit sympathy for the defendants or distract from the facts at issue.  The risk of juror confusion and unfair prejudice is manifest because the jury would be asked to look past a defendant's conduct in this case and instead consider personal information not relevant to an assessment of the charged conduct.  This sort of emotional appeal to the jury's sympathy should not be permitted under Rule 403.

Accordingly, Zottola should be precluded from using the absence of a prior felony criminal record, and all defendants should be precluded from offering evidence of specific instances of good conduct to prove good character.  To allow otherwise would confuse the issues under consideration, in violation of Federal Rule of Evidence 403, and violate Rule 405(b)'s restrictions against proving good character through specific instances of conduct.

IX.   The Court Should Preclude References to Punishment or the Lawfulness of Searches and Seizures

The Court should preclude any defendant from referencing at trial any consequences of a conviction.  The Court should also preclude the defendants from attempting to

relitigate—on cross-examination or any defense case-in-chief—the legality of the searches and seizures in this case.

Evidence regarding possible consequences a defendant may face if convicted, as well as the legality of searches and seizures in this case, should be precluded because it is not relevant. Pursuant to Rule 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Generally, relevant evidence is admissible and "[i]rrelevant evidence is not admissible." See Fed. R. Evid. 402. "[T]he district court has broad discretion to exclude evidence that is irrelevant . . . ." United States v. Edwards, 631 F.2d 1049, 1051 (2d Cir. 1980); see also Fed. R. Evid. 403. The defendant's punishment is not a fact "of consequence" to be determined at trial. Moreover, the legality of the searches and seizures in this case is a question for the Court, not the jury. Therefore, any evidence or argument regarding those issues is not relevant. See Shannon v. United States, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task.").

Such evidence is not only irrelevant, but it "invites [jurors] to ponder matters that are not within their province, distracts them from their responsibilities, and creates a strong possibility of confusion." Id. "It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict." United States v. Frank, 956 F.2d 872, 879 (9th Cir. 1991). Indeed, "it is the practice in the federal courts to instruct juries that they are not to be concerned with the consequences to the defendant of the verdict, except where required by statute." Id.; see also Rogers v. United States, 422 U.S. 35, 40 (1975) (jury should have been admonished "that the jury had no sentencing function and should reach its verdict without regard to what sentence might be imposed"); see generally Sand, et al., Modern Federal Jury Instructions ("Sand"), Instruction 9-1 (2017 ed.); United States v. Watts, 934 F. Supp. 2d 451, 464-65 (E.D.N.Y. 2013) ("[I]t is well-established precedent that jurors should not be informed about the possible consequences of their verdict due to the likelihood that prejudice, unfairness, and confusion [] would result."). The same is true for suppression-related questions, which fall within the province of the Court, not the jury. Indeed, the only purpose for such comments or questioning would be an "attempt[] to serenade [the] jury with the siren song of nullification." United States v. Sepulveda, 15 F.3d 1161, 1190 (1st Cir. 1993). Accordingly, defense counsel should be prohibited from making any reference to the nature of the charge being a felony, the potential punishment faced by the defendant, or the lawfulness of particular law enforcement actions, before the jury.

X.    Request for Sealing

        The government respectfully requests that this letter be filed under seal and that portions of this letter pertaining to the testimony of one or more cooperating and civilian witnesses whose identities may be identified by information contained in the letter be redacted for public filing.  The risk to the safety of these witnesses outweighs the public's right to disclosure.  United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995) (need to protect the integrity of an ongoing investigation, including the safety of witnesses, may be compelling reason to justify sealing). Moreover, unsealing this letter, and thus potentially revealing witness identities publicly will likely harm the ability of law enforcement to secure current and future cooperation from persons similarly situated, a fact that also weighs against public disclosure.

XI.    Conclusion

        For the reasons stated herein, the Court should grant the government's motions in their entirety.

Respectfully submitted,

BREON PEACE
United States Attorney

By:        /s/
        Kayla Bensing
        Devon Lash
        Emily Dean
        Andrew Roddin
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    Defense Counsel (By ECF and E-mail)
       Clerk of Court (RJD) (By ECF)