

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TH:KCB/EJD/DEL/AMR
F. #2018R01984

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 7, 2023

By ECF and Email

The Honorable Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  United States v. Anthony Zottola
>      Criminal Docket No. 18-609 (HG)

Dear Judge Gonzalez:

The government respectfully submits this letter in response to defendant Anthony Zottola's sentencing submission (ECF Dkt. No. 627, hereinafter "Def. Mem.") and in advance of sentencing in the above-captioned case, which is scheduled for April 14, 2022, at 11:00 a.m. The defendant was convicted in October 2022, following a jury trial, of murder-for-hire and conspiracy to commit murder-for-hire resulting in the death of Sylvester Zottola and the personal injury of Salvatore Zottola, as well as related firearms offenses. For the reasons set forth below, the government recommends that the Court impose a sentence of mandatory life imprisonment and a substantial fine in this case.

I.      Facts

  A.      The Defendants' Year-Long Efforts to Kill Sylvester and Salvatore Zottola

This case was part of a long-term investigation by the Federal Bureau of Investigation ("FBI") and the New York City Police Department ("NYPD") into violence committed against Sylvester and Salvatore Zottola. Presentence Investigation Report ("PSR") ¶ 9. Over the course of a year, Anthony Zottola hired hitmen to violently assault, menace, stalk and ultimately murder his father, Sylvester Zottola. Id. ¶¶ 9-36. He also arranged to have his brother, Salvatore Zottola, menaced and nearly shot dead. Id. The investigation led to charges against 11 defendants—including Bushawn Shelton, the principal hitman Anthony Zottola hired to kill his father and brother. See generally id. Shelton, in turn, hired numerous other men to help him throughout the conspiracy, culminating in the murder of Sylvester Zottola.

1.      The Initial Stages of the Conspiracy

In or around July 2017, Anthony Zottola moved his wife and children from the Zottola family compound to a home in Larchmont, New York, which he purchased for approximately $1.5 million without a mortgage.  Anthony Zottola did not tell his father or his brother that he was moving away from the section of the Bronx where his father had constructed houses for each of his three children.  Trial Tr. 1302-1305.  As Salvatore Zottola testified at trial, it was Sylvester Zottola's "dream" for his children to live on the property together, and Anthony's move caused a rift between him and his father.  Trial Tr. 1262.

In early August 2017, Anthony Zottola and Bushawn Shelton met, and Zottola saved Shelton's phone number as a contact.  Shortly thereafter, Shelton began texting other co-conspirators about a "mafia" or "Italian" connect who would pay Shelton to beat up "one of his tenants."  See PSR ¶ 7.  For example, Shelton texted co-defendant Herman Blanco, "are you with plucking a nigga out for me," and then, "My old Italian dude hit me and needs one of his tenants beat up lol.  Some old dude I guess he pissed him off."  GX 1206 at 1-2.  Shelton and Blanco exchanged additional text messages about the address—which was an address of one of the Zottola family's tenants—and discussed the plan to beat up the tenant.  Id. at 2.  Shelton informed Blanco that, "[i]f [the beating] happens near the house he said let him know and he will disable the cameras."  Id. at 2.[1]

On August 17, 2017, Anthony Zottola asked to meet with Shelton in person and, later that day, Shelton texted Blanco, "Don't worry about home boy in the TL [the car driven by the victim-tenant] something came up and he wants to wait on that."  Id. at 5.  Blanco responded, "Give me all the details on the new one."  Id.  Approximately one week later, Shelton texted Branden Peterson that Shelton could pay Peterson "[a] stack, $1,500" to have "somebody grandfather beat up in the Bronx," that the individual was "70" and "just needs a good ass whooping."  See GX 1311 at 3-4; PSR ¶ 13.

2.      September 2017 Assault of Sylvester Zottola

After several failed attempts to locate Sylvester Zottola, Peterson committed the first violent attack against Sylvester Zottola on September 8, 2017.  See PSR ¶ 13.  Zottola was 70 years old at the time of the attack.  Shelton and Peterson exchanged messages about the attack in early September 2017, including about Peterson traveling to Zottola's residence to surveil it.  See GX 1311 at 27-36.  The day of the attack, Peterson informed Shelton about police presence near Sylvester Zottola's home and sent Shelton a photograph of police cars near the Zottola residence.  See id. at 37; see also GX 101 at 1-2.  Shelton promptly relayed the information to Anthony Zottola, writing, "Peace brother is everything good with you.  On my way to work I passed your house and it's a lot of police in front.  Just making sure you ok."  GX 101 at 1. Zottola responded, "For now yes," after which Shelton texted Peterson, "He don't know, nothing on his end."  Id.

---

[1]     As established at trial, Anthony Zottola, who managed the Zottola family's camera systems, used his control over the systems to assist co-conspirators.

Shortly thereafter, Peterson approached Sylvester Zottola near his residence, as captured on video surveillance.  See GX 401; 402.  The video depicts Peterson lingering outside Zottola's residence and then approaching Zottola as Zottola checked his mail.  See id.  Peterson then punched Sylvester Zottola in the face and body repeatedly, knocking him to the ground and watching him roll on the street, before fleeing.  Zottola remained immobile in the middle of the street until passersby came over to assist him.  Id.

### 3.    November 2017 Menacing of Sylvester Zottola

After the September assault, the defendants began their attempts to murder Sylvester Zottola.  On November 26, 2017, a dark van pulled in front of Sylvester Zottola while he was driving, forcing him to stop.  PSR ¶¶ 14-15.  An individual wearing a mask exited the van and pointed a gun at Sylvester Zottola.  Id. ¶ 15.  After Sylvester Zottola escaped and notified law enforcement, police officers recovered the van at the scene and found a checkered face mask and jacket.  Shelton's DNA was on both the mask and the jacket, and Peterson's DNA was on the mask.  Id.

Around this time, Shelton began using a GPS tracking device to track Sylvester Zottola—a tool that Shelton turned to several times throughout the pendency of the murder-for-hire conspiracy.  Shelton regularly referred to these tracking devices as "the piece," often with references to the percentage of battery left on the tracking device.  A battery-operated tracking device was used in the days leading up to the November 26, 2017 attempted murder of Sylvester Zottola, although not on the day itself.  The tracking device was registered in Shelton's name, and, based on the activity of the tracking device and text messages between Shelton and Anthony Zottola, Shelton used the tracking device to establish Sylvester Zottola's patterns in order to know where and when to best attack him but removed the device shortly before the attack as not to implicate himself.

Early in the morning of November 25, 2017, a blue van (the "Blue Van") was stolen.  The afternoon of November 26, 2017, the Blue Van attempted to cut off Sylvester Zottola and a man with a gun and a mask—Shelton—exited the Blue Van in an attempt to kill Sylvester Zottola, who narrowly escaped by placing his car in reverse and speeding away to a police precinct to report the attack.  PSR ¶ 15.  License plate reader records show that the Blue Van had been parked in the Locust Point section of the Bronx, near where the Zottola family compound was located and near the section of the Throggs Neck Expressway where the November attack occurred, at approximately 2:45 p.m.  See GX 801.  Sylvester Zottola immediately reported the attempt on his life to the police.

Shortly after the attempted murder, Shelton and Anthony Zottola exchanged coded text messages.  See PSR ¶ 16.  Anthony Zottola wrote to Shelton, "I hope you can get the actor [i.e., Sylvester Zottola]."  Shelton replied that "the costar just got into it with the director about 15 minute ago and they had to call security [i.e., the police]."  Id.  After Anthony Zottola said that he "needed this bad," Shelton wrote that "[t]oday was set to be the end finally until the actor wanted to do his own stunts and throw it in reverse in the middle of shooting a scene and drive in the opposite direction"—a description of Sylvester Zottola's escape efforts.  Id. Anthony Zottola replied, "[o]k. But we can still do the end I hope."  Shelton assured Anthony

Zottola that he was "putting together a new cast," and that they were "going to film in his dressing room [i.e. Sylvester Zottola's residence]." Id.

### 4. Stabbing of Sylvester Zottola

The spree of violence continued the following month. In December 2017, two days after Christmas, three men beat and stabbed Sylvester Zottola inside of his home—an attack planned by Shelton and Anthony Zottola. PSR ¶¶ 17-18.

On Christmas Day 2017, Zottola texted Shelton, "Merry Christmas," and then, "I saw that actor today he looks ready to finish the scene. Hopefully everyone is ready tomorrow to wrap it up." SHELTON responded, "Yes the producer was filming last night but missed the perfect lighting and the moment was missed." GX 1209 at 22. On December 27, 2017, Shelton and Zotola exchanged the following text messages:

| | |
|---|---|
| ZOTTOLA: | Did you hear anything if not like we talked about last night I get the keys to the dressing room [i.e., Sylvester Zottola's residence] so that he has to finish tonight cause the people who live in the studios above are gone for the evening but just tonight |
| ZOTTOLA: | An[y] word |
| SHELTON: | Still nothing |
| ZOTTOLA: | We have to finish the film ASAP cause now I am really messed up if we don't by tonight |
| ZOTTOLA: | I got the keys to the dressing room |
| ZOTTOLA: | What do u think. I hate to bother you but th[i]s film is making my life hell if not done by tonight |
| SHELTON: | I am also dealing with hell behind this film. Which dressing room do you have access to? |
| ZOTTOLA: | The main one. Where the actor leaves from |
| ZOTTOLA: | Studio above is empty tonight only |
| ZOTTOLA: | I know this suck |
| SHELTON: | Ok yes that will work |
| ZOTTOLA: | I can meet u whenever I giv[e] u the set |
| SHELTON: | Okay I'll be available around 3 |

4

ZOTTOLA:             Great I meet u at my garage

Later that evening—after Shelton obtained keys from Zottola to Sylvester Zottola's home—three men entered Sylvester Zottola's residence from the rear of the home.  PSR ¶ 17.  One of the men, carrying a gun, struck Sylvester Zottola on the head, knocking him to the floor.  Id.  The men then stabbed Sylvester Zottola multiple times in and around his neck and torso.  Before leaving the residence, the men stole cash and the family's DVR system.  Id.  Sylvester Zottola's neighbor discovered Zottola bleeding on the hallway floor, called 911 and doctors were able to save his life.  As Salvatore Zottola described it when he arrived on the scene, "[t]here was blood everywhere."  Trial Tr. 1383.

When a police officer attempted to collect video footage from Anthony Zottola, he provided the officer with video from an incorrect, and irrelevant, time period, rather than video that would show the time period encompassing the assault.  Trial Tr. 3153-3158.  Anthony Zottola also suggested to his brother that the perpetrators had broken into the home through the garage, rather than the back door, despite his own texts with Shelton providing Shelton the key— and despite video surveillance showing the perpetrators entering through the back.  See Trial Tr. 1406-1407.  After the attack, Anthony Zottola cleaned the blood up from inside the house and then wrote a bill to his father charging $3450 for the work.  See GX 1670.

### 5. Additional Recruitment Efforts

In the months after the brutal home invasion, Shelton and Anthony Zottola planned additional attempts, with Shelton attempting to recruit numerous individuals with the promise of payment.  See, e.g., PSR ¶¶ 19-24.  In addition to hundreds of text messages recovered from Shelton's phones recruiting and attempting to recruit individuals, Shelton and Blanco also recruited another co-conspirator who ultimately became a cooperating witness ("CW-1"), in the winter of 2018, to kill the victims in exchange for money.  Id. ¶ 18.  Specifically, Shelton and Blanco offered to pay CW-1 $10,000 to murder Salvatore Zottola, and later offered CW-1 additional money to murder Sylvester Zottola.  Shelton provided CW-1 with a firearm and access to one or more vehicles on multiple occasions and arranged for multiple getaway drivers, including Himen Ross, to carry out the murder-for-hire plot.

Around this time period, Shelton and Anthony Zottola continued to exchange extensive text messages regarding the plot.  Zottola often pushed Shelton to work quickly, using the promise of performing work on Shelton's home to incentivize Shelton.  As one example, on January 17, 2018, Zottola and Shelton exchanged the following text messages:

ZOTTOLA:             Any luck with the job site

SHELTON:             We still haven't heard from the first contractor his wife is calling all over, so im going a different route in the meantime.[2]

---

[2]        Contemporaneous text messages reveal that one of the men Shelton had hired to complete the hit had stopped texting Shelton.

| ZOTTOLA: | Yes please just want to open and close the site quickly. |
|---|---|
| ZOTTOLA: | I am looking forward to doing work at ur place so u and ur wife can live comfortably |
| SHELTON: | If you only knew |
| ZOTTOLA: | I got you.  U will be a lot happier once all work is done. |
| ZOTTOLA: | Done right |
| ZOTTOLA: | Done clean |
| ZOTTOLA: | Done quick |

GX 1209 at 31.  Zottola also made clear to Shelton that he was willing to pay for Shelton's continued efforts.  For example, on February 7, 2018, Zottola texted Shelton, "I have no problem paying for a new permit as long as it's done so we can sign off the job."  Shelton texted Zottola that he still had the "$30 you gave me for this permit in the house untouched minus some tools purchased," to which Zottola responded, "Th[e] $30 [i.e., $30,000] is urs.  U are my friend.  That is urs.  Do what is needed."  Shelton then referenced an "extra $10" that Zottola had also given him.  Id. at 39.

Zottola continued to express his professed hatred for his father and brother.  For example, on February 20, 2018, Zottola texted Shelton, "[t]hey called me last night to get under my skin.  They called me at 1030 and put me in a non sleeping mood. . . .  Just give me a heads up if I should meet with these assholes or not.  Please.  Thanks."  Id. at 42.  When Shelton responded that his "people" were "there now looking for a break," Zottola responded, "I just like you want to be done.  The headaches they give me n[o]w more than before is even crazier."  Id. A few days later, Zottola asked Shelton to "please please please move on the permit cause they pissed me off today."  Id. at 44.  On March 1, 2018, Zottola texted Shelton, "[t]oday is so important I cannot explain.  The guys for the permit given me hell over here.  Especially the one who thinks he is a super hero and brags like crazy.  See if the expediter can get in line to pull permits first thing so I can shut his mouth."  Id. at 47.  On March 6, 2018, Zottola texted Shelton, "The fisherman is half retarded."  Id. at 62.  Zottola frequently referred to the two victims as the captain and the fisherman.  On March 11, 2018, Zottola texted Shelton, "Can we get a double header at all.  My business is all messed up by both of them especially the MF captain the worst.  Everyday it's gets harder for me with them."  Id. at 75.  On April 15, 2018, Zottola texted Shelton, "Captain and fisherman are assholes . . . .  Do we have the exterminator to clean boathouse infestation in morning."  Id. at 109.

Further, throughout this time period—and indeed, for the pendency of the conspiracy—Zottola provided Shelton with valuable information about the victims' cars, whereabouts and access to locations they would be visiting, including providing keys and codes.  See generally GX 1209.

6.     Spring and Early Summer 2018 Attempts and Attacks

Also in the spring 2018, Shelton recruited CW-2 to carry out the attacks.  Id. ¶ 21.
As with CW-1, Shelton provided CW-2 with firearms, access to vehicles and drivers on multiple
occasions to carry out the murder-for-hire plot.  On April 16, 2018, CW-2 drove to the Bronx to
kill Sylvester Zottola, at Shelton's behest.  Id. ¶ 23.  CW-2 approached Salvatore Zottola with a
gun in his hand—realized he was not his intended victim, Sylvester Zottola—and fled in a van
provided by Shelton.  Id.  Around the time of the attempted attack, Shelton texted Anthony
Zottola that "[t]he exterminator is waiting outside."  GX 1209 at 110.  At 10:06 a.m., shortly
after the attack, and after Salvatore Zottola had called Anthony to tell him what had happened,
Anthony Zottola texted Shelton, "Get out now," and then, "We have to meet tonight please."  Id.

On April 24, 2018, Shelton texted Zottola that "waiting inside for the FedEx to
deliver is better than walking around shopping and hoping to time the delivery to make it back
home," i.e., that it would be better to wait inside a location for the victims rather than attempt to
follow them around and kill them.  Id. at 118.  A couple weeks later, on May 1, 2018, defendant
Jason Cummings broke into the Zottola family office with a gun and with the intent to kill
Sylvester Zottola but fled after he accidentally tripped the office's panic alarm and the police
responded.  Id. ¶ 25.  Shelton had access to the Zottola family video surveillance system—
managed by Anthony Zottola—during the attempted attack.  See id.

On the evening of May 3, 2018, into the early morning of May 4, 2018, Shelton
arranged for another attempt—this time to be carried out by both CW-1 and CW-2 together.  In
the early morning hours of May 4, 2018, NYPD officers arrested CW-2 after officers observed
CW-1 and CW-2 exit CW-2's residence and, after the two men spotted the officers, CW-1
abandoned a bag containing, among other things, a gun and a license plate.  Although the case
against CW-2 was dropped in the state, both men testified at trial that they intended to go to the
Bronx that evening to carry out the murder.  After the botched attempt, Shelton texted Anthony
Zottola whether he knew "a lawyer, that can help my dude," and Zottola provided a
recommendation.  GX 1209 at 122-23.

On June 5, 2018, CW-1 and co-defendant Himen Ross attempted to kill Sylvester
Zottola near his residence.  Throughout the attempted attack, Anthony Zottola texted Shelton
updates, which Shelton then immediately relayed to the hitmen.  GX 1209 at 135; GX 119.  After
Salvatore Zottola spotted Ross and CW-1 and took a picture of the car they were driving,
Anthony Zottola warned Shelton, "I know he took a snap chat pic of ur order . . . .  Get a new
order number [i.e., car] but I know all else is good."  GX 119 at 4.  Later that day, after Shelton
and Ross texted about the "v," i.e., vehicle, Shelton informed Anthony Zottola that they were
"picking up a new car tomorrow so we will be back on Thursday morning."  Id. at 6.

On June 12, 2018, this time with a different car, Ross and CW-1 again went to the
Bronx to attempt to kill Sylvester Zottola.  Shelton texted Zottola that "last time one of the
customers [i.e., Salvatore Zottola] was being annoying trying to take the coffee.  The way the
tables were situated we couldn't get the cart to deliver both[.]  The one customer was just
blocking.  If that happens again she we just give him the coffee?  I'm trying to make enough for
everyone but just incase."  GX 1209 at 141.  Anthony Zottola, using similarly coded language,

7

gave Shelton the go-ahead to kill both Sylvester and Salvatore Zottola if necessary. See id. ("Try both if you have enough;" "If blocked than give whoever wants"). Shelton immediately relayed the message to Ross. See GX 120 at 5 ("if the boy want to play defense and block the rim and [t]he basket isn't clear then just give him the ball and be done with it. I'll have to figure something else out for the game winning shot"). Ross confirmed he was "[t]ryna score all points." Id. Later that day, Ross and CW-1 observed Sylvester Zottola leaving his girlfriend's residence. CW-1 followed Sylvester Zottola and attempted to shoot him, but his firearm malfunctioned. Sylvester Zottola fired a shot at CW-1, and CW-1 fled into Ross's waiting car. CW-1 and Ross were ultimately pulled over by the police in Manhattan, at which point CW-1 was arrested.

After the failed attempt, Anthony Zottola quipped to Shelton, "I hear we just have to up our service rates. Lol. U am not kidding. See you tonight." GX 1209 at 142.

7.      The July 11, 2018 Attempted Murder of Salvatore Zottola

In June 2018, Shelton and Anthony Zottola began tracking Salvatore Zottola's location through the use of two tracking devices on Salvatore Zottola's personal vehicle and a work van that he frequently used.

The evening of July 10, 2018, Anthony Zottola and Shelton met. On the morning of July 11, 2018, Salvatore Zottola parked his vehicle in front of his residence. PSR ¶ 26. As he exited the vehicle, a red Nissan Altima (the "Red Nissan") carrying Ross and Julian Snipe, and driven by Arthur Codner, pulled up to the residence. Id. As Salvatore Zottola pulled up to his home and stepped out of his car, Ross shot Salvatore Zottola from the window of his car. As Salvatore Zottola tried to take cover, Ross got out of his car, chased Zottola and continued shooting Zottola at close range as he writhed on the ground. Ross only stopped shooting Zottola when his gun ran out of bullets. He then jumped back in the getaway vehicle and sped away. Though Salvatore Zottola sustained multiple gunshot wounds across his body, including his chest, he miraculously survived. He underwent operations and a hospital stay. As he detailed in his testimony at trial, "I remember waking up in a bed with my family around me, with the intubator in my mouth. I couldn't speak. . . . I was in and out of consciousness, so I was always in pain, the pain didn't stop." Trial Tr. 1480. Salvatore Zottola lost his gallbladder, portions of his intestines and part of his liver. Id. at 1481. He has scars across his body, and still suffers pain from the injuries to this day. Id.

Law enforcement officers later recovered a tracking device from the underside of the vehicle Salvatore Zottola was driving on the morning he was attacked.

8.      The October 4, 2018 Murder of Sylvester Zottola

Following the July 11 attempted murder of Salvatore Zottola, Anthony Zottola and Shelton continued to exchange near-daily text messages. On September 3, 2018, Shelton and Anthony Zottola exchanged text messages to meet up the following morning. On September 5, Shelton and Ross exchanged text messages about the "old news" situation and the two agreed to look for a driver for Ross. Shelton texted Ross, "I'm trying to see if I can get him to link me tomorrow because I need our plate cleared already the break been long enough I'm trying to

collect the royalties before it run out."  Following these conversations, efforts recommence to kill the victims.  On September 29, 2018—only days before the murder—video surveillance captured Blanco, Shelton and Ross meet up and test out a tracking device that was then placed on Sylvester Zottola's car.

Anthony Zottola continued to text Shelton pressuring him to finish the job.  See generally GX 1209.  On October 3, 2018, Shelton assured Anthony Zottola that the hitmen "definitely are good athletes as long as the endorsement checks are right"—a reference to the fact they would be paid.  On October 4, 2018—the day that Ross murdered Sylvester Zottola—Shelton and Anthony Zottola were in close contact the entire day.  At approximately 10:47 a.m., Shelton texted Zottola, "I'm banking on my players to land a big contract today so the signing bonus would get me all the way straight."  Zottola responded, "Yes.  U can be singing fat joe song, 'All the way up'."  GX 1209 at 192.

That afternoon, Ross and Alfred Lopez (who was acquitted at trial) tracked Sylvester Zottola's car to a McDonald's in the Bronx, where Ross shot him to death in the drive-thru lane.  PSR ¶ 30.  Immediately following the murder, Ross texted Shelton, "Done" and Sylvester Zottola's then-girlfriend called Anthony Zottola, informing him she believed Sylvester Zottola had been shot at a McDonald's.  Shelton texted Anthony Zottola, "Can we party today or tomorrow."  Less than ten minutes after learning his father had been shot, Anthony Zottola responded to Shelton, "Tomorrow most likely. . . .  It's my lil man bday I am taking him to his favorte place mcDonald's than a movie.  Lol," and then, "Like I can eat that stuff.  Thank you for being a great friend my man."  GX 126 at 8-9.  Shelton responded, "Hey it's like it's your birthday today as well lol."  Id. at 9.

In the days after the murder, Anthony Zottola paid Shelton and Shelton paid additional co-conspirators.  Id. ¶¶ 32-36.  Specifically, on October 5, Anthony Zottola and Shelton exchanged numerous text messages regarding Shelton's obtaining cases of water from Zottola.  See GX 127.  A photograph dated that same day, recovered from one of Shelton's cellular telephones, depicts a cardboard box of bottled water, as well as over $200,000 in banded currency.  On October 7, 2018, Zottola texted Shelton, "All good.  Did you drink the water.  Was it the right one," to which Shelton responded, "Definitely was the right one thanks I was able to water the plants and get some of them squared away."  Zottola replied, "Glad to hear.  Would you like to meet Wednesday or Thursday I am going to get mri to make sure all is clear and than [sic] going to sit with contractors for you."  Later, Zottola texted Shelton, "Drink up the water.  Let me know when you need to get more."  GX 1209 at 196-97.

On October 9, two days before Shelton's arrest and just five days after his father was murdered, Anthony Zottola texted Shelton, "My brain hasn't stop moving for a week yet with ideas," and then, "I am fulllllly focused."  Id. at 198.

Following Shelton's arrest on October 11, 2018 for the murder of his father, Anthony Zottola denied knowing Shelton.  See, e.g., Trial Tr. 1534.  However, even after Shelton's incarceration at the Metropolitan Detention Center, Shelton, using a contraband phone, remained in touch with Anthony Zottola, as did his wife.  See, e.g., Trial Tr. 5342-5348.

B.      The Jury Trial

On October 19, 2022, following a seven-week trial during which the government presented testimony from more than 65 witnesses, including the defendant's brother, brother-in-law and sister-in-law, and hundreds of exhibits, the jury found the defendant guilty of murder-for-hire and murder-for-hire conspiracy and related firearms offenses.  As the evidence at trial made clear, the defendant hired Shelton to commit numerous violent acts against his father and brother to take control of the family's real estate portfolio, ultimately leading to his father's death and the defendant's successful succession of his father in running the family's businesses.

C.      The Defendant's Arrest and Criminal History

Zottola was federally arrested on June 17, 2019.  PSR ¶ 37.  He has remained in custody since then.  He has no known criminal history.  PSR ¶¶ 75-80.

D.      Guidelines Calculation

The government concurs with the calculation set forth in the PSR finding that under the United States Sentencing Guidelines, the advisory sentence is life imprisonment.  PSR ¶ 106.  Notably, the defendant faces a mandatory term of life imprisonment for his convictions on Counts One and Two, and a statutory minimum sentence of 10 years' imprisonment for his conviction on Counts Three and Four.  PSR ¶¶ 103.  The term of imprisonment for Counts Three and Four must be imposed consecutively to any other count.  PSR ¶ 104-105.

II.      Analysis

Zottola tried to kill his father for months.  He had him scared, stalked, beaten and stabbed before having him killed.  He also tried to kill his brother, and nearly succeeded.  He wreaked havoc, and horror, on his entire family for more than a year.  And he did all this for his own personal gain.  Killing his father enabled him to seize control of the multi-million dollar real estate business owned by his family—some of the proceeds of which he distributed to Shelton, who in turn distributed the money to other hitmen.  For the reasons set forth below, the government respectfully requests that the Court impose a sentence of mandatory life imprisonment on Counts One and Two, life imprisonment on Counts Three and Four, and a substantial fine.  Such a sentence is appropriate given the nature and characteristics of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offenses, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

The government has outlined at length the nature of the crimes in this case.  They warrant life sentences.  The violence was extensive.  The defendant had his elderly father menaced with a gun over and over again; arranged to have him beaten so hard that he lay in pain in the street; and had his father slashed in his childhood home—the same house where in which his sister and brother-in-law lived, and the same house from which his father's blood had to be cleaned before the defendant's nephews could return home.  The defendant paid hitmen to shoot his brother all over his body and to gun his father down, execution-style, leaving his father to die alone at a McDonald's.

The defendant witnessed first-hand the pain all of this caused.  He saw the bruises his father sustained after the September beating.  He observed his family members' panic after their father narrowly escaped the November attempted murder.  He went to the hospital and saw the slashes on his father's neck.  He watched as his father, scared to stay in one location for too long lest he be found and attacked again, started living from house-to-house.  He scared his family.  He stood by as his brother and sister tried to deal with the implications of the recurring attacks in their homes.  He went to the hospital after his brother was shot, knew about the pain he had and the surgeries he had to go undergo.

Despite this, he did not stop the attacks.  Instead, he tried to obscure efforts to identify who was behind the attacks.  One of the most tragic aspects of this tragic case is the way that Anthony Zottola weaponized his unsuspecting family members.  He called them to ask where his father was, and then relayed that information to Shelton to send men in to kill them.  He heard about upcoming sibling vacations, and then planned attacks around them.  He listened as his father and brother recounted the attacks that had occurred on them, and then passed key details on to Shelton to better fine-tune the next attempt.  He watched his brother collect evidence against the hitmen, and then warned them to use a different car, or different location, or to "get out" when close to being caught.  He turned his family into unwitting players in their own heartbreak.

Meanwhile, Anthony Zottola pressed Shelton to work faster and better—incentivizing him with the promise of payment and the performance of work on Shelton's home.  The defendant chose, every day for over a year, not to end the violence, but instead to escalate it.  He was the driving force behind every act in this case.  He chose to keep paying Shelton, to keep encouraging him to recruit more and more people into the conspiracy, and to keep him close—calling him a brother while, at the same time, disparaging his father and brother, calling them "retards" and "assholes," and describing how they infuriated him.

The defendant's actions after his father's death are similarly shocking.  He celebrated his father's murder with Shelton at the same time that he was speaking with grieving family members.  He was excited about the next chapter of his life, texting Shelton that his mind had not stopped "moving . . . with ideas."  As his family attempted to piece together what had happened to them, particularly in the aftermath of Shelton's arrest, the defendant was in a unique position to bring some peace to those that were supposedly closest to him.  He did not.  He continued to act as though he had not been in nearly continuous contact with the man who had been arrested for killing their father.  He continued to let them anxiously search for answers, and safety, as the family did not know whether the murder of their father—even with the arrest of Shelton—would result in a cessation of attacks on the family.  Indeed, throughout every stage of this case, this defendant has demonstrated a lack of remorse and a refusal to accept responsibility for his horrendous acts of violence.

In this case, the nature and circumstances of the offense are intertwined with the history and characteristics of the defendant.  That the defendant was capable of planning and executing such violent acts as constitute the nature and circumstances of this case warrants the most significant term of imprisonment that the law offers.  That he was able to do this to his elderly father, who had given the defendant a job, money and a home, and to his brother, who, as the Court observed at trial, still loves the defendant despite the trauma he has suffered at the

11

defendant's hands, reinforces the appropriateness of such a sentence in this case.  Indeed, the sheer frequency and depth of the defendant's coded correspondence with Bushawn Shelton—particularly when contrasted to his treatment of his father and brother—demonstrate that the defendant would go to any violent lengths to wreak harm on his family.

Finally, the defendant's actions evince unbelievable greed.  By all accounts, the defendant's father was extraordinarily generous to his children.  He built a multi-million real estate portfolio for them.  He built homes for them.  He gave them jobs.  He taught them, working side-by-side with them.  It was not enough for the defendant.  As the evidence at trial established, the defendant slowly seized control of the family real estate business over the course of the year that he had his father hunted and killed.  Shortly before and continuing after his father's death, the defendant incorporated a new company—named after his initials only—to strike out on his own business ventures, all the while still using workers from his father's company to, for example, make improvements on his personal home in Larchmont.

Despite this, the defendant boldly asks this Court to impose no financial penalties on him.  Def. Mem. 2-3.  As to forfeiture, the government has conferred with counsel for the defendant since the filing of his sentencing submission, who has agreed to the forfeiture of (a) approximately one hundred thirty-eight thousand five hundred forty-four dollars and zero cents ($138,544.00) in United States currency, and all proceeds traceable thereto, seized from the real property and premises located at 15 S. Ridge Road, Larchmont, New York 10538 on or about June 18, 2019, and (b) approximately forty-five thousand dollars and zero cents ($45,000.00) in United States currency, and all proceeds traceable thereto, seized from the residence located at 561 Belmont Avenue, Brooklyn, New York 11207 on or about October 11, 2018 (items (a) and (b), together, the "Seized Currency") pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), as property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of violations of 18 U.S.C. § 1958(a).  Accordingly, pursuant to Rule 32.2 of the Federal Rules of Criminal Forfeiture, the government respectfully requests that the Court enter the enclosed proposed Preliminary Order of Forfeiture directed to the Seized Currency.[3]  The government does not intend to proceed with seeking forfeiture of the defendant's home, where his wife and children reside.

---

[3]      Prior to the government securing the defendant's consent to forfeiture of the Seized Currency, the defendant suggested in his sentencing submission that the government was required, at this stage of the proceedings, to establish the forfeitability of certain assets in which he ostensibly sought to assert an interest.  Def. Mem. 1-2.  While the defendant's argument has been rendered moot by his consent to forfeiture of the Seized Currency, it should be noted that the government bears no such burden because the property at issue is already the subject of various preliminary orders of forfeiture entered against the defendant's co-conspirators.  See Preliminary Orders of Forfeiture, ECF Nos. 560, 561, 598, 599.  As a result, the exclusive mechanism for the defendant to have contested the forfeiture of such property is through the filing of a third-party petition in a criminal forfeiture ancillary proceeding conducted in accordance with procedures codified in 21 U.S.C. § 853(n).  See United States v. Watts, 477 Fed. Appx. 816, 817-818 (2d Cir. 2012) (citing De Almeida v. United States, 459 F.3d 377, 381 (2d Cir. 2006) (""[C]riminal forfeiture is not a measure restricted to property owned by the criminal

As to a fine, the defendant suggests that "[a]dding financial sanctions . . . would . . . serve no legitimate punitive or deterrent goal." Def. Mem. 3. In arguing for no fine, the defendant suggests that a financial penalty would harm only his family. But the defendant's family presently receives tens of thousands of dollars from the defendant's siblings each year from the proceeds of the real estate business. And Zottola clearly has an ability to pay. In addition to his documented multi-million dollar wealth, it is notable that neither he nor his wife submitted a financial statement to the Probation Department. See PSR ¶ 98. The imposition of a fine takes into account, among other things, the "complexity, scope, and . . . nature of criminal activity." United States v. Zukerman, 897 F.3d 423, 429 (2d Cir. 2018). Money was at the heart of the scope and nature of the criminal activity in this case. Money was the tool this defendant used to get what he wanted—his father dead and control of the real estate business. Money motivated the defendant, and money is what the defendant used to motivate the rest of conspirators in this case. Under these facts, a fine within the Sentencing Guidelines range of $50,000 to $500,000 is appropriate in this case. PSR ¶¶ 99-102.

Accordingly, the Court should impose a mandatory term of life imprisonment for his convictions on Counts One and Two. The Court should further impose life terms of imprisonment on Counts Three and Four (which encompasses the mandatory 20-year consecutive sentences those statutes require), as well as a substantial fine, consistent with the Guidelines.

---

defendant . . . . The likelihood that some property involved in an offense will be owned by persons other than the criminal defendant is reflected in the provision for an ancillary proceeding")); United States v. Davenport, 668 F.3d 1316, 1321 (11th Cir. 2012) ("A codefendant in a criminal case is properly viewed as a third-party with regard to another defendant's forfeiture of property.") (citation omitted); United States v. Porchay, 533 F.3d 704, 709 (8th Cir. 2008) (affirming district court's decision to treat acquitted defendant as third-party petitioner under Section 853(n)); United States v. Becker, No. 10-40077-02-JAR, 2011 WL 93762, at *1 (D. Kan. Jan. 11, 2011) (declining defendant's request to conduct hearing on release of funds for payment attorney's fees in circumvention of ancillary proceeding where funds were identified in order of forfeiture entered against co-defendant).

III.      Conclusion

        For these reasons, the government respectfully requests that the Court sentence the defendant to life imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney

By:      ___/s/_____
                          Kayla Bensing
                          Emily Dean
                          Devon Lash
                          Andrew Roddin
                          Brian Morris
                          Assistant U.S. Attorneys
                          (718) 254-6279

cc:      Henry Mazurek and Ilana Haramati, Esq.
        United States Probation Officer Jennifer E. Baumann

FR:BDM
F. #2018R01984

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

       - against -

ANTHONY ZOTTOLA, SR.,

         Defendant.

– – – – – – – – – – – – – – – – – X

PRELIMINARY ORDER OF FORFEITURE

18-CR-0609 (S-3) (HG)

WHEREAS, on or about October 19, 2022, ANTHONY ZOTTOLA, SR. (the

"defendant"), was convicted by a jury at trial, including as to Count One and Count Two of

the above-captioned Superseding Indictment, charging violations of 18 U.S.C. § 1958(a); and

WHEREAS, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c),

the defendant has consented to the forfeiture of all right, title, and interest in the following

assets:

(i)      approximately one hundred thirty-eight thousand five hundred forty-four dollars and zero cents ($138,544.00) in United States currency, and all proceeds traceable thereto, seized from the real property and premises located at 15 S. Ridge Road, Larchmont, New York 10538 on or about June 18, 2019; and

(ii)     approximately forty-five thousand dollars and zero cents ($45,000.00) in United States currency, and all proceeds traceable thereto, seized from the residence located at 561 Belmont Avenue, Brooklyn, New York 11207 on or about October 11, 2018 (items (i) and (ii), together, the "Seized Currency");

as property, real or personal, constituting, or derived from, proceeds obtained directly as a

result of violations of 18 U.S.C. § 1958(a).

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, on consent, by and between the United States and the defendant as follows:

1.      The defendant shall forfeit to the United States all right, title, and interest in the Seized Currency pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

2.      Upon entry of this Preliminary Order of Forfeiture ("Preliminary Order"), the United States Attorney General or his designee is authorized to seize the Seized Currency, to conduct any proper discovery, in accordance with Fed. R. Crim. P. 32.2(b)(3) and (c), and to commence any applicable proceedings to comply with statutes governing third-party rights, including giving notice of this Preliminary Order.

3.      The United States shall publish notice of this Preliminary Order in accordance with the custom and practice in this district on the government website www.forfeiture.gov, of its intent to dispose of the Seized Currency in such a manner as the Attorney General or his designee may direct.  The United States may, to the extent practicable, provide direct written notice to any person known or alleged to have an interest in the Seized Currency as a substitute for published notice as to those persons so notified.

4.      Any person, other than the defendant, asserting a legal interest in the Seized Currency may, within thirty (30) days of the final publication of notice or receipt of notice or no later than sixty (60) days after the first day of publication on an official government website, whichever is earlier, petition the Court for a hearing without a jury to adjudicate the validity of his or her alleged interest in the Seized Currency, and for an amendment of the order of forfeiture, pursuant to 21 U.S.C. § 853(n)(6).  Any petition filed in response to the notice of forfeiture of the Seized Currency must be signed by the petitioner

under penalty of perjury and shall set forth the nature and extent of the petitioner's right,

title, or interest in the property, the time and circumstances of the petitioner's acquisition of

the right, title, or interest in the property, any additional facts supporting the petitioner's

claim, and the relief sought.

5.      The defendant shall not file or interpose any claim or petition seeking

remission or contesting the forfeiture of the Seized Currency in any administrative or judicial

(civil or criminal) proceeding.  The defendant shall fully assist the government in

effectuating the surrender and forfeiture of the Seized Currency to the United States.  The

defendant shall take whatever steps are necessary to ensure that clear title to the Seized

Currency passes to the United States, including, but not limited to, the execution of any and

all documents necessary to effectuate the surrender and forfeiture of the Seized Currency to

the United States

6.      The defendant knowingly and voluntarily waives his right to any

required notice concerning the forfeiture of the monies and/or properties forfeited hereunder,

including notice set forth in an indictment or information or administrative notice.  In

addition, the defendant knowingly and voluntarily waives his right, if any, to a jury trial on

the forfeiture of said monies and/or properties, and waives all constitutional, legal and

equitable defenses to the forfeiture of said monies and/or properties, including, but not

limited to, any defenses based on principles of double jeopardy, the *Ex Post Facto* clause of

the Constitution, any applicable statute of limitations, venue, or any defense under the Eighth

Amendment, including a claim of excessive fines.

7.      Pursuant to Fed. R. Crim. P. 32.2(b)(4)(A) and (B), this Preliminary

Order shall become final as to the defendant at the time of the defendant's sentencing and

shall be made part of the defendant's sentence and included in his judgment of conviction.  If no third party files a timely claim, this Preliminary Order, together with Supplemental Orders of Forfeiture, if any, shall become the Final Order of Forfeiture, as provided by Fed. R. Crim. P. 32.2(c)(2).  At that time, the monies and/or properties forfeited herein shall be forfeited to the United States for disposition in accordance with the law.

8.  The United States alone shall hold title to the Seized Currency following the Court's disposition of all third-party interests, or, if none, following the expiration of the period provided in 21 U.S.C. § 853(n)(2).

9.  The forfeiture of the Seized Currency shall not be considered a payment of a fine, penalty, restitution loss amount, or payment of any income taxes that may be due, and shall survive bankruptcy.

10.  This Preliminary Order shall be binding upon the defendant and the successors, administrators, heirs, assigns and transferees of the defendant, and shall survive the bankruptcy of any of them.

11.  This Preliminary Order shall be binding only upon the Court's "so ordering" of the order.

12.     The Court shall retain jurisdiction over this action to enforce

compliance with the terms of this Preliminary Order and to amend it as necessary, pursuant

to Fed. R. Crim. P. 32.2(e).

Dated:   Brooklyn, New York
_____, 2023

SO ORDERED:

_____
HONORABLE HECTOR GONZALEZ
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK