1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      :    18-CR-609(HG)

          Plaintiff ,          :
                                    United States Courthouse
     -against-                 :    Brooklyn, New York

ANTHONY ZOTTOLA, SR.,          :
                                    April 14, 2023
          Defendant.           :    11:00 a.m.

- - - - - - - - - - - - - X

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE HECTOR GONZALEZ
UNITED STATES DISTRICT JUDGE

APPEARANCES:


For the Government:          BREON PEACE
                             United States Attorney
                             BY: EMILY J. DEAN,
          `                  KAYLA C. BENSING,
                             ANDREW M. RODDIN,
                             Assistant United States Attorneys
                             271 Cadman Plaza East
                             Brooklyn, New York


For the Defendant:           MEISTER SEELING & FEIN LLP
                             125 Park Avenue, 7th floor
                             New York, NY 10017
                             BY: HENRY E. MAZUREK, ESQ.
                                 ILANA HARAMATI, ESQ.

Court Reporter:              Andronikh M. Barna
                             225 Cadman Plaza East
                             Brooklyn, New York
                             (718) 613-2178

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

2

1          THE COURTROOM DEPUTY:  This is criminal cause for

2   sentencing, Docket No. 18-CR-609, United States of America

3   versus Zottola.

4          Parties, please state your appearances for the

5   record starting with the government.

6          MS. BENSING:  Kayla Bensing, Emily Dean and

7   Andrew Roddin for the government, joined by FBI Special Agent

8   Michael Zoufal and Probation Officer Jennifer Baumann.

9          THE COURT:  Good morning, all.

10          MR. MAZUREK:  Good morning, Your Honor.

11          Henry Mazurek and Ilana Harimati on behalf of

12   Anthony Zottola, who is standing to our right.

13          THE COURT:  Good morning.

14          Everybody be seated.  Thank you.

15          All right.  So Mr. Zottola, we're here today to

16   conduct a sentencing proceeding in response to your conviction

17   at trial of the four counts in the third superseding

18   indictment in this case.

19          What I am going to do now is explain the process,

20   what's going to happen during the sentencing.  I am going to

21   review every submission that I have received regarding your

22   sentence today so that I have -- so that I'm sure that I have

23   all the materials that I should have.

24          We're then going to discuss the Probation

25   Department's presentence report.  And then I will spend a

3

1  little bit of time, although I don't think there is any real

2  disagreement, with the sentencing guidelines and what

3  guidelines apply in this case.  And while the guidelines are

4  advisory, I still need to consider them as one of the factors

5  for sentencing.

6          After that I will give the attorneys for both

7  yourself and for the government an opportunity to make

8  whatever remarks they want to make, then any victim statements

9  I will take at that point.  And then you will have an

10  opportunity to make a statement.  Again, it's an opportunity,

11  not an obligation.  And certainly if you choose to not make a

12  statement, that is not something that will impact me in any

13  way in terms of a sentence.

14          Do you have any questions for me at this point?

15          THE DEFENDANT:  No.

16          THE COURT:  All right.  After that I will go through

17  what are known as the sentencing factors, the 3553 statutory

18  factors that I need to consider.  And after reviewing those

19  factors, I will impose a sentence.

20          Let me just briefly summarize the charges.  The

21  Defendant was convicted by a jury in October of last year of

22  four counts.  The first count was a murder-for-hire

23  conspiracy.  The second count was the substantive crime of

24  murder for hire.  And Counts Three and Four were firearm

25  charges related to those other offenses.

1          At the close of the government's evidence, the

2   Defendant moved for a judgment of acquittal pursuant to

3   Rule 29.  I reserved ruling on that motion until the

4   Defendants had rested their case, at which point I denied the

5   Rule 29 motion before sending the case to the jury.  I gave

6   all Defendants at the trial an opportunity to renew their

7   Rule 29 motion through written submissions, and the Defendant

8   did not submit a posttrial Rule 29 motion.

9          Let me now go through the documents that I've

10  reviewed in preparation for today's sentencing.

11         I reviewed the presentence report, which is dated

12  March 10th, which is Docket No. 619, and the addendum to the

13  presentence report, which is dated April 10th and Docket

14  No. 634.

15         There was also -- as part of the presentence report,

16  there was a sentencing recommendation that I asked Probation

17  to provide to the parties.

18         Mr. Mazurek, did you have an opportunity to review

19  that sentencing recommendation?

20         MR. MAZUREK:  Yes, Your Honor.

21         THE COURT:  Other documents that I reviewed.

22         I reviewed the Defendant's sentencing memorandum,

23  which is dated March 31st and Docket No. 627, along with a

24  supplemental submission that was filed on April 12th which

25  attached a number of letters attesting to Mr. Zottola's

5

1  character, which was Docket No. 638.

2          I also reviewed the government's sentencing

3  memorandum dated April 7th, which is Docket No. 632.  That

4  memorandum attached a proposed preliminary order of forfeiture

5  two weeks ago and represented that the Defendant had

6  consented.  And I entered that forfeiture order on April 11th,

7  and that is Docket No. 636.

8          Ms. Bensing, are there any other sentences

9  submissions that you think I need to be aware of?

10          MS. BENSING:  No, Your Honor.

11          THE COURT:  Mr. Mazurek?

12          MR. MAZUREK:  No, Your Honor.

13          THE COURT:  Okay.  Mr. Mazurek, did you have an

14  opportunity to review the various sentencing submissions,

15  including the presentence report, with Mr. Zottola?

16          MR. MAZUREK:  Yes.  Ms. Haramati and I have both

17  reviewed all of the materials that Your Honor has mentioned

18  with Mr. Zottola.

19          THE COURT:  And do you any objections to the PSR

20  other than those identified in your sentencing submission?

21          MR. MAZUREK:  None others than those that were

22  previously submitted.

23          THE COURT:  Okay.  So in light of that, I don't

24  believe either party is seeking an evidentiary hearing; is

25  that right?

6

1          MS. BENSING:  That's correct from the government,

2    Your Honor.

3          MR. MAZUREK:  Yes, Your Honor.

4          THE COURT:  Now, let me go through the sentencing

5    guidelines.  While I don't -- like I said, I don't think there

6    is much dispute as to those guidelines, I think given the

7    severity of the potential sentences in this case, I think it's

8    important to make sure that there's a clear record of the

9    guidelines that I am considering.

10          So first, I don't think there's any disagreement

11   with the Probation Department's use of the 2021 sentencing

12   guideline manual.

13          Is that correct, Ms. Bensing?

14          MS. BENSING:  Correct, Your Honor.

15          THE COURT:  Mr. Mazurek?

16          MR. MAZUREK:  Yes, Your Honor.

17          THE COURT:  So for Count One, which is the

18   conspiracy charge, conspiracy to commit murder for hire, the

19   base offense level for that offense is 43.  There is no

20   applicable decreases or increases to that offense level.  So

21   that's 43 as it relates to what I'll call Count 1-A, which is

22   the conspiracy to commit the murder for hire with respect to

23   Salvatore -- excuse me, with respect to -- yes,

24   Salvatore Zottola.  No.  My mistake.  I'm sorry.  With respect

25   to Sylvester Zottola.

7

1          With respect to the base offense level for the other

2    object of that conspiracy, which was Salvatore Zottola, the

3    base offense level for that offense is 33.  That base offense

4    level is increased by four levels because the victim sustained

5    permanent or life-threatening bodily injuries.  And that level

6    gets further increased by four levels because the offense

7    involved the offer or receipt of something of pecuniary value.

8    So the total offense level for that portion of Count One is

9    41.

10          With respect to Count Two, the substantive

11   murder-for-hire offense, the base offense level for that is

12   43.

13          With respect to Count Three, the applicable

14   guideline simply directs you to the statutory minimum of

15   ten years because the jury expressly found that the firearm

16   was discharged during the commission of Count Three.

17          With respect to Count Four, because the underlying

18   offense involved or the related offense involved the murder,

19   the first-degree murder, the base offense level for Count Four

20   is 43.  So the total offense level for that count is 43.

21          I then had to do a grouping analysis as a result of

22   the number of counts.  There were two units that get assigned,

23   one for each group, which results in a total offense level of

24   45.  But because the highest offense level under the

25   guidelines is a 43, the effective total offense level for the

8

1    offenses of conviction is 43.

2           Is there any dispute with respect to that sentencing

3    guidelines calculation, Ms. Bensing?

4           MS. BENSING:  Yes, Your Honor.  As set forth in the

5    PSR, and the government agrees, this Defendant should have an

6    aggravating -- a four-level aggravating role enhancement.  It

7    ultimately results, Your Honor, I believe, in the same

8    guidelines range.

9           But as the Probation Department calculated, and as

10   the government agrees, given that this Defendant drove all of

11   the violence in this case, Your Honor, the government will

12   request that that four-level role enhancement be applied.

13          THE COURT:  Mr. Mazurek?

14          MR. MAZUREK:  Your Honor, given where the guidelines

15   sit prior to that enhancement, I don't think -- I think the

16   issue is relatively moot.  We don't take a position on that.

17          THE COURT:  Right.  I do think that there is no

18   question that the Defendant had the aggravating and, in fact,

19   the leading role in this conspiracy; and therefore, I do find

20   that that enhancement is appropriate, the four-level

21   enhancement, however.  So I will apply that.

22          But the net result is the same because it increases

23   the offense level of 43, and the highest offense level under

24   the guidelines is 43.  So I will include that enhancement, but

25   it does not affect the ultimate sentencing guideline.

9

1      I don't think there is any dispute that the

2  Defendant is in Criminal History Category I; is that correct?

3      MS. BENSING:  Correct, Your Honor.

4      MR. MAZUREK:  Correct.

5      THE COURT:  Based on the charges of conviction, the

6  potential sentencing range for supervised release under the

7  guidelines is two to five years.

8      Does the government have a view in light of the

9  mandatory sentences that are required here whether a term of

10  supervised release is appropriate in this case?

11      MS. BENSING:  We're not requesting it, Your Honor.

12      THE COURT:  The guideline fine range for these

13  offenses is 50,000 to $500,000, according to Guideline 5E1.2.

14      Mr. Mazurek, I know you have made a filing regarding

15  the position of a fine, and we will address that when you make

16  your statement, but is there any dispute as to the applicable

17  guideline range?

18      MR. MAZUREK:  No, Your Honor.

19      THE COURT:  All right.  So in light of my own

20  calculations and the representation to the parties, I am going

21  to adopt the guidelines calculations that I just described.

22      I want to briefly touch on the Probation

23  Department's recommendation in this case, which was the

24  imposition -- the recommendation that I impose concurrent life

25  sentences on Counts One and Two, followed by consecutive

10

1    ten-year sentences on each of Counts Three and Four.

2            Mr. Mazurek, like you said, you had an opportunity

3    to review that Probation Department recommendation?

4            MR. MAZUREK:  Yes, Your Honor.

5            THE COURT:  Let me briefly summarize the statutory

6    sentencing provision since they certainly are significant in

7    this case.

8            With respect to Count One, the statutory minimum of

9    imprisonment in this case for a conspiracy to commit murder

10   for hire that resulted in a death would be a sentence of life

11   or death.  But in this case, since the government did not seek

12   the death penalty in this case, the appropriate sentence for

13   Count One is a mandatory minimum sentence of imprisonment of

14   life.  There is also a fine provision for the imposition of

15   both this period of incarceration and a fine.

16           Any dispute as to the applicable statutory

17   provisions on Count One, Mr. Mazurek?

18           MR. MAZUREK:  Well, I think we will speak later

19   about the mandatory nature of such sentence and the mandatory

20   sentencing system.  I think that is an accurate description of

21   the current law.

22           THE COURT:  I think with respect to Count Two, as

23   with Count One, Count Two being the substantive

24   murder-for-hire offense, that also carries a statutory minimum

25   sentence of life imprisonment under the circumstances of this

1  case.  And Count Three, one of the gun offenses, carries a

2  statutory minimum sentence of ten years and a statutory

3  maximum sentence of life.  That sentence must run consecutive

4  under the statute consecutively with any other count of

5  conviction.

6          Similarly, with respect to Count Four, another

7  related gun offense, that one in particular refers to the

8  death of Mr. Sylvester Zottola, and that carries, likewise, a

9  statutory minimum sentence of ten years and a statutory

10 maximum sentence of, as applicable in this case, life.  That

11 count, Count Four, like Count Three, prohibits any sentence on

12 that count to run concurrently with any other sentence, so it

13 must run consecutively.

14          With respect to Count Two, Three and Four, any other

15 issues with respect to the statutory sentencing provisions?

16          MR. MAZUREK:  I think Your Honor described them

17 accurately.

18          THE COURT:  Okay.  In addition, I have no discretion

19 and will have to enter a special assessment of $400, which is

20 $100 for each count of conviction.

21          So at this point, like I said, I have reviewed the

22 various sentencing submissions, but Mr. Mazurek or

23 Ms. Haramati, if there is anything else in addition to what

24 you have already submitted or adding context to what you have

25 submitted, if you want to address the Court at this point.

1        MR. MAZUREK:  Yes, Judge.  If we could indulge your

2   discretion given how long we've been with this case and the

3   gravity involved, both Ms. Haramati and I would like to make

4   brief remarks.

5        THE COURT:  However you want to divide it, yes.

6        MR. MAZUREK:  Ms. Haramati will begin.

7        THE COURT:  Thank you.

8        MS. HARAMATI:  Thank you, Your Honor.

9        THE COURT:  You can stay seated if that is easier

10  just because of the mic.

11       MS. HARAMATI:  I think if you can hear me, I will

12  prefer to stand.

13       THE COURT:  Yes, whatever your preference.

14       MS. HARAMATI:  Thank you.

15       Your Honor, as you just went through the statutory

16  scheme, we obviously recognize that the Court has very little

17  discretion in the effective sentence that's going to be

18  imposed on Mr. Zottola today given his counts of conviction.

19       But, you know, the life sentence, mandatory life

20  without parole, bears a really awful finality.  But on this

21  solemn day, Mr. Zottola's literal judgment day, I did want to

22  take a few minutes to give the Court a glimpse of the man that

23  I have gotten to know over the last four years that I had the

24  honor of representing him together with Mr. Mazurek and give

25  Your Honor a flavor of what his wife and his children and he

1    has endured over the last nearly four years of his

2    incarceration getting to today.

3            And I hope that these remarks will shed some light

4    on the few areas where Your Honor does have discretion, which

5    is of course, the fine and making a recommendation to the

6    Bureau of Prisons for where Mr. Zottola will be ultimately

7    designated to serve his sentence.

8            At Mr. Zottola's core, and this is something that I

9    think Mrs. Zottola's very touching testimony during trial

10   really brought out, Anthony Zottola is and has been since the

11   day that his first child was born, he has always been just a

12   superlative father.  He is a father of three children,

13   Anthony, Jr., little Anthony who is now 15; Lucas, who is

14   going to be 13 just next month; and Nina, who is seven years

15   old and honestly barely got to know her father since he was

16   arrested when she was just three.

17           Since little Anthony's birth in 2007, Mr. Zottola

18   has, by all accounts from anybody in his family that I have

19   gotten to know, just poured his energy into supporting his

20   children.  They have always been his top priority and the

21   first things on his mind every single day.

22           As Your Honor heard during Mrs. Zottola's testimony

23   during the trial, little Anthony was born with special needs.

24   He was born prematurely at just over two pounds when he was

25   born.  He suffered a small bleed on the frontal lobe of his

1    brain.  And so, you know, from birth he had cognitive delays,

2    and still to this day he requires additional support in school

3    and socially in order to be able to develop into the beautiful

4    teenager that he is today.  Anthony Zottola has always been

5    his son's fiercest advocate and his closest companion.

6            Heidi Zottola, she testified and described Anthony's

7    role as a father, that he was a beautiful father.  That's her

8    words.  He was always very nurturing to his children.  She

9    described in her testimony that from the time their children

10   were babies, Anthony was involved in every single little thing

11   that they needed.  He would change their diapers, he would do

12   feedings, give them baths, read with them.  She said, quote,

13   he's always been very patient and playful right down to a

14   tickle and a laugh.  He was a great dad.

15           She testified that as their children grew and their

16   needs -- the children's needs developed, Anthony was there

17   every single step of the way with his children.  He remained

18   very involved in every aspect of their lives.

19           With Nina, his youngest child who was just three, as

20   I said, at the time of Mr. Zottola's arrest, Anthony was

21   playful.  After he would come home from a long day's work in

22   construction, in the sun, in the cold, physical labor, he

23   always had time and effort and energy to invest in his

24   daughter, read her a bedtime story, play with her on the

25   floor, just enjoy each other's company.

15

1          Lucas, Anthony's middle son, has always been their

2    family's budding athlete.  And Anthony made sure to be right

3    there with Lucas in everything that his son wanted to do.

4    When Lucas wanted to learn how to play soccer, Anthony said,

5    "That's great.  I want to be involved.  I want to be there to

6    support you."  He was Lucas's soccer coach, he was Lucas's

7    baseball coach.  He was there every single step of the way

8    supporting and helping his children develop their own talents.

9          And Anthony's relationship with little Anthony is

10   especially close and really, really special.  For many years,

11   Anthony, Jr. continued to struggle in school and socially, and

12   he needed extra care and an extra boost from his father.

13          And Heidi testified during Mr. Zottola's trial that

14   it was Mr. Zottola who knew how to get through to his son when

15   his son needed a little bit extra.  Heidi Zottola described in

16   her testimony how Mr. Zottola would, every single day,

17   lovingly take their son out for a walk just to talk about his

18   son's day, see how things were going with his son and, in

19   Mrs. Zottola's words, give little Anthony confidence and just

20   lift his son up when he needed something extra.

21          By all accounts, Mr. Zottola would do anything for

22   Anthony, Jr.  And to this day, Anthony, Jr. is particularly

23   attached to his father.

24          I will say, Your Honor, that even from the confines

25   of the BOP facilities where it is very challenging to maintain

1    a close family relationship, Mr. Zottola has prioritized

2    maintaining a close connection with his wife and with his

3    three children.  He speaks to them every single day that he

4    can.  Even through the COVID lockdowns and all of the turmoil

5    at the BOP facilities, Mr. Zottola's number one priority is

6    getting on the phone with his family to make sure that he can

7    hear their voice, and he can stay connected to his children

8    who mean the world to him.

9           You know, I -- I listened.  As part of the

10   discovery, the government produced a large number of

11   Mr. Zottola's BOP calls, all of which were with his family,

12   and I listened to many of them.  And it was striking to me

13   just listening to these calls, some of which were from 2019,

14   right after Mr. Zottola's arrest, some of which were from late

15   2021 during and immediately proceeding the time of this trial,

16   which is nearly more than three years after he was arrested,

17   and it was striking to me how attuned Mr. Zottola remained in

18   all of those calls to the daily needs and the lives and the

19   happenings of his family.

20          He was just interested in hearing about his

21   children's day and giving them whatever support he felt that

22   they needed listening to them on the other side of the phone

23   and showing them whatever struggles he has in his life, that

24   they -- he just wants to continue to be a source of support to

25   his children in any way that he still can.

1          Your Honor, I know you saw the letters that we

2   submitted with the -- both sets of sentencing submissions.

3   And I just want to note, in our first submission, we included

4   a number of letters from Bureau of Prisons corrections

5   officers who got to know Mr. Zottola during the time of his

6   incarceration, particularly when he was at the MCC, which is

7   now condemned as an unlivable place for federal inmates.

8          And one of the officers, Officer Joint, who spends

9   his entire day by people who are separated from their

10  families, noted just how remarkable Mr. Zottola's care for his

11  wife and his three small children is.  And I'm quoting

12  Officer Joint who explained that Mr. Zottola talks about his

13  wife and his children all the time.  He writes letters to them

14  each and every single day of the week.

15         Mr. Zottola's absence in the lives of his children

16  and Heidi Zottola's life to this day has left a gaping void

17  for these children.  And to this day, Anthony, Jr., Lucas and

18  Nina are of course grieving the loss of their father in their

19  daily lives.

20         So of course we're going to ask the Court for a

21  strong recommendation of a designation that is close by for

22  Mr. Zottola so he can continue to receive family visits from

23  his wife and his three children as much as they can come and

24  see him.

25         Now, I also want to take an opportunity -- in the

1    vein of Your Honor's placement recommendation authority, I

2    wanted to take an opportunity to talk about Mr. Zottola's

3    honestly terrible physical suffering that he's endured

4    during -- due to the grueling conditions of the BOP facilities

5    that I know Your Honor has doubtless heard so much about, as

6    every person who touches, you know, this court system has

7    heard and seen a lot of since COVID times.

8            And Mr. Mazurek and I have repeatedly raised to the

9    Court, primarily to Judge Dearie, in the first three plus

10   years of Mr. Zottola's custody of the really horrific

11   conditions that he has endured.  And honestly, no matter what

12   the crime of conviction that a person has, no one should

13   suffer in this way, particularly not at the hands of our

14   federal government.

15           Just to give a little bit of color and a few

16   examples to what Mr. Zottola has already gone through during

17   his time in the BOP facilities.  Immediately prior to the

18   start of this trial, just I think before the case was

19   transferred to Your Honor, when Mr. Zottola was moved from a

20   local jail in Hudson County to the MCC so that he could be

21   housed nearby for trial, he was inexplicably placed in the SHU

22   for weeks, weeks on end.

23           He had done nothing wrong.  To this day,

24   Mr. Zottola, as noted in the PSR, has maintained an absolutely

25   perfect BOP record.  Through -- through everything that he's

1   been through in there, it just -- he has not a single

2   disciplinary infraction.  And at that time right before his

3   trial when we, as his counsel, needed him to be engaged with

4   us the most to prepare for trial and when he needed to be in

5   contact with his family the most to prepare himself, honestly

6   emotionally, for the grueling endeavor of fighting for his

7   life before the jury that was impaneled in this courtroom,

8   Mr. Zottola was cut off from everyone.

9            His calls were several restricted.  He didn't speak

10   to his wife and family for more than three weeks.  Mr. Mazurek

11   and I could not see him for legal visits for weeks.  He wasn't

12   given a shower for more than a week.  He didn't have a shaving

13   razor.  He was brushing his hair with a toothbrush.

14            And when we were finally able to see him after --

15   you know, with the pressures of the trial just imminently

16   coming, he was almost an unrecognizable man from the person

17   that we had seen, you know, almost weekly from the time that

18   we first began representing him shortly after his arrest.  And

19   this was just the last, you know, in some ways, most egregious

20   instance of what he has endured since his arrest.

21            It was after everything that he had gone through

22   during the COVID-19 pandemic, which, of course, you know,

23   every inmate in the BOP facilities during the COVID pandemic

24   suffered tremendously, but that does not diminish the very

25   real suffering that Mr. Zottola endured; and by extension,

1  that his family had to endure through their separation and by

2  witnessing his suffering.

3          I'm sure Your Honor is aware that during the

4  pandemic starting in March 2020, all legal and social visits

5  were suspended.  Mr. Zottola was basically in a black hole to

6  us, to us and to his family.  I didn't hear from him for more

7  than a month.  His family didn't hear from him for more than a

8  month.  He was totally cut off from the outside world for the

9  start -- for the start of the pandemic.

10         During that time he was periodically transferred

11 from isolation in his cell to isolation in the SHU.  It was

12 just basically just isolation all around for him.

13         And beginning in March 2020, he did not see his

14 family for more than 17 months.  There were periods without

15 calls and really an entire 17-month period with no physical

16 contact whatsoever, which is especially painful for a man who

17 is so close to his children who can't even see them, you know,

18 as they're growing up even within the limited confines of

19 ordinary legal visits at a BOP facility.

20         After living through all these months of lockdowns,

21 in August 2020, Mr. Zottola was placed in the, honestly,

22 infamous supermax ten south unit of the MCC where Al-Qaida

23 terrorists and, you know, drug kingpins, just the worst

24 highest-security risk detainees who are placed in the MCC.

25 And he was placed there not for any reason, you know, of

1    anything that he did, just because the BOP ran out of space to

2    put people in COVID quarantine.

3              And so he ended up in the super, super max unit on a

4    concrete mattress, with a steel toilet, no chair, no soap, no

5    cleaning supplies during the -- really the height when COVID

6    was raging before any person was vaccinated.  No toothbrush,

7    no towel, the lights were on 23 hours a day.  And that kind of

8    random and protracted isolation that Mr. Zottola endured was

9    really unfathomable.  And that is what he has gone through in

10   the last nearly four years that he's been in custody.

11             It's taken a terrible toll on his health, of course.

12   He now walks with a limp that is so severe that, every time I

13   see him, I think he's almost unsteady on his feet.  I'm like

14   worried that he's going to fall over because he can't walk

15   properly.  He's developing diabetes.  And he needs to be moved

16   to a place out of the MDC and quickly where he can get

17   adequate medical care but that's still close enough that he

18   can maintain a connection with his wife and children.

19             And so in that vein, we respectfully ask the Court

20   for the strongest possible recommendation that Mr. Zottola be

21   placed not just as close to home as possible, but specifically

22   that he gets assigned to USP Allenwood Challenge Program for

23   rehabilitation purposes.  That's a special residential

24   rehabilitative program for high-security inmates that's run

25   out of USP Allenwood that I think Mr. Zottola qualifies for

1    under the BOP guidelines.  And that would be the best place

2    for him to be able to serve -- to serve his sentence.

3           Now, before I sit down, I do briefly want to address

4    the issue of the fine.  As Your Honor noted by negotiated

5    settlements, Mr. Zottola has already agreed to forfeit

6    $138,544.  That's the -- Your Honor entered the preliminary

7    order of forfeiture earlier this week.

8           Imposing additional financial penalties on a man who

9    is serving mandatory life would, I think, be almost by

10   definition excessively punitive and really risk running afoul

11   of the sentencing statute's parsimony clause.

12          And I say that for two primary reasons that are

13   really directed towards the factors in the guidelines and in

14   5E1.2(d) that guides the Court's consideration of whether a

15   fine is important.  I think two factors are particularly

16   salient here.

17          The first of those factors is whether a fine is

18   necessary to reflect the seriousness of the offense and

19   provide a just punishment.  The mandatory lifetime nature of

20   the punishment that Mr. Zottola is going to receive, there

21   just simply is almost no punishment more severe, more serious

22   than that.  There is nothing that can be added to that that

23   would meaningfully increase the seriousness of the punishment.

24   The length of his sentence, the permanence of his sentence is

25   more than enough to reflect the seriousness of even, you know,

1    the most severe and harmful offense.

2              I mean, and from a practical perspective, looking at

3    this particular factor, a fine would be almost meaningless to

4    Mr. Zottola personally.  He has no personal use for any money

5    that's in his name or in his family's name whatsoever, and he

6    never will have any, you know, personal use.  It will never go

7    to his benefit since the BOP -- will be confined to a BOP

8    facility for the rest of his life.  A fine won't impact his

9    financial stability.  It won't help him with his personal

10   comforts.  It has just no bearing on his personal financial

11   wherewithal in any way.

12             All that a fine would do is harm Mr. Zottola's wife

13   and his children.  And that is I think -- you know, that goes

14   to the other guidelines factor that is really salient here,

15   which is Factor 5E1.2(d)(3) instructs the Court to consider

16   the burden that the fine places on the Defendant and his

17   dependents relative to other potential punishments.

18             Any financial resources that Mr. Zottola has

19   remaining in his name or in his family's name are good for him

20   only to the extent that they can help support his wife and

21   three children.  But prior to his arrest, Anthony Zottola was

22   the sole financial supporter for his family, and he will never

23   again be able to fill that role.

24             So a fine is only going to stress his family, tax

25   their financial futures, their financial stabilities, as

24

1  Mrs. Zottola is already struggling to figure out how she is to

2  proceed forward, knowing that she is for the future now going

3  to be the sole supporter of herself and her three children

4  with a lifetime of imprisonment facing her husband.

5          And so on that basis, I respectfully urge the Court

6  not to impose any further financial penalties on Mr. Zottola

7  other than the already very significant close to $140,000 that

8  he has agreed to forfeit.

9          THE COURT:  Ms. Haramati, one question I have.

10         MS. HARAMATI:  Sure.

11         THE COURT:  I noticed in the PSR at paragraph 98

12  that the Defendant did not submit any sort of financial

13  information, either for himself or for his family.

14         So one, why?  If you're asking me not to impose a

15  fine, it's very difficult for me to assess without that

16  information whether imposing a fine would cause this sort of

17  hardship that you are noting.

18         So why was there no financial information submitted?

19         MS. HARAMATI:  Well, I think -- just two separate

20  points to that, Your Honor.

21         The first is, during this trial, there was quite a

22  bit of financial evidence for Mr. Zottola and his family that

23  was presented to the Court.  And so, you know, our thinking

24  was that it was really duplicative.  Your Honor has a very

25  good view.

1       But what we did submit that was new to Probation and

2  also as one of the exhibits to our initial sentencing

3  submission was a list of the lawsuits that his -- that

4  Salvatore Zottola has filed against Anthony Zottola and the

5  real estate businesses.  As Your Honor is aware, based on the

6  extensive financial evidence presented at trial, Mr. Zottola's

7  entire net worth basically is tied up in the family real

8  estate business, and his brother has filed -- I think it's

9  five separate actions against Anthony Zottola and the real

10 estate businesses.

11      Most importantly, is a personal injury action, a

12 tort claim, for Salvatore Zottola's shooting that claims

13 $10 million in pecuniary harm and $30 million of punitive

14 damages.  And so with a $40 million, I think, really very

15 likely judgment, my rudimentary understanding of state civil

16 law is that once there is a conviction in a case like this,

17 Salvatore Zottola's claims, you know, can be based on the

18 conviction here, and so, you know, with a $40 million

19 potential judgment hanging over Anthony Zottola and all of his

20 assets, that far exceeds any assets that Anthony Zottola has.

21      And so -- and that, you know, sort of ties in.  So

22 for one -- just to finish the thought, for one, a financial

23 disclosure of specifically how much his house is worth, which

24 Your Honor already heard about, and any amount he has in the

25 bank is just absolutely eclipsed by the potential civil

1   exposure from his brother's suit.

2          And, Your Honor, that ties into one of the other

3   guidelines factors in considering whether to impose a fine.

4   The guidelines also instruct the Court to consider any

5   potential civil penalties that Mr. Zottola faces.  And so, you

6   know, in that vein, the $40 million that he may owe to his

7   brother, I think, is -- also seriously weighs against

8   imposition of a fine here.

9          THE COURT:  You will agree with me that while the

10  conviction may result in a relatively easy finding of

11  liability under the civil standard, that does not equate into

12  a $40 million judgment.  I mean, that's a whole different

13  issue about what a jury would find, right?  So the only thing

14  that the conviction does is ensure or at least make it much

15  easier to find civil liability.

16         MS. HARAMATI:  Certainly liability and damages are

17  two separate questions under -- you know, under a civil

18  proceeding, of course Your Honor is right about that.

19         But we all heard in this courtroom during trial the

20  very significant injuries that Salvatore Zottola endured as a

21  result of his shooting.  And so, you know, again, not as a

22  civil lawyer but as just somebody -- you know, a criminal

23  lawyer looking at that and looking at the suit, you know, when

24  considering, you know, the fine potential and the financial

25  disclosures to Probation are specifically geared to determine

1   whether Mr. Zottola has an ability to pay the fine, they're

2   not to be -- their purpose is an ability to pay determination,

3   not for other purposes.

4        And so just looking at that and considering the

5   limited nature of what the financial disclosures are for, you

6   know, I still think that the civil suits brought by

7   Salvatore Zottola are a very significant factor for the

8   Court's consideration.

9        THE COURT:  But you will agree with me, right, that

10  congress at least thought that even in a situation where a

11  Court imposed life or even death as a penalty, that the

12  addition of a fine is statutorily permitted.

13       MS. HARAMATI:  Of course it is statutorily

14  permitted, and I'm not disagreeing with that.  I just think --

15  the point is just that in this particular case -- and I mean,

16  perhaps, you know, my argument is generally applicable to all

17  people who are serving a mandatory life sentence, but I don't

18  think it has to go that far.

19       In this particular case where we have Mr. Zottola

20  who was the sole supporter of his family, who will be serving

21  a mandatory life sentence, a fine is, I think, you know, for

22  him personally, almost gratuitous.  The only practical impact

23  that it could have -- other than additional emotional anguish

24  for him that his family will be strapped with those resources,

25  but the only real practical pecuniary impact is going to be on

1   his wife and children who are left to support themselves.

2          THE COURT:  I want to give you an opportunity now to

3   address what the government has already put in, in its

4   submissions, which is, I sat through seven weeks of this trial

5   and I grappled every day with the "why" question, what was the

6   motive here?

7          And the only thing that consistently came out for me

8   throughout the evidence was that this was monetary.  There

9   was -- I saw no history in anything, and I think I would have

10  heard about it, of Mr. Zottola being abused in any way.  I

11  heard a lot of testimony about the nature of the relationship

12  with his father, the giving nature of his father.  I think

13  there was no question about the financial support that his

14  father gave to all his children, went as far as divesting

15  himself of the ownership interests in the property to make the

16  transitions and passing on of that to his children that much

17  easier.

18          So when I'm here with a situation where it seems to

19  me that the only reason, or at least the dominant reason that

20  I saw at trial, was for obtaining either control or -- or I

21  don't know what, I mean, because, like I said, I still -- one

22  of the most disturbing aspects of this case for me is the

23  underlying monetary aspect of it and the desire to do this

24  crime in order to obtain increased control or remuneration as

25  a result of the father's passing.  It strikes me that, unlike

1    other pure violence cases, that money was at the heart of this

2    case.

3           So under those circumstances, why shouldn't I be

4    considering a fine?  I mean, you have said what you said, but

5    is -- and I know you are not obviously conceding guilt in this

6    case.  But from what I saw at trial, what else is there to

7    this case but money?  I mean, it's caused a tremendous amount

8    of hardship and pain and suffering and grief.  But at bottom,

9    this was about money.  What else?  You tell me what else the

10   evidence shows me that -- other than the gruesome violence

11   that was involved here, that this case was not about money?

12          MS. HARAMATI:  Well, Your Honor, I think that what

13   the evidence shows is that there was absolutely no motive,

14   which obviously was a central part of our arguments to the

15   jury.

16          THE COURT:  Let me interrupt you.  If there was

17   anything in what I said that indicated that there was no

18   motive, that's not what I said and certainly not what I meant.

19          What I said is that the evidence, the best I could

20   come up with, given the strength of the evidence, was that the

21   driving motive here was financial in nature.  So I think it's

22   certainly a stretch to say that there was no motive

23   demonstrated.  One, it is not an element and not necessary,

24   but I think there was no question that the underlying and

25   driving motive here was financial in nature.  And I just don't

1   see any other thing given the family history, as best as I can

2   decipher it from everything I've heard both at trial and in

3   victim statements.

4         MS. HARAMATI:  Your Honor, first, I did not mean to

5   suggest that Your Honor was saying that there was no motive.

6   I think that our view of the evidence is that it strongly

7   shows that there was no motive here, and certainly not a

8   financial one.  The -- you know, obviously we both sat through

9   that trial and heard the testimony of the witnesses and saw

10   the evidence.

11         But what the financial evidence said to me, and I

12   think that this was a very strong takeaway, is that there was

13   plenty to go around in the Zottola family.  There was no

14   reason for any kind of financial action in this case.

15   Everybody was supported, everybody had enough, everybody was

16   able to live in a nice house, you know, different people had

17   different positions within the family business.  But everybody

18   had something to do and had a way to support their family

19   amply.  There was absolutely, in my view of the evidence, no

20   financial motive.

21         But even taking --

22         THE COURT:  Let me just -- because I want you to

23   know what is on my mind because I want you to address it.

24         The flip side of that, of no one having need and

25   that the trough was large enough, is what makes this even more

1    sort of challenging as to what else was this case about.  I

2    mean, where -- I could see where the trough is small and you

3    are trying to fight your way to get to the trough, but that

4    wasn't the case here.

5           I mean, from everything I heard, the wealth of this

6    family was split relatively evenly, as far as I could tell.

7    The support that each family member got was relatively equal.

8    And like you said, there was a lot to go around.  So in my

9    mind, that makes it worse.  There was a lot to go around.  Yet

10   from what I could gather from the trial testimony, the

11   Defendant wanted more than that.

12          MS. HARAMATI:  Your Honor, I understand that the

13   government's theory is that there was a financial motive and

14   that was the evidence that the government presented.  I think

15   it did not get there, and it was -- that is only a small --

16   only a small slice of the family history and of the

17   relationships in this family were presented as part of the

18   trial because, as Your Honor said, motive was not an element

19   of the crime.  And so it was a very limited -- there was a

20   very limited view of what these family relationships were, and

21   so, you know, Your Honor has limited evidence.

22          And, you know, I think that the fact that, as

23   Your Honor said, the pie was large, everybody had enough,

24   there is very limited reason, and I think no real reason at

25   all to think that, you know, Mr. Zottola was specifically

1    motivated financially.

2           But, you know, what I think is maybe even, you know,

3    kind of a stronger point to Your Honor's thinking, even if,

4    you know, you're not persuaded as I am that there was no

5    financial motive here, any motive, it didn't work.  If

6    they're -- in the government's view, you know, Mr. Zottola set

7    out to do something because he wanted more for himself and for

8    his family, more control, more money, whatever the specific

9    theory is, and I think it shifted over the course of the

10   trial, which in some ways further undermines that argument.

11   But whatever specific idea the government has that for -- as a

12   motive, it did not work.

13          He did not end up with more control, more money.  He

14   is sitting here before Your Honor facing the rest of his life

15   in a BOP facility.  And I think just the practicalities of

16   this sentence are that, even if Your Honor's persuaded by the

17   government's financial motive, practically speaking, what

18   would a fine do?  A fine would do nothing for this man sitting

19   next to me.

20          THE COURT:  Maybe it doesn't, but address then the

21   general deterrence effect of a fine where the crime has, at a

22   minimum, I think we can all agree, at a minimum, has some

23   financial motivation.  Right?  So, you know, your point that

24   it did not work, that was not because of the Defendant.  It

25   didn't work because he got caught.  Usually anyone who is

1  sitting in front of a Court to get sentenced, it is because

2  whatever the scheme was did not work.  Or it might have worked

3  partially.  But certainly that's not enough.

4          And on your point about limited evidence, I can only

5  work with what I have seen, right?  And what I have seen is

6  what I have already described.

7          But why don't you speak to me a little bit about

8  general deterrence since that is also one of the factors that

9  I need to think about beyond what the effect is on this

10  individual Defendant.

11          MS. HARAMATI:  Your Honor, with a sentence of life

12  without parole, literally a life of sitting in a BOP facility,

13  if that is not sufficient for general deterrence, I don't

14  think there is any financial penalty that could additionally

15  be imposed that would have an additional deterrent effect.

16          There is literally, other than the death penalty,

17  nothing more severe than spending the rest of your natural

18  life in a BOP facility behind bars.  His liberty will be

19  totally taken away from him forever.  He will never be going

20  back to his family.  His children are going to grow up without

21  him.  His family will be forced to move on from him.

22          If that is not, you know, sufficient general

23  deterrence, I just -- as a human being, I do not see what a

24  fine could possibly add to the realities of what this man

25  faces.

1          THE COURT:  All right.

2          Mr. Mazurek?

3          MR. MAZUREK:  Thank you, Judge.

4          I certainly will not go over the same areas that

5    Ms. Haramati already presented to the Court.  But I would like

6    to say a few words with the Court's indulgence, and I thank

7    you.

8          Judge, I have -- Ilana and I both have known

9    Anthony Zottola now for over four years.  And when Your Honor

10   was talking in the context of fine, you talked about the only

11   evidence you have is that is what is presented before you, and

12   that is how you must act as an arbiter, what you see and hear

13   in the courtroom.  And certainly that is a judge's role in the

14   context of the decisions you're making for sentencing.

15         But, and it's a big "but," that evidence obviously

16   is circumscribed in a large way by the rules that we all play

17   by in the courtroom, the rules of evidence and such.

18         Your Honor, sentencing, by its very nature, is the

19   most difficult job that anybody has to do, and I do not envy

20   you.  Because you have to, under Section 3553(a), under most

21   circumstances, consider everything that's presented before

22   you, not just the evidence that was presented at trial.

23         Now, this case is a little different than most cases

24   because that discretion's been taken away from you.  As much

25   as you may want to consider the personal history and

1    characteristics of this man, as Ms. Haramati has so eloquently

2    presented, you can't.  Congress has given you a mandate, a

3    mandate that you must follow and a mandatory sentence of life

4    without the possibility of parole is the sentence that we know

5    will soon come out of your mouth in just a few minutes this

6    afternoon.

7           I want to speak very briefly about the honor of

8    being a defense lawyer, of getting to know a client in a way

9    that prosecutors cannot, that Your Honor cannot.  You can't

10   spend time as we did in the many prisons that he sat in the

11   last four years.

12          Mr. Zottola is a very complex person.  There's no

13   question about that.  We all want the simple answers.  If I

14   had a dollar every time a judge at sentencing asked, why do

15   you think he did it?  Why would someone who has such a life, a

16   beautiful life, a beautiful wife, three beautiful, gorgeous

17   children, a brother and a sister cared and loved for him?  Why

18   would he do it?

19          Your Honor, one of the most poignant moments in this

20   God-awful case occurred when Your Honor was not presiding, it

21   was Judge Dearie.  We presented a bail package.  And it's

22   unusual even to say that because of the charges here in

23   federal court on murder for hire, multiple attempts at life

24   and shooting at a second person, you would think no chance

25   that that person could ever possibly get bail.

1        But you know what?  What struck me was that, as we

2   prepared that bail package, person who is looking at mandatory

3   life without parole, people came out, people came out to

4   support him and said -- not just one or two; we had about a

5   dozen people, a dozen people, say we will put our family home,

6   our family home, we'll secure it for this man,

7   Anthony Zottola, knowing what incredibly serious and heinous

8   crimes he was charged with.

9        And let me tell you that.  It couldn't be his

10  family, because, you know, they were victims and they're not

11  supporting him in that way.  They support him in other ways.

12  But these were people he got to know, friends and neighbors

13  from the community he grew up with, six or seven different

14  families.  They were willing to put up their own home.  He

15  would be an incredible flight risk.  Your Honor would

16  recognize that.

17       And so when we appeared before Judge Dearie with

18  that bail presentation, Judge Dearie, who I have the most

19  incredible respect for and believe he's one of the greatest

20  jurists that I'll ever chance, present company excluded, of

21  coming before --

22            THE COURT:  No need to say that.

23            MR. MAZUREK:  -- and a guy who was 40 years on the

24  bench and seen everything in life possible, at least in the

25  context of crime, he locked down upon us and he said, "Why?"

1  And he asked Ms. Bensing, "Why?"  The thing that concerns me

2  is that I just -- you know, the most common -- the concerning

3  and puzzling and unanswerable question is, look at this, a guy

4  who has no record, who had lived a peaceful and honest

5  law-abiding life and has these people coming, friends coming

6  out to support him and put their homes up, you know,

7  12 different people, it doesn't make sense.  It doesn't make

8  sense.

9       And honestly, there was a moment in that bail

10  hearing where Judge Dearie had a very pained expression on his

11  face and said, "This is really hard."  And he wouldn't rule on

12  the bail hearing from the bench.  He said, "I'm not going to

13  rule."  He eventually denied the following Monday.  But he

14  said, "This is one of the hardest situations I've had to face

15  as a judge because I just don't get it.  How could this be?"

16       And that's what we're all -- this entire courtroom,

17  that's what we're all asking.  There may be a -- you know, we

18  all want simple answers, money, there's a lot of money

19  involved, so it must be money.  But, Your Honor, as in most

20  complicated and difficult things in life, as part of the human

21  spirit, we won't know the answer.  You won't get that simple

22  answer.  It's not that simple.

23       And I know you need to make decisions based on

24  things.  Look, I think for purposes of a fine, I would ask --

25  you have very little discretion in this case because congress

1    has imposed a lot of mandatory sentencing paradigms in front

2    of you.  So I would just ask, let the family decide about the

3    money.  Don't give it to the -- I mean, the government, they

4    need money, but this is not necessarily that kind of case.

5            And certainly for general deterrence purposes, I

6    don't think that the next guy who is out to commit murder for

7    hire is going to think before he commits it, that oh, I'm

8    afraid I'm going to lose a few hundred thousand dollars.  I

9    think the real general deterrence is mandatory life without

10   parole.

11           Now, I am here to also just, one, I want to thank

12   Anthony for choosing us as lawyers.  It was an incredible

13   privilege to get to know you and your family.  We've had a

14   chance to get to know Anthony and his family probably better

15   than most.  Maybe even better than the prosecutors.  Got to

16   know his sister.  I even got to know a little bit his brother.

17           And we got to walk through his family home at

18   2005 Hobart, got to see the place he grew up, walked in the

19   bedroom that he shared with his brother, across the hall where

20   his parents raised him.  We got to hear about his beautiful

21   mother who died at a way too early age of cancer in the 1980s.

22   We got to go to the beautiful, beautiful homes that were built

23   in Throgs Neck, right on the water, that Anthony used his own

24   hands to help build.

25           This case, Your Honor, is not one that any of us --

1   maybe human comprehension can't put our arms around to really

2   understand the "why" despite our human curiosity of wanting to

3   know that answer.

4          I know that -- I'm a father of two.  Anthony is a

5   father of three.  We talked a lot in our time together about

6   the children, about Anthony's coaching on the sidelines,

7   Lucas's soccer team, trying to get Anthony, Jr. to get away

8   from his video games and be more social and about how he loved

9   his little girl just to be on his lap as long as he could at

10  night.  And he talks about his undying love of Heidi.  And it

11  is an infinite love and somehow it's still growing.

12         So there is -- I can tell you, Your Honor, that

13  despite the fact, like in all of these cases, you only see the

14  person that's presented in the worst context of the crime that

15  comes before you in court, we get to see the full person, the

16  earlier life and even the life that they are spending behind

17  bars.  And I can tell you that Anthony portrays a good and

18  decent man.

19         Now, there's one other thing before I sit down I

20  wanted to talk about because it is something that, as a

21  defense lawyer, is painful to me.  And that is the system of

22  sentencing that Your Honor is constricted to impose today.

23  It's a mandatory system that does not leave Your Honor

24  discretion to sentence Mr. Zottola based on his individual

25  characteristics and background.

1        And in preparing for my comments, difficult comments
2    here in court today, I came across an incredible statistic.
3    And that is, in 2020, 15 percent of the U.S. prison
4    population, which counts for over 200,000 people, are serving
5    life sentences.

6        Your Honor, my very humble opinion, such a sentence
7    is cruel, inhuman, it is degrading treatment and in my mind
8    arbitrary deprivation of liberty.  When you impose the
9    sentence that you're obligated to impose in a few minutes, you
10   are going to issue a sentence that you're going to call life
11   imprisonment without the possibility of parole.  I think it is
12   more aptly described as death by incarceration.

13       In my mind, the law should value human life.  The
14   human spirit, Your Honor, always allows a possibility of
15   redemption.  A much wiser lawyer than me once told me a phrase
16   that is burnished in my memory.  She said, "Mercy is not
17   earned; it is bestowed.  The law always, in a fair and free
18   society, should allow Your Honor to choose mercy."  But
19   instead, in this case, it allows you only to impose a sentence
20   of death by incarceration.

21       Your Honor, I believe that such a sentence achieves
22   no rational penal goal.  No one wins in this courtroom today.
23   No one.  The Zottola family loses again.  Another death will
24   be imposed today, this time by incarceration.  The Zottolas
25   lose their youngest son and sibling.  They lose a loving and

1    caring husband.  They lose a doting and protective father.

2         We are faced as a society with helping people like

3    Salvatore, Debbie, Katie, with helping them overcome a loss

4    that is impossible, impossible to restore.  An extreme

5    sentencing like the one the Court is constrained to impose

6    today only amplifies and prolongs the suffering for everyone

7    involved.  In my mind, it does not correct or rehabilitate.

8         The penalty, Your Honor, is to impose in just a few

9    minutes is too devastating for most of us to comprehend.  If

10   he is lucky, Anthony Zottola will grow old in a prison cell, a

11   cell of about six-by-eight feet in dimension with steel or

12   brick walls and one solid or barred door that locks from the

13   outside.

14        At a maximum-security USP, it will be equipped with

15   a single twin bed, thin mattress, stainless steel sink/toilet

16   combination and a small table with a nonremovable stool.  He

17   will be alone as he grows older and older.  His body will

18   weaken, his hair will thin.  His back will not allow him to

19   stand straight anymore.  He will walk in a shuffle and with a

20   stoop.  His knees will always hurt.  His feet will not allow

21   him to stand for long periods of time.  His eyesight and

22   hearing will diminish.  He won't be able to read anymore or

23   hear what the correction officers are telling him.

24        Finally, one day he will die, wearing the same khaki

25   clothes he would've worn for 20 or 30 or 40 years.  By then,

1    maybe a few people will know or care.  And it will not matter,

2    Your Honor, if Anthony commits to bettering himself and those

3    around him, it will not matter, Your Honor, if he demonstrates

4    remarkable rehabilitation and commitment to prosocial

5    activities in the prison.  It will not matter, Your Honor, if

6    while incarcerated he obtains educational and vocational

7    achievements, completes rehabilitation programs or

8    participates in or even leads programs, initiatives and

9    service of others.

10           It will not matter, Your Honor, that at age 70, 75,

11   or 80.  He poses no safety risk if released to complete his

12   life with his family.  Death by incarceration.  That is what

13   the legislation, Your Honor, gives to Anthony Zottola today.

14   Mercy is not earned; it is bestowed.  And in my mind, it

15   should always be possible in the law.  And today, very sadly,

16   mercy has left our federal courtroom.  Your Honor is not

17   allowed to consider redemption and hope in constructing a fair

18   and reasonable sentence.

19           In my mind, for that, the law must be wrong.  And

20   someday a more enlightened society may judge sentences like

21   this one, death by incarceration, as merciless and wrong.  And

22   for that reason, Your Honor, we strenuously object to the

23   sentence that you will impose today and preserve our argument

24   that life without possibility for parole is unconstitutional

25   under the Fifth Amendment's due process clause and the Eighth

1   Amendment's admonition against cruel and unusual punishment.

2          As to Anthony, my final words in these proceedings,

3   first of all, I love you.  Second is, don't lose hope because

4   hope is the most human of the feelings that we have.  It stems

5   from our ability to think, to love, to empathize, and to

6   improve as caring human beings.

7          Anthony, I hope with you.  And my hope is that one

8   day you get to reunite with your family whom you love so very

9   much.  I hope with you that one day you can fall asleep under

10  the roof, the same roof, with Heidi, Anthony, Jr., Lucas and

11  Nina.  Anthony, I leave you with that hope, even if the law

12  right now does not.

13         Thank you, Your Honor.

14         THE COURT:  Thank you, Mr. Mazurek.

15         Ms. Bensing?

16         MS. BENSING:  Thank you, Your Honor.

17         I know that the Court, as always, has carefully read

18  the government's sentencing submission in this case, and I

19  will try not to repeat it.

20         I do want to address some of the statements that

21  were made on the record today.  And I'll start, I think, with

22  Ms. Haramati's emphasis on this Defendant's role as a father.

23         And I think it's important, Your Honor, and it's

24  really impossible, Your Honor, not to consider, given the

25  emphasis that this Defendant is placing on family, to consider

how he treated his own father.  The words that he used when
talking about his father to Bushawn Shelton, the injuries that
he paid for his father to sustain.

Your Honor, one of the moments that I come back to
in this case is the December home invasion where
Sylvester Zottola was stabbed in the throat.  He bled all over
that family home that Mr. Mazurek just talked about, that home
where his family had these cherished memories.  He arranged
for his father to be slashed in the throat.  He bled out all
over the home, Your Honor.  There was blood all over it.  The
Court heard that from the crime scene witnesses in this case.

Anthony watched his father come home from the
hospital with these injuries and the psychological trauma that
being a victim of a home invasion necessarily imposes,
Your Honor.  And it is one of the moments, one of the many,
many, many, many, many, many, many moments that he could've
stopped it.  That he was capable of continuing, I think,
speaks volumes to the history and the characteristics of this
Defendant.

Both parties agree, Your Honor, that the Defendant's
actions in this case are difficult to comprehend.  Not because
of the evidence.  The strength of the evidence, I think, was
extraordinarily strong in this case, Your Honor.  The
government has read and reread and reread those text messages
with Bushawn Shelton.  And the manner and the sheer length of

1  time that the two of them communicated about killing his

2  father and then killing his brother is something that is

3  unprecedented, Your Honor, certainly in terms of what I have

4  seen.

5          And there's been a lot of discussion of why, but the

6  government submits that some point the "why" is eclipsed by

7  the "what," the "what" of what happened here. You know, I

8  have sat with this family and I have watched the process of

9  trying to comprehend what happened to them, the fear, the

10  anguish and the loss, all kinds of loss, I think, is what

11  they've experienced, Your Honor. And I think the Court has

12  seen a small measure of that.

13          I think Ms. Haramati described the -- I think the

14  words were "the gaping void" that this Defendant's absence

15  will leave in his family's life. But I ask the Court to

16  consider the sheer impact that this Defendant's actions have

17  had both on his extended family and on really everybody else

18  who has touched this case, Your Honor. The Court has sat here

19  through these sentencings of the other Codefendants in this

20  case, has heard from the family members for those Defendants

21  as well, and they have been tough to sit through, Your Honor.

22          And this Defendant knew that all of these men who

23  were getting drawn into this plot, he shield himself from it,

24  he had Shelton do the actual work, but the text messages made

25  clear that he knew that person after person after person was

1    getting recruited and involved in this.

2           And what I keep coming back to in this case is that

3    he could have stopped it.  You know, Mr. Mazurek just talked

4    about hope.  I think that this family, from the moment that

5    these attacks started in September of 2017, had hope that they

6    would stop.  They hoped that their father would not die.  They

7    hoped that the attacks would stop.  They hoped that their

8    families would be safe.  And this Defendant uniquely,

9    Your Honor, could have stopped it and he did the opposite.  He

10   encouraged Shelton, he pressured Shelton, and ultimately he

11   celebrated with Shelton.

12          I think, as the Court has already mentioned, but in

13   terms of the discussion of the fine in this case, Your Honor,

14   I think both parties agree that there was plenty to go around

15   with this family.  I think those were the words, I think, that

16   the Defense used and suggested that it didn't work, you know,

17   the Court can't consider that here because it didn't work.

18          But it did work.  His father went into hiding,

19   Your Honor.  He was moving around.  He was trying to stay

20   safe, trying to stay underground.  And that's when the

21   Defendant starting yielding more control.  That's when he

22   started taking over.  He started controlling the bills.  He

23   started controlling the direction of the family business.  He

24   incorporated a new business, Your Honor, so that he could set

25   out on his own without his brother and certainly without his

1  father.

2         And I think what I will end on, unless the Court has

3  any questions, is that unlike the vast majority of people that

4  this Court will see or has seen, this Defendant comes from a

5  place of enormous privilege.  He committed this crime with a

6  loving family, with a very stable and secure financial

7  profile, and yet he destroyed his family, Your Honor.

8         The government agrees that the Defendant's

9  sentencing will have an extreme and tragic impact, that this

10 case has had an extreme and tragic impact on this family.  But

11 what I think is missing from the Defense remarks is that

12 impact is solely caused by Anthony Zottola.

13        So unless the Court has any further questions, the

14 government will otherwise rest on its papers.

15        THE COURT:  I do have a couple of questions,

16 Ms. Bensing.

17        Unlike many criminal cases in this court and

18 throughout the federal system for crimes of violence, the

19 issue of fines is not something that comes up often.  I mean,

20 it comes up every time, but it's not a realistic punishment,

21 likewise the ability of the victims to engage in the legal

22 system in order to garner some sort of financial offset to the

23 harm that was caused to them.

24        So how should I weigh the fact that, in this case,

25 the victims do have the wherewithal to pursue monetary -- to

48

1   obtain some sort of monetary recourse through the civil

2   system?  That's one question.

3           Another question, as you are well aware of, and has

4   been the case in this case given the background and

5   characteristics of the Codefendants in this case who were,

6   unlike this Defendant, not individuals who had or most of them

7   who did not have any means or a stable family, so how should I

8   consider also what effect, if any, a fine in this case would

9   have on the Defendant's family?  Not his children in

10  particular.

11          Often we hear about the effect of sort of

12  non-supportive families, the effect of broken homes on

13  defendants as a reason for mitigating.  I also want to avoid

14  sort of causing that kind of problem through a financial

15  penalty.  So those are the things that are on my mind as I

16  think about whether a fine in this case is appropriate.

17          So I want to give you an opportunity to address that

18  and sort of help me think about that in -- through the prism

19  of those questions.

20          MS. BENSING:  Thank you, Your Honor.  I think that

21  those are appropriate considerations for the Court to take

22  into account.

23          There's obviously, I think, been some conflation by

24  the Defense in this case of the purpose of the imposition of a

25  fine and forfeiture, for example.  And as to the lawsuits,

1    Your Honor, we are sitting here today without judgments in

2    those lawsuits.  The Plaintiffs in those lawsuits could choose

3    not to proceed.  There may not be a monetary award.  And so at

4    this point, Your Honor, I think that that's speculative.

5         It may be that the victims in this case do get

6    something from those lawsuits.  It may be that they don't.  I

7    think sitting here today, we don't know, Your Honor.  I

8    certainly think it's appropriate for somebody who had his

9    brother arranged to shoot him all over his body would seek

10   some sort of redress.

11        But again, Your Honor, we don't know what's going to

12   happen with those lawsuits.  And so I think, as the Court is

13   sitting here today, that's a sort of speculative concern.

14        As to the impact on the Defendant's family, I think

15   the government noted this in its submission, but the

16   Defendant's family is still getting money from the Zottola

17   siblings, Your Honor.  They receive money each month, their

18   portion of the business proceeds.  The government is, as the

19   Court knows, not proceeding on a forfeiture of the Defendant's

20   house.

21        And so certainly there was no filing of financial

22   affidavits in this case, although the financial evidence

23   certainly would not have been duplicative as the Defense

24   suggested.  The Court is aware of the real estate portfolio

25   that the family owns in this case.  And, as the Court saw,

50

1   Anthony Zottola was making multiple thousands and thousands,

2   hundreds of thousands of dollars payments to Bushawn Shelton.

3   So I think financial affidavits would have been appropriate

4   and certainly not duplicative in this case.

5          But even sort of setting that aside and just looking

6   at what the Court knows, his family is receiving their portion

7   of the business proceeds, or at least that's the government's

8   understanding, Your Honor, and so that's all I can represent

9   to the Court.  And I don't think we've heard anything

10  different from Defense counsel as well.

11         THE COURT:  What was the -- just remind me, the --

12  sort of the best estimate of the total payment for the scheme.

13         By my calculations, it was somewhere north of

14  200,000, but south of 300,000, so it was somewhere in that --

15  in that range.

16         MS. BENSING:  Your Honor, our estimate of the bands

17  and the money bands that were found at Bushawn Shelton's house

18  and in that photograph is that there was approximately

19  $260,000 in the payment that Shelton received from Anthony

20  after his father's death.

21         Of course, as the Court saw, there were references

22  all along the way to having money up front.  You know, Shelton

23  refers to having 30, the 30,000.  And he had, you know, ten

24  still you or I think it was actually ten that had been spent.

25  And he sort of wanted to reserve some of his money to make

1    sure that he could complete both hits.

2           And so I think that there's at least 260,000,

3    approximately 260,000 is our best estimate from the aftermath

4    in Shelton's arrest.  And then there's the other monetary

5    payments that I referenced.  So I think that puts it somewhere

6    around $300,000.

7           THE COURT:  Do you have any estimated of the value,

8    if any, of the work that was being done on Shelton's home, on

9    that -- not his home; that property in Brooklyn?

10          MS. BENSING:  So at least $10,000 had been paid,

11   Your Honor, by Anthony to an architect.  And I think some

12   additional work had been done on the property, but I don't

13   have a value for that.  And I apologize, Special Agent Zoufal

14   just corrected me, not 260,000 in the box.  220,000,

15   Your Honor.

16          THE COURT:  Thank you, Ms. Bensing.

17          MR. MAZUREK:  Judge, on that, can I just very

18   briefly reply?

19          THE COURT:  Yes.

20          MR. MAZUREK:  And for the sake of looking for, you

21   know, the most compassionate result here on an issue which,

22   you know, is important, but obviously when you're talking

23   about life in prison, that's what we're really focusing on.

24          But on the issue of monetary, look, this family has

25   suffered so much already.  I would ask for a very creative

1  response by the Court on this since your hands are tied on

2  almost everything else.

3          And that is, if the Court is really contemplating a

4  significant fine on Mr. Zottola, perhaps you could inform the

5  courtroom what your fine is considering and we can make a

6  representation right here and now that it won't go to the

7  government, but it will go to the Zottola family.  I think

8  that would be a lot fairer and more compassionate results than

9  imposing a fine.

10          THE COURT:  Who are you referring to in the Zottola

11  family?

12          MR. MAZUREK:  To certainly Salvatore since he is the

13  victim and I think, you know -- and Debbie doesn't want

14  anything, so it's Salvatore.

15          THE COURT:  So you're offering restitution, that's

16  what that is?

17          MR. MAZUREK:  Well, Your Honor, it's -- there's no

18  restitution in this instance, but I'm saying is, rather -- if

19  the Court is considering putting another penalty on top of

20  everything else that is happening to Anthony today, we would

21  rather it go to the family.

22          The punitive process -- I know that you're saying

23  general deterrence.  But to be honest, if you're considering a

24  $300,000 fine or something like that, that's not going to

25  prevent the next person out there to commit murder.

53

1          THE COURT:  Well, let's be clear.  General

2    deterrence is one of the factors that I think about and must

3    think about.

4          MR. MAZUREK:  Yes.

5          THE COURT:  It's not the only factor.  I mean, even

6    by your own presentation, the imposition of a fine while,

7    true, is not going to affect Mr. Zottola's accommodations at

8    the hands of the BOP, one of the things you did say or

9    Ms. Haramati said is that it will have a psychological effect

10   on him, and that likewise is a form of punishment.  So I'm

11   weighing that.

12         So it is specific as well.  And part of the

13   retributive aspect of the sentence is that it be felt, right?

14   And I'm not suggesting that life in prison is not something

15   that will be felt, but that is other -- those are other

16   factors that I need to consider.

17         But let me just ask the government what its position

18   is on restitution.

19         MS. BENSING:  Well, Your Honor, I guess just to be

20   clear, the victims in this case have not sought this money.

21   The government, consistent with its position for almost all of

22   the Defendants in this case, is seeking a guidelines sentence.

23   And the guidelines here call for a fine between 50,000 and

24   500,000.  So this is not something that is being sought on

25   behalf of the victims, Your Honor.  The government is seeking

1     a guidelines sentence, as it does in most cases.

2            I don't -- restitution is also not being sought

3     here, Your Honor, so I don't know how the Court can impose

4     restitution.  And I don't think, unless I am mistaken, under

5     the law, that there is a basis for directing a fine in a

6     particular -- in a way like that, Your Honor.

7            THE COURT:  No, obviously I cannot sort of impose a

8     fine that is paid to an individual.  A fine is paid to the

9     treasury, not to -- not to an individual.

10           MR. MAZUREK:  What I was suggesting, Your Honor, I

11    was suggesting -- I think Your Honor has, based on the

12    information that we presented, given Your Honor's significant

13    basis where you do not have to impose a fine under all of the

14    conditions or the factors in the sentencing guidelines and

15    also under 3553(a).

16           All I'm saying is, if the Court is grasping with

17    that in determining what is a just and fair sentence with

18    respect to that monetary penalty, that there's a way that we

19    can maybe do some collaborative good here in this courtroom by

20    making our promise that we would make good instead of going to

21    the treasury, that we would help the family.

22           THE COURT:  I'll get to that when I get to it.

23    Okay.  Thank you.

24           All right.  At this time, I understand that there

25    are statements that some of the family members would like to

1   make.

2          MS. BENSING:  Yes, Your Honor.  I think we will have

3   two victims who would like to address the Court.  And then I

4   can read a statement into the record as well.

5          THE COURT:  Okay.

6          MS. BENSING:  So I think if I could just start with

7   the victims who would like to speak.

8          THE COURT:  Yes, please.

9          MR. SALVATORE ZOTTOLA:  Thank you, Your Honor.

10  Thank you, U.S. district attorney, the FBI.

11         The last time we actually seen or spoken to each

12  other was on Pilgrim Avenue where we grew up.  And this is a

13  hard speech I got to say, but I got a few words for you and

14  then I'm going to be on my way.

15         First, again, I want to thank Your Honor, the U.S.

16  district attorney, the FBI.

17         Anthony, my brother.  Why?  What did you do?  God

18  gave you everything.  You had everything in life.  Beautiful

19  wife, amazing and beautiful children.  You destroyed every

20  memory we had together, my childhood, our childhood.  You, Dad

21  and myself were the three musketeers.  Whatever problems you

22  had, Dad would've helped you.  Whatever you needed, I had your

23  back.  What you did to Dad, myself and this entire family is

24  unimaginable, Katie, me and the kids, Debbie, Phil and their

25  children and your wife and your children, this entire family.

1   Let's not forget about Dad, Sally "Daz," Sylvester.  He did

2   anything for you and your family, our family.  You took that

3   all away.

4           Thank you.

5           THE COURT:  Thank you, Mr. Zottola.

6           MS. BENSING:  And, Your Honor, if Debra Zottola

7   could address the Court and, again, if we could just play the

8   slideshow that she --

9           THE COURT:  Yes, of course.

10          Ms. Zottola?

11          MS. DEBORAH ZOTTOLA:  Your Honor, attorneys of the

12   government, Defense attorneys, I appreciate -- I appreciate

13   you giving me this honor to speak on behalf of my father and

14   my family.  I appreciate how hard the government has worked

15   along with the FBI.  Henry and Ilana, I watched how you loved

16   my brother.  I hope you know how much it means to me.

17          Today is the last day I will spend in a room with

18   both of my brothers at the same time.  I have been to

19   countless court appearances regarding my father's murder,

20   appearances, status conferences, pleas, the trial and

21   sentencings of the Defendants.  You've heard my story of a

22   beautiful life, a life filled with love, heartbreak, courage

23   and strength.  I think it's fair to say this one has left me

24   not sure where to start.  This is by far a statement that has

25   left me speechless, which everyone knows in this room I am

1   never speechless.

2          You have heard people take the stand, Your Honor,

3   but you've never heard my story.  I've watched people's

4   testimonies, not giving you a full story.  Some testimonies

5   were actually false.  I will forever know there's missing

6   pieces to this puzzle.  As you've said, you don't know the

7   motive, me neither.  Growing up in the Zottola household

8   involved special times and moments that will last forever.

9          My father worked countless hours as my beautiful

10  mother ran the household.  We'd gather for dinner, my mother

11  and my brothers while my father was at work.  Mommy would

12  coordinate the plates.  I was always the color yellow, which

13  happened to be her favor color.  Sal was the color green and

14  Anthony was the color red.  Those colors basically carried

15  through the rest of our lives at 2005 Hobart Avenue.

16         On Fridays we would gather together for the Dukes of

17  Hazard with popcorn and pillows on the floor in the living

18  room, the same living room my father walked through in blood.

19  Sometimes my father would make it home at the end of the show.

20         There are nights where we would be sleeping, and my

21  father would come home from work late and would wake us up to

22  swim in the backyard because he wanted to spend time with us.

23  My mother did not think it was so pleasant in the middle of

24  the night at midnight when we needed to get back to bed.

25         My father would take us to work with him to give my

1    mom a break, and he always made special trips to the candy

2    store.  My two little brothers, a year apart, were always

3    inseparable.  They always loved each other and respected each

4    other.  More importantly, they respected me as their oldest

5    sister even though I drove them crazy.  My father would say,

6    "Make sure you always look out for your sister."  And they

7    did.  He always told me to look out for them.  And I did, too.

8    And I will do that until the day that both of them die.

9             I truly enjoy the brotherly love they had and the

10   bond they shared.  It killed me to watch one brother on the

11   stand and one Defendant on trial in the last days of all three

12   of us together in the same room.

13            June 20th, 1986, we suffered a terrible loss, my

14   beloved mother.  My father promised to never leave our side.

15   And he didn't.  He worked all day while my grandmother and

16   aunt would take care of us.  He never made us feel alone,

17   never unwanted.  He was selfless.  He always kept a positive

18   attitude and a sense of humor.

19            As the years passed, we got older, he got wiser.  He

20   showed us and anyone that he was always around and

21   unconditional love.  We were four people, but he bonded us as

22   one.  We were like a force that cannot be reckoned with.  As

23   my brothers got older, they worked alongside my father in

24   different ways, Anthony with the construction and Sal with the

25   vending.  My father wanted them to have good work ethics.  And

1  they did.

2          As we got older, we shared so many parties on Hobart

3  Avenue and Locust Point, Sunday breakfasts, dinners,

4  birthdays, weddings, 4th of July parties, jet skis,

5  just-because parties.  It's no surprise, being the role model

6  my father was to us, that my brothers would make amazing dads.

7          Sal and Anthony started out imitating my father's

8  love and compassion to my son, Phil.  He was the very first

9  grandchild, and my father called him "the main event."  And in

10  Sal and Anthony eyes, he also was the main event.  Sal and

11  Anthony treated my son like their own.  They loved him so

12  much, and the feeling was mutual.

13          As the years went on, they became fathers to their

14  own children and the love grew more and more.  Anthony is a

15  loving husband to Heidi.  Heidi adores Anthony.  When I asked

16  her once when we were planning a party for Anthony to pick a

17  song, she picked "My Eyes Adored You by Frankie Valli.

18          As the years went on, they had three beautiful

19  children, Anthony, Lucas and Nina.  Anthony loves each of his

20  children so much and always found time to work after working

21  endless hours to pick his kids up and spend as much time with

22  them as he could.  No surprise, he learned that from my

23  father.

24          My father taught us how to be attentive parents.  It

25  is evident that both of my brothers are the fathers they are

1  today because of the model my father was his whole life from

2  up until the moment he died.

3          The impact this has put on my family, on our family,

4  is more than just someone dying.  My own personal family was

5  affected.  My marriage was affected, as well as my children's

6  lives.  My dad taught me how to be a hands-on parent.  I'm

7  just not a happy one.  There has not been one day in the last

8  four years, six months, one week and three days that my father

9  and the way he died has not been brought up.  It's not the way

10  he died; it's the way he lived.

11          For me, there has not been any peace in five years,

12  seven months, one week when the attack started.  You would

13  think this experience would have brought us closer together.

14  Instead, it ripped us apart.

15          I know my father is with my mother and all his loved

16  ones in heaven, for this is my peace.  My father's love will

17  be imprinted on my heart forever.  His last year of his life

18  was pure torture.  All I did was love Daddy and I am

19  suffering.

20          Financial hardship, I know we sound like a bunch of

21  rich kids.  I am in financial hardship from what my other

22  brother is doing to me, $360,000 in legal fees and I did

23  nothing wrong.  My father may not have been a very spiritual

24  man, but the last year of his life he was like when Jesus was

25  crucified to the cross.

1          We had to leave our childhood home of 45 years to

2     live in other places to stay safe.  2005 Hobart Avenue, I

3     watched on this screen in court almost every day.  It became

4     our childhood home to a crime zone, an unsafe haven, from the

5     beating in front of the house to the home invasion to locking

6     him inside with alarm next to him so he can watch TV to the

7     SWAT team raiding the house with the TV on.

8          Home is now Hobart.  Not what he would've wanted.

9     He built an empire for his children and grandchildren and it

10    blew up in his face.  No one really knows besides my brothers

11    and I, and I mean no one, on what really went on in our

12    household.  The true love that we shared, I continue to share

13    with both brothers.  My brothers were and will forever be my

14    life.  My father and mother's love created Debbie, Sal and

15    Anthony.  And my dad, Sal and Anthony, they will be my forever

16    family.  Daddy, you and Sal are my forever family.  No matter

17    if you see it or not, I will love you both forever.

18         Daddy and I spoke quite often every single day as

19    you know.  He would tell me, "Debbie, they are going to kill

20    me, and all I want you to do is keep your head high.  I am

21    going to throw you the ball, you are going to catch the ball,

22    do not drop the ball.  Run.  Run fast and don't drop the ball.

23    You did nothing wrong."  For that is what he did when our

24    mother died, he ran with the ball.

25         I also made a promise to him a couple of days before

62

1   he passed.  He said, "Promise me, you will be there for both

2   of your brothers no matter what they do to you."

3          I promise you I will do that.  I promise not to

4   bring you down more than you are.  I promise to be there for

5   your kids.

6          Monday, April 17th is Daddy's 76th birthday.

7   Instead of singing a special birthday song in Locust Point,

8   I'll visit him in the cemetery as I do every day.

9          Anthony, I want you to know that I will always

10  treasure in my heart, my mind and my soul our happy times.  I

11  assure you that I will continue our stories we shared as a

12  loving family with your children.  I will support Heidi,

13  Anthony, Lucas and your beautiful princess Nina to the best

14  ability I can.  I will carry on the story of our happy life

15  that we shared.

16         Anthony loves hearing my stories about our

17  childhood, and it makes me happy that he likes to hear them.

18  He seems so interested to know the special love that we

19  witnessed.  I won't dig you a deeper grave.  You will not be

20  alone.  I will be with you in thought and prayer.  I will

21  continue to pray for you every single day as I have been for

22  the last three years, ten months on Monday.  But please, pray

23  for me, too.  I am in agony of so many things.  I lost my hero

24  father.  I lost my two brothers.  I will never be the same.

25         I hope Your Honor and the Court take into

63

1  consideration his beautiful wife and his children and the

2  forever bond they share.  I ask you for not a penny.  I ask

3  Anthony for not a penny.  I would never, ever take any money

4  from you or your family, for money means nothing.

5          I was told from a priest, "Don't cry because it's

6  over, smile because it happened."  And I do smile because it

7  happened.

8          You see, Your Honor, I didn't love them like

9  brothers, I loved them like a mother loves.  And if you ever

10  loved like a mother, you would know how I feel.  I truly

11  appreciate you giving me this honor to speak to my brother.

12          I don't know if it's allowed, but am I able to hug

13  him?

14          THE COURT:  No, you're not.  I'm sorry, ma'am.

15          MS. DEBORAH ZOTTOLA:  Thank you, Anthony.  I love

16  you.

17          And Sal, I love him too, as much as he doesn't think

18  so.

19          THE COURT:  Thank you.  Thank you, Ms. Zottola.

20          Ms. Bensing, I understand you have another statement

21  you would like to read.

22          MS. BENSING:  Yes, Your Honor.  There's just one

23  statement that Katherine Zottola, Salvatore Zottola's wife,

24  has asked the government to read into the record.

25          THE COURT:  Please do so.

1          MS. BENSING:  First, I would like to thank the

2   US Attorney's Office and the FBI for working diligently and

3   ultimately seeking justice for our family.

4          As we all know, the summation of these heinous

5   crimes resulted in the death of my father-in-law, Sylvester,

6   in October of 2018.  Although that was the time of his

7   physical death, his spirit was killed much earlier as he was

8   hunted down and terrorized for 13 months.

9          Sylvester was a self-made man, built successful

10  businesses and provided for his children, grandchildren and

11  extended family.  But his greatest accomplishment by far is

12  his grandchildren.  When he was with his grandchildren, his

13  love and happiness was beyond measure.  He treasured each and

14  every moment.

15         However, because of you, Anthony, and the horrific

16  plot that you orchestrated, my two youngest children have been

17  robbed from ever knowing their pop-pop.  Of all the

18  coconspirators involved in these crimes, you are the only one

19  with personal ties to this family.

20         I am devastated that you were the mastermind behind

21  these evil acts that relentlessly terrorized us.  For

22  21 months my family imagined unimaginable terror.  During

23  sleepless nights, one of us was constantly looking out the

24  window or checking the door locks to survey the safety of our

25  home.  We have had many lifelong relationships severed because

65

1   they feared that socializing with us could put them in harm's

2   way.

3          I will never understand your motive for attempting

4   to take your brother, my husband's, life.  You and your father

5   was his entire world.  Those feelings seemed reciprocated,

6   especially when you sat across from me at dinner after my

7   engagement to Sal and said, "Sal is the best person you will

8   ever meet."

9          Sal is a selfless, doting husband and a loving

10  father to our four children.  I admire his strength and

11  willingness to wake up every day with a smile on his face

12  despite this inconceivable nightmare.  I thank God every day

13  that he rolled across the pavement on July 11th dodging

14  bullets at point-blank range to save his own life.

15         Miraculously, he physically survived that attack.

16  However, it scarred him emotionally and broke a piece of his

17  heart that is beyond repair.  I was surprised to hear during

18  the trial that you had a soft spot for a child without a

19  parent.  Meanwhile, your two nephews could've been left

20  without their father.  Our two sons would've grown up with one

21  living parent as you did.

22         Your deceit and disloyalty towards your brother are

23  the ultimate acts of betrayal.  These vicious crimes that you

24  orchestrated against your father and my husband has tainted

25  the Zottola family legacy for generations to come.  It hurts

1    me deeply that Sal and I will have to explain to our children

2    that their Uncle Anthony, whom they adored and loved, was

3    capable of this.

4           You created such a beautiful family with Heidi and

5    your three amazing children.  My heart breaks to know that

6    they will have to learn how to navigate through life with the

7    decisions that you made.

8           Anthony, no apology will suffice for the pain and

9    suffering you have caused my family.

10          Thank you, Your Honor.

11          THE COURT:  Thank you.

12          Are there any other victim statements?

13          MS. BENSING:  That's it, Your Honor.

14          THE COURT:  Thank you, Ms. Bensing.

15          All right.  Mr. Zottola, like I said at the

16   beginning of this proceeding earlier this morning, you have

17   the right to make a statement.  Like I also said, you have no

18   obligation to make a statement.

19          So if you wish to make a statement, now is the time.

20          MS. HARAMATI:  Your Honor, Mr. Zottola is going to

21   read something that he prepared.

22          THE COURT:  Okay.  Thank you.

23          THE DEFENDANT:  Thank you, Your Honor, for allowing

24   me to say just a few things from my heart.

25          I am not a person who speaks well in any type of

1  public, so please give me a moment.  There are a few things I

2  would like to say on the record.

3  First and most important, to my most beautiful wife,

4  Heidi, I want you to know I love you and our three beautiful

5  children so very much.  I miss my wife and my children so very

6  much.  You and our children are my life and my world and my

7  everything.  I am so very proud and honored to have the

8  world's best wife and children that any man could ever asked

9  for.

10  I love and miss Heather and Joseph March.  I love

11  and miss my mother-in-law, Sandra Parrillo.  I love and miss

12  my niece, Renee Parrillo.  I love and miss my wife's uncle,

13  Phil, and Maria Mena (ph) and our family.  I love and miss my

14  sister, Debbie, and brother, Sal.

15  Heidi, my babe.  You are my life, my best friend,

16  and I love you so very much.  Keep that beautiful smile

17  shining for yourself, our children and for us.

18  Thank you.

19  THE COURT:  Thank you, Mr. Zottola.

20  All right.  At this point I want to discuss the

21  applicable sentencing factors.

22  I think, Mr. Mazurek, you have acknowledged that

23  Counts One and Two carry a sentence of mandatory life

24  imprisonment.

25  I hear what you said about the wisdom of that, but

1  is there any mitigating factor that you want me to consider in

2  addition to what you have already considered at least with

3  respect to the fine?

4          I know you have also asked for in your submissions

5  regarding designation to a place where Mr. Zottola can receive

6  adequate and appropriate medical treatment.  You also asked

7  for a recommendation regarding a designation to a specific

8  program at Allenwood.

9          Can you tell me the name of that program?

10          MR. MAZUREK:  The Challenge Program, Your Honor.

11  USP in Allenwood.

12          THE COURT:  Are there any other mitigating factors

13  that you would like me to consider?

14          MR. MAZUREK:  At this time we'll rest on all

15  previously submitted and provided in court today.

16          THE COURT:  All right.  So I have considered the

17  relevant factors set out by congress in Title 18,

18  Section 3553(a), including the advisory sentencing guidelines

19  to ensure that I impose a sentence that is sufficient but not

20  greater than necessary to comply with the purpose of

21  sentencing, which includes the need for the sentence to not

22  only reflect the seriousness of the crime, but also to promote

23  respect for the law to provide just punishment for the offense

24  and deter criminal conduct not only by this Defendant, but by

25  others who might seek to engage in this type of crime.

1          I have also considered the nature and circumstances

2     of the offense, the history and characteristics of the

3     Defendant, the kinds of sentences that are available and the

4     need to avoid unwarranted sentence disparities among

5     defendants with similar records who have been found guilty of

6     similar conduct.

7          I consider this last factor particularly important

8     in this multi-defendant case which involved defendants who

9     committed a wide variety of different acts in furtherance of

10    their conspiracy.

11         With respect to the aggravating factors that I've

12    considered in thinking about the appropriate sentence in this

13    case, I have to say there are many, but most notably in my

14    mind this Defendant orchestrated a series of attacks on his

15    family, on his father, on his brother over the course of more

16    than a year.  He subjected his family to really -- it cannot

17    be described as anything other than a reign of terror.

18         While we will never know why this happened, every

19    indication from the record is that it had to do with either

20    financial gain or with gaining control over the family's

21    business.

22         These attacks, like I said, lasted well over a year.

23    The Defendant communicated about the attacks extensively with

24    his Codefendant, Mr. Shelton, and demonstrated through that,

25    that series of communications, an eagerness that Shelton bring

1    the plan to fruition.

2         There were numerous opportunities throughout this

3    period of time where the Defendant could have acted to stop

4    what he set in motion.  There is no question, at least in my

5    mind, and certainly based on the evidence, that had the

6    Defendant put a stop to this, it would have stopped.  Because

7    I found no other reason why any of the other coconspirators

8    would have carried on with this scheme but for the fact that

9    the Defendant was urging them to do this and agreeing to pay

10   them for this.

11        After the fatal shooting of his father, the text

12   messages reflect never mind a lack of remorse, but actually a

13   sense of excitement about what the future would bring now that

14   the Defendant's father had passed away.

15        So you mentioned before, Mr. Mazurek, discretion and

16   the fact that the statute takes away discretion from me.  And

17   while I have no doubt that Section 1958 takes away my

18   discretion, I think there is perhaps some ambiguity in the way

19   Section 1958 reads about the ability to impose a mandatory

20   sentence or a fine or both.

21        So to extent that there is any ambiguity in that

22   section because of where the commas might be placed, I want to

23   make it clear that to the extent a life sentence is not

24   required in this case, which I think it is, but to the extent

25   that any Court might find that it's not required, I find that

1   by weighing the aggravating factors related to this Defendant

2   to his conduct to just the unimaginable horror that he caused

3   his own family and considering the guideline range of life in

4   this case, if I did have any discretion, I would exercise that

5   discretion and impose a life sentence in this case, regardless

6   of what the statute required as a minimum.

7           I have considered the mitigating factors that you

8   have addressed in your submissions.  I appreciate the fact

9   that the Defendant appears to have been helpful to individuals

10  that he has met while detained in federal custody, but I find

11  no reason to believe that the fact that the Defendant might be

12  good-natured toward many, even most, suggests that he bears

13  any less responsibility for the offenses he committed.  In

14  fact, I have heard almost nothing that demonstrates any sense

15  of remorse for these offenses.

16          So after assessing the particular facts of this case

17  in considering both the statutory minimum punishments and the

18  relevant Section 3553 factors, I sentence you Mr. Zottola as

19  follows:

20          As to Count One and Two of the indictment, I

21  sentence you to a period of life incarceration to run

22  concurrently with each other.

23          With respect to Count Three, I sentence you to a

24  period of 492 months or 41 years, which was the age that your

25  brother was in July of 2018 when he was brutally gunned down.

1    That sentence of 492 months under the statute must run

2    consecutively with the sentences that I have imposed on

3    Counts One and Two and will run consecutively with the

4    sentence I am about to announce with respect to Count Four.

5              I have considered the government's position on the

6    futility of supervised release, so I am not going to -- even

7    though I am allowed to, I am not going to impose supervised

8    release on any sentence of conviction.

9              With respect to Count Four, I am going to sentence

10   you to a period of 852 months or 71 years, which was the age

11   of your father on the date in October 2018 when he was

12   brutally gunned down.  This period of incarceration for

13   Count Four will run consecutively with the sentences that I

14   have imposed on Counts One, Two and Three.

15             Now, with respect to forfeiture, I understand that

16   the government has -- that I have already signed.  On

17   April 11th, I signed the preliminary order of forfeiture,

18   which I understand the Defendant has consented to, so that

19   forfeiture order is going to become final when I issue my

20   judgment reflecting the sentence in this case.

21             With respect to a fine, I am very torn on this

22   issue.  There is no question in my mind that -- at least from

23   everything I have seen, that the overriding motive here at

24   some level, maybe not all, but at some level had to do with

25   greed or at least translating that greed into wanting to

1    control or have more say over how the family ran the business.

2         So at bottom, I see it as, while this is too

3    simplistic, I understand I still see greed and money as one of

4    the core reasons for why this heinous crime was committed.

5         I am, however, sympathetic to the position that's

6    been raised by counsel regarding any additional harm that a

7    fine in this case might impose on the Defendant's family.  And

8    for that reason, I am going to exercise my discretion and not

9    impose a fine in this case.

10        With respect to restitution, neither the government

11   nor any victim has put forward any evidence of pecuniary loss

12   that would merit restitution.  So in light of that, I do not

13   have a basis for and, therefore, I am not ordering any

14   restitution.

15        I have no discretion in assessing the mandatory

16   special assessment, so I, therefore, order that the Defendant

17   pay a special assessment in total of $400.  That is $100 per

18   each count of conviction, as I am required to do by statute.

19        I find this sentence -- perhaps this word is just

20   not enough to convey the harm that has been caused in this

21   case, but I find that this sentence is sufficient but not

22   greater than necessary to comply with the purposes of

23   sentencing.

24        Mr. Zottola, you have the right to appeal your

25   conviction and your sentence.  And I have to let you know that

1    any notice of appeal on your part must be filed within 14 days

2    of the entry of a judgment, which will probably, if not today,

3    will happen early next week or within 14 days of the filing of

4    a notice of appeal by the government.

5              If requested, you can ask for the assistance of the

6    clerk of the Court to prepare and file a notice of appeal on

7    your behalf.  And if you cannot afford to pay that cost of an

8    appeal for an appellate counsel, you have the right to

9    petition the Court to waive that filing fee and to seek the

10   appointment of counsel to assist you with that.

11             That concludes the sentence in this case.

12             I don't believe that there are any other matters, at

13   least with respect to open counts.

14             Is that correct, Ms. Bensing?

15             MS. BENSING:  Correct, Your Honor.

16             THE COURT:  I will make a -- while the Bureau of

17   Prisons -- while I have no authority to direct the Bureau of

18   Prisons in terms of where they will designate Mr. Zottola, I

19   do believe that it is important for him to be designated at a

20   facility that is sufficiently close to the greater

21   New York City metropolitan area in order that he could try to

22   sustain some level of contact with his family, and in

23   particular his wife and children.

24             So, therefore, I will make a recommendation to the

25   Bureau of Prisons that the Defendant, if at all possible, be

75

1   designated to the Challenge Program at the Allenwood

2   United States Penitentiary.  And if that is not possible, I

3   will, as a secondary recommendation, ask that the Defendant be

4   placed in a facility that is as close to the New York City

5   area as possible.

6          Anything else, Mr. Mazurek?

7          MR. MAZUREK:  No.  Thank you, Judge.

8          THE COURT:  All right.  So with that, I thank

9   everyone for the hard work that they put into both obviously

10  the trial in this case, but the preparation and the

11  presentations made today at sentencing.  And with that, we

12  stand adjourned.  Thank you.

13         MS. BENSING:  Thank you, Your Honor.

14         (Matter concluded.)

15

16              *    *    *    *    *

17

18  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
19

20    /s/ Andronikh M. Barna              May 22, 2023
    _____     _____
21     ANDRONIKH M. BARNA                DATE

22

23

24

25

Andronikh M. Barna, Official Court Reporter, RPR, CRR